**No. 24-2229**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

DISABILITY RIGHTS OREGON et al.,
*Plaintiffs-Appellees*,

v.

DAVID BADEN et al.,
*Defendants-Appellees*,

v.

MARION COUNTY
*Proposed Intervenor-Appellant.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:02-cv-00339-AN
Honorable Adrienne Nelson

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 2 of 3**

James Bopp, Jr.,  Ind. Bar No. 2838-84
Joseph D. Maughon, Va. Bar No. 87799
Taylor C. Shetina, Ind. Bar. No. 37887-45
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434

*Counsel for Marion County*

**USDC Dkt. No. 487**

04/08/2024

ORDER: Pursuant to Marion County's Motion to Expedite or Accelerate Ruling, ECF 479, Marion County agreed to an expedited briefing schedule on its Second Motion to Intervene wherein its reply would be filed by close of business on April 3, 2024. Therefore, Marion County's Reply, filed on April 4, 2024, is untimely and is STRUCK from the record. Ordered by Judge Adrienne Nelson. Associated Cases: 3:02-cv-00339-AN, 3:21-cv-01637-AN (joha) (Entered: 04/08/2024)

**UNITED STATES DISTRICT COURT**
**OF THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| **Disability Rights Oregon, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON**, | |
| *Plaintiffs*, | **Civ. No.: 3:02-cv-00339-MO (Lead Case)** |
| *v.* | **Case No.: 3:21-cv-01637-MO (Member Case)** |
| **PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of Oregon State Hospital**, | **MARION COUNTY'S REPLY IN SUPPORT OF THE PROPOSED MOTION TO INTERVENE** |
| *Defendants*. | |

## I. INTRODUCTION

Proposed intervenor Marion County ("**the County**") respectfully requests this Court to allow it to join the present case as a party to challenge Judge Mosman's March 6, 2024 Order ("**March 2024 Mosman Order**"). ECF No. 475. Plaintiffs Disability Rights Oregon, Metropolitan Public Defender Service, and A.J. Madison ("**Plaintiffs**") contend that the County's motion to intervene is untimely, that the County lacks standing, and a legally protectable interest. However, the law is clear that the County meets the requirements for both intervention as of right and permissive intervention.

The County respectfully requests this Court rule on this motion today because it is the last

**Reply in Support of Sec. Mot. Intervene      1**

date for the County to timely file its Protective Notice of Appeal to the Ninth Circuit.

**I. The County appropriately filed pleadings necessary to intervene in this case.**

FRCP 24(c) provides that "[a] motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Plaintiffs assert that the County did not file an appropriate pleading as required by FRCP 24(c), or in the alternative that the County insufficiently specified the scope of its intervention. *See* ECF No. 480 (citing *California Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086 n.7 (9th Cir. 2022))

The text of FRCP 24(a) and (b) does not address the comparatively unique circumstance of intervention to file an appeal. *See* FRCP 24(a)-(b). However, it is well established that the rule permits intervention for purposes of appealing. *See Yniguez v. Arizona*, 939 F.2d 727 (9th Cir. 1991) *vacated and remanded on other grounds* ("[P]ost-judgment intervention for purposes of appeal may be appropriate if the intervenors . . . meet traditional standing criteria") (internal citations omitted). Here, the County seeks to appeal the March 2024 Mosman Order and therefore attached a Notice of Appeal to the Ninth Circuit to its Second Motion to Intervene. Even if this Court did find a mismatch between FRCP 24(c) and the Notice of Appeal as attached, such a circumstance would amount to merely a "'purely technical' defect which does not result in the 'disregard of any substantial right.'" *Id.* (citing *Westchester Fire Ins. Co v. Mendez*, 585 F.3d 1183, 1188 (9th Cir. 2009)).

Plaintiffs also argue that the County does not appropriately limit the scope of its intervention to appeal. That argument misreads the County's Second Motion to Intervene. The language of the

**Reply in Support of Sec. Mot. Intervene**        2

Second Motion to Intervene reflects the County's intent to intervene for the purpose of appealing the March 2023 Mosman Order, as further shown in the attached Notice of Appeal.

Plaintiffs arguments in its Response contain numerous "catch-22" legal arguments. Plaintiffs argues that the County failed to properly file any pleadings in the lead up to the March 2024 Mosman Order. Seizing on the County's self-description as a "de facto adverse party" Plaintiffs try to use this to claim that the County's Second Motion to Intervene was untimely. ECF No. 480 The Plaintiffs' argument ultimately justifies intervention by the County. The County was unable to file a meaningful pleading in opposition to the March 2024 Mosman Order because the County is not yet a party to the case.

Contrary to the Plaintiffs' assertions, the County has timely filed all required pleadings in compliance with the standards set forth in FRCP 24(a), (b), and (c). Therefore, intervention is warranted on both a procedural technical basis, and on the merits.

**II. This Court is not divested of jurisdiction to grant the County's motion while a similar appeal is pending before the Ninth Circuit.**

Plaintiffs assert inaccurately that the County's First Motion to Intervene divests this Court of jurisdiction. ECF No. 480 (citing *McClatchy Newspapers v. Cent. Valley Typographical Union*, 686 F.2d 731, 734 (9th Cir. 1982)). The remedial phase of the case that began with the 2019 contempt proceedings effectively launched a new case, and the March 2024 Mosman Order is a newly appealable final order that resulted in a new circumstance for the County.

Previously, the Ninth Circuit has approved intervention during the late remedial stages of a case, particularly where ordered relief "had an unexpected effect on a nonparty." *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990) (citing *United States v. City of Chicago*, 870 F.2d

**Reply in Support of Sec. Mot. Intervene        3**

1256, 1259-60 (7th Cir. 1989) (decree affects intervenors' chances of promotion). Other circuits have likewise permitted intervention during the remedial phase. *See Howard v. McLucas*, 782 F.2d 956, 959-60 (11th Cir. 1986); *see also Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) (remedial phase of labor dispute)).

Much like in *Oregon*, intervention by the County–a third party--is appropriate because the relief ordered "had an unexpected effect on a nonparty." *Oregon*, 913 F.2d at 588. This case has involved a lengthy and complicated remedial phase, resulting in multiple orders. The March 2024 Mosman Order is a new final order, posing a new circumstance for the County, that is appealable to the Ninth Circuit. This Court is not divested of jurisdiction to grant intervention.

## CONCLUSION

The County respectfully asks this Court to grant intervention as of right or permissive intervention to allow it to defend its interests in this case.

DATED this 4th day of April, 2024.

Respectfully submitted,

JANE E. VETTO
MARION COUNTY COUNSEL

Jane E. Vetto, OSB #914564
Marion County Legal Counsel
555 Court St. N.E.
P.O. Box 14500
Salem, OR 97309
Phone: 503-588-5220
Email: jvetto@co.marion.or.us
Attorney for Proposed Intervenor

**Reply in Support of Sec. Mot. Intervene**    4

**ER - 47**

James Bopp, Jr., Ind. Bar No. 2838-84*
Eamon McCarthy Earls, Ind. Bar No. 38528-49*
*Admission *pro hac vice* forthcoming
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street Terre Haute,
Indiana  47807
Telephone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com;
emearls@bopplaw.com
Counsel for Proposed Intervenor

**Reply in Support of Sec. Mot. Intervene**      5

**UNITED STATES DISTRICT COURT
OF THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| **Disability Rights Oregon, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON**, | |
| *Plaintiffs*, | **Civ. No.: 3:02-cv-00339-MO (Lead Case)** |
| *v.* | **Case No.: 3:21-cv-01637-MO (Member Case)** |
| **DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of Oregon State Hospital**, | **MOTION FOR EXPEDITED RULING ON MARION COUNTY'S SECOND MOTION TO INTERVENE** |
| *Defendants.* | |

**MOTION FOR EXPEDITED RULING**

**I. INTRODUCTION**

Proposed intervenor Marion County ("**the County**") moves this Court for an expedited ruling on the Second Motion to Intervene. Specifically, the County requests this Court expedite consideration of the Second Motion to Intervene and issue a ruling by April 4, 2024 in order to allow the County to file a Notice of Appeal to the Ninth Circuit of the Court's March 6, 2024 Order.

**1.** The County has filed contemporaneously with this motion its Second Motion to Intervene.

**2.** The County wants to file a Notice of Appeal attached to the Second Motion to Intervene. That Notice of Appeal is due to be filed April 4, 2024.

**3.** The County requests an expedited schedule on the Second Motion to Intervene wherein

Mot. Expedited Ruling                    1

the response shall be due by the close of business on April 2, 2024, any reply by close of business

on April 3, 2024, and that the Court rule on the Second Motion to Intervene promptly on April 4,

2024, in time for the County to file its Notice of Appeal.

## V. CONCLUSION

The County respectfully ask this Court to conduct expedited ruling on its Second Motion for

Intervention. Specifically, the County requests that this Court issue a ruling by April 4, 2024.


DATED this _29_ th day of March, 2024.

Respectfully submitted,

JANE E. VETTO
MARION COUNTY COUNSEL

 /s/ Jane E. Vetto
Jane E. Vetto, OSB #914564
Marion County Legal Counsel
555 Court St. N.E.
P.O. Box 14500
Salem, OR 97309
Phone: 503-588-5220
Email: jvetto@co.marion.or.us
Attorney for Intervenor-Appellant


James Bopp, Jr., Ind. Bar No. 2838-84*
Eamon McCarthy Earls, Ind. Bar No. 38528-49*
*Admission *pro hac vice* forthcoming
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street Terre Haute, Indiana  47807
Telephone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com; emearls@bopplaw.com
Counsel for Proposed Intervenor

**Mot. Expedited Ruling**                              2

**UNITED STATES DISTRICT COURT**
**OF THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| **Disability Rights Oregon, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON**, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> **DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of Oregon State Hospital**, <br><br> *Defendants.* | **Civ. No.: 3:02-cv-00339-MO (Lead Case)** <br> **Case No.: 3:21-cv-01637-MO (Member Case)** <br><br> **MARION COUNTY'S SECOND MOTION TO INTERVENE** |

**CONFERRAL CERTIFICATION**

Pursuant to the requirements of LR 7-1, Marion County ("**the County**") hereby certifies that it has conferred with all parties prior to filing this motion. Plaintiffs stated that they oppose the motion and Defendants took no position on the motion.

**SECOND MOTION TO INTERVENE**

Proposed intervenor Marion County ("**the County**") hereby moves this Court to intervene in the above captioned case pursuant to Federal Rule of Civil Procedure 24, subsections (a) and (b) in the alternative.

This motion is supported by the following Memorandum of Law. The County respectfully includes a Motion to Expedite a ruling by April 4, 2024, so that it may file the Notice of Appeal attached.

Sec. Mot. Intervene                                    1

## MEMORANDUM OF LAW

## I. INTRODUCTION

Beginning in August 2022, the County participated in this matter as *amicus* of this Court. The County previously sought intervention in June 2023, but was denied. ECF No. 415. At the time, it was experiencing the effects of Judge Mosman's Order to Implement Neutral Expert's Recommendations ("**August 2022 Mosman Order**") (formally issued after deliberation on September 1, 2022). ECF No. 271. Although the order did not formally apply to the County or direct how its staff and employees needed to act, in fact it had a significant collateral impact on Marion County and particularly the Marion County Sheriff's Department. In fact, as a result of the August 2022 Mosman Order, the County's community restoration caseload tripled while placement options dwindled. ECF No. 403 (Matthews Decl. ¶ 5, 7). The new March 6, 2024 Mosman Order ("**March 2024 Mosman Order**") further increases the financial and administrative burdens on the County. ECF No. 475. The March 2024 Mosman Order exacerbates these problems and the County faces a public health and safety crisis even more intense than what prompted its first effort to intervene in 2023.

By prohibiting Oregon State Hospital ("**OSH**") outpatient services as an alternative to community restoration, the County will be presented with even more individuals requiring services. Declaration of Ryan Matthews (March 28, 2024) ("**Second Matthews Decl.**") at ¶ 10. These individuals often remain housed in jail, taking up valuable jail resources and in many cases pose risks of harm and liability to the County. Declaration of Nick Hunter (March 28, 2024) ("**Hunter Decl.**") at § 8, 9.

In addition, because they will now be denied outpatient services, these individuals will

Sec. Mot. Intervene                                        2

require a higher level of services, further burdening the County's already strained resources.
Second Matthews Decl. at ¶ 11. An increase in the number of individuals returned to the County
inevitably means an increase in the number of individuals remaining in jail, where they remain
untreated, posing greater risk of harm and liability. Hunter Decl. at ¶ 9. An increase in the
number of individuals returned to the County will result in an increased number of individuals
charged with violent crimes simply leaving services without receiving stabilizing treatment.
Second Matthews Decl. at. ¶ 12. Finally, there are obvious fiscal consequences to the County
from the increase in services that is caused by turning individuals away from outpatient services.
*Id.* ¶ 16. The State of Oregon has specific statutory and constitutional obligations to address this
crisis. Marion County seeks to intervene so that it may safeguard its resources, to minimize risks
to its staff, and risks of liability.

Because of the most recent developments, the County seeks to intervene in this case to
address particularized harms: (1) unlawfully and at great cost holding individuals in jail, (2) the
financial burdens of an unfunded mandate from the State to maintain community restoration
programs without additional support, and (3) inadequate treatment being provided for in
community-restoration who need hospital-level care.

The County respectfully requests this Court grant its Second Motion to Intervene so that it
may appeal the March 2024 Mosman Order.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure sets out two ways for a party to intervene under FRCP
24(a) and 24(b): intervention by right and permissive intervention.

Intervention by right under FRCP 24(a)(2) requires proof of four elements: (1) the motion is

Sec. Mot. Intervene                                    3

timely, (2) the applicant claims a "significantly protectable" interest relating to the transaction

that is the subject of the matter, (3) "the applicant must be so situated that the disposition of the

action may as a practical matter impair or impede its ability to protect that interest," and (4) "the

applicant's interest must be inadequately represented by the parties to the action." *Cooper v.

Newsom*, 13 F.4th 857, 864 (9th Cir. 2021). Federal courts in the Ninth Circuit construe Rule

24(a)(2) "broadly in favor of proposed intervenors." *Wilderness Soc. v. U.S. Forest Serv.*, 630

F.3d 1173, 1179 (9th Cir. 2011) (internal citations omitted).

FRCP 24(b) gives courts discretion to permit intervention when the prospective intervenor

"has a claim that shares with the main action a common question of law or fact." To meet this

standard, a prospective intervenor must prove three elements: (1) the applicant "shares a common

question of law or fact with the main action," (2) "the motion is timely," and (3) "the court has an

independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman*, 159 F.3d

405, 412 (9th Cir. 1998).

Once a prospective intervenor establishes all three, the district court must then decide

whether to exercise its discretion. *Id*. The decision to permit intervention under a permissive

intervention approach is based on whether the "intervention will unduly delay or prejudice the

adjudication of the original parties' rights." FRCP 24(b).

### III. ANALYSIS

Here, the County's case for intervention is straightforward. The County is responsible for the

housing and care of individuals who are left sitting in jail while the Court's order impairs their

ability to receive treatment from OSH and the County is responsible for individuals discharged

from OSH to indefinite community restoration. The March 2024 Mosman Order directly

Sec. Mot. Intervene                             4

contradicts the February 9, 2024 Order ("**February Order**") issued by Marion County Circuit

Judge Audrey Broyles pertaining to the restoration of a defendant, thereby greatly expanding the

scope of the original case and threatening the power of the Oregon courts, placing Marion

County in a compromising legal situation. The County's rights are inherently implicated by this

case.

Moreover, because the March 2024 Mosman Order directly interferes with the outpatient

treatment of any criminal defendant who has already had in-patient treatment in accord with the

August 2022 Mosman Order, the County is required to compromise its community restoration

initiatives to comply with the March 2024 Mosman Order. Accordingly, intervention is

warranted either by right or on a permissive basis as to Marion County.

## A. Intervention as of right by Marion County

### 1. The County's motion to intervene is timely.

A court considering a motion to intervene under FRCP 24(a) weighs the timeliness of the

motion with three factors: "(1) the stage of the proceeding at which an applicant seeks to

intervene, (2) the prejudice to other parties, and (3) the reason for the length of the delay." *Smith

v. Marsh*, 194 F.3d 1045, 1050 (9th Cir. 1999).

This case has an unusually long history. The lead case that forms the basis for the sequence

of three Mosman Orders issued between August 2022 and March 2024, the Complaint in *Oregon

Advocacy Center v. Mink*, No. 3:02-cv-00339-MO, was originally filed in March 2002. ECF No.

1. In May 2002, the case resulted in a Judgment, in which the Court retained jurisdiction to

enforce a permanent injunction, ordering Oregon State Hospital ("**OSH**") to provide adequate

services for individuals unable to aid in their own defense. *See* Judgment, May 15, 2002 (ECF

Sec. Mot. Intervene                                    5

No. 51) ("***Mink* Injunction**").

Apart from a few remaining appellate proceedings in the early 2000s, the case remained

dormant until May 2019, when Plaintiffs--Oregon disability rights groups– ("**Plaintiff Disability**

**Rights Organizations**") filed a motion seeking contempt sanctions against OSH for failing to

comply with the *Mink* Injunction. *See* Mot. for Order to Show Cause for Finding of Contempt

(ECF No. 85). That May 2019 motion effectively revived the case 18 years after a decision was

reached. As a result, Dr. Debra Pinals was brought in to consult about what steps OSH needed to

take to come into compliance. Stipulated Mot. to Appoint Neutral Expert (ECF No. 238). Dr.

Pinal's recommendations resulted in the issuance of the August 2022 and July 2023 Mosman

Orders that impose limitations on in-patient restoration at OSH but did not address outpatient

restoration services. (ECF No. 271).

The County first began to experience the effects of the August 2022 Mosman Order at this

time, as the Order reduced capacity at OSH, resulting in more individuals on community

restoration and strain on the County program's limited resources. *See* Matthews Decl. ¶ 6-10.

Anticipating new burdens, the County moved to participate in the *Mink* case as an *amicus* of the

Court after the August 2022 Mosman Order was first proposed. Mot. to Appear *Amicus Curiae*

(ECF No. 259).

By the time the County became involved as an *amicus* of the Court, the parties to the case

were effectively no longer opposed on the major aspects of the litigation. *See* Unopposed Mot.

for Order to Implement Neutral Expert's Recommendations (ECF No. 252). The County and

other *amici* effectively took on the role of adverse parties in the case, contesting the

implementation of the Mosman Order. *See Amicus* Brief of Marion and Washington Counties

Sec. Mot. Intervene                                  6

(ECF No. 259-1).

As *amicus* of the Court, the County took part in all major aspects of the litigation after August 2022, including arguments on amendments to the August 2022 Mosman Order and mediation. *See* Minutes, Nov. 21, 2022 (ECF No. 322); *see also* Amended Scheduling Order (ECF No. 355).

The County effectively became a de facto party in March 2023 when Plaintiff Disability Rights Organizations filed a motion seeking an order requiring the County to transport individuals committed at OSH back to the County jail after discharge. Pls.' Mot. for Order Requiring Marion County to Transport Patients (ECF No. 359). At the time, the Court denied the motion but indicated that it wanted to amend the Mosman Order to fill the "gap" in transport. Tr. at 25. All proposals submitted included language ordering county sheriffs to transport individuals back from OSH after discharge. *See* Mot. for Order Amending September Order (ECF No. 382) (filed by Plaintiff Metropolitan Public Defenders); *see also* Proposed Order (ECF No. 383) (filed by the County).

The net effect of the March 2024 Order is to greatly increase the County's responsibilities. It prohibits outpatient services as an alternative to community restoration, which inevitably presents the County with even more individuals requiring a higher level of services, Second Matthews Decl. at ¶ 10, 11. Just as inevitably, this will increase the number of individuals requiring treatment to remain housed in jail, with the commensurate burdens and risks to the jail. Hunter Decl. at § 8, 9. This will spill over into an increased number of individuals charged with violent crimes simply leaving services without receiving stabilizing treatment. Second Matthews Decl. at. ¶ 12.

Sec. Mot. Intervene                                      7

The County's Second Motion to Intervene is timely. The contempt proceedings in 2019 effectively initiated a new case on a separate issue from the original 2002 case. That case took on new contours with the August 2022 Mosman Order, the July 2023 Mosman Order that prompted the County's initial effort to intervene, ECF No. 416, and now the March 2024 Mosman Order that prompts the County's current Second Motion to Intervene.

The County's entrance into the case at this point is not likely to result in prejudice to any parties. The County shared its position beginning at the earliest possible time, as soon as its interests were impacted, giving other parties ample notice of its opposition to the three Mosman Orders. Because the County has served as a de facto adverse party for nearly two years, its entrance into the litigation at this time cannot be expected to raise new or unforeseen issues for the parties. In fact, the County's concerns have been the primary issue in the case for some time.

Here, any delay in filing the County's motion to intervene is not a grounds for finding untimeliness. "Delay is measured from the date the proposed intervenor should have been aware that its interests would no longer be adequately protected by the parties." *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1999).

The County promptly sought to take part in the case immediately upon learning that the parties were in agreement about implementation of the August 2022 Mosman Order and as a result would not adequately protect its interests. Initially, that participation was formally labeled as that of an *amicus* but in practical terms the County effectively served the role of an adverse party. As a result there was functionally no delay in the County's efforts to adequately protect its interests.

The time from when the County appeared as *amicus* to the filing of this Second Motion to

Sec. Mot. Intervene                                    8

Intervene should not be counted as a delay. Because the County as *amicus* served as a functionally adverse party, there was initially no need to seek formal intervention until it became clear that the August 2022 Mosman Order would be amended to directly bind the County. At the time, it became clear that *amicus* status was insufficient to defend the County's interests. The County found itself in need of the rights of a party in the case: the right to make and respond to motions, receive copies of filings, and seek appellate review if needed. The County promptly moved to intervene in 2023 to become a full-fledged party in the case.

Even if the Court deemed the original 2023 First Motion to Intervene untimely, the County's current Second Motion to Intervene is timely because of the significant change in circumstances wrought by the March 6, 2024 Mosman Order. Under that Mosman Order, the case has been extended to outpatient services, directing both the County and Oregon state court judges from which it receives court orders. Accordingly, this Second Motion to Intervene is timely and County has met the first element needed for intervention as of right.

### 2. The County has a "significantly protectable" interest that is affected.

The County claims a "significantly protectable" interest that is impacted. A prospective intervenor must have a "specific legal or equitable interest" to meet the "significantly protectable" interest prong of mandatory intervention. *See Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980). Generally, it is "enough that the interest is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." *Sierra Club v. United States EPA*, 995 F.2d 1478, 1488 (9th Cir. 1993). The Ninth Circuit takes the view that a prospective intervenor "has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation." *California ex*

Sec. Mot. Intervene                                    9

*rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006).

Here, the County's interests are significantly impaired due to the litigation. The County is required to pick up the slack, providing resources and bearing the risks of harms related to the confinement of individuals on community restoration. The March 2024 Mosman Order heightens the preexisting burdens on the County by blocking outpatient treatment for individuals on community restoration, forcing the County to shoulder that burden alone.

The surge in demand for restoration services comes at a high cost. The County lacks adequate staff and funds to provide the resources needed to ensure that individuals on community restoration are given appropriate placement and medications.

Individuals who are not stabilized are leaving the community restoration program. Many of these individuals are charged with grave violent offenses and pose a significant risk to themselves and others.

The March 2024 Mosman Order directly orders the County's staff forcing County personnel to violate state court orders. This risks forcing the County to litigate state court contempt proceedings. As a result of the foregoing factors, the County's interests are squarely implicated in this litigation. Accordingly, the County meets both the second and third elements needed for intervention as of right.

### 3. The County's interest in the case are not adequately represented by the current parties.

The interests of the current parties in the case do not align with those of the County. Functionally, the current parties to the litigation are not adverse to one another, jointly agreeing to shift the burdens of restoration onto the County. Because of this de fact circumstance, the County and other *amici* (some of which have also sought to intervene) have become in effect the

Sec. Mot. Intervene                    10

adverse party in the case. Accordingly, the County has satisfied the fourth element needed for mandatory intervention.

**B.  Permissive Intervention by Marion County.**

**1.  The County has questions of law and fact in common with the original case.**

The County shares common questions of law and fact with the original action that merit intervention. The County's concerns all relate to the sequence of Mosman Orders that extend an injunction affecting OSH to parties beyond the scope of the original order, such as the County. The County's concerns align with the Plaintiff Disability Rights Organizations' original concern that OSH was originally failing to treat individuals unable to aid and assist in their own defense. However, beginning in 2022 OSH sought to limit the services they offer to individuals unable to aid and assist by agreeing to time limits on in-patient care. In March 2024, this was limited even further to outpatient services. Thus, the County now bears the heightened burdens of both OSH's practice of shifting individuals who still hospital-level care to community restoration and an inability to meet its obligations under Oregon state court orders as a result of the March 2024 Mosman Order. Principles of standing and judicial economy favor resolving the County's concerns along with those already considered in this action. As a result, the County satisfies the first element of permissive intervention.

**2.  The County's motion to intervene is timely.**

The County's motion to intervene on a permissive basis is timely for the same reasons that its motion to intervene on a mandatory basis is timely, as outlined previously. Accordingly, the second element is met.

Sec. Mot. Intervene                              11

3. **The County's motion will not unduly delay or prejudice the adjudication of the original parties' rights.**

The County's intervention in this case would not significantly delay or prejudice other parties for the same reasons that the case is timely. In effect, the County has acted as a de facto adverse party in the case since August 2022. Therefore, the parties are already aware of the County's position for nearly two years. This Court has taken the time to consider the County's arguments in the past during this interlude of time. Adding the County as a party at this time is unlikely to surprise any of the parties and nor will it likely result in any additional delay. Thus, this Court should use its discretion to permit intervention.

## V. CONCLUSION

For the foregoing reasons, prospective intervenor Marion County respectfully ask the Court to allow intervention in this case.

DATED this _29_ th day of March, 2024.

Respectfully submitted,

JANE E. VETTO
MARION COUNTY COUNSEL

_/s/ Jane E. Vetto_____
Jane E. Vetto, OSB #914564
Marion County Legal Counsel
555 Court St. N.E.
P.O. Box 14500
Salem, OR 97309
Phone: 503-588-5220
Email: jvetto@co.marion.or.us
Attorney for Intervenor-Appellant

James Bopp, Jr., Ind. Bar No. 2838-84*

Sec. Mot. Intervene                    12

**ER - 62**

Eamon McCarthy Earls, Ind. Bar No.
38528-49*
*Admission *pro hac vice* forthcoming
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street Terre Haute,
Indiana  47807
Telephone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com;
emearls@bopplaw.com
Counsel for Proposed Intervenor

**Sec. Mot. Intervene**                          13

**ER - 63**

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF Oregon

### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

U.S. District Court case number: 3:02-cv-00339-AN

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 03/19/2002

Date of judgment or order you are appealing: 03/06/2024

Docket entry number of judgment or order you are appealing:

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes   ○ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Marion County, Oregon
Marion County Comissioners, in their official capacity

Is this a cross-appeal?  ○ Yes   ◉ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case?  ◉ Yes   ○ No

If yes, what is the prior appeal case number?  23-5516

Your mailing address (if pro se):

City:            State:         Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature**  /s/ Jane E. Vetto          **Date** 3/29/2024

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 1                     ER - 64                     *Rev. 06/09/2022*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

| |
|---|
| Marion County, Oregon<br>Marion County Commissioners in their official capacity |

Name(s) of counsel (if any):

| |
|---|
| Jane Vetto, County Counsel<br>Counsel for Intervenor: James Bopp, Jr. (pro hac vice forthcoming)<br>Eamon McCarthy Earls (pro hac vice forthcoming) |

Address: | 555 Court St. N.E., P.O. Box 14500, Salem, OR 97309; The Bopp Law⊞

Telephone number(s): | (503) 588-5220; Bopp Law Firm: (812) 232-2434

Email(s): | jvetto@co.marion.or.us; jboppjr@aol.com; emearls@bopplaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?    ● Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

| |
|---|
| David Baden, in his official capacity as director of the Oregon Health Authority<br>Dolores Matteucci, in her official capacity as superintendent of the Oregon State Hospital |

Name(s) of counsel (if any):

| |
|---|
| ELLEN F. ROSENBLUM<br>Attorney General<br>CARLA A. SCOTT #054725 |

Address: | 100 SW Market Street

Telephone number(s): | (971) 673-1880

Email(s): | Carla.A.Scott@doj.state.or.us; Sheila.Potter@doj.state.or.us; Craig.M.⊞

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                         ER- 65                         *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

**Appellees**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Disability Rights Oregon, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON

Name(s) of counsel (if any):

Emily Cooper OSB #182254; Thomas Stenson OSB #152894; Jesse Merrithew OSB #074564

Address: Disability Rights Oregon

Telephone number(s): (503) 243-2081

Email(s): ecooper@droregon.org; tstenson@droregon.org; jesse@lmhlegal.com

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                    ER - 66                              *New 12/01/2018*

# Exhibit 2

Second Declaration of Ryan Matthews

Jane E. Vetto, OSB #914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
Facsimile No.: (503) 373-4367
Attorney for County of Marion

## UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON ,** | |
| *Plaintiffs,* | **Civ. No.  3:02-cv-00339-MO (Lead Case)** |
| *v.* | **Case No.: 3:21-cv-01637-MO (Member Case)** |
| **DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of Oregon State Hospital,** | **Declaration of Ryan Matthews in Support of Marion County's Second Motion to Intervene** |
| *Defendants.* | |

### Declaration of Ryan Matthews

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

   1.   I am employed with Marion County Health and Human Services ("MCHHS") as the

Health Administrator and have served in this capacity at all times relevant to this litigation.

**Declaration in Support of
Marion County's  Second Motion
to Intervene**

**ER - 68**

**2.**   I have served with Marion County Health and Human Services since 2004.

**3.**   I make this declaration from a combination of personal knowledge and my review of records and oversight of MCHHS.

**4.**   This declaration is offered in support of Marion County's Motion to Intervene.

**5.**   When this Court's September 1, 2022 order limiting the duration of inpatient restoration at the Oregon State Hospital ("Mosman Order") came into effect, there was an extraordinary increase in the number of individuals being discharged from OSH, many without having been found able to aid and assist in their defense. As a result, Marion County's community restoration programs experienced an unprecedented surge in cases. As of the first six months of 2023, the community restoration case load approximately tripled.

**6.**   The sudden increase in cases has stressed Marion County's community restoration program nearly to its breaking point.

**7.**   Prior to the implementation of the Mosman Order, Marion County was already experiencing the effects of a system-wide shortage of behavioral health staff. In the time since, hiring and retaining qualified mental health providers to support outpatient treatment has not become any easier. As a result, Marion County remains severely understaffed relative to the demand for community restoration services and is unable to provide the care necessary for all individuals in need.

**8.**   Prior to the implementation of the Mosman Order, there was also already an extreme shortage of Secure Residential Treatment Facility ("SRTF") beds that has not improved in the months since. This shortage severely limits Marion County's ability to place individuals who

**Declaration in Support of
Marion County's  Second Motion
to Intervene**                                    2

require residential care to regain fitness to proceed into an appropriate facility. SRTF facilities are frequently so full that they will not even accept referrals for their waitlists.

9.    In some cases, Marion County's community restoration program also lacks the resources necessary to even provide individuals with appropriate medication. Because individuals discharged from the Oregon State Hospital ("OSH") have not yet reached a point of even relative stability, prescribers in the community are often unwilling to administer injectable medications due to liability concerns and jails are often unable to administer such medications because staff lack the appropriate training. The end result is that some individuals on community restoration simply receive no treatment to regain fitness to proceed.

10.    Based on my personal knowledge, experience and familiarity with this issue and MCHHS, I fully expect the effect of Court's March 6, 2024 order will be to exacerbate these problems; by prohibiting OSH outpatient services as an alternative to community restoration, the Order ensures that Marion County will be presented with more individuals in the community restoration program.

11.    In addition to an even higher number of individuals presenting to community restoration services, I expect that the level of required services will increase as a result of the March 6 Order. Prior to the Order, much of the influx to the community restoration program was from those that required hospital-level care. Now, those individuals will be turned away from even outpatient hospital care.

12.    The current status quo constitutes a significant public safety issue. Many of the individuals returned to Marion County from OSH have been charged with violent crimes and

**Declaration in Support of**
**Marion County's  Second Motion**
**to Intervene**                                     3

would have previously remained on secure commitment prior to the Mosman Order. While on community restoration, Marion County has no means of preventing them from leaving services. As a result, individuals simply leave their placements into the community without receiving stabilizing treatment.

**13.**   In my capacity as MCCHS Administrator, I oversee MCHHS's budget.

**14.**   In fiscal year 2022-2023, MCHHS's community restoration program had expenditures of $1,182,720.73 and employment of 11.70 FTE. From OHA, MCHHS received funding of $1,601,476.50.

**15.**   As a direct result of increased demand for community restoration services, in fiscal year 2023-2024, MCHHS's community restoration program expenditures increased to $1,724,699 and employment was increased to 12.60 FTE. From OHA, MCHHS received funding of $1,606,477.

**16.**   From 2022-2023 to 2023-2024, MCHHS's community restoration services expenditures increased just over 45%, while funding increased by less than 0.01%. As a result, MCHHS is currently expecting a budget shortfall for community restoration of $118,222 for fiscal year 2023-2024.

**17.**   One resource crucial to helping meet the need for mental health care services is SRTF beds. However, Plaintiff is unable to create or make use of SRTF beds unilaterally. SRTF facilities are licensed solely by the state and have the ability to refuse any placement.

**Declaration in Support of
Marion County's  Second Motion
to Intervene**                                4

I declare under penalty of perjury that the foregoing is true and correct. Executed on this

<u>28th</u> day of March, 2024.


_____
Ryan Matthews
Marion County Health and Human Services

**Declaration in Support of**
**Marion County's  Second Motion**
**to Intervene**                                     5

**Certificate of Service**

I hereby certify that I served the foregoing Declaration of Ryan Matthews on:

March   , 2024 by electronic means through the Court's Case Management/Electronic Case File

system on the date set forth below;

DATED this ___ day of _____, 2024.

_____
Jane Vetto,, OSB #914564
Of Attorneys for Marion County
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
Facsimile No.: (503) 373-4367
kemurphy@co.marion.or.us

**Declaration in Support of
Marion County and Judge Broyle's
Second Motion to Intervene**                6

# Exhibit 3

## Declaration of Nick Hunter

Jane E. Vetto, OSB #914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
Facsimile No.: (503) 373-4367
Attorney for County of Marion

## UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON ,** | |
| *Plaintiffs,* | **Civ. No.  3:02-cv-00339-MO (Lead Case)** |
| v. | **Case No.: 3:21-cv-01637-MO (Member Case)** |
| **DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of Oregon State Hospital,** | **Declaration of Nick Hunter in Support of Marion County's Second Motion to Intervene** |
| *Defendants.* | |

### Declaration of Nick Hunter

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

**I.** I serve as the Marion County Sheriff. My job duties include overseeing and managing

all Sheriff's Office operations, including the Marion County Jail.

**Declaration in Support of
Marion County's
Second Motion to Intervene**

**ER - 75**

2.    The Marion County Sheriffs Office ("MCSO") employs Institutions deputies whose duties include transporting adults in custody to and from the Oregon State Hospital (OSH) who have been determined to be unable to "aid and assist" in their criminal cases and have been ordered by state circuit court judges to OSH for in patient restoration services.

3.    **MCSO** is not affiliated in any way with OSII. To the extent that we work with OSII to coordinate transports, those transports are pursuant to court order. In September of 2022, the MCSO was notified that the timelines for restoration of individuals at the OSH had been shortened. The transport deputies incorporated these shortened timelines into their tracking sheets, but otherwise the process of arranging classification and transport to and from OSH has not changed.

4.    Both transport from the jail to OSH and transport back to the jail from OSH of "aid and assist" individuals is conducted pursuant to court order, I am aware that parties in a federal lawsuit alleged at one time that MCSO "actively thwart[ed]" this order.

5.    The September 1, 2022, order did not address the transport issue. All orders the Sheriffs Office has received regarding transport of "aid and assist" individuals to OSH since September 1, 2022, have been issued by state circuit court judges.

6.    Pursuant to these orders, deputies work to conduct transports. Between September 22, 2022 and August 2023, the MCSO transported approximately 121 individuals to OSH and approximately 101 individuals from OSH back to the Marion County jail, totaling approximately 222 separate transports.

7.    The 2002 Order required OSH to admit individuals for inpatient restoration within 7

**Declaration in Support of**
**Marion County's**
**Second Motion to Intervene**              2

days. The September 1, 2022 order imposed a maximum limit on the time that an individual can be subject to inpatient restoration at OSH. The March 6, 2024 Order prohibits outpatient restoration treatment after the maximum inpatient restoration time.

8.     During the delay in admission to inpatient restoration and when residential Secure Residential Treatment Facility ("SRTF") beds are unavailable, the individuals awaiting admission or placement take up valuable jail resources, such as bed space, and in some cases pose risks of harm to jail staff and liability to the County.

9.     Likewise, because there are no alternatives, individuals in need of community restoration may remain at jail, where they cannot be provided those services and similarly pose risks of harm to jail staff and liability to the County.

**Declaration in Support of
Marion County's
Second Motion to Intervene**                3

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28 day of March, 2024.

Nick Hunter
County Sheriff

**Declaration in Support of**
**Marion County's**
**Second Motion to Intervene**          4

Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB #074564
jesse@lmhlegal.com
**Levi Merrithew Horst PC**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
*Counsel for Plaintiff, Metropolitan Public Defender*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | Case No.  3:02-cv-00339-MO (Lead Case) Case No.  3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | PLAINTIFFS' RESPONSE TO PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE |
| v. | |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants. | |

Page 1

JAROD BOWMAN, JOSHAWN
DOUGLAS-SIMPSON,

      Plaintiffs,

    v.

DOLORES MATTEUCCI, Superintendent
of the Oregon State Hospital, in her
individual and official capacity, PATRICK
ALLEN, Director of the Oregon Health
Authority, in his individual and official
capacity,

      Defendants.

Case No. 3:21-cv-01637-MO (Member Case)

## PLAINTIFFS' RESPONSE TO PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE

The Court should promptly determine the Supremacy Clause issues in this matter. The Marion County Court's order violates the Supremacy Clause in several ways. With regards to federal law, "the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "The Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 382 n.12 (2012) "A State's authority to organize its courts, while considerable, remains subject to the strictures of the Constitution." *Haywood v. Drown*, 556 U.S. 729, 740–41 (2009). A federal court order is "a fully enforceable federal judgment that overrides any conflicting state law or state court order." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 n.20 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992).

Page 2

## I.   The Marion County Court's Order Directly Violates the Fourteenth Amendment and the 2002 Permanent Injunction

In addition to the Supremacy Clause issues involved in the violation of the July 2023 order, the Marion County Court's ruling violates the Fourteenth Amendment and the 2002 permanent injunction. The proposed disposition in the Velasquez-Sanchez matter, requiring him to lodge seven days a week at the Marion County Jail for an undefined time period with a once-a-week "outpatient" services at the Oregon State Hospital, would violate the Fourteenth Amendment and the 2002 permanent injunction. Mr. Velasquez-Sanchez is unable to aid and assist presently, yet he has been housed for more than a month at the Marion County Jail since his release from OSH. "There is no rationalization that passes constitutional muster for unreasonably detaining persons found unfit to proceed in county jails." *Oregon Advoc. Ctr. v. Mink*, No. CV 02-339-PA, 2002 WL 35578910, at *6 (D. Or. May 10, 2002). County jails provide "constitutionally inadequate" mental health care and placement there for "more than a brief period" causes delays in treatment. *Id.* The Court's order was plain that only "full admission of such persons into a state mental hospital or other treatment facility" would meet Oregon's constitutional burden. *Oregon Advoc. Ctr. v. Mink*, No. CV 02-339-PA, 2002 WL 35578888, at *1 (D. Or. May 15, 2002). The notion that a brief, once-a-week session meets the constitutional burden is defeated by the Court's explicit acknowledgement that only "full admission" to OSH suffices. The plain effect of the Marion County Court's order would be to defeat the underlying permanent injunction of this Court from 2002. The Marion County Court's order conflicts with the 2002 injunction of this Court.

Page 3

## II. The Plain Text of the Marion County Order Would Also Violate the July 2023 Order of this Court

The Marion County Court's order plainly disregarded the July 2023 Order of this Court, engaging instead in an extensive vilification on the record of this Court, Dr. Pinals, and the Court's order when issuing her order. ECF 462, at 27-34. At no point did Judge Broyles acknowledge or mention that she had personally been invited to and did participate in mediation to address her concerns by this Court, nor that she had been permitted to participate in these proceedings as a friend of the court. ECF 462. In issuing its order, the Marion County Court made several overgeneralizations and stated outright falsehoods about this Court's order. For instance, the Marion County Court bizarrely stated that under the "Mosman edict," a state court with a defendant who has timed out from the state hospital has "two choices; put the person in community restoration or put them in jail." ECF 462, at 31-32. That statement is doubly false. Under Oregon law, a person who has timed out of the hospital and cannot be committed there further, but who remains unable to aid or assist, remains eligible for at least *four* possible dispositions, none of which is "put[ting] them in jail": community restoration, civil commitment, protective proceedings, or dismissal. ORS 161.370(2)(c); ORS 161.371(3)(c)(B) (a state court, when addressing a defendant unable to aid and assist released from the state hospital, shall "determine an appropriate action . . . as described in ORS 161.370(2)(c)").[1]

---

[1] Of those four alternatives to commitment, no evidence indicates that any were completely unavailable. ECF 462, at 5. A community placement was offered by the district attorney and rejected by the judge. While the judge claimed civil commitment is unavailable, ECF 462, at 33, the judge did not consider whether either the exceptional admission process to OSH is possible or if the detainee could be civilly committed to another setting. The judge did not consider protective proceedings and had previously rejected release. *Id.* at 5.

Page 4

Neither this Court's orders nor any Oregon statute offers any authority for putting people unable to aid and assist "in jail" indefinitely, with or without occasional legal training.

This Court's July 2023 order did not mandate any particular outcome in any case, except that it prohibited keeping a person in or returning a person to the state hospital for restoration purposes once certain timelines were reached.[2] The operative language in the order states: "OSH shall not admit patients except as provided for by the recommendations in the Neutral Expert's Reports or as otherwise provided by this Court." ECF 416.[3] No element of this Court's order nor the Neutral Expert's reports indicated that requiring a person unable to aid and assist to live in a jail cell and providing them restoration services once a week is an adequate or appropriate resolution.

The transcript does not evidence much concern about whether the Marion County order actually complies with the July 2023 order. The transcript vaguely states that the detainee would "not take up a bed [at OSH] which is the thing Judge Mosman is apparently concerned about. . . ." ECF 462, at 35. The Marion County Court then says that her order "satisfies both the issue about the Mosman order and worrying about a person in, person out that he is so concerned about. . . ." *Id.* at 36. But the Court's July 2023 order does not order OSH to maintain a certain number of beds or adopt a "person

---

[2] Prior briefing on Judge Broyles's behalf demonstrated understanding of the limited nature of this holding. ECF 385, at 3 (noting that the gist of the Court's order was that "OSH maximum commitment timelines are shorter than the maximum periods for restoration under ORS 161.371(5)").

[3] This Court's July 2023 order did not specifically address the partial or temporary admission of a patient to OSH, as contemplated by Marion County, simply because no such program of temporary admission existed at OSH, nor had one ever been contemplated by any party. The mediation process—in which Judge Broyles participated personally—did not yield any particular recommendation for such temporary admission nor carve out an exception for it.

Page 5

in, person out" policy. This Court's order does prohibit OSH from "admit[ting] patients" except as provided by Dr. Pinals' recommendations and the federal court's orders.

The Marion County Court's order specifies that "every Friday at 10 a.m." the detainee should be taken to OSH "where custody will transfer" from the Marion County Sheriff to OSH. ECF 471, at 5. The transfer of custody of a patient from one facility to another contemplates an effective "admission" of the patient to the hospital. A person seeking routine outpatient care at a dentist's office or other similar outpatient site is not "transferred into the custody" of the dentist. The "transfer of custody" language used by the Marion County Court clearly indicates a legal change of custodial status inconsistent with anything but admission to the hospital, albeit brief in duration. *Cf. Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1168 (9th Cir. 2002)(describing a patient being "transferred from the emergency room and admitted into the hospital for treatment"). The Marion County Court order is inconsistent with this Court's July 2023 order.

Dr. Pinals' reports—which form part of the basis of the July 2023 order—are also consistently negative with regard to jail-based restoration or placement of aid-and-assist patients in jail cells. ECF 416 ("OSH shall not admit patients except as provided for *by the recommendations in the Neutral Expert's Reports* or as otherwise provided by this Court.") (emphasis added). Dr. Pinals repeatedly expressed interest in her second, third, fourth, and fifth reports in outpatient restoration programs which were nonhospital-based programs contrasted with hospital-based restoration. *See, e.g*., ECF 262-2, at 30 (discussing the prospect of outpatient restoration on "timeframes for restoration that are the same as those for people in hospitals"). Dr. Pinals' statements are unambiguous: "it

Page 6

**ER - 84**

is clear that jails are not hospitals and cannot provide the same therapeutic type of environment as a hospital or a community care setting." ECF 313-1, at 20. Dr. Pinals specifically raised concerns about a "recent state court case ordering restoration in a jail setting, which raises significant concerns regarding the federal requirements of the Mink order as well as other potential risks for defendants unable to assist in their own defense." ECF 313-1 at 21. No one familiar with the recommendations of Dr. Pinals' reports could reasonably believe that her recommendations would be consistent with a placement order repeatedly and indefinitely alternating lengthy admission to a jail and brief admission to the hospital for the purposes of restoration.

The Marion County Court issued an order violating the plain language of the July 2023 order restricting placement of detainees at the state hospital, except under the terms described by Dr. Pinals' recommendations and other orders of the federal court. By compelling the transfer of custody of a jail detainee to OSH, the Marion County Court would violate the restrictions on admitting patients to OSH set out in the July 2023 order of this Court. No party or *amicus*—including the remaining state court judges—has sought to excuse, explain, or defend the Marion County Court's decision. ECF 470.

DATED March 4, 2024.

LEVI MERRITHEW HORST PC

/s *Jesse Merrithew*
Jesse Merrithew OSB # 074564
jesse@lmhlegal.com

Page 7

**ER - 85**

610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

*Counsel for Plaintiffs Metropolitan Public Defender,
Jarrod Bowman, and Joshawn Douglas-Simpson*

DISABILITY RIGHTS OREGON

/s *Emily Cooper*
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Tel:    (503) 243 2081
FAX:  (503) 243 1738

*Counsel for Plaintiff Disability Rights Oregon*

Page 8

Keith M. Garza, OSB No. 940773
Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges Matthew
Donohue, Jonathan Hill, and Nan Waller

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | ) ) ) ) | Case No. 3:02-cv-00339-MO (Lead Case) Case No. 3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | *AMICI* JUDGES' RESPONSE TO PETITION FOR EXPEDITED RULING |
| DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | ) ) ) ) ) ) ) | ON SUPREMACY CLAUSE ISSUE |
| Defendants. | ) ) | |
| JAROD BOWMAN and JOSHAWN DOUGLAS-SIMPSON, | ) ) ) ) | Case No. 3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |

Page 1 – *AMICI* JUDGES' RESPONSE TO PEITITON FOR EXPEDITED RULING ON
SUPREMACY CLAUSE ISSUE

DOLORES MATTEUCCI, Superintendent )
of the Oregon State Hospital, in her )
individual and official capacity, and DAVID )
BADEN, Director of the Oregon Health )
Authority, in his official capacity, and )
PATRICK ALLEN, in his individual )
capacity, )
)
Defendants. )

## INTRODUCTION

Pursuant to Paragraph VII of this Court's Second Amended Order to Implement to
Implement Neutral Expert's Recommendations (Second Amended Order) (Dkt. 416 at 7), *amici*
state court judges respond as follows to OSH's February 15 petition for an expedited Supremacy
Clause ruling (Dkt. 460).

## DISCUSSION

*Amici* judges take no position on the merits of OSH's petition.

That said, the underlying circumstances are all too familiar and unfortunately emblematic
of the often difficult decisions Oregon trial judges have been required to make when attempting
to balance—as state law requires them to do—the interests of defendants, victims, the public,
and the justice system in the aid and assist context (*e.g.*, ORS 161.370; ORS 135.239) while also
complying with the Second Amended Order.  Simply stated, by any measure other than
throughput, the order is not working well.  With the individual and systemic costs reaching a
breaking point, and in light of the extension of the order through at least the end of 2024 and an
apparent focus of the Oregon Legislative Assembly on the 2025 session, the judges ask this
Court to once again refer the parties and *amici* to mediation with Judge Beckerman to determine

Page 2 – *AMICI* JUDGES' RESPONSE TO PEITITON FOR EXPEDITED RULING ON
SUPREMACY CLAUSE ISSUE

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

if additional modifications (as with the violent felony and discharge planning extensions from before) could both lessen the impact of the order on all those involved and, at the same time, permit defendants to remain in compliance with their constitutional obligations while the order remains in effect.

Setting aside the daily experiences of judges across Oregon who effectively are unable to exercise meaningful discretion in many of their post-OSH discharge matters and are left merely to hope that unthinkable outcomes will not ensue, the *amici* judges ask the Court to consider the following considerations animating their request:

- Litigants do not appear to have abused either of the "safety valves" negotiated during the prior mediation (*see* Neutral Expert Eighth Report at 15 (noting only seven violent felony and 11 discharge planning extensions over three-month period)).

- As defendants acknowledge, OSH has become demonstrably less successful not only in its ability to restore defendants to competency (from 56.9% (2021 data) to only 39.4% (September 2022 through October 2023)) but to make any type of conclusive determination (2.7% reduction in never-able and 1.1% reduction in med-never-able findings) – today, more than half of OSH-admitted defendants (52.6%) are discharged prior to reaching a dischargeable finding (*see id*. at 15-16).[1]

---

[1] *See also id*. at 19 (noting Oregon Judicial Department comparisons of data from September 2021 through August 2022 and September 2022 through August 2023 showed that "[t]he number of defendants with commitment terminated without regaining fitness more than doubled (from 334 to 695)[.])"

Page 3 – *AMICI* JUDGES' RESPONSE TO PEITITON FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

- Oregon Judicial Department data comparisons from the year before the Court's initial remedial order (September 2022) and the year thereafter revealed a marked increase in recidivism by discharged defendants: "The number of new felony cases filed within six months of a defendant's commitment being terminated increased 15%" while the number of new misdemeanor cases increased by **46%**. (*See id*. at 19.)

- Or, as Dr. Pinals opined in mid-December:

"It appears that fewer people are being restored in the hospital, and people are silting up in the community restoration system [for which only a maddening few placements are available for justice-involved individuals in need of high levels of restorative care] from OSH. This has put increasing strain on community systems, and raised concerns for judges, prosecutors and counties, albeit different types of concerns. Although **these are very significant issues**, in my opinion, more time is needed for the system to adjust, rebuild itself after the pandemic, and equilibrate to the Mosman order to understand whether these downstream effects can be improved." (*Id*. at 22 (bracketed text and emphasis added).)

Two months later—with no visible movement toward equilibrium and downstream effects at flood stage, the judges believe that renewed mediation efforts not only are warranted but, as before, both necessary and likely to produce suggestions for additional amendments that

//

//

//

//

//

//

Page 4 – *AMICI* JUDGES' RESPONSE TO PEITITON FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE

will make the Court's continued exercise of active federal jurisdiction more effective in balancing individual needs, public safety, and victims' rights.

Respectfully submitted February 22, 2024.

_____/s/ Keith M. Garza_____

Keith M. Garza, OSB No. 940773

Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges

Page 5 – *AMICI* JUDGES' RESPONSE TO PEITITON FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE

Erin K. Olson, OSB 934776
Law Office of Erin Olson, P.C.
1631 N.E. Broadway Street #816
Portland, OR  97232-1425
Telephone:  (503) 546-3150
Email:  eolson@erinolsonlaw.com

Rosemary W. Brewer, OSB 110093
Oregon Crime Victims Law Center
7412 SW Beaverton Hillsdale Hwy Ste 209
Portland OR  97225
Telephone:  (503) 208-8160
Email:  rosemary@ocvlc.org
*Attorneys for Proposed Intervenors*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDERS INCORPORATED, and A.J. MADISON, | Case No.:  3:20-cv-00339-MO (Lead) Case No.:  3:21-cv-01637-MO (Member) |
| Plaintiffs, | |
| vs. | **DECLARATION OF ERIN K. OSLON IN SUPPORT OF MOTION TO INTERVENE** |
| PATRICK ALLEN, in his official capacity as Director of Oregon Health Authority, DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants, | |
| and | |
| LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH, LEGACY HEALTH SYSTEM, | |

PEACEHEALTH, and PROVIDENCE
HEALTH & SERVICES – OREGON,

Intervenors.

I, Erin K. Olson, make this declaration subject to penalty of perjury:

1.      I am one of the attorneys representing Laurie Miller, Andrew Limbeck,
and Ashley Rochelle in this matter and in Marion County Circuit Court Case No.
23CR28431, *State of Oregon v. Charly Velasquez-Sanchez.*

2.      I have reviewed the publicly-available criminal history of Charly
Velasquez-Sanchez ("the defendant"), a listing of which is attached as Exhibit 1.
The factual predicates alleged in each of those cases, which wereas obtained from
publicly-filed documents, is as follows:

A.  Case No. 19CR17968:

(1) Incident 1:  On February 17, 2019, the defendant was involved in a
motor vehicle accident involving another vehicle, and failed to remain
at the scene to exchange information.  He was charged with the Class
A misdemeanor of Failure to Perform the Duties of a Driver when
Property is Damaged.

(2) Incident 2:  On July 4, 2019, while on release for Incident 1, the
defendant ran into a gate at the Marion County Jail, causing extensive
damage, and left the scene even after being directed to stay by a jail
employee.  The District Attorney Information for the February 17,
2019, incident was amended to add a charge of a Class A misdemeanor

of Failure to Perform the Duties of a Driver when Property is
Damaged, and a warrant was issued to show cause why the
defendant's release should not be revoked.

(3) Incident 3: On August 5, 2019, at 9:50 pm, an Oregon State Police
trooper requested assistance locating the defendant's vehicle after the
vehicle had eluded the trooper. Keizer Police located the vehicle a
short time later, operated by the defendant, and attempted to detain it.
The defendant took off in the vehicle, driving erratically and without
his lights on to his home with police in pursuit. He was arrested
outside his home, with numerous empty beer bottles in his car. He
refused a breath test, and was arrested and eventually indicted on the
charges for the first two incidents, as well as Felony Fleeing or
Attempting to Elude a Police Officer, Driving Under the Influence of
Intoxicants, Reckless Driving, and Interfering with a Peace Officer.

B. Case No. 19CR56085: On August 25, 2019, the defendant was arrested for
Menacing two Keizer Police officers and Interfering with a Police Officer,
all Class A misdemeanors.

C. Case No. 19CR68880: On October 20, 2019, the defendant was arrested
for Attempted Assault in the Fourth Degree, perpetrated against his
brother. He was detained in custody, then released for an out of custody
aid and assist evaluation, then ordered into custody to be transported to
the Oregon State Hospital on February 7, 2020.

D. Case No. 20CR08901:  On February 8, 2020, the defendant was arrested for Assaulting a Public Safety Officer for an assault on a Marion County Sheriff's Deputy.  He was transported to the Oregon State Hospital, and after three months of restorative treatment, he was found fit to proceed. Upon his return to Marion County, he entered into a global plea agreement on May 12, 2020.

E. Case No. 21CR46350:  On September 22, 2021, the defendant was arrested for assaulting his brother and pushing his mother in the presence of his six year-old niece.  He was charged with Assault IV and Harassment, evaluated for fitness to proceed, and sent to the Oregon State Hospital for treatment.  He was found fit to proceed four months later, and upon his return to Marion County, entered a plea in February 2022.

F. Case No. 22CR35776:  On June 9, 2022, the defendant was arrested in a city park where he "cause alarm and placed several people in fear when he * * * was cussing, throwing an axe, and pointing at adults and children while holding the axe."  He was again found unfit to proceed, and was treated at the Oregon State Hospital until he was found fit to proceed four months later in November of 2022.

G. Case No. 23C28431:  On June 20, 2023, the defendant was arrested after assaulting three school employees on an elementary school playground. The accompanying declarations of Laurie Miller, Ashley Rochelle, and

Andrew Limbeck describe this incident.  The defendant was found unfit to proceed on July 12, 2023, and sent to the Oregon State Hospital for treatment.  He was discharged in January 2024, after six months of treatment that reportedly did not restore his fitness to proceed.

**I declare under penalty of perjury under the laws of the United States of America and the State of Oregon that the foregoing is true and correct.**

Dated:  February 21, 2024.

_____

Erin K. Olson, OSB 934776

# Criminal, Traffic and Parking Case Records Search Results

Skip to Main Content Logout My Account Search Menu Search Criminal, Traffic and Parking Case Records Refine Search     Location : All Locations    Help

**Record Count:** 7
**Search By:** Defendant   **Exact Name:** on   **Party Search Mode:** Name   **Last Name:** velasquez*   **First Name:** Charly   **All** All   **Sort By:** Filed Date

| Case Number | Citation Number | Defendant Info | Filed/Location | Type/Status | Charge(s) |
|---|---|---|---|---|---|
| 19CR17968 | | Velasquez-Sanchez, Charly 1996 | 03/15/2019 Marion | Offense Felony Closed | Failure to Perform Duties of Driver- Property Damage Failure to Perform Duties of Driver- Property Damage Fleeing or Attempting to Elude a Police Officer Driving Under the Influence of Intoxicants Refusal to Take a Test for Intoxicants Interfering w/ Peace/ Parole and Probation Officer Reckless Driving |
| 19CR56085 | | Velasquez-Sanchez, Charley Josh 1996 | 08/26/2019 Marion | Offense Misdemeanor Closed | Menacing Menacing Interfering w/ Peace/ Parole and Probation Officer |
| 19CR68880 | | Velasquez-Sanchez, Charly Josh 1996 | 10/21/2019 Marion | Offense Misdemeanor Closed | Attempt to Commit a Class A Misdemeanor |
| 20CR08901 | | Velasquez-Sanchez, Charly Josh 1996 | 02/10/2020 Marion | Offense Felony Pending Fitness to Proceed | Assaulting a Public Safety Officer |
| 21CR46350 | | Velasquez-Sanchez, Charly Josh 1996 | 09/23/2021 Marion | Offense Felony Pending Fitness to Proceed | Assault in the Fourth Degree Harassment |
| 22CR35776 | | Velasquez-Sanchez, Charly Josh 1996 | 07/26/2022 Marion | Offense Misdemeanor Pending Fitness to Proceed | Disorderly Conduct in the Second Degree |
| 23CR28431 | | Velasquez-Sanchez, Charly Josh 1996 | 06/15/2023 Marion | Offense Felony Pending Fitness to Proceed | Assault in the Fourth Degree Assault in the Fourth Degree Assault in the Fourth Degree Criminal Trespass in the Second Degree |

**ER - 97**

ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT #054725
SHEILA H. POTTER #993485
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Carla.A.Scott@doj.state.or.us
        Sheila.Potter@doj.state.or.us
        Craig.M.Johnson@doj.state.or.us

Attorneys for Defendants David Baden and Dolores Matteucci

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br>        Plaintiffs, <br><br>      v. <br><br> DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, <br><br>        Defendants. | Case No. 3:02-cv-00339-MO (Lead Case) <br> Case No. 3:21-cv-01637-MO (Member Case) <br><br> PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE |
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, <br><br>        Plaintiffs, <br><br>      v. <br><br> DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, David Baden, Director of the Oregon Health Authority, in his official | Case No. 3:21-cv-01637-MO |

Page 1 -   PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE
CAS/a3m/953738480

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 Fax (971) 673-5000

ER-98

capacity, and PATRICK ALLEN in his
individual capacity,

        Defendants,

## I.    Introduction

The Oregon State Hospital (OSH) seeks this Court's assistance in resolving a
Supremacy Clause issue arising from a recent order by the Marion County Circuit Court.
Marion County Judge Audrey Broyles entered an order in a criminal case, calling for a
criminal defendant to be transported to OSH for weekly "outpatient" restoration services,
following his discharge from OSH after six months of in-patient restoration services failed to
restore him to competency.  OSH understands that the Marion County Circuit Court's order
conflicts with orders issued by this Court and thus invoked the mediation process provided
for by section VII of this Court's September 2022 Order, as amended in its July 2023 Order
(the Federal Court Order).  Judge Stacie Beckerman mediated the Supremacy Clause issue
with OSH counsel, the parties in the criminal case, and counsel for the victims. Mediation
was unsuccessful. OSH now requests this Court's assistance in resolving the Supremacy
Clause issue.

## II.    Analysis of the Supremacy Clause Issue

Section II of the Federal Court Order provides: "OSH shall not admit patients except
as provided for by the recommendations in the Neutral Expert's Reports or as otherwise
provided by this Court."  On February 9, 2024, Marion County Circuit Court Judge Audrey
Broyles held a hearing regarding whether community restoration was appropriate for a
defendant who had been discharged from OSH to Marion County pursuant to the Federal
Court Order after receiving restoration services at OSH for six months.  Declaration of Craig
Johnson (Johnson Decl.), Ex. 1.[1]  This defendant's underlying charges include three counts
of felony Assault 4 and one count of Criminal Trespass in the Second Degree, as well as

---

[1] This declaration is filed under seal pursuant to the Health Insurance Portability and
Accountability Act (HIPAA).

Page 2 -   PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE
      CAS/a3m/953738480

probation violations for person offenses. *Id.* The Marion County District Attorney's Office did not seek an extension of this defendant's length of restoration through any of the avenues provided for in the Federal Court Order. *Id.* ¶ 2.

On February 9, following the hearing, Judge Broyles issued an order, submitted by the Marion County District Attorney's Office, finding that this defendant is a public safety risk and unable to engage in community restoration. *Id.* Instead, Judge Broyles ordered the Marion County Sheriff's Office to transport the defendant every Friday at 10 a.m. on a weekly basis to OSH for "outpatient" restoration services, starting Friday, February 16, 2024, "where custody will transfer for purposes of restoration services until such time as the defendant completes restoration services on that same day." *Id.*

OSH understands, after consultation with the Neutral Expert (Dr. Debra Pinals), that neither this Court's orders nor Dr. Pinals' recommendations contemplate or permit outpatient treatment at OSH for a defendant who has spent the permissible duration of inpatient restoration at OSH under the Federal Court Order. Pursuant to the Supremacy Clause, OSH believes it is precluded from complying with Judge Broyle's order.

Page 3 -   PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE
CAS/a3m/953738480

### III.    Conclusion

In light of February 16, 2024, deadline imposed by Judge Broyles' February 9 order, OSH asks for expedited clarification from this Court whether complying with that order would conflict with the Federal Court Order.

DATED February 15, 2024.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

_s/ Carla A. Scott_
CARLA A. SCOTT #054725
Senior Assistant Attorney General
SHEILA H. POTTER #993485
Chief Trial Counsel
CRAIG M. JOHNSON #080902
Senior Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.state.or.us
Sheila.Potter@doj.state.or.us
Craig.M.Johnson@doj.state.or.us
Of Attorneys for Defendants

Page 4 -    PETITION FOR EXPEDITED RULING ON SUPREMACY CLAUSE ISSUE
CAS/a3m/953738480

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

ER - 101

JANE E. VETTO, OSB 914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court Street N.E.
P.O. Box 14500
Salem, OR 97309
Telephone No.: (503) 588-5220
Facsimile No.: (503) 373-4367
Attorney for Marion County

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | 3:02-cv-00339-MO |
| *Plaintiffs*, | **NOTICE OF APPEAL** |
| v. | |
| DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital | |
| *Defendants*. | |

Notice is given that Marion County hereby appeals to the United States Court of Appeals for the Ninth Circuit from the order denying its motion to intervene (ECF No. 415) entered in this matter on June 29, 2023. Attached to this notice is the representation statement required by Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Rule 3-2.

**ER - 102**

Dated this 27th day of July , 2023

Respectfully submitted,

JANE E. VETTO
MARION COUNTY LEGAL COUNSEL


/s/Jane Vetto
Jane E. Vetto, OSB #914564
Marion County Legal Counsel
Attorney for Defendants Marion County

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form:* [*http://www.ca9.uscourts.gov/forms/form06instructions.pdf*](http://www.ca9.uscourts.gov/forms/form06instructions.pdf)

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Marion County

Name(s) of counsel (if any):

Jane E. Vetto

Address: | 555 Court St. NE, Ste. 5242 Salem, OR 97301

Telephone number(s): | (503) 588-5220

Email(s): | jvetto@co.marion.or.us

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes   ◯ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Disability Rights Oregon

Name(s) of counsel (if any):

Emily Cooper
Thomas Stenson

Address: | 511 SW 10th Ave., Ste. 200 Portland, OR 97205

Telephone number(s): | (503) 243-2081

Email(s): | ecooper@droregon.org, tstenson@droregon.org

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at* [*forms@ca9.uscourts.gov*](mailto:forms@ca9.uscourts.gov)

**Form 6**                          ER - 104                          *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

## **Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?  ○ Yes  ○ No

## **Appellees**

Name(s) of party/parties:

Metropolitan Public Defender
A. J. Madison

Name(s) of counsel (if any):

Jesse Merrithew

Address: 610 SW Alder St., Ste. 415 Portland, OR 97205

Telephone number(s): (971) 229-1241

Email(s): jesse@lmhlegal.com

Name(s) of party/parties:

Patrick Allen
Dolores Matteucci

Name(s) of counsel (if any):

Sheila Potter, Carla Scott, Craig Johnson

Address: 100 SW Market St. Portland, OR 97201

Telephone number(s): (971) 673-1880, (503) 947-4700

Email(s): sheila.potter/carla.a.scott/craig.m.johnson@doj.state.or.us

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                ER 2 105                          *New 12/01/2018*

ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT  #054725
SHEILA H. POTTER #993485
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.state.or.us
           Sheila.Potter@doj.state.or.us
           Craig.M.Johnson@doj.state.or.us

Attorneys for Defendants David Baden and Dolores Matteucci


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, <br><br> Defendants. | Case No.  3:02-cv-00339-MO (Lead Case) <br> Case No.  3:21-cv-01637-MO (Member Case) <br><br> NOTICE OF SUBSTITUTION OF THE OFFICIAL CAPACITY OHA DIRECTOR DEFENDANT |
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, <br><br> Plaintiffs, <br><br> v. <br><br> DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, DAVID BADEN, Interim Director of the Oregon Health | Case No.  3:21-cv-01637-MO |

Page 1 -   NOTICE OF SUBSTITUTION OF THE OFFICIAL CAPACITY OHA DIRECTOR
            DEFENDANT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Authority, in his official capacity, and
PATRICK ALLEN in his individual capacity,

    Defendants,

Defendants provide notice that pursuant to FRCP 25(d), Defendant Patrick Allen in his prior official capacity as Director of the Oregon Health Authority (OHA) is automatically substituted with his successor, OHA Interim Director David Baden.

DATED July 14, 2023.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

_s/ Carla A. Scott_
CARLA A. SCOTT #054725
Senior Assistant Attorney General
SHEILA H. POTTER #993485
Deputy Chief Trial Counsel
CRAIG M. JOHNSON #080902
Senior Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.state.or.us
Sheila.Potter@doj.state.or.us
Craig.M.Johnson@doj.state.or.us
Of Attorneys for Defendants

Page 2 -    NOTICE OF SUBSTITUTION OF THE OFFICIAL CAPACITY OHA DIRECTOR
DEFENDANT
CAS/a3m/876210756

**USDC Dkt. No. 415**

06/29/2023

MINUTES of Proceedings: Oral Argument held before Judge Michael W. Mosman on June 29, 2023, on Marion County's Motion to Intervene 402 and the various Motions regarding the Amended Remedial Order. See 411 , 382 , 367 , and related filings. For the reasons stated on the record, Marion County's Motion to Intervene 402 is DENIED. The Unopposed Motion for the Further Remedial Order 411 , which incorporates the agreed-upon changes, is GRANTED. Defendants' Unopposed Motion to Amend the Remedial Order 367 is likewise GRANTED. Plaintiffs' prior Motion to Amend the Remedial Order 382 is DENIED AS MOOT. Formal Amended Remedial Order to follow. As discussed, any comments on the previously circulated court draft of the Amended Remedial Order are due by 5:00PM on June 30, 2023. Associated Cases: 3:02-cv-00339-MO, 3:21-cv-01637-MO (kms) (Entered: 06/29/2023)

JANE E. VETTO, OSB #914564
Marion County Legal Counsel
*jvetto@co.marion.or.us*
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
Facsimile No.: (503) 373-4367
Attorney for County of Marion

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br> *Plaintiffs*, <br><br> v. <br><br> DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital <br><br> *Defendants*, <br><br> and <br><br> LEGACY EMANUEL HOSPITAL & HEALTH CENTER *d/b/a* UNITY CENTER FOR BEHAVIORAL HEALTH LEGACY HEALTH SYSTEM, PEACEHEALTH, and PROVIDENCE HEALTH & SERVICES, <br><br> *Intervenors*. | Case No. 3:02-cv-00339-MO (Lead Case) <br> Case No. 3:21-cv-01637-MO (Member Case) <br> Case No. 6:22-cv-01460-MO (Member Case) <br><br> **DECLARATION OF RYAN MATTHEWS** <br><br> **in Support of Marion County's Motion to Intervene** |

Page 1 - **DECLARATION OF RYAN MATTHEWS**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

ER - 109

| | |
|---|---|
| JAROD BOWMAN and<br>JOSHAWN DOUGLAS- SIMPSON, | 3:21-CV-01637-MO (Member Case) |
| *Plaintiffs,* | |
| v. | |
| DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, DAVID BADEN, Director of the Oregon Health Authority, in his official capacity, and PATRICK ALLEN in his individual capacity, | |
| *Defendants,* | |
| and | |
| LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH LEGACY HEALTH SYSTEM, PEACEHEALTH, and PROVIDENCE HEALTH & SERVICES, | |
| *Intervenors.* | |
| LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH; LEGACY HEALTH SYSTEM; PEACEHEALTH; and PROVIDENCE HEALTH & SERVICES OREGON, | 6:22-cv-01460-MO (Member Case) |
| *Plaintiffs,* | |
| v. | |
| DAVID BADEN, in his official capacity as Director of Oregon Health Authority, | |
| *Defendant.* | |

I, Ryan Matthews, under penalty of perjury declare that the following is true and based upon my personal knowledge:

1.      I am employed with Marion County Health and Human Services as the Health Administrator and have served in this capacity at all times relevant to this litigation.

2.      I have served with Marion County Health and Human Services since 2004.

Page 2 - **DECLARATION OF RYAN MATTHEWS**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 110**

3.      I make this declaration from a combination of personal knowledge and my review of records and oversight of Marion County Health and Human Services.

4.      This declaration is offered in support of Marion County's Motion to Intervene.

5.      Since this Court's September 1, 2022, order limiting the duration of inpatient restoration at the Oregon State Hospital ("Mosman Order") came into effect, Marion County's community restoration programs have experienced an unprecedented surge in cases.  As of the time of writing, our community restoration case load has approximately tripled and future projections suggest that this number will only continue to grow.

6.      This sudden increase in cases has stressed Marion County's community restoration program nearly to its breaking point.

7.      Prior to the implementation of the Mosman Order, Marion County was already experiencing the effects of a system-wide shortage of behavioral health staff.  In the time since, hiring and retaining qualified mental health providers to support outpatient treatment has not become any easier.  As a result, Marion County remains severely understaffed relative to the demand for community restoration services and is unable to provide the care necessary for all individuals in need.

8.      Prior to the implementation of the Mosman Order, there was also already an extreme shortage of Secure Residential Treatment Facility ("SRTF") beds that has not improved in the months since.  This shortage severely limits Marion County's ability to place individuals who require residential care to regain fitness to proceed into an appropriate facility.  SRTF facilities are frequently so full that they will not even accept referrals for their waitlists.

9.      In some cases, Marion County's community restoration program also lacks the resources necessary to even provide individuals with appropriate medication.  Because

Page 3 - **DECLARATION OF RYAN MATTHEWS**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97301
Telephone: 503-588-5220 | Fax: 503-373-4367

ER - 111

individuals discharged from the Oregon State Hospital ("OSH") have not yet reached a point of even relative stability, prescribers in the community are often unwilling to administer injectable medications due to liability concerns and jails are often unable to administer such medications because staff lack the appropriate training. The end result is that some individuals on community restoration simply receive no treatment to regain fitness to proceed.

10. The current status quo constitutes a significant public safety issue. Many of the individuals returned to Marion County from OSH have been charged with violent crimes and would have previously remained on secure commitment prior to the Mosman Order. While on community restoration, Marion County has no means of preventing them from leaving services. As a result, 10 individuals already have simply left their placements into the community without receiving stabilizing treatment.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED this  30  day of  May , 2023.


Ryan Matthews
Health Administrator
Marion County Department of Health and
Human Services


Page 4 - **DECLARATION OF RYAN MATTHEWS**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 112**

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing DELCARATION OF XXXXXXX on:

*****
*****

By the following indicated method or methods:

___     By electronic means through the Court's Case Management/Electronic Case File system on the date set forth below;

X_     By mailing a full, true, and correct copy thereof in a sealed, first-class postage-prepaid envelope, addressed to the attorney's last known office address listed above and causing it to be deposited in the U.S. mail at Salem, Oregon on the date set forth below;

___     By electronic means to the attorney's last-known e-mail address listed on the Oregon State Bar Online Membership Directory on the date set forth below;

___     By causing a copy thereof to be hand-delivered to said attorney at each attorney's last-known office address listed above on the date set forth below;

DATED this ___ day of _____, 2022.

Jane Vetto, OSB #914564
Of Attorneys for Marion County
555 Court St. N.E., Suite 5242
P.O. Box 14500
Salem, Oregon  97309
Telephone:  (503) 588-5220
Fax:  (503) 373-4367
E-mail: kemurphy@co.marion.or.us

Page 5 - **DECLARATION OF RYAN MATTHEWS**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 113**

JANE E. VETTO, OSB 914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court Street N.E.
P.O. Box 14500
Salem, OR 97309
Telephone No.: (503) 588-5220
Facsimile No.: (503) 373-4367
Attorney for Marion County

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON,<br><br>     *Plaintiffs,*<br><br> v.<br><br>DAVID BADEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital<br><br>     *Defendants.* | 3:02-cv-00339-MO (Lead Case)<br>3:21-cv-01637-MO (Member Case)<br><br>**MARION COUNTY'S MOTION TO INTERVENE**<br><br>*Oral Argument Requested* |
| JAROD BOWMAN and JOSHAWN DOUGLAS-SIMPSON,<br><br>     *Plaintiffs,*<br><br> v.<br><br>DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, DAVID BADEN, Director of the Oregon Health Authority, in his official capacity, and PATRICK ALLEN in his individual capacity,<br><br>     *Defendants.* | 3:21-CV-01637-MO (Member Case) |

Page **1** of **14 - MOTION TO INTERVENE**
Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 114**

## LR 7-1 CERTIFICATION

Pursuant to the requirements of LR 7-1, Marion County ("the County") hereby certifies that it conferred with all parties prior to filing this motion. Plaintiffs and Defendants both stated that they object to the motion.

## MOTION

Marion County ("the County") hereby moves this Court for an order to intervene in the above-captioned matter pursuant to Federal Rule of Civil Procedure ("FRCP") 24(a) or, in the alternative, FRCP 24(b). This motion is supported by the following memorandum of law and the County respectfully requests that oral argument be heard on the motion.

## MEMORANDUM OF LAW

### I. Introduction

Since August of 2022, the County has participated in this matter solely in the capacity of *amicus* of the Court. Although the County expected at the time of joining that this Court's September 1, 2022, order ("Mosman Order") would have a significant impact on many of its programs and services, it sought only to participate as an *amicus* because those impacts had not yet happened and were expected to be indirect—that is, the Mosman Order did not specifically apply to the County or prescribe anything that staff and employees needed to do. However, over the following months, the County began to experience just how catastrophic even the indirect effects of something as significant as the Mosman Order can be. In the short time since the order's issuance, the County's community restoration caseloads have tripled while placement options have only become scarcer. Declaration of Ryan Matthews ("Matthews Dec.") ¶ 5, 7. Many adverse impacts have also come to pass regarding community restoration as a vehicle for delivery of care necessary for those that the County has been court ordered to treat. Because

Page **2** of **14** - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 115**

many of the individuals discharged under the Mosman Order to community restoration are not yet stabilized, community providers are often incapable of administering medications to them that are necessary to regain their fitness to proceed. *Id.* ¶ 9. As a result—still unstable—several individuals charged with violent offenses have simply chosen to leave restoration services and wander off into the community. *Id.* This situation represents nothing short of a public health and safety crisis—one that the State of Oregon has specific state statutory and constitutional obligations to address.

Additionally, in the time since joining as an *amicus*, the County's own rights have been drawn squarely into this case's orbit. On March 22, 2023, Plaintiffs filed a motion seeking an order requiring the Marion County Sheriff's Office to transport individuals back from the Oregon State Hospital ("OSH") following the expiration of their commitment periods. Pls.' Mot. for Order Requiring Marion County to Transport Patients (ECF No. 359). Although this Court denied that motion after oral argument on March 31, 2023, it requested that the parties and *amici* submit amended language filling the "gap" in the Mosman Order regarding transport. Minute Order, Apr. 3, 2023 (ECF No. 368). During argument, the Court stated that it was "willing to do the most pragmatic thing" by ordering the county sheriff to be the one to conduct transport but asked the parties and *amici* to first submit briefing regarding any legal barriers to doing so. Transcript of Oral Argument, March 31, 2023 ("Tr.") at 25.

Several weeks later, Plaintiffs filed a proposed amended order requiring county sheriffs to conduct transport but did not submit any briefing addressing the legal basis for why such an order is appropriate. Mot. for Order Amending Sept. Order (ECF No. 382). At the same time, the County—a non-party—filed its own briefing restating its objections to an order that would require county sheriffs to conduct transport but also providing language addressing the "gap" as

Page **3** of **14 - MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 116**

requested.  Proposed Am. Order (ECF No. 383); Mem. in Support of Proposed Am. Order (ECF

No. 384).  The Court has scheduled oral argument on Plaintiffs' and the County's filings for June

29, 2022.  Were this Court to adopt an amendment requiring county sheriffs to conduct transport,

it would represent a sea change for this case.  Rather than experiencing only the indirect effects

of this Court's decisions, the County's rights and responsibilities going forward could be directly

at issue because it would be bound by the order.

    As a result of the developments on both of these fronts, the County now seeks to

intervene in this case to obtain redress for several harms—being required to unlawfully hold

individuals in the jail, the State's issuance of an unfunded mandate and failure to otherwise

provide support for the increased workload that community restoration programs are

experiencing, and the inadequate treatment being provided to individuals on community

restoration who still require a hospital-level of care.  These issues and the fact that the County's

rights may now be directly implicated in this litigation mean that the County should be entitled to

the same rights and protections afforded to parties, including the ability to raise new issues, *see*

*California v. United States DOI*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019) ("Amicus participation

goes beyond its proper role if the submission is used to present wholly new issues not raised by

the parties.") (internal quotation marks omitted), the ability to respond to motions as a matter of

right, *see* LR 7-1(e)(1) (permitting only parties 14 days to respond to motions), the right to

receive a copy of filed documents and to be conferred with prior to motions filings, *see* FRCP

5(a)(1) (providing that service is only required on "every party"); LR 7-1(a) (requiring conferral

with only parties prior to filing); and the right to seek appellate review.  *See United States v. City*

*of L.A.*, 288 F.3d 391, 400 (9th Cir. 2002) (noting that *amicus* status "gives . . . no right of

appeal").  Thus, the County is respectfully requesting that this Court grant its motion to intervene

Page **4** of **14** - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

in this matter.

## II. Legal Standard

FRCP 24(a) and (b) set out two paths to intervention: one mandatory and the other permissive. Under subsection (a), intervention must be allowed as a matter of right when a prospective intervenor

> "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

FRCP 24(a)(2). This standard requires proof of four elements:

> "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action."

*Cooper v. Newsom*, 13 F.4th 857, 864 (9th Cir. 2021). In evaluating whether these requirements are met, courts construe Rule 24(a)(2) "broadly in favor of proposed intervenors." *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (citations omitted). This is because "[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *City of L.A.*, 288 F.3d at 397-98.

By contrast, under subsection (b) of FRCP 24 a court has discretion to permit an intervention when the prospective intervenor "has a claim or defense that shares with the main action a common question of law or fact." This standard requires proof of three elements:

> "(1) [the applicant] shares a common question of law or fact with the main action; (2) [the] motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims."

*Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998). If a prospective intervenor establishes all three, the district court must then decide whether to exercise its discretion. *Id.* That decision

Page **5** of 14 - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 118**

is based on "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FRCP 24(b)(3).

### III.  Analysis

The County's case for intervention is straightforward.  Because the County is responsible for providing care and other resources to both individuals left sitting in jail while awaiting transport to OSH and to individuals discharged from the state hospital to indefinite community restoration without a determination on fitness to proceed, the County's rights are squarely implicated here.  Moreover, because the various amendments proposed by the parties and *amici* all involve directly ordering county sheriffs to transport individuals to and from OSH, the County may very well soon be directly ordered to provide support for the Mosman order. Accordingly, intervention is warranted on either a mandatory or permissive basis.

A.  <u>Mandatory Intervention</u>

*i.)*      *The County's motion to intervene is timely.*

In considering whether a motion to intervene pursuant to FRCP 24 is timely, courts consider three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Smith v. Marsh*, 194 F.3d 1045, 1050 (9th Cir. 1999).  In applying these factors, it should first be acknowledged that this case has an unusually long history.  The lead case *Oregon Advocacy Center v. Mink*, No. 3:02-cv-00339-MO, was originally filed back in March of 2002 and resulted in the issuance of a permanent injunction ("*Mink* Injunction") two months later in May requiring transport of individuals to the state hospital within 7 days of being found unable to aid and assist.  *See* Judgment, May 15, 2002 (ECF No. 51).  In that judgment, the court retained jurisdiction over the case in order to enforce the injunction as needed.  *Id.* at 1.  Apart from appellate and other

Page **6** of **14** - **MOTION TO INTERVENE**
Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 119**

ancillary proceedings, the case remained dormant until May of 2019 when Plaintiffs filed a

motion seeking contempt sanctions against Defendants for failing to comply with the *Mink*

Injunction. Mot. for Order to Show Cause for Finding of Contempt (ECF No. 85). That motion

effectively revived the case and eventually resulted in the consultation of Dr. Debra Pinals about

steps that OSH could take to come into compliance. Stipulated Mot. to Appoint Neutral Expert

(ECF No. 238). In turn, Dr. Pinals's recommendations led to issuance of the current version of

the Mosman Order that, among other provisions, imposes maximum limitations on inpatient

restoration at OSH and prohibits most civil commitment patients from being admitted. Mosman

Order (ECF No. 271).

  At this point, this litigation began to impact the County's interests, as reduced capacity at

the state hospital means more individuals on community restoration and greater strain on the

program's limited resources. *See* Matthews Decl. ¶ 6-10. As a result, when the Mosman Order

was originally proposed in August of 2022, the County promptly moved to participate in this

matter as an *amicus* of the Court in order to share its perspective as a Community Mental Health

Program. Mot. to Appear as *Amicus Curiae* (ECF No. 259). At the time of the County's

entrance into the case, the parties' positions had shifted into what was effectively alignment, with

them agreeing on most major aspects of the litigation. *See* Unopposed Mot. for Order to

Implement Neutral Expert's Recommendations (ECF No. 252). As a result, in many ways, the

County (as well as other *amici*) began serving the function of adverse party by arguing against

the implementation of the Mosman Order. *See Amicus* Brief of Marion and Washington

Counties (ECF No. 259-1). In that capacity, the County has participated in all major aspects of

this case, including argument on amendment of the Mosman Order, *see* Minutes, Nov. 21, 2022

(ECF No. 322), and mediation, *see* Amended Scheduling Order (ECF No. 355). The transition

Page **7** of **14 - MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 120**

from *amicus* to de facto party became complete in March of 2023 when Plaintiffs filed a motion

seeking an order requiring the County to provide transport for individuals committed at OSH

back to the County jail following discharge.  Pls.' Mot. for Order Requiring Marion County to

Transport Patients (ECF No. 359).  Although the Court denied the motion, it indicated that it was

inclined to amend the Mosman order to fill the "gap" regarding transport, Tr. at 25, and at this

point all proposals submitted include language ordering county sheriffs to be the entity that

transports individuals back from OSH following discharge.  *See* Mot. for Order Amending

September Order (ECF No. 382) (filed by Plaintiff Metropolitan Public Defenders); Proposed

Order (ECF No. 383) (filed by the County)

     This recounting of the case's history serves three crucial functions.  First, it highlights the

fact that, although the County's motion to intervene comes at what would be considered a "late"

stage in a conventional case, this case is far from conventional.  Second, it shows that, although

the County has not been a direct party to this case, once it began to suspect that its interests

would be impacted by the Mosman Order, the County promptly began seeking to participate in

the case as an *amicus* and has actively shared its position with the parties both in briefing and

throughout court ordered mediation.  Finally, the history reflects that, in spite of being labeled as

only an *amicus*, the County has essentially served as a party to this litigation since August of

2022, including in the sense that it may be directly ordered to engage in a particular course of

conduct as part of the soon-to-be amended Mosman Order.

     Against that backdrop, it is clear that the County's motion is timely.  The contempt

proceedings initiated in 2019 in effect constituted the beginning of a brand-new case about an

entirely separate issue, the resolution of which is still ongoing.  Furthermore, the County's

entrance into the case at this phase is not likely to result in any prejudice to the parties.  The

Page **8** of 14 - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 121**

County has freely shared its position from the earliest possible opportunity after its interests were impacted, meaning that the parties have had notice of its opposition to the current order. Moreover, because the County has been serving as a de facto adverse party for approximately the past nine months, its entrance into the litigation at this point should not be expected to raise any new or unforeseeable issues for the existing parties. Rather, the County's arguments are what has primarily been at issue in this case for some time.

Lastly, any delay in the filing of the County's motion to intervene is not a basis for a finding of untimeliness. "Delay is measured from the date the proposed intervenor should have been aware that its interests would no longer be protected adequately by the parties." *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996). Here, the County sought to participate in this case immediately upon learning that the parties were in agreement about the implementation of the Mosman Order and would not be adequately protecting its interests. Although its participation was initially as an *amicus* in label, the County was effectively serving the role of adverse party, meaning that there was functionally no delay in the County's efforts to adequately protect its interests. And even if the time from when the County appeared as an *amicus* to the filing of this Motion to Intervene were to be counted as some form of delay, that delay is justified by valid reasons. Because the County as *amicus* served as a functional adverse party and was therefore able to fully defend its interests, there was simply no need to seek formal intervention. Now that the Mosman Order may be amended to directly bind the County, however, *amicus* status does not provide sufficient voice to protect its interests. Rather, the protections provided to parties—including the rights to make and respond to motions, receive copies of filings, and seek appellate review if appropriate—are necessary at the point that the parties in this matter are filing motions seeking orders directly against the County. Accordingly,

Page **9** of **14** - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 122**

this Motion to Intervene is timely and the County has satisfied the first element for Mandatory

Intervention.

        *ii.)*     *The County claims a "significantly protectable" interest that is impacted.*

A prospective intervenor need not have "a specific legal or equitable interest" to satisfy

the mandatory intervention requirement of a "significantly protectable" interest. *Cty. of Fresno*

*v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980). Rather, "[i]t is generally enough that the interest is

protectable under some law, and that there is a relationship between the legally protected interest

and the claims at issue." *Sierra Club v. United States EPA*, 995 F.2d 1478, 1484 (9th Cir. 1993).

Some formulations of the standard set the bar even lower: A prospective intervenor "has a

sufficient interest for intervention purposes if it will suffer a practical impairment of its interests

as a result of the pending litigation." *California ex rel. Lockyer v. United States*, 450 F.3d 436,

441 (9th Cir. 2006).

Here, the County has suffered a significant impairment of its interests as a result of this

litigation. As previously noted, when Defendants fail to provide timely transport to individuals

in the Jail, the County is the one required to pick up the slack and provide resources to support

that individual, as well as bear the associated risks of any liability or other harms inherent in their

confinement. Additionally, the shortened timeframes for inpatient restoration imposed by the

Mosman Order have caused a spike in the number of individuals on community restoration when

commitment to OSH is no longer an option. Matthews Decl. ¶ 5. This sudden increase in

demand for restoration services has stretched Marion County's limited resources to their

breaking point. *Id.* ¶ 6. The County is simply unable to provide adequate staff to deliver

required services and lacks the resources necessary to ensure that all who need it are placed

appropriately and given necessary medications. *Id.* ¶ 8-9. As a result, individuals who are not

Page **10** of 14 - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 123**

yet stabilized are simply leaving services. *Id.* ¶ 10. Because many of these individuals have been charged with violent offenses, this amounts to an extraordinary public safety issue—ten such individuals have already disappeared into the community in Marion County alone. *Id.*

Lastly, the proposed amendments to the Mosman Order may *explicitly* include language ordering county sheriffs to transport individuals back from OSH upon discharge. To the extent the Mosman Order is amended to issue direct orders to the County's staff to engage in a particular course of conduct—particularly one that violates existing state court orders and risks the County having to litigate state contempt proceedings—the County's interests are implicated in this litigation. Accordingly, the County has satisfied the second and third elements for mandatory intervention.

   *iii.)*  *The County's interest is inadequately represented by the current parties.*

The interests of the current parties to this case are in no way aligned with those of the County. As discussed in previous sections, the current parties jointly agreed to the implementation of the Mosman Order, despite the fact that it shifts a significant amount of the burden onto local governments to provide restoration services. For that reason, the County and other *amici* have acted in effect as the adverse party since joining this case nine months ago. Accordingly, the County has satisfied the fourth element for mandatory intervention.

  B. Permissive Intervention

   i)  *The County shares common questions of law or fact with the main action.*

The factual underpinnings of the County's proposed complaint have significant overlap with the issues in play in this litigation already. Count 1 of the County's First Claim for Relief directly mirrors Plaintiffs' underlying claim that Defendants' practice of failing to promptly transport individuals found unable to aid and assist is unconstitutional, just viewed through the

Page **11** of **14** - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

**ER - 124**

lens of the County's interests in maintaining resources and avoiding liability. Similarly, the County's remaining claims are focused on the stresses that OSH's practice of releasing individuals who still require a hospital-level of care pursuant to the Mosman Order places on the County's community restoration programs and on the individuals who participate in them. As a result, principles of judicial economy favor resolving the County's claims along with those already part of this action and the first element of the test for permissive intervention is satisfied.

ii)    *The County's motion to intervene is timely.*

The County's motion to intervene on a permissive basis is timely for the same reasons as described above with respect to mandatory intervention. Accordingly, the second element is also satisfied.

iii)    *The Court has jurisdiction over the County's claims.*

The County's complaint contains two claims: one under 42 U.S.C. § 1983 and another under 28 U.S.C. § 2201. In the case of the § 1983 claim, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. As for the remaining claims under § 2201, in any civil action over which a district court has original jurisdiction over at least one claim, that court also has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367. A claim is part of the same "case or controversy" as another if they both "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Arroyo v. Rosas*, 19 F.4th 1202 (9th Cir. 2021). As noted with respect to the first element, the County's claims all primarily concern OSH's practice of releasing individuals who still require a hospital-level of care—the primary issue in this litigation already. Accordingly, this Court has supplemental jurisdiction over those claims under § 1367

Page **12** of 14 - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

and the third element is satisfied.

> iv)    *Intervention will not significantly delay or prejudice adjudication of the parties'*
> *rights.*

The County's intervention would not delay the case or prejudice other parties for the same reasons that it is timely. Functionally, the County has served as an adverse party in this matter since August of 2022. In that capacity, the parties have been aware of the County's positions for months and this Court has already taken the time to consider its arguments on various matters. Allowing the County to become a party to the case at this point is thus unlikely to result in surprise to any party or any additional delay beyond what would have already happened from the County participating in the capacity of *amicus*. Accordingly, this Court should exercise its discretion and permit intervention.

### IV.  Conclusion

For the reasons stated above, the County is entitled to intervene on a mandatory basis and, in the alternative, should be permitted to intervene on a permissive basis. Accordingly, the County respectfully requests that its motion to intervene be granted.

Dated this 8th day of June, 2023

Respectfully submitted,

JANE E. VETTO
MARION COUNTY LEGAL COUNSEL

Jane E. Vetto, OSB #914564
Marion County Legal Counsel
Attorney for Defendants Marion County

Page **13** of **14** - **MOTION TO INTERVENE**

Marion County Legal Counsel
555 Court Street NE · P.O. Box 14500 · Salem, OR 97309
Telephone: 503-588-5220 | Fax: 503-373-4367

ER - 126

Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB #074564
jesse@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
*Counsel for Plaintiff, Metropolitan Public Defender*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES INC., and A.J. MADISON, | Case No. 3:02-cv-00339-MO (Lead Case) Case No. 3:21-cv-01637-MO (Member Case) Case No. 6:22-cv-01460-MO (Member Case) |
| Plaintiffs, | |
| vs. | PLAINTIFFS' PROPOSED AMENDMENTS TO SEPTEMBER ORDER REGARDING TRANSPORTATION FROM THE STATE HOSPITAL |
| JAMES SCHROEDER, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants, | |
| and | |
| LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH; LEGACY | |

PROPOSED AMENDMENTS - 1
(Case No. 3:02-cv-00339-MO)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

**ER - 127**

HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES,

      Intervenors.

JAROD BOWMAN, JOSHAWN
DOUGLAS-SIMPSON,

      Plaintiffs,

DOLORES MATTEUCCI, Superintendent of
the Oregon State Hospital, in her individual
and official capacity, JAMES SCHROEDER,
Direction of the Oregon Health Authority, in
his official capacity, and PATRICK ALLEN
in his individual capacity,

      Defendants,

    and

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES
OREGON,

      Plaintiffs,

    vs.

JAMES SCHROEDER, in his official
capacity as Director of Oregon Health
Authority,

      Defendant.

Case No. 3:21-cv-01637-MO (Member Case)

Case No. 6:22-cv-01460-MO (Member Case)

PROPOSED AMENDMENTS - 2
(Case No. 3:02-cv-00339-MO)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

## LR 7-1 CERTIFICATION

The parties and amici conferred extensively regarding this proposed language as ordered by the Court and required by LR 7-1. The Defendants do not oppose this language. Amici counties do oppose this language.

## PROPOSED MODIFICATION

Pursuant to the Court's Order of March 31, 2023 (Dkt. No. 368), Plaintiffs submit the following proposed amendment to paragraph (3)(d) (edits underlined):

> Before a patient reaches this maximum duration of commitment for restoration under this Order and remains unfit to proceed, OSH shall notify the committing court of the patient's impending discharge 60 days before the date on which the hospital is required to discharge the patient pursuant to this Order. The Sheriff's Office/Department in the committing jurisdiction shall transport and return the patient to the jail upon notification from OSH that the patient is ready for discharge, except that, where the patient and the committing jurisdiction agree, the Sheriff's Office in the committing jurisdiction will transport the patient to from OSH to another appropriate place. If there is a conflict between this order and the committing jurisdiction, the Supremacy Clause establishes this order takes precedence over any state court order pursuant to Article VI, paragraph 2 of the US Constitution.

And the following amendments to paragraph (3)(f):

> No later than March 15, 2023, patients currently admitted at OSH who have exceeded the length of restoration set forth in this Order shall be discharged from their restoration commitment and from the hospital. The Sheriff's Office/Department in the committing jurisdiction shall transport and return the patient to the jail upon notification from OSH that the patient is ready for discharge except that, where the patient and the committing jurisdiction agree, the Sheriff's Office in the committing jurisdiction will transport the patient to from OSH to another appropriate place. If there is a conflict between this order and the committing jurisdiction, the Supremacy Clause establishes this order takes precedence over any state court order pursuant to Article VI, paragraph 2 of the US Constitution.

Plaintiffs rely upon their original motion to support this requested amendment which lays out why the county sheriffs for all practical purposes are the most appropriate

PROPOSED AMENDMENTS - 3
(Case No. 3:02-cv-00339-MO)

entity to transport patients from the hospital. Their participation is necessary to effectuate the remedial order issued by this Court, which the Court has already found is the least restrictive means of enforcing its injunction.

DATED this 9th day of March, 2023.

LEVI MERRITHEW HORST PC

/s *Jesse Merrithew*
Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092
*Counsel for Plaintiffs Metropolitan Public Defender, Jarrod Bowman, and Joshawn Douglas-Simpson*

DISABILITY RIGHTS OREGON

/s *Emily Cooper*
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Telephone: (503) 243 2081
Facsimile: (503) 243 1738
*Counsel for Plaintiff Disability Rights Oregon*

PROPOSED AMENDMENTS - 4
(Case No. 3:02-cv-00339-MO)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

ER - 130

**USDC Dkt. No. 363**

03/23/2023

ORDER: Any response from Amicus Marion County to Plaintiff's Motion for Order Requiring Marion County Sheriff to Transport Patients 359 is due by March 29, 2023. A hearing regarding Plaintiffs motion is tentatively scheduled for March 31, 2023 at 1:30PM before Judge Michael W. Mosman in Portland Courtroom 16, should the Court consider a hearing necessary. Ordered by Judge Michael W. Mosman.Associated Cases: 3:02-cv-00339-MO, 3:21-cv-01637-MO, 6:22-cv-01460-MO (kms) (Entered: 03/23/2023)

Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB #074564
jesse@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
*Counsel for Plaintiff, Metropolitan Public Defender*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES INC., and A.J. MADISON, | Case No. 3:02-cv-00339-MO (Lead Case) Case No. 3:21-cv-01637-MO (Member Case) Case No. 6:22-cv-01460-MO (Member Case) |
| Plaintiffs, | |
| vs. | MOTION FOR ORDER REQUIRING MARION COUNTY SHERIFF'S OFFICE TO TRANSPORT PATIENTS |
| JAMES SCHROEDER, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants, | |
| and | |
| LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH; LEGACY | |

**ER - 132**

HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES,

        Intervenors.

JAROD BOWMAN, JOSHAWN
DOUGLAS-SIMPSON,

        Plaintiffs,

Case No. 3:21-cv-01637-MO (Member Case)

DOLORES MATTEUCCI, Superintendent of
the Oregon State Hospital, in her individual
and official capacity, JAMES SCHROEDER,
Direction of the Oregon Health Authority, in
his official capacity, and PATRICK ALLEN
in his individual capacity,

        Defendants,

    and

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES
OREGON,

        Plaintiffs,

    vs.

JAMES SCHROEDER, in his official
capacity as Director of Oregon Health
Authority,

        Defendant.

Case No. 6:22-cv-01460-MO (Member Case)

## LR 7-1 CERTIFICATION

Plaintiffs conferred with Defendants regarding the relief sought and Defendants do not

oppose. Plaintiffs also conferred with counsel for Amici Judges (among the amici judges is the

state court judge who issued the orders described herein), and counsel for Marion County Sheriff's Office ("MCSO") (county counsel for Marion County, also an amicus in this matter). Plaintiffs were unable to resolve this dispute with those third parties.

## MOTION

Defendants are in violation of the Court's September 1, 2022 order ("September order") with respect to four patients currently at the Oregon State Hospital ("OSH"). All four patients were required to be discharged from OSH by March 15 at the latest. The commitment orders for each of the patients order that the patient cannot be discharged without authorization of the state court judge who committed them. When OSH attempted to discharge the patients, MCSO refused to transport them, citing the state court judge's order. In addition, the state court judge sent a letter to Defendant Matteucci, informing her that if she discharged the patient, she would be held in contempt in state court. To comply with this Court's September order, Plaintiffs request that the Court order the MCSO to transport the four patients.

## MEMORANDUM OF LAW

This Court has the authority to order non-parties to act in compliance with its orders under Fed. R. Civ. P. 65(d)(2). In relevant part, this rule states, that "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with" the parties listed above are bound by a court's injunction order if they received "actual notice" of the order. Fed. R. Civ. P. 65(d)(2). The Supreme Court has previously interpreted this language to "allow injunctions to bind not only defendants but also people 'identified with them in interest, in "privity" with them, represented by them or subject to their control.'" *Cal. Chamber of Commerce v. Council for Educ. & Rsch. On Toxics*, 29 F.4th 468, 483 (9th Cir. 2022), quoting *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179

(1973); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). The moving party must also demonstrate "by clear and convincing evidence that the alleged contemnor violated a 'specific and definite order of the court.'" *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999), citing *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992).

Here, the MCSO has received actual notice of the order, at the very least they received notice via conferral on this motion. The Court's order is specific and definite: "No later than March 15, 2023, patients currently admitted at OSH who have exceeded the length of restoration set forth in this Order shall be discharged from their restoration commitment and from the hospital." Dkt. No. 271, at 4. MCSO is refusing to allow OSH to discharge these four patients in clear violation of the Court's order. Because the MCSO works in active concert and participation with OSH to effectuate discharges, MCSO is within the scope of this Court's authority under Fed. R. Civ. P. 65(d)(2).

In Oregon, the county sheriffs transport patients who are under ORS 161.370 orders to and from OSH. In this role, then, the county sheriffs are charged with completing the patient discharge process by returning the individuals to their county of origin. This relationship thus makes the county sheriffs integral to OSH's compliance with the September order, as OSH cannot complete their required processes without them. Therefore, because the county sheriffs must work with OSH and vice versa, the county sheriffs are active participants with OSH. This means that MCSO—who was tasked with completing the discharge process pursuant to the September order—should be ordered to comply pursuant to Fed. R. Civ. P. 65(d)(2).

"Rule 65(d) does not empower the Court to enjoin a nonparty." *Swanberg v. Tro*, No. 3:14-cv-00882-HZ, 2016 U.S. Dist. LEXIS 12586, at *7-8 (D. Or. Jan. 31, 2016). This rule does, however, "authorize[] the Court to hold certain nonparties in contempt for violating an existing

order as a way to ensure that a party cannot carry out a prohibited act." *Id.*, citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1280 (9th Cir. 1992); *Peterson v. Highland Music, Inc*., 140 F.3d 1313, 1323 (9th Cir. 1998). In *Peterson,* for example, the court found the non-parties' actions—granting licenses—were a necessary, albeit final, step in the party's prohibited acts. 140 F.3d at 1324. This is because selling a license to the party encouraged them to continue disobeying the court order to return the property and cease business dealings. *Id.* at 1323–24. As such, the Court held that even though this specific conduct had not been prohibited, the non-parties' roles were integral to continuing the party's prohibited conduct. *Id.* at 1324. Thus, the Court found that the non-parties "flagrant[] and deliberate[]" assistance violated the court order and allowed the non-parties to be held in contempt. *Id.* So, too, here. For the reasons stated above, it is undisputed that MCSO is violating the September order and forcing OSH to carry out a prohibited act—namely holding patients past their specified discharge date. And, MSCO's role is integral to continuing the prohibited conduct. Thus, this nonparty should be enjoined.

Furthermore, to the extent the state court orders are contrary to this Court's order, the Supremacy Clause controls, and the state order is preempted. Article VI, paragraph II of the Constitution states that federal laws, including federal court orders, are the "supreme law of the land." In articulating this authority in a federalism question, it has been noted that federal courts should "exercise the least possible power adequate to the end proposed." *Stone*, 968 F.2d at 861, citing *Spallone v. United States*, 493 U.S. 265, 280 (1990); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982).

But, "when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable." *Stone*, 968 F.2d at 861. This is because federal courts must protect constitutional rights, allowing these courts to "possess whatever powers are necessary to remedy

constitutional violations." *Id.*; *see also Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). The Supreme Court has ruled that this responsibility means that "otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Id.* at 862. And, "[s]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees." *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971). Thus, should state and local officials fail to resolve an issue, or actively contribute to said issue, the federal court can "invoke its broad equity power to remedy the situation." *Stone*, 968 F.2d at 861, citing *Hutto*, 437 U.S. at 687 n.9. This power "should begin with what is absolutely necessary[, but if] ineffective, more stringent [remedies] should be considered." *Ruiz v. Estelle*, 679 F.2d 1115, 1145–46 (5th Cir. 1982).

Here, the District Court gave OSH and state authorities years to fix the issue of discharging patients in an untimely manner. State officials failed to rectify the problem repeatedly. So, the District Court issued the September Order to remedy the situation. *Hutto*, 437 U.S. at 688 n.9. Now, local officials are actively impeding the District Court's remedial scheme. In refusing to transport discharged patients—an essential part to completing the OSH discharge process in compliance with the September Order—the Marion County Sheriff's Office undermines the District Court's remedy. *Stone*, 968 F.2d at 861. In fact, the parameters established in the Marion County state court orders make it impossible for OSH to simultaneously comply with it and the September order. Therefore, the state order cannot stand. *North Carolina State Bd. of Educ.*, 402 U.S. at 45. Additionally, because state and local officials are now contributing to the issue rather than resolving it, more stringent requirements should be instated by the Federal court. *Ruiz*, 679 F.2d at 1145-46. It is thus equitable to compel the MCSO to comply with the September order because their refusal to transport OSH patients actively

impedes the federal court's remedial scheme and contributes to the violation of these patients' rights. *North Carolina State Bd. of Educ.*, 402 U.S. at 45.

## CONCLUSION

Pursuant to Fed. R. Civ. P 65(d)(2), the Marion County Sheriff's Office should be compelled to comply with the September order because they are active participants with a named party, they had actual notice of the September order, and they consciously violate this order's terms. Additionally, this Court has broad equity power to resolve constitutional violations when state and local officials fail to do so or actively impede federal remedies. Thus, this court has the authority to contravene the state court orders to the extent they are contrary to this Court's order.

DATED this 22nd day of March, 2023.

<div style="margin-left: 50%;">

DISABILITY RIGHTS OREGON

/s Emily Cooper
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Telephone: (503) 243 2081
Facsimile: (503) 243 1738
*Counsel for Plaintiff DRO*

LEVI MERRITHEW HORST PC

/s Jesse Merrithew
Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092
*Counsel for Plaintiffs MPD, Jarrod Bowman, and Joshawn Douglas-Simpson*

</div>

**ER - 138**

**USDC Dkt. No. 269**

08/29/2022

MINUTES of Proceedings: Hearing held before Judge Michael W. Mosman on Plaintiffs' Amended Supplemental Memorandum 265 in support of Plaintiffs' Unopposed Motion for Order to Implement Neutral Expert's Recommendations 252 held. Washington and Marion Counties' Motion to Appear as Amicus Curiae 259 and District Attorneys for Washington, Clackamas, and Marion Counties' Motion to Appear as Amicus Curiae 267 are GRANTED. Upon consideration of Plaintiffs' Amended Supplemental Memorandum 265 , Defendants' Supplemental Brief 263 , and Washington and Marion Counties' Amicus Brief [259-1] and Rebuttal Brief 266 , the Court GRANTS in full Plaintiffs' Unopposed Motion for Order to Implement Neutral Expert's Recommendations 252 for the reasons stated on the record. Formal order to follow. As discussed on the record, the deadline for Amici to file any brief addressing legal issues is set for September 28, 2022. The deadline for Plaintiffs' and Defendants' response is set for October 11, 2022. The deadline for Amici to file any brief addressing factual issues is set for January 13, 2023. The deadline for Plaintiffs' and Defendants' response is set for February 3, 2023. Emily Cooper, Jesse Merrithew present as counsel for plaintiff(s). Sheila Potter, Carla Scott present as counsel for defendant(s). Billy Williams, Thomas Carr, Jane Vetto present as counsel for amici. Court Reporter: Bonita Shumway. Judge Michael W. Mosman presiding. Associated Cases: 3:02-cv-00339-MO, 3:21-cv-01637-MO. (joha) Modified to add counsel for amici on 8/29/2022 (joha). (Entered: 08/29/2022)

### Debra A. Pinals, M.D.

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Second Report
Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** 6/5/22
**Neutral Expert:** Debra A. Pinals, M.D.

### Background and Context of this Report

On 12/21/21, the Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as a Neutral Expert in granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and Plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulates further that OHA enter into a contract with the Neutral Expert and provide any needed information to her.  Further, the Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert, due 1/31/22, shall include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)."  The Court further ordered a second report by the Neutral Expert, due by 4/29/22 that should include "a short report and recommendations for a proposed long-term compliance plan for OSH."  In conducting the activities needed to form recommendations, I sought and received an extension of the due date of this Second Report.

This report represents the Second Report of the appointed Neutral Expert in this matter.

### Background and Summary of the Two Consolidated Cases

In 2002, Oregon Advocacy Center, now known as Disability Rights Oregon (DRO) filed a civil rights lawsuit against the state of Oregon alleging that the state was failing to timely admit individuals found incompetent to stand trial (Unable to Aid and Assist) who were ordered to Oregon State Hospital (OSH) for competence to stand trial restoration. The ruling out of the Ninth Circuit (*OAC v. Mink*) found on behalf of plaintiffs that the State was out of compliance and must admit these individuals within seven (7) days. In June 2019, after the State had fallen out of compliance, the Court compelled the state to get in compliance with *Mink* within 90 days.  Although the State met its burden at the time, compliance with became challenging once again with the pandemic creating other barriers. The State filed a motion requesting greater latitude in admitting individuals found Unable to Aid and Assist to mitigate the

spread of COVID-19. That motion was granted, and DRO appealed to the Ninth Circuit Court of Appeals. The Ninth Circuit issued an order vacating the modification but also sought review by the District Court Judge. In December 2021, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations.

In November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after the Honorable Nan Waller had ordered them to OSH for treatment, without unreasonable delay. The plaintiffs remained, however at the Multnomah County Detention Center for months (Plaintiff Bowman for nearly eight months, and Plaintiff Douglas-Simpson for nearly six months) after the commitment order was issued. Plaintiffs alleged a violation of their substantive due process rights and filed a motion for a Temporary Restraining Order asking for plaintiffs to be transported to OSH within seven days of the order. The defendants argued that a lack of space at OSH, in part related to the need to timely admit individuals in the Aid and Assist process, contributed to the delays in admitting the patients. The Court granted the plaintiffs' motion for a Temporary Restraining Order, noting that "The *Mink* injunction does not address the relative priority of aid-and-assist patients and GEI patients…" noting that "any prioritization stems from Defendant's failure to provide the funds, staff, and facilities necessary to satisfy the *constitutional rights* of both groups. When satisfying constitutional guarantees, Defendants cannot rob Peter to pay Paul." In that opinion, The Honorable Marco A. Hernandez, United States District Court Judge, did agree with the defendants that a consolidation of the *Mink* and *Bowman* cases may make sense. As noted above, after the decision about the Temporary Restraining Order regarding the two specific plaintiffs, and at the time of the appointment of the Neutral Expert, the parties entered an interim agreement that no individuals found GEI would wait longer than four months for admission to OSH.

**Qualifications to Perform this Consultation**

My qualifications to render opinions as the Neutral Expert were described in my first report. In summary of that experience, I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level administrative leadership, management, policy development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions.

**Sources**

To help inform the recommendations contained in this report, I reviewed numerous documents that were received since the production of my First Neutral Expert Report. I reviewed additional documentation/correspondence periodically from the Parties related to areas they each brought to my attention. I received miscellaneous correspondence from interested parties, often with rich information and perspectives regarding Oregon's history related to this matter. In addition, I also saw news outlet coverage of this matter from time to time. These various categories of items are not specifically delineated below as sources. Also, some items may have been inadvertently omitted. Apart from those caveats, to understand the scope of my activities, documents I reviewed include the following:

1. *Mink* 0339 Court Order Granting Mtn for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;

2.  Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21

3.  Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21

4.  Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20

5.  *Mink* and *Bowman* Interim Agreement, Filed 12/17/21

6.  *Bowman* 1637 PLD Pltfs 1st Amended Complaint #22;

7.  January 30, 2022, Neutral Expert First Report

8.  Twice weekly data from OSH with metrics related to admissions and discharges, currently including net bed capacity, current census at OSH, OSH Discharge Ready list, and OSH 0.370 Admissions List;

9.  Mink & Bowman Monthly Progress Reports from OHA from February 3, March 3, April 4, May 3, 2022, and June 3, 2022;

10. OSH Aid and Assist Fact Sheet;

11. OSH letter requesting resolution of a warrant for individuals under .370 deemed no longer needing hospital level of care;

12. *The Unwanteds: Looking for help, landing in Jail: An analysis of how trespass arrests at Portland-area hospitals criminalize mental illness*. Disability Rights Oregon. Spring 2019;

13. Contempt Tracker from OSH, 2/3/22, 2/15/22 No PHI, and 2/23/22 with DOJ updates no PHI, and 4/18/22 no PHI and identified version;

14. Ready to Place Statutory Process map, received 2/8/22

15. Plaintiffs' Response to Defendants' February 4, 2022 Report, dated 2/8/22;

16. OHA Oregon State Hospital Staffing Request, dated 12/6/21;

17. OHA Letter to Dr. Pinals regarding Request for OSH Contempt Data, dated 2/15/22;

18. OSH Update Legislative Session 2022 February- BROAD;

19. Draft 161.371 cost sharing amendment language from 2/16/22;

20. Memorandum from Debra Maryanov, Senior Assistant General Counsel to Circuit Court Judges, Trial Court Administration, regarding Clarification of Court Requirements in Aid and Assist Process and related attachments, received 2/17/22;

21. Intensive Services Team outline and related responsibilities, received 2/17/22;

22. Juvenile Fitness to Proceed and JPSRP, Linn County RS PowerPoint and 2020 and 2021 Restorative Services Data Points for juveniles;

23. FES evaluations by type (2010-2020);

24. OSH Master Discharge Process Map (evolving document);

25. PSRB 2019-2024 Strategic Plan, available at: https://www.oregon.gov/prb/Documents/2019%20Strategic%20Plan.pdf

26. Psychiatric Security Review Board Work Group Report, December 2021;

27. Administrative Burden Challenges and Recommendations letter from Cherryl Ramirez, Executive Director, Association of Oregon Community Mental Health Programs, to Ann Braun, Senior Advisor to the Senate President, Representatives Rob Nosse, and Senator Kate Lieber, Co-Chairs, Joint W/M Human Services Subcommittee, dated 2/3/22;

28. 2022 CCO Contract Template;

29. Materials for Aid & Assist Workgroup meetings 3/4/22, 3/18/22, 4/15/22, and 5/20/22;

3

**ER - 142**

30. Request for Application Aid & Assist Programming OHA, Health Systems Division, Intensive Services Unit February 2022;

31. OHA Community Consultation Template updated 8/11/21;

32. Deschutes County Behavioral Health (DCBH) Annual Report and website – Crisis and Adult Intensive Services, as of 3/5/22;

33. 9b packet that is presented to the court and CMHP upon the OSH clinical determination that hospital level of care is no longer required, provided by OSH 3/7/22;

34. LOCUS (Level of Care Utilization System) and Level of Care Decision Determination Tree, provided by OSH 3/7/22;

35. Compiled list of states and length of stay for restoration, sent from OSH 3/17/22;

36. OSH.OHA SB 295 Aid and Assist Training PowerPoint, sent 3/18/22;

37. OSH Contested Notice Process, Template Notice to Contest OSH Evaluator's Report, and Contested Notice Tracker Data for DOJ, sent 3/30/22 (data also sent 3/3/22);

38. OJD Memo re Legislative Alert SB 295 – Aid and Assist, 7/1/21 and SB 295 Enrolled Bill Section by Section review;

39. Example of Motion to Intervene for Limited Purpose 3/18/22 related to SB 295 process provided by OHA 3/30/22;

40. Aid & Assist "Ready to Place" Process and Statutory Authority to Commit summary provided by OJD 3/30/22;

41. OJD Memorandum from Debra Maryanov to Presiding Judges and Trial Court Administrators regarding Processing Contempt Filings in Aid & Assist Cases, dated 3/24/22;

42. Aid & Assist Community Restoration Data 1/1/20 to 6/30/20;

43. Competency Community Restoration Averages by County 2019;

44. OSH Forensic Admission and Discharge Dashboard drafts as well as produced versions describing data for March, April, and May 2022;

45. Psychiatric Inpatient Beds List March 2022;

46. Chat notes from Teams meeting with peers and family supports, sent 4/13/22;

47. 2021-04-12 Mink Bowman PSRB Overview;

48. Aid & Assist Workgroup minutes re time limit on community restoration from 1/19/22;

49. Letters to me from two patients at OSH received 12/20/21 and 4/18/22;

50. 1996-2019 Civil Commitment Total-NS and Civil Commitment discussion overview sent 4/19/22;

51. Media release 4/18/22 regarding the death of a 22-year-old man in the Washington County Jail;

52. GAINS Workgroup-Review of the Oregon Forensic Evaluation System;

53. GAINS Community of Practice Workgroup Goals and Objectives;

54. Patients on the OSH Admission List under Forensic Commitments Request for OSH Expedited Consultation/Admission;

55. Key Behavioral Health Investments (21-23 biennium) Expected to Increase Resources and Improve Outcomes for the Population Needing Intensive Services;

56. OHA Public Health Division, Health Security, Preparedness and Response (HSPR), bed status tracking transition information to Apprise;

57. OHA News Release: OSH to Submit Corrective Action Plan to State, Federal Regulators, 5/9/22;

58. Sixth Amendment Center Report on The Right to Counsel in Oregon, January 2019;

59. The Oregon Project: An Analysis of the Oregon Public Defense System and Attorney Workload Standards, American Bar Association Report January 2022;

60. Mandamus Proceeding sample filing;

61. Funding of BH Services for AA/PSRB/Civil Commit Workgroup Information;

4

**ER - 143**

62. OJD information on forensic evaluations in Oregon including OPDS costs for Aid & Assist analyses, including Multnomah County Contract for Rapid Evaluations;
63. CMHP services for Forensic and Civil Commitment clients, 5/31/22;
64. Independent Consultant Report #5 OHA Activities to Implement the Oregon Performance Plan by Pamela S. Hyde, J.D., August 2019; and
65. Reviews of Oregon administrative rules and pertinent statutes.

In addition, to inform my work, I spoke with and/or exchanged emails, attended meetings, and spoke with numerous individuals. Because of the number of individuals at each meeting, in this report I will not summarize each of the participants in these meetings and the discussions other than the parties and select key leaders who helped introduce me to the Oregon community.  That said, I would like to gratefully acknowledge the robust participation of the many stakeholders.

I engaged in numerous regular/semi-regular meetings including the following:

1. Periodic review of progress with Judge Mosman;
2. Nearly weekly meetings with OHA, OSH, and DRO representatives and leaders both separately and together, with MPD joining the regular conversations in May 2022, including:
   a. From OHA, OSH, ODDS:
      i. Steve Allen, Director of Behavioral Health, OHA
      ii. Dawn Jagger, Chief of Staff, OHA
      iii. Dolores Matteucci, OSH Superintendent-CEO
      iv. Derek Wehr, MSW, Deputy Superintendent OSH
      v. Cody Gabel, LPC, CADC 3, OPMA, Court and Corrections Liaison, Aid and Assist and Jail Diversion, OHA
      vi. Bill Osborne, BH Intensive Services Manager, OHA
      vii. Ryan Stafford, Forensic Utilization Coordinator, OHA
      viii. Isela M. Ramos Gonzalez, Senior Policy Advisor, Government Relations, OHA
      ix. Dr. Sara Walker, Interim Chief Medical Officer, OSH
      x. Scott Hillier, Chief Data Analyst, OSH
      xi. Mandy Davies. Interim Director, Forensic Evaluation Service, OSH
      xii. Micky Logan, Legal Affairs Director at OSH
      xiii. Della Huffman, Director of Social Work, OSH
      xiv. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
      xv. Tristan Fernandez, Senior Legislative Policy Analyst, OHA
      xvi. Andrea Ogston, DOJ representing ODDS
      xvii. Chelas Kronenberg, ODDS Manager
      xviii. Lilia Teninty, Director, ODDS
   b. From Oregon Department of Justice (DOJ):
      i. Carla Scott, DOJ Special Litigation Unit Counsel
      ii. Kailana Piimauna, Senior Assistant Attorney General
      iii. Melissa Chureau, Senior Assistant Attorney General
      iv. Craig Johnson, Assistant Attorney General
   c. From Disability Rights Oregon (DRO):
      i. Emily Cooper, Legal Director

    ii. KC Lewis, Managing Attorney
    iii. Timothy Roessel, Advocate
    iv. Meghan Moyer, Public Policy Director
    v. With input from Jake Cornett, Executive Director & CEO
   d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC

3. Approximately Bi-Weekly huddles with OHA, OSH, DRO, and OJD leadership. OJD leadership largely involved the following individuals:
   a. State Court Administrator Nancy Cozine
   b. Judge Nan Waller, Multnomah County
   c. Debra Maryanov, Senior Assistant General Counsel
   d. Amy Miller Director Court Programs Innovations
   e. Scott Kaplan, General Counsel
   f. Christopher Hamilton, Behavioral Health Business Analyst
   g. Connor P. Wall, Behavioral Health Data Analyst

4. Several meetings with Dr. Alison Bort, J.D., Ph.D., PSRB Executive Director, along with legal counsel, related to PSRB matters;

5. Meetings with DOJ and other legal staff, including meetings to discuss contempt hearings and PSRB processes;

I engaged in several meetings to help gather information about Oregon and understand broad perspectives. Examples of these included meeting with the following:

1. AOCMHP Executive Director, Cherryl Ramirez, Mary Rumbaugh, AOCMHP President and Clackamous County CMHP Director, Julie Dodge, Interim Director for Multnomah County CMHP, and members of OHA leadership on 2/2/22;

2. Lane County representatives including Mr. Brad Anderson and Mr. Alex Cuyler, on 2/18/22;

3. Multnomah County Pilot meetings beginning in February 2022;

4. Individuals committed to OSH under a GEI legal status on 4/18/22;

5. Jail Diversion and Community Restoration Providers on 3/3/22 (up to 42 providers in attendance)

6. Janice Garceau, Deputy Director Behavioral Health, Deschutes County, 3/9/22;

7. Klamath Basin Behavioral Health (KBBH) leadership including Ms. Amy Bolvin, Director of Clinical Services, Mr. Kendall Alexander, CEO, and Mr. Stan Gilbert, former Director, on 3/30/22;

8. Oregon Criminal Defense Lawyers Association including Mae Lee Browning, Legislative Director, as well as attorneys associated with that organization;

9. Eugene Municipal Court Presiding Judge Greg Gill, on 4/5/22, and in other meetings;

10. Oregon District Attorneys Association, including Mr. Michael Wu, Executive Director, and Ms. Melissa Merrero who has been serving on the AA workgroup;

11. Family and peer support meeting with approximately 29 participants along with OHA staff, on 4/13/22;

12. Aid & Assist workgroup meetings;

13. Legislative workgroup on the Forensic and Civil Committed Populations

14. Conversations with legislative representatives including:
   a. Senator Kate Lieber;
   b. Annaliese Dolph, Policy Advisor to House Speaker; and

c.  Anna Braun, Senior Adviser to Oregon Senate President.

I testified in front of the Oregon Legislature House Behavioral Health Committee and the Senate Human Services Mental Health and Recovery Committee on 2/17/22. In addition to the above, I was invited to speak at several meetings including an AOCMHP meeting on 5/26/22 and the Presiding Judge/Trial Court Administrator Meeting on 4/21/22. Each of these activities allowed me to field questions and gain valuable perspectives about the Oregon system. I am appreciative of the community's investment in these discussions to help facilitate my work in this matter.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
MPD: Metropolitan Public Defender
OHA: Oregon Health Authority
OSH: Oregon State Hospital
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities Since the First Neutral Expert Report**

Following the issuance of my First Report, the State and the plaintiffs met regularly discussing the implementation of my initial recommendations, and the State continued to produce a monthly progress report to me in this matter. I testified in front of two subcommittees of the Oregon Legislature to help explain my recommendations.

The OSH team worked diligently to begin crafting a data dashboard in consultation with the Neutral Expert that was developed and has been released monthly since April. The Social Work department at OSH began working on their process map related to discharges and improving efficiencies when feasible. Multiple meetings with OSH and social work services were held to review updates to discharge process map and seek input from stakeholders. OSH leadership reviewed with me their work admitting a significant number of patients after the pause in admissions due to COVID-19 and opened their Junction City unit.  I had a preliminary meeting with leadership from the Oregon Developmental Disability Services to discuss the AA population. Their office had not been directly involved with the *Mink/Bowman* matters to date. This is a conversation that will be important to continue.

**ER - 146**

An RFA for $15M dollars was released and responses received from the communities in the interim since my First Report. I have had an opportunity to review the RFA as well as the early responses. This work will help provide critical infrastructure focused specifically on the AA population. State concerns that the money be allocated for specific activities that would yield a reduction in jail wait times was clear.

In regular meetings with the parties, both plaintiffs and the State expressed an urgency related to the *Mink/Bowman* matters. Issues and concerns arose about whether residential bed numbers had decreased, and there was also recognition of significant staffing shortages across both hospital and community systems in the context of COVID-19. OSH had maximized admissions with its Junction City Unit opening but demand for evaluations continued to be high. I met with several individuals pertaining to contempt hearings against OSH for failure to timely admit AA defendants, which were taking time away from clinical services, and reviewed related data. This was useful in that it demonstrated that contempt hearings created significant work despite data showing they did not necessarily expedite admissions. This information was shared with stakeholders.

In keeping with my work on this case, I had asked that recommendations be mutually crafted with input from the parties. This created a need for multiple meetings to review ideas for specificity, feasibility, and consideration of their potential ultimate yield. As a group there was consensus that any recommendations should be made to maximize achievement of compliance with *Mink/Bowman* specifically, rather than focus on system improvements broadly. To that end, many discussions took place with challenging but earnest participation. In my opinion the discussions were productive and helped shape the recommendations outlined below. Furthermore, over the course of my work I made several data requests and include data below to help inform the Court about my recommendations.

**Data Summaries:**

*Background Data*: According to data received (See **Figure 1** and **Table 1**), there is progress in terms of overall numbers of people waiting from the time of the First Expert report, but a recent upward trend (after a downward trend) in days waited and numbers waiting. There appears to be more gains for the GEI population than for the AA population. Also, the census of OSH is nearly at capacity (See **Table 2** and **Table 3**) with about vacancies related to emergency bed need planning (generally one bed held open on each unit to allow for safety and planning for unexpected issues). Also, the numbers of individuals determined by the hospital to not need hospital level of care outnumber those awaiting admission (see **Figure 1** and **Table 4**).

Regarding the demand for admissions, A&A orders continue to increase (see **Table 4** and **Figure 2**). Because of that metric, it is important to recognize that the rise in admissions reflects improvements in discharge processes. As noted in **Figure 1**, days waiting to discharge have decreased slightly, and the state is to be commended, along with the community, for all efforts to discharge individuals who do not need hospital level of care. This work needs to continue, given patient needs and the *Olmstead* decision.

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

**Figure 1. Data Dashboard Charts Reflecting Progress in Mink/Bowman as of May 31, 2022**

OSH Forensic Admission and Discharge Dashboard
**May 2022**









OSH Quality Management – Data and Analysis
*'Informing the Pursuit of Excellence'*

Page 1 of 4
6/3/2022

**Table 1. Individuals awaiting admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | |
|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* |
| Total Number of individuals | 46 | 93* | 67 |
| Average days waiting | 15.8 days | 22.5 days | 16.2 days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days |
| 2. Regarding individuals found GEI and ordered to OSH | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* |
| Total number of individuals | 15 | 4 | 3 |
| Average days waiting | 45.6 days | 23 days | 18 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days |

*The marked increase in numbers awaiting admission is most likely a residual of the pauses in admissions due to COVID-19

**Table 2: OSH Bed Capacities as of 5/1/22**

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | **151** | **145** |
| **OSH Total** | **743** | **706** |

**Table 3**. **OSH Census as of 5/23/22**

| Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|
| 401 | 265 | 16 | 1 | 683 |

*Data provided by OSH Quality Management – Data Analysis to OJD to the Neutral Expert

**Table 4. Individuals determined to be clinically appropriate for discharge as of 5/1/22**

| Legal Status | Total on "ready to discharge list" | Numbers and level of care needed |
|---|---|---|
| **Aid & Assist** | 63 | LOCUS 1(0), 2(4), 3(5), 4(13), 5(40), 6(1) |
| **GEI/PSRB** | 32 | Level of care not determined until discharge |
| **Civil** | 6 | Level of care not determined until discharge |

**Table 5. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| December 2021 | 76 | 8 (5 standard/ 3 revocations) |
| January 2022 | 76 | 7 (4 standard/ 3 revocations) |
| February 2022 | 56 | 5 (2 standard/ 3 revocations) |
| March 2022 | 85 | 4 (3 standard/ 1 revocation) |
| April 2022 | 80 | 7 (4 standard/ 3 revocations) |

**Figure 2. Aid & Assist Admissions/Orders Trends through April 2022**



**ER - 149**

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

*Admissions Data*: In terms of the demographics of the population, however, as I noted in my First Report, the data reflects that many of the individuals especially in the AA process cycle back to the hospital multiple times (see **Figure 3** showing an almost 20% return to hospital rate within a year for AA patients compared to half that for other populations). Also, patients return multiple times as seen in **Tables 6** and **7**. In an email correspondence with OJD's Mr. Christopher Hamilton, he summarized the findings as follows

- 58.7% (401) of the current OSH census are aid & assist defendants
- 41.6% (167) of the current aid & assist defendants have been admitted to OSH previously
- 55% (92) of the 167 current aid & assist defendants have been admitted to OSH **two or more times**
- 11.4% (19) of the 167 current aid & assist defendants have been admitted to OSH **five or more times**

**Figure 3. OSH Readmission Rate by Legal Status**

| Readmission Rate By Legal Status Type | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AA | | | | | PSRB | | | | | Civil | | | | | VG | | | | | All |
| Patients discharged from 2020-05 through 2021-04 | 634 | | | | | 69 | | | | | 63 | | | | | 26 | | | | | 792 |
| **Readmissions** | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | All |
| Patients readmitted within 30 days of discharge | 10 | 1 | 0 | 0 | **11** | 0 | 2 | 0 | 0 | **2** | 0 | 0 | 0 | 0 | **0** | 0 | 0 | 0 | 0 | **0** | **13** |
| Patients readmitted within 90 days of discharge | 30 | 2 | 1 | 0 | **33** | 0 | 4 | 0 | 0 | **4** | 0 | 0 | 1 | 0 | **1** | 0 | 0 | 0 | 0 | **0** | **38** |
| Patients readmitted within 180 days of discharge | 63 | 7 | 1 | 0 | **71** | 0 | 5 | 0 | 0 | **5** | 0 | 0 | 1 | 0 | **1** | 0 | 0 | 0 | 0 | **0** | **77** |
| Patients readmitted within 360 days of discharge | 104 | 18 | 2 | 0 | **124** | 1 | 7 | 0 | 0 | **8** | 3 | 0 | 1 | 0 | **4** | 0 | 0 | 0 | 1 | **1** | **137** |
| **Readmission Rate** | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | All |
| Readmission rate within 30 days of discharge | 2% | 0% | 0% | 0% | **2%** | 0% | 3% | 0% | 0% | **3%** | 0% | 0% | 0% | 0% | **0%** | 0% | 0% | 0% | 0% | **0%** | **2%** |
| Readmission rate within 90 days of discharge | 5% | 0% | 0% | 0% | **5%** | 0% | 6% | 0% | 0% | **6%** | 0% | 0% | 2% | 0% | **2%** | 0% | 0% | 0% | 0% | **0%** | **5%** |
| Readmission rate within 180 days of discharge | 10% | 1% | 0% | 0% | **11%** | 0% | 7% | 0% | 0% | **7%** | 0% | 0% | 2% | 0% | **2%** | 0% | 0% | 0% | 0% | **0%** | **10%** |
| Readmission rate within 360 days of discharge | 16% | 3% | 0% | 0% | **20%** | 1% | 10% | 0% | 0% | **12%** | 5% | 0% | 2% | 0% | **6%** | 0% | 0% | 4% | 4% | **4%** | **17%** |

Note: The GEI patient category includes both GEI and RVC patients, the Civil patient category includes only Civil Commitment patients, and the VG header stands for Voluntary by Guardian patients


19

**Table 6. Analysis of Repeat OSH Admissions for AA Defendants**

| 401 Current Aid & Assist Defendants (as of 5/23/22) | Count | Percent |
|---|---|---|
| Current admission is the only admission | 234 | 58.4% |
| One or more previous aid & assist admissions | 143 | 35.7% |
| One or more previous civil or voluntary commitment admissions | 42 | 10.5% |
| One or more previous PSRB admissions | 3 | 0.7% |
| One or more previous other admissions | 3 | 0.7% |

*Data provided by OSH Quality Management – Data Analysis to OJD to the Neutral Expert

**ER - 150**

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

**Table 7. Total admissions across 10 years for 167 current (as of 5/23/22) AA Defendants with prior OSH admissions***

| OSH Admissions Count | Defendants |
|---|---|
| One previous aid & assist admission | 75 |
| Two previous aid & assist admissions | 47 |
| Three previous aid & assist admissions | 17 |
| Four previous aid & assist admissions | 9 |
| Five previous aid & assist admissions | 10 |
| Six previous aid & assist admissions | 4 |
| Seven previous aid & assist admissions | 3 |
| Eight previous aid & assist admissions | 2 |
| **Total** | **167** |

*Data provided by OSH Quality Management – Data Analysis to OJD to the Neutral Expert

*Contested Cases Data*: Data was also collected regarding the 2-day notice policy that went into effect during the pandemic that required AA defendants to remain in the hospital if there was a notice that an evaluation opinion might be contested after OSH submitted their evaluation reports to the Court. From 5/28/20 to 2/14/22, there were 93 cases that were ultimately contested.

- The bulk of the cases that are contested were "able" findings at 55 out of 93.
- Most of the contested cases resulted in the same finding that OSH made, at 72 out of 85 (which is about 85%) that were determined of those for which information was known.

From 5/26/20 to 5/26/22, there were 965 OSH patients clinically opined as "able", and 55 patients for whom this opinion was contested, accounting for 3,301 bed days. This number of bed days compares to admitting almost 14 additional AA patients per year based on an average length of stay of 120 days.

*Demographic and Clinical Data*: Data was examined related to those individuals in forensic process that have intellectual and/or other developmental disability disorders (I/DD) based on a point in time from OSH from 4/21/22 and an informal survey of community restoration providers regarding services from October to December 2021 (see **Table 8**). The OSH numbers do not account for any people who might qualify for DD services but had not been enrolled in them, and the community restoration participant numbers do not have a specific metric that was used to identify who had IDD needs (e.g., enrolled in DD services).  Still, the informal poll of community restoration providers showed that several communities were working with individuals with I/DD needs, such as Benton County were three (3) out of four (4) people were identified as IDD. Overall, these data are worth noting in that there may be more of these individuals in the community, in CMHP systems not equipped or financed to support their needs and may limit how many people can be served in community restoration. Also, even the small numbers in the hospital may create challenges for the hospital that is not designed to provide habilitation supports for individuals with these needs, which may delay discharge access.

**Table 8. Population of AA and GEI Identified with IDD**

| | Total IDD | Total | % With IDD |
|---|---|---|---|
| **OSH AA Population as 4/21/22** | 8 | 418 | 2% |
| **OSH GEI/PSRB Population as of 4/21/22** | 5 | 258 | 2% |
| **Community Restoration Population Oct-Dec 2021*** | 31 | 246 | 12.6% |

*Reflects only those numbers of communities that provided responses

12

Demographic data discussed at the AA Workgroup on 5/20/22 also warrant further analyses related to racial and ethnic backgrounds of individuals in the AA and GEI system to understand how to address disparities related to the intersection of psychiatric illness and access to care for those criminally involved vs criminalization that could potentially yield progress in *Mink/Bowman*.

*Length of Stay Data*: Length of Stay data showed that the bulk of individuals are discharged prior to 180 days (See **Figure 4**).

**Figure 4. Distribution of Aid & Assist Length of Stay for OSH Over 10 Years**



Based on the data of OSH length of stay over the last 10 years, according to OSH, the following points are relevant for a six (6) month time maximum frame for restoration:

- Since 2012, 15.5% (909) of Aid & Assist patients stayed longer than six months (180 days)
- These 909 patients accounted for 321,375 inpatient bed days over the 10+ year period
- Had those patients been limited to six (6) months of restoration services, it could have made available roughly 40 additional beds per year, which could have allowed OSH to serve roughly 130 additional patients annually and freed up resources spent on re-evaluation and restoration to be allocated elsewhere.

Based on the data of OSH length of stay over the last 10 years, according to OSH, the following points are relevant for a one-year maximum frame for restoration:

- Since 2012, 3.7% (215) of Aid & Assist patients stayed longer than 365 days for all charge types
- These 215 patients accounted for 122,286 inpatient bed days over the 10+ year period
- Had those patients been limited to one year of restoration services, it could have made available roughly 12 additional beds per year, which could have allowed OSH to serve roughly 36 additional patients annually and freed up resources spent on re-evaluation and restoration to be allocated elsewhere.

*Review of other state statutes:* To form my opinions and recommendations, I reviewed statutes from multiple states and a summary of state restoration statutes published *in Journal of the American Academy of Psychiatry and the Law.* Although data from statutes is difficult to depict in a figure, OHA staff assisted me in producing this summary, which I refer to in my recommendations.

**Figure 5**. **Sample State Statutes and Maximum Time Allotted for Inpatient Restoration**



Table adapted from Wall BW, Ash P, Keram E, Pinals DA, Thompson CR. *AAPL Practice Resource for the Forensic Psychiatric Evaluation of Competence to Stand Trial.* J Am Acad Psychiatry Law 46 (3 Supplement) S4-S79, 2018.

Statutes may have been revised since publication. Table omits states with indefinite/undefined restoration periods. Some states have separate provisions for murder charges not depicted in this representation.

*States that allow for shorter maximum time for competency restoration based on the potential sentence of the most serious charge.

**General Background Information**

In order to inform my opinions, as noted above I met with several individuals across numerous meetings. Information gathered from these discussions is summarized below.

Meetings with CMHP Representatives:

I had the opportunity to meet with several CMHP leaders and representatives. Themes that they discussed included:

- Concerns with individuals in the AA system and their level of clinical acuity
- Concerns about the state getting the dollars received to the community
- Many people in the AA system have co-occurring substance use disorders that are not fully addressed, and there was worry as to whether Measure 110 would help
- Funding not seeming to keep pace with the needs
- Housing capacity is limited, houseless population has grown
- There seem to be long waits for SRTF level of care, and a need for secure beds as the courts ask for these
- Secure residential bed capacity decreased during the pandemic, potentially due to pay structure and workforce along with other pressures
- Enormous workforce challenges at all levels in the context of the pandemic's impacts

- Liability concerns are high with regard to dealing with high-risk clients.
- Commitment laws are not as effective and may have over-corrected toward autonomy over helping people who need care get care
- Hard to explain the increase numbers of AA referrals, methamphetamine psychosis may play a role
- Not as many funded services for prevention
- Need more services attached to the AA population with specific models
- Need for more peer support
- Lack of clarity regarding community restoration including and what it means, what to do with someone who is not participating and there were problems with the lack of time limits
- There is often a disconnect between courts and CMHPs on whether an individual needs a secure placement, with courts erring more toward ordering confined settings
- Basic structures related to municipal courts can become an issue with the use of the AA process when alternatives might be reasonable clinically, or when housing is a need

In many of my conversations, I heard about innovations, efforts to establish more options for placement and housing, and outreach to courts. For example, at Klamath Basin and old hotel had been purchased to help house individuals who had criminal justice and behavioral health histories. More counties were accessing the Northwest Regional Reentry Center and seeing that as a positive option. The counties were eager to see how the request for a Medicaid 1115 waiver would help further their abilities to cover the costs of supporting individuals with complex needs. However, concerns were raised that there is a narrative that the counties do not care as much about people being left in the hospital, despite their sense that CMHPs are working hard with limited options and a higher risk population who is not always engaged in treatment. Also, many people with whom I spoke indicated that financial risk sharing should not be carried only by the CMHPs as there was a role for the CCOs and counties as well, and the structures made accountability complicated. I spoke to leadership in Deschutes and Klamath Basin Behavioral Health and other counties about the Certified Behavioral Health Clinic (CCBHC) model (currently available in limited places). The individuals with whom I spoke indicated it offered promise of increased flexibility and a funding mechanism to help with the more complicated populations at risk of criminal involvement. There were significant concerns that the increased dollars allocated by the legislature had not yet reached the community, though there was hope for this to help.

<u>Information Gathered from CCOs:</u>

In April I met with several CCO directors along with OHA staff. The CCO directors indicated that there were many good things happening in Oregon and that relationships with CMHPs were growing. They stated that there were activities to grow ACT, FACT, and other wrap around service models. They note there had been a shift for OSH to become more forensic, leaving a civil commitment population with little access to the hospital. In addition, comments included:

- Some people at OSH who would not meet medical necessity for hospitalization.
- There is no end date for community restoration
- Housing is separate from health benefits and housing solutions are needed for the population
- Certain community homes were closing because they could not pay the bills
- Comagine plays a role separate from CCOs
- Social Determinants of Health are important to consider in developing support models

15

- The carve out for residential settings can create barriers to accessing various levels of care
- CCBHCs and behavioral health homes are promising models
- More dedicated programs or a risk pool approach might be helpful, as well as braided funding to help support their complex needs
- An increase rate category for more care coordination would be important for the AA population

Jail Diversion and Community Restoration Provider Information:

In early March I met with about 42 staff who came to a meeting organized by OHA's Cody Gabel. The staff were from all over the state and the discussion was lively. They were invited as providers of jail diversion and AA community restoration services. Over the course of my meetings, I heard from other stakeholders who provided similar input. There were several themes that emerged from these conversations summarized here:

- Lack of community options and having information like a bed board might be helpful
- Job responsibilities that span multiple functions (e.g., crisis clinician, jail diversion, consultation and AA coordinator potentially performed by one person)
- Limited resources for PSRB populations in the community.
- Much demand for "secure" placements
- Many of the people in community restoration have IDD needs and the providers expressed often feeling ill-equipped to work with that population
- High rates of co-occurring substance use disorders
- Workforce shortages increasing strain on providers
- COVID-19 impacts still making service provision difficult
- Northwest Regional Reentry Center provides a good resource
- Post resolution of AA processes, there seems to be a gap with limited help for these individuals as they transition out of the AA system
- Individuals often push back on learning legal skills and counties handle the restoration work differently
- High levels of trauma for the AA population
- Having rapid evaluations statewide might help with demand

Perspectives of Two Patients at OSH

I met with two patients who asked to speak with me regarding OSH. Both patients were involved in the GEI process and under the PSRB authority. Both had been brought back into OSH after revocations of conditional release. Both explained that there had been discrepancies in diagnoses and determinations of what level of care was needed. Themes that emerged in these conversations were:

- Concerns that treatment teams are not pursuing discharge because of "anticipating" the outcome from the PSRB
- Concerns that the PSRB has made decisions that are conservative in nature
- Concerns that their term under the PSRB at the outset was arranged as the maximum period possible (One individual said, "it takes hope off the table" reducing motivation to do well)
- PSRB services with the community are more positive, people are given multiple chances with relapse and recovery

16

**ER - 155**

- Long waitlists for community placements- one individual stated he had been accepted in two different community settings but neither has a bed until 2023
- Need for greater coordination between the hospital and the community
- Limited evidence was reviewed for the revocation
- Complex diagnostic issues may warrant further analyses (both patients were not being prescribed medications with no apparent psychotic symptoms, though no formal assessment was conducted. They indicated drug-induced psychosis may have been relevant to their stories

Peer and Family Support Perspectives:

On 4/13/22 a meeting of about 29 people took place focused on hearing the perspectives of peers and family supports.  The conversation involved robust participation, and there seemed to be good geographic representation. The group was very appreciative of the meeting, and it was also very helpful to me to hear their perspectives. Though much was discussed, some of the themes included the following:

- Attorneys try their best to represent rights of individuals but may decide what is best for them, and there should be a way to have the individual voices heard more
- There is a need for more support services, more peer supports for individuals in the AA process
- There is a need for warm handoffs and continuity of care for people leaving OSH
- Continuity of care across systems and locations is a challenge, and getting to know people, their legal case, and required timelines from the courts, before they leave OSH could help
- Communities are understaffed so participation in supporting individuals upon return to the community is limited at times
- Increased capacity to serve and house people found GEI is needed
- Peers are starting to get more involved, but more should be built into systems
- The Directive for Mental Health treatment is an avenue to help people be more engaged in their own care, but needs to be more broadly discussed, but there are limits in certain settings

PSRB Perspectives:

Several meetings took place related to PSRB specific matters. Dr. Bort helped provide an overview to PSRB processes and updated protocols to OHA and OSH leadership and to me. She noted that the philosophy of the PSRB has been increasingly about helping individuals move from more to less restrictive settings. Dr. Bort noted several impediments to helping expedite discharges, though she acknowledged that many of the time issues are related to statutes and requirements for notice and the like. She explained that the hearings required of the PSRB occur timely though there was a public perception of delays, she felt that the statutory requirements were being followed. That said, impediments were identified related to getting community evaluation appointments and finding residential vacancies suitable for the PSRB client needs. There was also recognition that some of the requirements related to conditional release and risk review could benefit from updates.

Legislative Perspectives:

Oregon's legislative interest in behavioral health is a major strength that was apparent in many of my meetings. Many of the legislative staff I spoke with had worked in roles that related to the behavioral

health system and were quite knowledgeable, which was another strength I noted. In speaking to them individually and listening to broader group meetings and discussions, questions about transparency of state spending were raised. There was concern that additional dollars requested would not take into account dollars already allocated. Below I discuss how the state responded to a recommendation related to the transparency of funding utilization. Other issues that came up in my conversations with legislative representatives included a desire to better clarify overall responsibility and accountability, as funding structures between CCOs, CMHPs, counties, and the County Financial Assistance Award (CFAA) mechanics. There was a plan for ongoing conversation with OHA leadership to examine these issues. The legislative presiding officers have also convened a workgroup that would examine the needs of the "committed" populations including AA, GEI, and civil commitments. I was able to participate in some of these meetings and observed a serious review of barriers support and reduce the AA population.

Defense Attorneys Perspectives:

The defense attorneys with whom I spoke described cases where their perseverance and efforts to identify what might make positive outcomes for their clients came through quite clearly. They provided perspectives however that there were limited resources in the system, that the community restoration had no timelines making it hard to justify for their clients in many cases, and concerns that the admissions list at OSH requires contempt filings to ensure their clients' timely access. There was much discussion about this, and we discussed data from the State showing that the individuals are largely admitted by virtue of the waitlist movement that moves faster than court contempt proceedings. Concerns were raised about challenges with accessing diversion, alternative pathways or even dismissals for AA defendants, especially those that cycle through the criminal system.

Prosecution Perspectives:

I heard perspectives in the AA workgroups and in some discussion with prosecution attorneys. It is commendable to see the level of engagement in the system-wide conversations from the prosecution. I focused some discussions on restoration services. In discussing my preliminary recommendation to shorten timeframes for restoration, the prosecution registered opposition. Concerns were raised especially related to individuals with charges pertaining to violent crimes, and as such, recommendations provide some options for longer restoration for certain individuals.

Municipal Court Perspectives:

In my conversation with Judge Gill from Eugene Municipal Court, he described how the municipal courts do not have the same structure as OJD. He indicated feeling staffed with compassionate and capable people who daily work with community issues. He manages a well-established local mental health court. He described that he works hard to help the parties in matters identify community solutions, and that OSH is needed still for some of the sickest people. He noted that restoration in the community has been difficult and that there is little data related to outcomes. Although he recognized that Lane County seeks beds at OSH, he was concerned on what might happen if misdemeanant defendants were not able to access OSH. He described his willingness to partner with stakeholders to be part of any solutions.

(117 of 269), Page 117 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 117 of 269
Case 3:02-cv-00339-AN   Document 262-2   Filed 08/26/22   Page 19 of 35

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

OJD Perspectives:

Regular meetings with OJD and the Parties provided opportunities to share updated information about respective AA-related activities. Several conversations resulted in educational and informational memoranda to be written for OJD judges statewide. I had the opportunity to verbally review my preliminary recommendations and refine them based on OJD input. OJD has also been taking on, with technical assistance from the SAMHSA GAINS Center, discussions about evaluation processes in Oregon to help make improvements and gain efficiencies. This is consistent with my First Report and will be further delineated below. The leadership at OJD is to be commended for its efforts in data collection, developing innovations and working to help resolve the waitlist issues in partnership with the parties.

**Comments on Specific Areas of Focus**

*Bed Board and Bed Access:* Several conversations related to limited capacity to access beds, and challenges with the Comagine services in authorizing residential bed access. Work being done on a bed "registry" was authorized through Oregon Health Sciences University (OHSU) and is a project that is underway. Individuals at the state indicated that lessons learned through COVID revealed that knowing where "open beds" are in the system was not as straightforward as there could be numerous variables that might make an open bed not available (staffing, infrastructure, acuity). There was discussion with the parties also that ongoing work with the Intensive Services Unit might facilitate further discussions about how to improve information about beds in the community system.

*Multnomah County Pilot Initiative Initial Meeting 2/22/22 and follow Up:* Under the auspices of the interim Settlement Agreement there was discussion regarding specific work in Multnomah County. Through discussions with the parties and with OJD, it was determined that the County and Judge Waller would initiate a review of individuals in the jail who had mental health needs eligible for diversion, with a specific focus on the AA population. Some of the model was gleaned from a prior trip that stakeholders had looking at the Arizona system. Since the first meeting 2/22/22, there were several follow up meetings that appeared to foster ongoing discussion and collaboration. In conversation with OJD and Judge Waller as well as staff at DRO, these meetings seemed to bring the right partners to the table and allow for dialogue and improved understanding of various perspectives. This pilot was seen as a very beginning effort that would have promise to help find alternative pathways for those individuals waiting for AA processes or impacted by them.

*Information Gathered Related to County Risk Sharing Proposal:* In my First Report, I made a recommendation for county financial risk sharing, with legislative proposal to allow charging counties for patients who no longer require hospital level of care on the OSH 9b list beyond a date threshold. There was a great deal of discussion and concern about this recommendation. As noted below, based on feedback received, this recommendation was ultimately modified with extensive discussion with the parties who agreed with the shift.

**Information from Progress Reports to the Neutral Expert**

I received pursuant to the Court's order, monthly progress reports from the State from February through June regarding actions taken to address issues pertaining to *Mink/Bowman* compliance. The following summarizes elements of information from those reports:

(118 of 269), Page 118 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 118 of 269
Case 3:02-cv-00339-AN    Document 262-2    Filed 08/26/22    Page 20 of 35

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

- Opening Junction City second unit on 2/1/22
- Proposed legislation by OHA allowing for charging counties for patients who no longer require HLOC and are on the Ready-to-Place list proposed but not entered into budget note
- Planning for the spending of $130M in investments from the 2021 Legislature
- IMPACTS grants working to launch second grant cycle
- Added six (6) positions to the OHA Intensive Services Unit
- CCBHC received $121M in total funds
- DOJ worked with state courts to help support the discharge processes required by SB 295
- Data dashboard developed
- OSH and OHA began work reviewing and improving discharge processes, and expanding use of NWRRC
- Focused effort to build out the 988 crisis system recognizing the new three-digit phone number—988—will be available on 7/16/22
- OHA planning to restructure County Financial Assistance Agreements (CFAA) and complete a research study to better understand increases in AA referrals was underway
- CMHP Funding RFA for FY 2023 developed, with planned distribution of funds around 7/1/22
- OHA's Intensive Services Unit hired all open positions
- DOJ general counsel coordination in GEI cases where community evaluations were not orders
- Increased coordination for people on the Ready to Place List between HSD staff and OSH in coordination with CMHPs
- Expansion of Lane County Contract for SRTF beds on the grounds of Junction City Campus
- OSH received legislative approval for 228 budgeted positions and $10.8M, including position authority for 134 unbudgeted FTE and 94 new positions
- Ongoing work with the legislature regarding provider rate issues and behavioral health workforce stabilization
- Re-opening of IMPACTS grants
- RFA posted to OregonBuys on 3/18/22, and RFA applications currently under review
- CCBHC state infrastructure hired, planning underway to achieve focused work on AA population
- Development of meetings with 911 PSAP and new rules pertaining to 988
- Ongoing work regarding SB 295 adherence
- Contract with Lane County signed and in effect to expand SRTF bed capacity in that area
- Resuming meetings to examine CFAA increased accountability
- Ongoing efforts with OHA, OSH, DOJ working on discharge processes
- Multnomah County "jail review" meetings established bi-monthly with OHA engagement

Barriers initially identified included ongoing challenges with COVID-19 and the Omicron variant, leading to some earlier pauses in admissions at OHA. There were also initial concerns about whether counties and providers would bid for the funding opportunities given concerns about expanding in light of staffing crises and COVID-related issues as well as residential rates.

**Recommendations and Comments:**

As described above, the parties worked diligently with me to discuss various strategies to achieve compliance with the 7-day admission requirement of *Mink* as soon as possible, and the need of the GEI patients to be similarly released from jail and timely admitted. There was discussion about "break-the-glass" ideas, but even those were recognized to potentially have unintended consequences for certain

**ER - 159**

(119 of 269), Page 119 of 269 Case: 24-2229 08/28/2024, DktEntry: 27.3, Page 119 of 269
Case 3:02-cv-00339-AN Document 262-2 Filed 08/26/22 Page 21 of 35

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

populations. Tragically, a death in jail of an individual on the admissions list occurred during the interim period between the First and this Second Report. Although the circumstances of that death are being examined separately, all parties recognize the critical need to maximize access to the hospital when needed, but everyone with whom I spoke recognized that there is no simple single solution that will fix the issues that are contributing to the increased referrals to OSH and difficulties with discharges that creates ongoing barriers to opening space at OSH for those waiting in jails and other places. The below recommendations are set forth with this in mind, to address, per Judge Mosman's order, both capacity issues at OSH and admissions protocols.

**I.        State Level Data and Process Improvements**

In this first section, I outline priority activities that I recommend be taken that are largely within the purview of OHA/OSH or the Plaintiffs and would not require legislative changes.

**A.   Data and Information Sharing with Stakeholders**

Consistent with my recommendation in January 2022 to "develop data infrastructure," and use data to help achieve compliance, the following recommendations pertain to this data development and information sharing:

1. *Enhanced utilization of data dashboard*: OSH provided the first data dashboard for this matter in April 2022, and monthly thereafter.  To understand trendlines, it will be helpful to produce these dashboards twice per month, and this should begin by *August 2022*. Future dashboards should be distributed twice per month to a distribution list consisting of the Neutral Expert, OHA, DOJ, DRO, MPD, OJD, CMHP directors, Coordinated Care Organizations (CCOs), PSRB leadership, and other stakeholders who have requested this information or are newly identified by the Parties.  OHA's Intensive Services Unit should also distribute this data dashboard twice monthly to their Aid and Assist and PSRB contact lists. By the end of *June 2022*, OHA, DRO, and MPD should begin to engage with stakeholders to review this data and develop a process to best use this data to inform system change at local levels.

2. *Consideration of additional staff for data development*: If expansion of data development is needed OHA should seek to add an additional Data Technician, through the development of a Policy Option Package (POP) to be submitted to the legislature or any means available.

3. *Partnering with OJD around data*: OHA/OSH should work in partnership with OJD to examine best mechanisms to share their own data and utilize regular data reports from each entity to mutually inform practices.

4. *Development of website*: As soon as feasible, OHA/OSH should develop a public facing *Mink/Bowman* website to inform stakeholders and provide public access to items such as related Federal Court Orders related to this matter, settlement agreements, public reports, legislative testimony, identified key relevant policies, funding opportunities, notices of open meetings, and the distributed data dashboard reports, and any other information that would help stakeholders understand this matter and progress toward compliance.

**B.  Streamlining and Improving Processes and Contract Revisions**

1. *Review of discharge assessment processes*: In April 2022, OHA/OSH began reviewing "locus scores" and how level of care determinations are made for patients on the Ready-to-Place wait list. Starting in *June 2022*, OHA/OSH will work with consultation of the Neutral Expert to develop standardized assessment processes that support level of care determinations without over-reliance on a single score. By *August 2022*, OHA should convene key partners to review the standardized assessment process and make any final recommendations that will lead to consistent and transparent placement decisions.  Rule changes shall occur as needed. Input from individuals with lived experience would be helpful in this review.

2. *Shift of court notification practice*: By *June 2022,* OHA should re-establish prior policy and discharge .370 defendants back to the committing county upon a forensic evaluation of "able."  For now, those individuals opined as "never able," or "med never" should be further studied for potential process change to support direct community discharge, if clinically appropriate, with CMHP assistance rather than routing back to jail. This will require further discussion. For those individuals for whom an evaluator opines they are "able" OHA should stop its temporary policy established during the pandemic of keeping defendants up to 30 days past the evaluation where a party has contested that finding. This has contributed to extended lengths of stay for many individuals. Although it is understood that the official finding is based on an adjudication, for most cases as noted in the data above, when there are external evaluations, they agree with the original forensic review.

   I have been told that there may be legal arguments against this recommendation. However, for compliance with *Mink* to be achieved, the hospital must look to practices that impede access, and this notice to the courts appeared in my review to be one of them in that it increases length of stay beyond clinical recommendations for individuals clinically thought to have improved sufficiently to be able to Aid and Assist in their defense. When state hospitals have discharge processes controlled by courts, there is a risk of challenges by regulatory bodies examining medical necessity of services, given that hospitals require medical staff to make discharge decisions on clinical grounds. With that in mind, I recommend that OSH revert in part to its long practice in place prior to the pandemic, which is anticipated to allow for additional bed space to become available on an ongoing basis.

3. *Clinical reviews of utilization of OSH beds*: By *July 1, 2022*, OSH should develop plans for prioritization of a) early referrals for evaluations of persons in Aid and Assist process at OSH to re-examine their competence to stand trial; and b) earlier reviews for Hospital Level of Care (HLOC) determinations for AA patients at OSH to clinically determine readiness for stepdown or discharge as early as possible, with implementation of both these plans as expeditiously as possible.

4. *Multidisciplinary training related to AA and misdemeanants*: By *July 1, 2022*, plaintiffs should develop a plan presented to the Neutral Expert working in partnership with OJD and other

(121 of 269), Page 121 of 269 Case: 24-2229 08/28/2024, DktEntry: 27.3, Page 121 of 269
Case 3:02-cv-00339-AN Document 262-2 Filed 08/26/22 Page 23 of 35

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

stakeholders, and OHA should collaborate on this, to develop multidisciplinary education for defense, prosecution and judiciary regarding the importance of maximizing the use of diversion from Aid and Assist processes for any defendant for misdemeanant defendants and for those defendants for whom prosecution is not likely to be pursued.  Training should also include information about accessing and prioritizing community restoration for those that cannot be diverted from criminal case processing and can meet the criteria for such services in the community. The work between DRO plaintiffs and OHA should not be construed to undercut plaintiff's independence and legally mandated role.

5.  *Coordination with ODDS*: By *July 1 2022*, OHA, OSH and the Office of Developmental Disability Services (ODDS) should meet to review the *Mink/Bowman* case to determine where there may be needed improvements for timely discharge from OSH and diversion for individuals with IDD in the Aid and Assist and GEI processes to appropriate community alternatives in lieu of OSH admission where feasible, as well as explore community restoration support opportunities for clients eligible for DD services.

6.  *Development of community navigator model*: Data from OSH discharges indicates that recidivism rates (defined as return to OSH) are highest for the people who were admitted in the Aid and Assist system (See again **Figure 3**, **Tables 6** and **7**).  To help offset this risk of recidivism and sustain compliance, OHA in coordination with stakeholders and in consultation with the Neutral Expert should develop a model to create "community navigators" to support individuals sent for restoration as they transition from OSH into community settings. Model development should begin in *July 2022* with expected design for a pilot model by *December 2022*, which will then inform a mechanism for establishment of the pilot implementation date. Elements of this model should include:

    a.  New, focused navigators to support individuals who were ordered for Aid and Assist restoration at OSH and in the community, and to connect with those hospitalized prior to discharge, and to continue to work with them for no less than six months most discharge and three months after community restoration has ended. The goal of the navigators would be to provide support and reduce recidivism into the Aid and Assist systems.
    b.  Implementation of augmented transitional support structures to help individuals stay connected to services after their involvement with the Aid and Assist processes. This service should leverage existing potential resources, such as might be available through CCOs and ACT services or other supports that can be expanded with this targeted approach.
    c.  Use of evidence-informed practices and other state examples of similar services to help inform best available approaches.
    d.  Engagement of peer supports as part of the model.
    e.  Inclusion of elements of data tracking for evaluation purposes including an examination of recidivism to OSH for Aid and Assist restoration.
    f.  Establishment of a clear organizational structure with regard to management, data collection, accountability, and oversight.

23

7.  *Consultation/Expedited admission and diversion processes*: Enhance existing *Mink/Bowman* Consultation/Expedited Admission Service and support opportunities for early diversion from OSH for individuals Awaiting Admission to OSH leveraging community resources as follows:

    a.  *Consultation/Expedited Admission Service*: Modify expedited admission processes to emphasize consultative availability upon request regardless of referral source, with protocol development in consultation with the Neutral Expert to go into effect by *June 30, 2022*.
    b.  *Court-lead "Jail Review":* Starting in *July 2022*, support OJD's efforts to expand the Multnomah County "jail review" initiative and prioritize AA assessments and reviews of individuals in jail who have appeared to have positive changes in mental status that would likely yield a finding of Able to Aid and Assist prior to admission to OSH and/or be eligible for diversion from the pool of individuals waiting for admission.
    c.  *Community Jail In-Reach and Diversion from OSH Admissions List:* By *August 2022* regardless of whether there is a court-led "jail review", OHA should engage stakeholders to develop a process for real-time ongoing local in-jail review/consultation of all currently detained defendants in the Aid and Assist process ordered for restoration, and leverage resources expended on jail diversion programs in the community to conduct these reviews. These reviews should provide in-jail real time coordination for individuals on the inpatient admission list and leverage opportunities for diversion from OSH admission when feasible. OHA and OSH should work in partnership with the communities and with courts to maximize opportunities for alternative pathways for individuals on the admissions list. For example, when it appears an individual has been restored or is newly taking medication and eligible for community restoration while awaiting admission, these reviews should aim to facilitate diversion from OSH admission. Contract changes may be needed to fulfill this recommendation. If resources are not available for such a process, OHA and OSH should seek support for such resources.

8.  *Improvements in GEI community placement elements*: Recommended improvements related to GEI processes include the following actions to be taken by OHA and OSH:

    a.  OHA should explore all available means to provide additional resources for community providers to prepare timely discharge plan development for GEI patients including evaluations by CMHPs.  This will include devising a funding mechanism to pay for evaluations by CMHPs as ordered by the PSRB.  This may include a base rate for completing evaluations within 30 days.

    b.  OHA should present a plan to ensure that community evaluations are scheduled within 15 days of receipt of the order and completed within 45 days. This may include review of data on the timeliness of these evaluations, modification of contracts, rules, or other means to accomplish this recommendation. OHA should take all reasonable steps to implement such a plan and secure funding needed to implement it. OHA, in consultation with the PSRB, should present to the Neutral Expert a proposed timeline for implementing this plan as expeditiously as possible. OHA's plan for timely evaluations and expedited discharge processes should provide for a review of denials of referrals by

programs to ensure transparency with program waitlists and related resource issues and
address factors including but not limited to:

    i. Delays in interview/evaluation that are created because of a program not having
       a vacancy;

    ii. Delays that may be created when the program is "open to referrals," but may
       not have a vacancy; and

    iii. Delays created by virtue of programs "rejecting" a referral, with potential
       remedies including a required review by OHA of any referrals being declined.

9. *Discharge process prioritization*: Continue implementation of SB 295 Court case specific actions
and initiate any needed associated rulemaking.  The parties agree that adherence to SB 295 (law
providing for discharge of .370 patients who no longer require HLOC) is critical for compliance
and efforts to help with this seem to be working.  The state hospital must be able to make room
for new admissions to OSH and to have individuals who no longer need institutional care placed
in a less restrictive setting. According to tracking by the State, some state courts and CMHPs are
not following this law as it is written, which results in .370 patients on the Ready to Place List
staying at OSH for longer than necessary or allowed by law.  To support adherence to SB 295,
the parties will do the following:

    *a. Informal support.* General counsel for OSH will continue already ongoing efforts to
    support compliance through targeted communications with individual defense lawyers and
    prosecutors. MPD will now also make themselves available to try and intervene with
    defense lawyers to ensure they follow SB 295.

    *b. Advocacy.*  DOJ will continue evaluating cases on a state-wide basis for direct legal
    intervention on behalf of OSH where they determine that SB 295 is not being followed by
    state courts or CMHPs.  DRO will develop, and revise as needed, an amicus brief that it will
    file such cases where appropriate. DOJ will notify DRO about the OSH intervention and will
    provide information needed for DRO to evaluate whether to intervene or submit an amicus
    brief.  DOJ will track reasons courts are not ordering discharge. DRO will also enlist the
    advocacy of MPD when appropriate.

    *c. Rulemaking and Reduced Reliance on Single Solutions for Discharge*.  OHA shall amend the
    OARs applicable to AA Ready-to-Place defendants to clarify that the treating clinical team's
    clinical recommendations primarily guide discharge planning.  Consistent with clinical best
    practice and existing legal standards regarding the ADA's integration mandate, level of care
    should be the least restrictive.  CMHPs should provide information about what is available in
    the community including any reasonable options for a referral to a different community
    supportive placement when clinically appropriate, if the identified recommended "level" is
    not available. This might include, for example, providing information about a lower level of
    care that could be crafted with enhanced supports to meet the individual's needs.

10. *Forensic evaluation quality and efficiencies*: OHA/OSH should continue to support work to
develop improved infrastructure and efficiencies for forensic evaluations. I recommended in my
First Report the need to examine evaluation practices in greater depth. OJD has been taking the
lead convening a broad stakeholder group to examine structures and funding for Oregon

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

forensic evaluation services. With this in mind, OJD has agreed to lead in the writing of a report regarding the workgroup's efforts, and OHA/OSH and the other Parties in the *Mink/Bowman* matter should review and refine any drafts of that report before finalizing. This report would help inform any future recommendations or legislative proposals. I recommend that such a report be produced by *October 2022*, and that the report include:

    a. Summary "map" of current evaluation processes across Oregon

    b. Sources of funding and evaluators and associated costs across Oregon

    c. Delineation of at least three (3) model options to highlight that include for each option:

        i. Organizational structure

        ii. Funding recommendations

        iii. Prioritization of access to court-ordered evaluations for first evaluations to maximize access to evaluators

        iv. Maximum efficiency for access to evaluators and production of their reports

11. *Contractual requirement reviews*: In consultation with the Neutral Expert and the plaintiffs and in an ongoing manner, OHA should review existing contracts with the CCOs and CMHP's to determine the scope of the existing contractual obligations to serve the Aid and Assist and GEI population. I understand these discussions are also happening in the legislative workgroups, but a focus on this population in particular is imperative and urgent. For example, OHA should explain to both CCOs and CMHPs that transport back to community from OSH through Non-Emergency Transport Provider (NEMT) is a Medicaid funded service, and OHA should work further with OJD to review this option given OJDs interest in this as a potentially helpful addition to increase timely transports from OSH. OHA should provide monthly updates on this in its regular progress reports to the Neutral Expert.

12. *1115 Medicaid waiver development*: The OHA Medicaid team will continue working on the 1115 waiver, which would continue limited Medicaid coverage and for individuals at OSH under .370 orders 6 months prior to discharge. If the waiver is accepted, OHA will amend the CCO contract in 2023 to require Intensive Care Coordination for all clients currently at OSH under 370 orders in preparation for community placement. Should this occur, such ICC should be coordinated and take into account the Community Navigators, and OHA should evaluate whether the new ICC services or other available programs (such as ACT Teams) are sufficient to perform the desired functions of Community Navigators.

13. *Substance use disorder treatments*: Expand access to substance use treatment including medications for addiction treatment (MAT) and contingency management (to address stimulant use disorder) in residential and community programs that serve people under AA orders. Similarly for the OSH population, efforts should be made to fostering greater focus on substance use treatment services for individuals in AA and GEI processes. These services are critical as the data shows there is a close nexus between recidivism or even referral for AA evaluations and restoration and co-occurring substance use disorders.  These services should be incorporated into the refinements of services offered for people in Community Restoration Programs (CRPs).

14. *Community Restoration Program access*: CRPs are seen by the Parties as a necessary component of the AA system and alternatives to OSH and need to be strengthened. To that end, OHA should conduct an inventory of the current status of CRPs and their statewide availability across all

**ER - 165**

counties and present findings of this review to the Neutral Expert and DRO and MPD by *August 15, 2022*. Plans to address any gaps in these services should be prioritized.

Additional items that were discussed as potential strategies for system improvement over time include strengthening bed tracking capabilities with regard to the availability of residential beds (SRTF, RTF, RTH, with ACT availability when feasible) and the closure of existing beds that are available to divert GEI or aid and assist patients from OSH or to such patients discharging from OSH, as well as reviewing Comagine Health activities. The development of any expanded bed tracking in the future should consider whether to link to the developing bed tracking system through Oregon Health Sciences University (OHSU) or whether a separate bed tracker would be more useful to help achieve and sustain compliance. Also, future reviews of additional contracts such as Comagine Health may be needed to ensure that barriers to access to care are minimized. Although these would be useful, in my opinion, these items should be re-evaluated after the above priority items are underway.

## II.    Recommendations Likely Requiring Legislative Actions, Rulemaking, or Federal Authorities

In addition to the recommendations noted above, several items are outlined below that would likely be helpful in achieving more timely compliance, yet they are dependent on factors not as directly under the purview of OHA/OSH. These items will generally require legislative or significant rule change or might be considering by the Federal Court in an effort to help the state move toward compliance. Such recommendations are as follows:

1.  *Finances Regarding State Hospital Utilization*: In my First Neutral Expert report, I made recommendations that were supported by the Parties regarding county financial risk sharing. Currently fiscal responsibility for utilization of OSH beds lies entirely with the state and not the counties. A greater shared focus with local entities on this resource could potentially improve its utilization management for communities, which would help increase access to more populations. In my own clinical experience, I saw this very active engagement with discharge processes when payment for bed days was also being factored into need for care.

    After my First Report, legislative language was proposed by OHA on the county risk sharing concept but was not picked up in budget notes. Many CMHPs and others raised concerns that the community system is still too fragile without having gained the dollars allocated by the legislature, and that funding for AA defendants is more complicated and involves more than the CMHPs. Some CMHP directors thought a risk sharing proposal had some merit but might be better with incentives attached. Therefore, taking feedback from communities and in consultation with OHA and DRO, I recommend shifting the January 2022 Neutral Expert Report recommendations to include incentives to the proposed cost sharing a program with CMHP and further recommend that counties, and CCOs share in both the risk and incentives aimed at reducing length of stay for individuals in the AA and GEI processes on the ready to place list. The parties should work with appropriate legislators and others to help develop formulas for this activity in advance of the 2023 legislative session.

2.  *Duration of Competence Restoration*: It is a Constitutional right to be competent to stand trial if one is to be tried criminally. With that in mind, efforts at restoration are critical. Nevertheless,

27

**ER - 166**

notions for the appropriate and permissible duration of competence restoration vary widely across states For Oregon, I recommend the parties work jointly with willing stakeholders to propose new legislation that decreases the maximum restoration time limits, Current legislation (ORS 161.370) for inpatient restoration holds that:

> *(10) …in no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter:*
>
> *(A) Three years; or*
> *(B) A period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted.*

There are no current time limits for community restoration. In my opinion, Oregon's processes could be improved and access to services gained if the law aligns more with clinical data, case law, and legislation in other states that focus restoration on its intended purpose. To that end, I recommend legislative change regarding restoration time limits and practices as follows:

a.  Time for both inpatient and community restoration services should be:
    i.   For misdemeanors, the lesser of the maximum permissible sentence (or a portion thereof) for the underlying offense or 90 days
    ii.  For felonies, the lesser of the maximum permissible sentence (or a portion thereof) for the underlying offence or six (6) months, unless the felony involves serious violence in which case an option for an additional six-month period of restoration could be sought for a total not to exceed one (1) year.

    1.  For serious violent felonies, after the initial six-month period of restoration and a finding that the defendant remains unable to Aid and Assist but restorable, a further period of restoration should require an affirmative request by a party to the litigation. The optional additional six (6) months for restoration of defendants charged with a serious violent felony should then require the Court to enter a finding that the Government's interest in prosecuting the case is strong, and that factors in progress toward restorability to date and likelihood of further restorability, as well as the pre-trial defendant's interest under *Olmstead v. L.C.* (1999). to be in the least restrictive setting to meet their clinical needs, as distinct from those that would allow a defendant to be held in custody. The finding by the Court authorizing an additional period would then allow for up to six months for a total restoration period not to exceed one (1) year.

b.  In my opinion, the Court in making its findings should rely upon clinical opinions, and the forensic evaluators in rendering their opinions of restorability should provide compelling clinical data to support a substantial likelihood beyond probability that the defendant shall regain their capacity to aid and assist at the end of the restoration period, based on evidence that with treatment, the defendant is likely to evidence signs such as, symptom attenuation related to thought, mood, orientation or memory, capacity to recognize reality, reasoning, judgment and/or behavior, or improvements in functional and adaptive deficits related to being able to Aid and Assist. Evaluators should take into

account the nature of the condition rendering the defendant unable to Aid and Assist with regard to restorability. For example, restorability opinions and adjudications should require specific data to support substantial likelihood beyond probability especially for defendants whose ability to aid and assist is less likely to be restored timely through inpatient or community-based restoration services such as those defendants who have repeatedly been previously found unrestorable or who have neurocognitive disorders (such as dementia and traumatic brain injury) or significant neurodevelopmental disorders contributing to their inability to aid and assist. Clinical evidence of symptom attenuation or improvements in competency functional deficits should be noted for defendants charged with a serious felony for whom an extension of the restoration period is granted.

c.  Restoration across multiple charges should be consolidated and contiguous consecutive periods of restoration should be eliminated unless there are new charges incurred after an initial period of restoration has ended.

d.  Aid and Assist progress/periodic Aid and Assist reports should be brief, relying on more complete evaluations that were made for the initial findings of a defendant being Unable to Aid and Assist. The brief periodic update reports should be done at intervals, with the first three at no longer than 30, 60 and 90 days, followed by every 90 days. Aid and Assist progress updates should also be filed as soon as feasible after there is clinical data supporting that the defendant has regained abilities to Aid and Assist, and no later than the external time limits. Again, these updated reports should be brief and delineate whether there have been any changes in mental status or clinical functioning related to Aid and Assist capacities (rather than complete de novo evaluations), sufficient for the Court to make a finding as needed.

e.  Although beyond these legislative recommendations, there should be further exploration of opportunities for defendants found Unable to Aid and Assist or "Med Never" to ensure access to appropriate services as needed.

The above recommendations are based on several supporting considerations, many of which are as follows:

*Background*: Case law (*Jackson v. Indiana*, 1972) specifies that the duration of restoration should be for the period of time in which there is a reasonable probability that an individual will be restored, and that commitment to an institution for restoration be for the purpose for which it was intended. Thus, once a defendant is thought to no longer be able to be restored, any additional confinement must be on other grounds.

*Clinical Studies*: Studies of inpatient restoration report restoration to be most likely between 90 days and six months, though methodological issues in these studies are complicated, making the findings limited. This data is likely skewed by days spent in legal processes and other factors that add time to the reported duration of restoration, given what we know about response to

medication occurring more rapidly in most cases of serious mental illness. Furthermore, reported times for "successful" restoration condense across defendants, regardless of diagnoses and charges and allowable duration.   Also, in a recent comprehensive review[1] of outpatient competency restoration programs (OCRP), states reported an average of 149 days for restoration for individuals restored, and with outliers removed, that average was 111 days even though some programs had individuals in residential services and others did not.

*OSH data and Community Restoration factors*: Data from 10 years of OSH admissions shows extended use of bed days-for some small population of individuals beyond one year of restoration services (See **Figure 4** above). This requires additional time and OSH resources to maintain restoration activities for prolonged periods for a few people in this process, and thus removes the potential for more timely access to beds for those that might be more likely to benefit from those restoration activities. Furthermore, having no end date to community restoration puts defendants at risk for perpetual court oversight, raising serious concerns that defendants with disabilities may be treated differently as pre-trial defendants with little meaningful purpose, and raises concerns about resource allocation.

*Policy and Other State Legislation*: According to Zapf's Washington Public Policy Institute review from 2013, almost a decade ago, the National Judicial College established proposed standards for timeframes for competency restoration, which were roughly 120 days for misdemeanants and up to one year for felony defendants.[2]  A review of state statutes as noted above (see **Figure 5**) for inpatient restoration shows that of those states with timelines for inpatient restoration, Oregon's time frames are the 8th longest out of 25 states. Also, for states that distinguish timeframes for restoration between misdemeanor charges and felony charges, there are significant differences of those allotted times.

Although outpatient programs are still new, in my opinion, it is reasonable to consider timeframes for restoration that are the same as those for people in hospitals especially as some time in a hospital is often related to working with individuals who have not been adherent to medication, and in Oregon persons with serious mental illness in CRPs are required to be adherent to treatment. There are challenges at times with follow-up and accessing community appointments, but by developing a clearer CRP manualized approach, some of those issues can be addressed in practice. Also, those with more significant I/DD needs or those with chronic mental illness and lower-level offenses may not be as likely to be restored regardless. Thus, timelines should not exceed those necessary to determine restorability (or remediation). As an example, Washington D.C. provides for a maximum restoration period not to exceed 180 days for all defendants (s.24-531.05(e)) in its Outpatient Competency Restoration Program.

*Clinical experience*: In speaking to countless individuals in competency processes in multiple states as a treating psychiatrist, evaluator and/or consultant, time spent in legal education for

---

[1] Gowensmith, W. N., Frost, L. E., Speelman, D. W., & Therson, D. E. (2016). Lookin' for beds in all the wrong places: Outpatient competency restoration as a promising approach to modern challenges. *Psychology, Public Policy, and Law, 22*(3), 293–305.
[2] Zapf, P. (2013). Standardizing Protocols for Treatment to Restore Competency to Stand Trial: Interventions and Clinically Appropriate Time Periods (Document No. 13-01-1901). Olympia: Washington State Institute for Public Policy.

individuals with serious mental illness and IDD, while getting needed treatment and supports can be of assistance and is considered an important part of restoration. However, an over-focus on legal education can have intangible collateral consequences of lowering self-esteem when task demand exceeds capacity and a belief that competency is a "pass/fail" assessment that creates anxiety (while factual understanding is only one aspect of competence to stand trial), and a sense of spending time in repetitive programming. These elements can also then translates into time not spent engaging in other activities that might have a more beneficial impact on illness management, overall recovery, and reduced recidivism. Current workforce demands make it even more imperative that work be directed in the most productive ways possible, while not leading to compromised public safety. These factors support my recommendation for shortening maximum durations for restoration, while recognizing the Constitutional right to be tried as a competent criminal defendant.

3. *Community Restoration Program Refinements*: As noted above, Community Restoration Programs (CRP) provide a critical opportunity for services outside of OSH when appropriate and maximizing their potential could yield greater compliance with *Mink (*as well as *Olmstead* requirements).  Above I made a recommendation to review and ensure current program access statewide. Other actions will likely require legislative requests, either through a Policy Option Package or other means to secure the necessary staff and funds to accomplish the following further recommendations. Therefore, OHA should work with stakeholders including DRO and in consultation with the Neutral Expert in advance of the 2023 legislative session to foster enhancements, including:

   a. By *October 1, 2023*, OHA should, in consultation with Plaintiffs and other stakeholders, and with input from the Neutral Expert, develop a CRP manual, delineate best practices across regions, engage in training, develop standard court forms. Oregon's rules (309-088-0115) already identify elements of restoration services, but some may be ambiguous or appear crossover with other funded behavioral health services. As such, suggested areas of focus for protocol development including the following examples of what might be included:
      i. referral processes
      ii. qualifying criteria (and any inclusion/exclusion criteria)
      iii. acceptance/admissions procedures
      iv. scope of services minimally required including those focused on co-occurring substance use disorders
      v. measurement of outcomes and data collection (consider including items such as length of stay, total number restored and total number served, total number found unable, hospitalizations, technical pre-trial violations, new arrests)
      vi. any special provisions for clients with I/DD needs
      vii. clarification for communities to best identify which services should be covered under which payment mechanism (e.g., Medicaid or CRP funding)

   b. By *October 2023*, OHA should enhance CRP data reporting from quarterly to more active regular contemporaneous reporting (and fund the needed infrastructure to do so) so that reports can be generated as needed by OHA to include potential items such as:
      i. Number of people being served in CRP

    ii.  Number of people ultimately opined Able and those opined Unable to Aid and Assist related to felony or misdemeanor charges

    iii.  Categorization of clinical issues: SUD, SMI, IDD, or a combination of these

    iv.  Types of services received

    v.  Categorization of residential level of care and/or housing status

    vi.  Categorizations that examine population demographics to inform policies to enhance equitable access to community-based restoration for diverse populations

c.  Beginning in the next fiscal year, OHA should produce an annual report on CRP activities for public access to inform further legislative needs for communities to best deliver CRP services, inform proposals for legislative change, resource needs, and inter-relationships of stakeholders involved with CRP participants and the courts.

d.  OHA should foster best practices in CRP through collaborative training opportunities across counties and in consultation with OJD, municipal courts, defense, and prosecution, by offering trainings/community of practice opportunities beginning by October 2023.

4.  *Alternative Pathways for Misdemeanant Defendants*: With regard to defendants charged with misdemeanors in the AA process, OHA/OJD/DRO/MPD should make every effort to work collaboratively with stakeholders to identify alternatives that no longer utilize OSH when there is no real Government interest in pursuing prosecution and work to pursue avenues for alternative community plans for these individuals. Alternative pathways should and could include, when possible, diverting them from evaluation all together, releasing them from jail on pretrial conditions, and diverting them from OSH or discharging them when community restoration is an option. The increased demand of competency services for persons charged with misdemeanant offenses is a national trend. Many of these individuals need hospital level of care, but their criminal issues are more minor, raising questions about the use of "restoration" as a means of accessing services when prosecution is not ultimately going to be pursued. Once referred for competence to stand trial evaluation and restoration, these defendants are at greater risk for jail stays as opposed to opportunities for diversion and treatment. Recommendation **I.B.4** in the section above speaks to developing training related to these issues. Beyond training, I recommend that the state also analyze data trends for individuals charged with misdemeanors sent to the state hospital to allow for further recommendations in this matter including legislative fixes that may provide pathways to alternative access to treatments for these populations. At the same time, this may be an issue of consideration also for the Federal Court, given the potential Constitutional and *Olmstead* issues at stake for all defendants but misdemeanant defendants in particular.

5.  *OSH Patient Care Improvement and Community Engagement*: Separate and distinct from staffing recommended in the January report, and recognizing that many of the recommendations throughout this report will require additional staffing, I support a proposal from OHA that they would explore all available means to obtain funding for seek one OSH data analyst and two OSH data integration specialist positions to support Mink/Bowman treatment discharge approaches,

community connections, and data reporting. The OSH Treatment Quality and Patient Care Improvement Unit will improve the provision of patient-specific resources to support an individual's recovery through community engagement, recommendations for continuity of care post-hospitalization, and recommendations for community resources post-hospitalization.  The OSH Treatment Quality and Patient Care Improvement unit will improve the provision of trauma-informed, patient-centered care through identification of an individual's community, cultural and linguistic needs to increase likelihood of treatment engagement/adherence post-hospitalization and potentially address diversity and equity issues. The OSH Treatment Quality and Patient Care Improvement Unit will improve the provision of direct-care services through staff training, coaching and engagement on the units where the treatment services are provided. This is an effort to sustain compliance by decreasing length of stay and recidivism rates and improving treatment engagement/adherence post-hospitalization.

6. *CCO Enrollment*: OHA should require counties to ensure ongoing CCO enrollment for all eligible individuals who have been under an Aid and Assist order within the past two years.

## II.    Tracking Progress and Benchmarks toward Compliance Goals

### A.  Benchmarks

Discussions with the parties resulted in the crafting of benchmarks to help drive toward measurable progress toward compliance. The parties agreed that benchmark time frames would not include "outliers" or the rare delays that are not attributable to bed or community restoration capacity. It is my recommendation that the following incremental benchmark goals be used to assess progress toward compliance in this *Mink* case:

- By August 1, 2022 – Average wait time to admission 22 days or fewer
- By October 1, 2022 – Average wait time to admission 17 days or fewer
- By January 1, 2023 – Average wait time to admission 11 days or fewer
- By February 14, 2023 – Average wait time to admission 7 days or fewer

With the above in mind, in recommending these benchmarks, I have taken into account an examination of existing data and consideration of efforts identified in my January report, current plans for funding the community system through the RFA process, progress as reported by the State, and implementation of recommendations prioritized above.

For many years, the State complied with the 7-day standard articulated in the Court's permanent injunction and the constitutional rights of pretrial detainees.  With the right planning, staffing, and community resource, Oregon can once again achieve complaint with the Court's order.  That said, it will be important to review each benchmark at each time point to understand the nuances in the system dynamics at those times as they relate to compliance. Moreover, in setting these benchmarks, I recommend that the Parties continue to meet regularly to discuss progress toward compliance and determine barriers and solutions to the next benchmark.  Therefore, if at the time of the Parties' meeting to discuss them, the benchmarks set out in this plan are not met, the Parties and the Neutral Expert will discuss additional actions that can be taken to meet the next benchmarks. Based on these

discussions, there may be recommendations to the Court regarding additional actions beyond those already recommended/agreed upon that can be taken to regain compliance. Of course, at any point, the Parties may also seek mediation through Federal Court processes as they see appropriate.

**B.    Tracking legislatively appropriated funding**

One theme that has arisen in my conversations with stakeholders has been whether the state has issued the dollars allocated in a timely and expedient manner to get to the communities to achieve compliance as soon as possible. Community leaders with whom I spoke have expressed several concerns about needing additional dollars, and others have wondered about why appropriated dollars have not been spent and expressed views bout perceived delays on many levels. At the same time the State has indicated that dollars that had been more widely distributed had not yielded the specific results and accountability toward compliance in this litigation that had been hoped, necessitating, from the State's perspective, alternative policy strategies for distributing dollars, and necessitating more internal staff resources to manage the newly appropriate dollars wisely.

Because of the questions raised, I asked the state to develop a high level financial analytic report that could address some of the questions. That analysis was conducted, and an early draft was shared with me. The State has since developed a website to provide information about behavioral health spending and improve transparency for it (See: https://www.oregon.gov/oha/HSD/AMH/Pages/index.aspx). This should continue to be updated. OHA should continue in regular meetings with DRO and MPD and the Neutral Expert to discuss implementation of legislatively appropriated funds that have the potential to help OHA achieve compliance, to address remaining questions about prior spending decisions and to foster planning for ongoing support of the above recommendations to achieve compliance.

**Concluding Comments:**

The parties are all in agreement that compliance with the seven-day standard is the ultimate goal set forth by the Court. Thus, in my discussions with them, there was agreement that the recommendations should be pursued with some urgency and with the timelines set forth above, and that where required, the State should utilize any available most efficient means for securing needed additional funding or staff resources. During June through September 2022, OHA has agreed to compile the above recommended legislative actions into a legislative concept and complete budget impact analyses. OHA will present the recommended legislation during upcoming 2023 legislative session.  In June 2023, if these recommendations are accepted, OHA has agreed to make any needed rule amendments and contractual changes to support the recommendations embedded in this report.

Even with the recommendations above, it is unclear which direction the legislature will go with them. As noted, the legislative presiding officers have convened a workgroup to examine funding of services for individuals in AA, PSRB and Civil Commitment processes. I recommend that the parties participate as requested in that work and help inform that workgroup of the activities and recommendations in this report. I also recommend that the State be prepared to respond to any inquiries related to funding expenditures, fiscal accountability, and requests for data to help the legislature take actions to assist the State in achieving *Mink/Bowman* compliance, including the enactment of the recommendations in this report that require the legislature's support. By doing so, it is hoped that the means to achieve these recommendations will be realized, and that proposed legislation will be met with broad-based

acceptance, recognizing the urgency of making system shifts for those individuals waiting in jail for access to needed behavioral health services. It is further hoped and recommended therefore that the parties will continue to work jointly to pursue support for the recommendations above through their own stakeholder engagement processes.

Finally, the Parties should continue to meet regularly with the Neutral Expert at a cadence to be determined as recommended by the Neutral Expert and in consultation with the Parties, but no less than monthly to track progress and discuss plans for the implementation of the recommendations outlined in both the First and this Second Report of the Neutral Expert Report in this matter.

I would like to acknowledge the stakeholders with whom I spoke and their uniform commitment to improving access to care and to serving a population with complex behavioral health needs while supporting public safety. I would like to especially commend the Parties for their incredibly thoughtful and mutual labor-intensive and good faith work within their roles to help inform the development of these recommendations and to support the work on behalf of the individuals affected by the *Mink/Bowman*-related challenges. I greatly appreciate the help of the leadership and staff at OHA, OSH, DRO, MPD, OJD, and the PSRB in my work. I also acknowledge with gratitude Mr. Cody Gabel who again assisted me in coordinating meetings and tracking information I requested, and to Mr. Scott Hillier for his data support used to inform these recommendations.

**Respectfully Submitted by:**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

Emily Cooper OSB# 182254
ecooper@droregon.org
Thomas Stenson OSB # 152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
**Levi Merrithew Horst PC**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
*Counsel for Plaintiff, Metropolitan Public Defender*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, <br><br> Defendants. | Case No. 3:02-cv-00339-MO (Lead Case) <br> Case No. 3:21-cv-01637-MO (Member Case) <br><br> PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS |

Page 1 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

| | |
|---|---|
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, | Case No.  3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | |
| v. | |
| DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, PATRICK ALLEN, Director of the Oregon Health Authority, in his individual and official capacity, | |
| Defendants. | |

Plaintiffs filed an unopposed motion for an order implementing the Court's neutral expert's recommendations in specific ways on August 15, 2022. The Court held a brief hearing on August 16, 2022, indicating that it was not prepared to enter the order Plaintiffs sought based on the record and legal arguments in front of it at that time. The Court set a further hearing for August 29, 2022 at 1:30 PM and invited the parties to offer supplemental briefing. The Court specifically asked that the parties address three questions:

1.  Whether a necessity showing has been made and whether there are other viable options for relief that the parties have not accessed yet;

2.  Whether the state executive branch can temporarily waive adherence to the time period restrictions and entry requirements;

3.  Whether, as Counsel represented at oral argument, (i) the measures sought are the only way to regain compliance with the 2002 injunction and (ii) the measures sought do not directly contravene state law as only a maximum is set.

Plaintiffs submit this brief in response to those questions.

Page 2 -   PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS
131840778

## MEMORANDUM

### I.   SUPPLEMENTAL FACTS

Plaintiffs provided an overview of the factual situation leading to this request in their memorandum of August 15, 2022. To answer the Court's questions, further explanation is necessary.

In 2003, the Ninth Circuit affirmed the District Court's permanent injunction requiring timely transfer of individuals found not able to aid and assist in their own defense out of jail and into competency restoration services within seven days. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1105 (9th Cir. 2003). Nearly twenty years ago, the Ninth Circuit also dismissed federalism arguments based on a theory that the Oregon legislature can require jails or counties to provide needed mental health services until a hospital bed became available: "Under Oregon law it is OSH, not counties, that has the duty to accept incapacitated defendants once they have certified as such by a circuit court." *Mink* at 1119. Then and here, "The injunction is consistent with legislative choice embodied in statute, and thus with principles of federalism."

Current counsel re-opened this case in May 2019, 16 years after the permanent injunction was affirmed in all respects by the Ninth Circuit. Since November 2018, the state hospital has been, with rare exception, out of compliance with that permanent injunction. Between May 2019 and December 2021, Plaintiffs have repeatedly come to this Court arguing that Defendants were not doing enough to get back into compliance with the injunction and asking the Court to remedy this non-compliance. Plaintiffs filed two appeals to the Ninth Circuit when their efforts were rebuffed. The second appeal was successful, leading this Court to set a deadline of December 3, 2021 for Defendants to return to compliance. *See* Dkt. No. 226 ("Order of Modification to Injunction"). When it became clear to all parties that the Defendants would not be in compliance by that date, the parties agreed to engage in a judicial settlement conference. The substantive result of that settlement conference was that the parties agreed to have a neutral expert look at the problems facing the state hospital and offer recommendations for solutions. The Court

Page 3 -   PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

**ER - 177**

appointed Dr. Debra Pinals to fulfill this role on December 21, 2021. *See* Dkt. No. 240 ("Order Consolidating Cases and Appointing a Neutral Expert").

To say that Dr. Pinals was thorough in the task assigned to her by this Court would be an understatement. *See* Cooper Declaration at Exhibits A and B (respectively the First and Second Report of Dr. Pinals).  In her second report to the Court, the list of sources relied upon (which is noted as non-exhaustive) stretches four pages. *Neutral Expert Second Report Regarding the Consolidated Mink and Bowman Cases*, at 2-7. Dr. Pinals brought her significant experience and expertise to this state and then proceeded to study every aspect of the system including engaging with key stakeholders in the system to inform her recommendations to this Court. As noted in her reports, Dr. Pinals met weekly with high level leadership in the hospital, the OHA, and the Plaintiffs to assist in the development of her recommendations. *Id.* at Ex. A, pgs 2-5, and Ex. B pgs 2-6.  Those meetings are particularly significant because they allowed the Plaintiffs to make suggestions for improvement, push back on how quickly or thoroughly certain recommendations could be implemented, and get substantive, data-based responses from the Defendants to support their claims. As a result of this process, neither party exercised their right under the Interim Agreement to engage in renewed settlement discussions or litigation regarding any disagreement with Dr. Pinals' recommendations. *See* Dkt. No. 238-1, at ¶¶ 5, 6 ("Interim Agreement").

Following her second report to the Court, the parties have continued to meet weekly with Dr. Pinals, and the court's neutral expert has continued to engage other stakeholders throughout the system. The focus of those weekly meetings has been the parties' progress in implementing Dr. Pinals' recommendations and tracking the situation at the state hospital. Once again, these meetings have allowed the Plaintiffs to ask questions and push back wherever and whenever we were concerned about any lack of progress or the speed of progress in implementation. The Defendants, for their part, have responded substantively to most of Plaintiffs' concerns as they were raised, including where it has been necessary to get further clarification from people outside of these high-level meetings.

Page 4 -    PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

There are approximately 75 discrete recommendations from Dr. Pinals that the parties are tracking. *See* Scott Declaration at ¶ 4, Exhibit 1. The progress in implementing those recommendations has been comprehensively reported on a monthly basis. *Id*. Once again, despite their right to do so, the Plaintiffs have not re-engaged with a settlement judge or litigation in this Court claiming the Defendants are not doing enough to implement the recommendations. Over the past several months, Defendants have demonstrated substantial effort to meet each of Dr. Pinals' recommendations but continue to lack the needed array of community-based resources to reach compliance.  Based on unprecedented funding from the legislature in 2021, Defendants have been provided with the long-needed capital to allow the Oregon Health Authority to reinvest resources back into community behavioral health.[1]  However, it will take time for those investments to be allocated and the funded services to come online and be made available to individuals who need them to avoid the criminal justice system and instead engage in effective recovery services.

Plaintiffs' position today is a marked changed from where we were between May 2019 and December 2021. We are not making allegations of bad faith or inadequate efforts on the part of the Defendants. Unfortunately, the Defendants' efforts alone are not enough to resolve the constitutional crisis currently occurring.  While Plaintiffs have confidence in Dr. Pinal's' recommendations and related compliance plan, we know that people are being harmed today and will continue to be harmed until the agreed-upon services, staff and facilities are available to serve people languishing in jails.

Wait times for people committed to the state hospital are longer now than they ever have

---

[1] See "Oregon Transforms Behavioral Health Care," available at
https://www.oregon.gov/oha/HSD/AMH/Pages/index.aspx (last accessed August 25, 2022).

Page 5 -    PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
            MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
            RECOMMENDATIONS
            131840778

ER - 179

been, and they are only getting longer. The root of this problem is simple: hospital beds are a finite resource[2], and each month the state courts order the admission of more patients than the hospital can discharge. With a finite number of beds available, and more people going in than coming out, the line to get in only gets longer. To get at this problem, one or more of three things needs to happen: 1) hospital admission orders need to decrease, 2) system capacity needs to increase, or 3) the pace of hospital discharges needs to increase.

###    A.    Legislative Efforts to Limit Admissions Orders Have Failed.

The Defendants have no control over admissions orders to the state hospital. Under Oregon law, it is the trial courts that order admission to the state hospital for restoration under ORS 161.370 and the Psychiatric Security Review Board that orders admission for patients under a GEI commitment who cannot be safely treated in the community. The Oregon legislature has amended ORS 161.370 in both of the past two regular legislative sessions to make it more difficult for the trial courts to admit criminal defendants to the state hospital. Senate Bill 24, passed in 2019, requires trial courts to consider community restoration before committing a criminal defendant to the hospital. *See* 2019 Or. SB 24, section 2; *see also* Dkt. 123 ¶ 31 ("OHA has proposed legislative changes (SB 24) in the 2019 legislative session to reduce the number of patients committed to the state hospital and to instead emphasize community restoration treatment in appropriate cases.")  SB 24 sought to divert detainees who have been determined to be not competent to community restoration programs if they do not meet "hospital level of care."

---

[2] The hospital has now converted to serving "Aid and Assist" and GEI patients almost exclusively, reserving only a handful of beds for civil patients who are acutely ill and cannot be cared for in private hospitals.

Page 6 -    PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
            MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
            RECOMMENDATIONS
            131840778

*Id.* SB 24 explicitly directs judges, prosecutors, and defense lawyers to choose appropriate dispositions of these cases that do not necessarily include nor require hospitalization at OSH.

The passage of SB 24 had zero effect on the pace of admissions to the state hospital, so the legislature took up the issue again in 2021. Senate Bill 295 now requires specific findings by the trial court as a prerequisite to a hospital commitment. *See* 2021 Or. SB 295, section 7. Once again, this additional restriction has had zero effect on the pace of admissions to the state hospital.



*See* Wehr Declaration at ¶ 6, Exhibit 1.

In her Second Report, Dr. Pinals recommends further study of whether hospital restoration for people charged with misdemeanors is a good use of hospital resources.  Cooper Decl. Ex. B, p. 32. She suggests that this Court may want to consider this issue given "the potential Constitutional and *Olmstead* issues at stake." *Id.* As implied in Plaintiffs' original motion, asking this Court to impose restrictions on misdemeanants being committed to the state hospital is something that the Plaintiffs continue to consider and may, depending on data trends, return to this Court to ask for. We are not asking for that at this time to allow for further study and consideration of potential unintended consequences and how such a limitation would or

Page 7 -   PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

would not conflict with state law.

**B.      Behavioral Health System Capacity Will Not Increase In The Near Term.**

"Lack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation." *Oregon Advocacy Center v. Mink,* 322 F.3d 1101, 1121 (2003)(citing *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir.1980)).

As noted above, the state hospital is using almost every bed available to serve the populations subject to the consolidated cases. The hospital currently has neither the physical space nor the necessary staffing to add more beds. Even if the legislature decided to appropriate money to expand capacity at the state hospital, which it almost certainly will not, new construction would take years to implement. The legislature's policy choice to expand capacity, which the Plaintiffs strongly support, is to invest in community mental health treatment. In 2021, the legislature made historic investments to begin to rebuild our communities' capacities to deliver mental health services where they are needed—locally. All parties are hopeful that these investments will eventually bear fruit in these cases by preventing people with mental illness from becoming involved in the criminal system in the first place and allowing for community restoration treatment when they do. That will not happen overnight. These investments are attempting to reverse decades of neglect. In short, increasing capacity is simply not an available solution in the near term. Instead, with the keen clinical leadership of Dr. Pinals and her resulting recommendations, Defendants have finally been provided a compliance plan and will need the continued resources from the legislature and the authority to enforce the constitution by this Court to realize those recommendations to reach compliance in the short and long term.

**C.      The Pace of Hospital Discharge Must Increase to Make Room for Prospective Patients Languishing in Jail for Court Ordered Mental Health Services.**

For patients found unable to aid and assist and ordered to the state hospital for restoration services pursuant to ORS 161.370, there are four possible routes to discharge: 1) the trial court

Page 8 -      PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS
131840778

finds, based on the opinion of a forensic evaluator, that the patient has regained capacity to stand trial under ORS 161.367(2)(c); 2) the trial court finds, based on the opinion of a forensic evaluator, that "there is no substantial probability that the defendant, in the foreseeable future, will gain or regain fitness to proceed" under ORS 161.367(1); 3) the patient reaches their jurisdictional maximum time in the hospital under ORS 161.371(5); or 4) the trial court authorizes their release from the hospital following a notice from the hospital under ORS 161.371(3)-(4) informing the court that person no longer needs a hospital level of care.

Here again, the Defendants are at the mercy of the trial courts in getting people out of the hospital, even when they have patients who their treating clinicians determined do not need a hospital level of care. This is also an area where the legislature has repeatedly tried to give the hospital more authority to discharge patients and made it harder for the trial courts to keep patients in the hospital, but those legislative changes have not meaningfully changed the pace of discharges. *See* 2019 SB 24; 2021 SB 295. Dr. Pinals spends four pages of her Second Report detailing the clinical basis for her recommendation to change restoration time limits and practices. Cooper Decl. Ex. B, 28-31.

> In my opinion, the Court in making its findings should rely upon clinical opinions, and the forensic evaluators in rendering their opinions of restorability should provide compelling clinical data to support a substantial likelihood beyond probability that the defendant shall retain their capacity to aid and assist at the end of the restoration period, based on evidence that with the treatment, the defendant is likely to…be able to Aid and Assist.

*Id.* at p. 28. Dr. Pinals goes on to cite to Supreme Court jurisprudence, additional data factors, and other states who have implemented similar restoration time limits consistent with the National Judicial College's established proposed standards for competency restoration time limits. *Id.* at 29-31.

Plaintiffs' proposed order sought this Court's authority to make this recommendation from the Court's own neutral expert an enforceable order. The goal of the proposed order is to

Page 9 -   PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
           MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
           RECOMMENDATIONS
           131840778

address noncompliance with the Court's permanent injunction and the existing constitutional crisis by giving the hospital the authority to impose clinically sound, data driven time limitations on hospital stays for restoration. With this order, the hospital has a reasonable chance of achieving short term compliance within the benchmarks set by Dr. Pinals, and then maintaining compliance in the long term. Without this order, there is no chance of reaching compliance in the predictable future leaving dozens if not hundreds of people in jail where they risk irreparable harm and even death. *See* Second Report at p. 21 ("Tragically, a death of an individual on the admission list occurred during the interim period the First and Second Report…all parties recognize the critical need to maximize access to the hospital when needed…"). The data projection produced by the hospital starkly makes this case:



*See* Wehr Declaration at ¶ 9, Exhibit 2. This above chart is based on a straightforward analysis of the trends of admissions versus discharges:

Page 10 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
        MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
        RECOMMENDATIONS
        131840778

| | No Changes to Current Practices | | | | Implement Restoration Limits Starting Sep 2022 | | | |
| Month | Est. New Orders[1] | Est. Discharges[2] | Difference | Est. Admit List Count[3] | Est. New Orders[1] | Est. Discharges[4] | Difference | Est. Admit List Count[3] |
|---|---|---|---|---|---|---|---|---|
| Sep-22 | 74 | 66 | +8 | 83 | 74 | 84 | -10 | 65 |
| Oct-22 | 74 | 66 | +8 | 91 | 74 | 84 | -10 | 55 |
| Nov-22 | 74 | 66 | +8 | 99 | 74 | 84 | -10 | 45 |
| Dec-22 | 74 | 66 | +8 | 107 | 74 | 84 | -10 | 35 |
| Jan-23 | 74 | 66 | +8 | 115 | 74 | 84 | -10 | 25 |
| Feb-23 | 74 | 66 | +8 | 123 | 74 | 84 | -10 | 15 |
| Mar-23 | 79 | 66 | +13 | 136 | 79 | 83 | -4 | 11 |
| Apr-23 | 79 | 66 | +13 | 149 | 79 | 83 | -4 | 7 |
| May-23 | 79 | 66 | +13 | 162 | 79 | 83 | -4 | 3 |
| Jun-23 | 79 | 66 | +13 | 175 | 79 | 83 | -4 | 0 |
| Jul-23 | 79 | 66 | +13 | 188 | 79 | 83 | -4 | 0 |
| Aug-23 | 79 | 66 | +13 | 201 | 79 | 83 | -4 | 0 |
| Sep-23 | 83 | 66 | +17 | 218 | 83 | 83 | 0 | 0 |
| Oct-23 | 83 | 66 | +17 | 235 | 83 | 83 | 0 | 0 |
| Nov-23 | 83 | 66 | +17 | 252 | 83 | 83 | 0 | 0 |
| Dec-23 | 83 | 66 | +17 | 269 | 83 | 83 | 0 | 0 |

*Id.*

What this data makes clear is that something must change, and change quickly, in order to stop the widespread violations of this Court's order and hundreds of peoples' constitutional rights.

## II.    ANALYSIS

### A.    A remedial order is necessary to achieve compliance with this Court's permanent injunction and the Constitution in the foreseeable future.

Out of respect for the sovereignty of the states, federal courts are only permitted to supplant state law when necessary to "enforce federal constitutional and statutory law." *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995). The seven-day limitation period imposed by this Court's permanent injunction has been repeatedly affirmed as a solid base line measurement that is consistent with the constitutional right at issue. *See Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003); *Trueblood v. Washington State Dept. of Social and Health Serv.*, 822 F.3d 1037, 1043 (9th Cir. 2016); *United States v. Donnelly*, 41 F.4th 1102, 1107 (9th Cir. 2022). There can be no serious argument that wait times of 38 days and growing exact a constitutional

Page 11 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

violation on each of the individuals forced to endure that wait.

As explained above, if this Court does nothing, there is no hope for compliance in the predictable future. Indeed, the hospital's own prediction is that the problem will continue to get worse before the 2021 legislatively funded community services can get up and running. This Court's neutral expert exhaustively studied all available options to attempt to get at this problem. There are other options for achieving short term compliance, but all of them require some order from this Court. The other available options—placing a moratorium on the admission of patients charged only with misdemeanors or forcing the discharge of those deemed no longer needing hospital level of care—would be more disruptive to the system and present a greater challenge with regards to comity towards state law. While Plaintiffs believe that either of these options is justified given the state of the data, their proposed solution is driven by the Ninth Circuit's admonition that district courts should enact the least intrusive measures first. *See Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). Plaintiffs view their proposed order as the least disruptive, most respectful of state sovereignty of the available options and is well supported by the Court's neutral expert. This is evidenced most directly by the Defendants' (who are the best positioned state officials to make that judgment call) non-opposition to the proposed order.

**B.      The limited authority of the state executive branch fails to provide a solution.**

As explained above, the Defendants lack specific statutory authority to impose the stay limitations proposed in this order. The only authority under state law to impose those limitations would be if the governor invoked her power to declare a state of emergency. *See* ORS 401.165 et. seq. While it is theoretically possible that she could do that, it is exceedingly unlikely. The governor has never invoked her emergency powers—despite governing through a global pandemic and the unprecedented and widespread effects of climate change. To counsel's knowledge, she has never even made a public statement about these cases or the problems

Page 12 -   PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
            MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
            RECOMMENDATIONS
            131840778

underlying them.

**C.    The proposed order does not violate state law and is the least disruptive option to get on a path to compliance.**

The proposed order does not violate state law nor related federal jurisprudence. The relevant Oregon statute only sets a maximum period of commitment. *See* ORS 161.371(5). "…[I]n no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter… ." *Id*. The law is silent on whether the hospital has the authority to set shorter time limitations. Absent further legal authority, the hospital does not believe it has authority to set limitations *sua sponte*. If this Court were to adopt the Plaintiffs' proposed order, there would not be a direct conflict with state law. Neither ORS 161.370, its newly adopted sibling statute 161.371, nor other state law requires any particular period of detention for defendants found unable to aid or assist their counsel. A state law that required the hospital to continue to detain prisoners after hospital treatment had become unnecessary would violate the Constitution. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (A prisoner found incompetent "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."); *see also Youngberg v. Romero,* 457 U.S. 307, 325 (1982) (citing to *Jackson,* the Supreme Court points to treating clinicians' decisions when determining whether the State has met its obligations to ensure the conditions of confinement reflect the purpose "decisions made by the appropriate professional are entitled to a presumption of correctness.").

Dr. Pinals has made specific findings in her report, indicating that patients held past the 6-month date rarely recover competency from further detention. Second Report, at 29-31. Granting the proposed order would instead be *consistent* with the expressed intent of the Oregon

Page 13 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS
131840778

legislature and the holdings of the United States Supreme Court, that competency detention at the state hospital be reserved for the limited purpose of restoring those defendants where "there is a substantial probability that, in the foreseeable future, the defendant will have fitness to proceed." ORS 161.371(1). Moreover, granting the proposed order would not affect any of the other processes and procedures outside of this single statutory subsection.

In *Stone*, the Ninth Circuit addressed an analogous situation. The district court, in an effort to compel compliance with a consent decree, authorized the sheriff to release inmates early to ease jail overcrowding. 968 F.2d at 863. Other than the fact that the inmates were sentenced to a certain term of incarceration by a state court judge, this early release authority was not directly in conflict with any state law. *Id*. It was, just as this proposed order is, a grant of authority to the sheriff who had no existing state statutory authority. *Id*. The district court, rather than "order[ing] the City to take particular steps to solve the problem," instead "allowed the City to consider the Special Master's recommendation and formulate its own plan. *Id.* The Ninth Circuit found no fault in this district court's order, because such deference to the city's decision making was "consistent with comity and institutional competence." *Id*. The court only found fault in the district court's later order, which authorized the sheriff to override state law and release inmates in direct contravention of a state court order. *Id*. The Ninth Circuit reversed the district court on this point because it failed to consider less intrusive options before authorizing the state law overrides. *Id*. at 864. "While we hold that the district court went too far under these circumstances in allowing the Sheriff to override state laws and state court sentences, we do not rule out the possibility that such action may be necessary in the future." *Id*.

The proposed order in this case is similar to the initial authorization to the sheriff in *Stone*. As in *Stone* where the Court allowed the City Defendants to craft a resolution following

Page 14 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS

131840778

advice from the Special Master, the parties have worked together for months to craft a mutually amenable resolution, based on the neutral expert's work and recommendations. There is no direct conflict with state law. However, even if the proposed order were in direct conflict with state law, it would still be authorized under the facts presented here. It is the least intrusive method of achieving compliance, without which the permanent injunction will be indefinitely violated, and hundreds of individuals will continue to have their fundamental constitutional rights ignored.

> D. **The Court must issue a remedial order reasonably calculated to address the now years-long deprivation of constitutional rights**.

In 2002, this Court issued a permanent injunction, declaring that prolonged delay of the admission of defendants found unable to assist their attorneys into the state hospital violated the United States Constitution and requiring the admission of all such defendants within seven days of the order finding them unable to aid or assist. With only brief exceptional periods of compliance, the state has been out of compliance with this order since November 2018. People suffering from acute mental illness have been lingering for months in local jails in violation of that permanent injunction and the protections of the Fourteenth Amendment for almost four years.

Plaintiffs have, without opposition from Defendants and in consultation with the neutral expert appointed by this Court, proposed a fix for the ongoing problems in the state hospital. Neither party, nor the neutral expert, believes that compliance can be achieved in the foreseeable future absent significant relief from this Court. Not only is the problem of capacity at the state hospital not improving, it is getting sharply worse and is likely to remain so.

In *Brown v. Plata*, the United States Supreme Court approved a district court determination to allow substantial releases of prisoners from California prisons, far more radical

Page 15 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

relief than sought here. 563 U.S. 493 (2011). The United States Supreme Court noted that, where

years of failures to redress constitutional violations had ensued, courts not only may, but *must,*

confront the need to issue dramatic relief. "This extensive and ongoing constitutional violation

*requires a remedy*, and a remedy will not be achieved without a reduction in overcrowding." *Id.*

at 545 (emphasis added).

The U.S. Supreme Court approved federal court action in a very sensitive area of state

control, over the objection of state authorities, because "[c]ourts may not allow constitutional

violations to continue simply because a remedy would involve intrusion into the realm of prison

administration." *Id.* at 511.  An "unnecessary period of inaction would delay an eventual remedy

and would prolong the courts' involvement, serving neither the State nor the prisoners." *Id.* at

516. Case law on federalism does "not suggest that a narrow and otherwise proper remedy for a

constitutional violation is invalid simply because it will have collateral effects." *Id*. at 531. Here,

in contrast to *Plata*, Plaintiffs have proposed an order that is narrow enough that the state

Defendants, the institutional experts, do not oppose it. It is difficult to understand how federalism

and comity concerns could be violated by the federal court granting state officials authority to do

something which they do not oppose doing, especially when taken in furtherance of executing

their constitutional duties.

Refusing to adopt the proposed order would simply declare that the only relief available

to the detainees whose rights are violated every day is to continue to endure constitutional

violations and face the increased risk of death as their detention in local jails without mental

health treatment drags on and on. This the Court may not do. "[T]he federal courts have the

power, *and the duty*, to make their intervention [into operation of prisons] effective." *Stone*, 968

F.2d at 861 *quoting Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir. 1980) (emphasis added).

Page 16 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
            MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
            RECOMMENDATIONS
            131840778

(150 of 269), Page 150 of 269
Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 150 of 269
Case 3:02-cv-00339-AN    Document 260    Filed 08/26/22    Page 17 of 17

That course of action, to insist that hundreds of detainees continue to endure the deprivations of their constitutional rights, with no serious plan or prospect for future relief, is not a permissible option under the law.

## III.    CONCLUSION

In order to regain compliance with this Court's permanent injunction, a remedial order is necessary. Of the available options, Plaintiffs' proposed order is the least disruptive option and the option most respectful of comity. Given the state of the data, doing nothing is not an option. This Court must take some action reasonably calculated to get the Defendants back into compliance.

DATED August 26, 2022.

LEVI MERRITHEW HORST PC

/s Jesse Merrithew
Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

*Counsel for Plaintiffs Metropolitan Public Defender, Jarrod Bowman, and Joshawn Douglas-Simpson*

DISABILITY RIGHTS OREGON

/s Emily Cooper
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Tel:    (503) 243 2081
FAX:   (503) 243 1738

*Counsel for Plaintiff Disability Rights Oregon*

Page 17 -  PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNOPPOSED
MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S
RECOMMENDATIONS
131840778

**Thomas Carr**, OSB No. 212598
County Counsel
tom_carr@co.washington.or.us
Office of Washington County Counsel
155 N First Avenue, Suite 340, MS #24
Hillsboro, OR 97124
Phone (503) 846-8747
Fax (503) 846-8636

**Jane Vetto,** OSB No. 914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court St NE
PO Box 14500
Salem OR  97309
503 588-5220

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | 3:02-cv-00339-MO (Lead Case) |
| Plaintiffs, | 3:21-cv-01637-MO (Trailing Case) |
| v. | |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | **MOTION FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE* AND MEMORANDUM IN SUPPORT THEREOF** |
| Defendants. | |
| JARROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON | |
| Plaintiffs, | |
| v. | |

DOLORES MATTEUCI, Superintendent of
the Oregon State Hospital, in her individual
and official capacity, PATRICK ALLEN,
Director of the Oregon Health Authority, in his
individual and official capacity,

                    Defendants.

## CERTIFICATE OF COMPLIANCE

Undersigned counsel of record certifies pursuant to Local Rule 7.1 that they have

conferred with defendants' and plaintiffs' counsel.  Defendants' counsel does not object to

amicus participation by counties.  Counsel for Plaintiff Disability Rights Oregon objects to

county amicus participation.

## MOTION

Washington and Marion counties, municipal corporations in the state of Oregon for

leave to participate in this case as *amici curiae*. A proposed amicus brief is attached.

## MEMORANDUM

### I.    The Interests of the Counties

Washington County and Marion County will be affected by any order that this court

issues.  The issues before this Court affect the counties in a myriad of ways.  Both counties

are the community mental health programs (CMHPs) for their respective counties under

ORS Chapter 430.  Pursuant to ORS 430.630 a CMHP provides an extensive array of

addictions and mental health services to the community.  These services include

preventative services for children and adults, inpatient and outpatient services.  The

services also include crisis stabilization services to people who are in a behavioral health

crisis, such as a Mobile Crisis Team, which includes clinicians available to provide free

face-to-face services 24 hours a day, seven days a week.  In Washington County there is

also a Mental Health Response Team made up of a crisis clinician and a law enforcement

officer who respond to emergency calls that have a behavioral health component.  CMHPs

also provides a crisis telephone line.  The Crisis Line staff is available to listen to a

person's issues, assess the situation, offer support and safety planning, and provide referrals

to local resources and treatment.  Individuals released based on an arbitrary timeline

without reference to mental health conditions will likely rely on county resources for

mental health assistance.

In addition, under Oregon state law, counties are required to provide local jails.

ORS 169.030.  Delays in admission to the state hospital result in longer stays in the county

jails.  Moreover, if individuals released while still presenting a risk to themselves or others,

there is a significant risk that they will be rearrested and reincarcerated in the county jail.

## II.    Relevant Legal Standards

District courts therefore rely on Federal Rule of Appellate Procedure 29 in addressing

such amicus requests. See *California v. United States Dep't of Labor*, No. 2:13-cv-02069-

KJM-DAD, 2014 WL 12691095, at *1 (E.D. Cal. Jan. 14, 2014). The Ninth Circuit has held

that "[t]he district court has broad discretion to appoint amici curiae," and the appellate court

will reverse "only if the district judge has abused his discretion." *Hoptowit v. Ray*, 682 F.2d

1237, 1260 (9th Cir. 1982), *overruled on other grounds*, *Sandin v. Conner*, 515 U.S. 472

(1995). "The touchstone is whether the amicus is 'helpful.' " *United States Dep't of Labor*,

2014 WL 12691095 at *1 (quoting *Hoptowit*, 682 F.2d at 1260.)

The counties seek the opportunity to provide a perspective that is not represented currently before the court. Although the case has been ongoing for almost twenty years, the remedy proposed is contrary to state law and impermissibly shifts Oregon Health Authority's duty onto Counties and their communities. The attached brief demonstrates that there are alternatives to the proposed remedy and that the remedy itself would violate Oregon state law. No present party can adequately represent the interest of the counties.

No prejudice to the parties will arise from allowing *amicus* participation. The counties will not participate in discovery; their participation will be limited to filing memoranda and such participation at any arguments or hearings as may be allowed by the Court.

## Conclusion

The counties' motion for leave to participate *amicus curiae* should be granted.

DATED: August 25, 2022.

Respectfully submitted,

 s/ *Thomas Carr*
**Thomas Carr**, OSB No. 212598
County Counsel
tom_carr@co.washington.or.us
Office of Washington County
Counsel
155 N First Avenue, Suite 340, MS #24
Hillsboro, OR 97124
Phone (503) 846-8747
Fax (503) 846-8636

 s/ *Jane Vetto*
**Jane Vetto,** OSB No. 914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court St NE
PO Box 14500
Salem OR  97309
503 588-5220

**Thomas Carr**, OSB No. 212598
County Counsel
tom_carr@co.washington.or.us
Office of Washington County Counsel
155 N First Avenue, Suite 340, MS #24
Hillsboro, OR 97124
Phone (503) 846-8747
Fax (503) 846-8636

**Jane Vetto,** OSB No. 914564
Marion County Legal Counsel
jvetto@co.marion.or.us
555 Court St NE
PO Box 14500
Salem OR  97309
503 588-5220

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | 3:02-cv-00339-MO (Lead Case) |
| Plaintiffs, | 3:21-cv-01637-MO (Trailing Case) |
| v. | **AMICUS BRIEF OF MARION AND WASHINGTON COUNTIES** |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants. | |
| JARROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON | |
| Plaintiffs, v. DOLORES MATTEUCI, Superintendent of the Oregon State Hospital, in her individual | |

**ER - 196**

and official capacity, PATRICK ALLEN,
Director of the Oregon Health Authority, in his
individual and official capacity,

                    Defendants.

Amicus Curiae Marion and Washington Counties respectfully submits the following

in response to the three questions posed by the court for supplemental briefing:

**1.  Whether a necessity showing has been made and whether there are other
     viable options for relief that the parties have not accessed yet?**

The counties do not support the remedy proposed in paragraphs 2 and 3 of the

proposed order.  The state legislature has worked diligently to address the situation at the

state hospital.  State law provides a detailed process for addressing defendants who cannot

aid and assist in their own defense.  ORS 161.370.  The legislature amended this statute in

2015, 2017, 2018, 2019 and 2021.   Laws 2015, c. 130, § 2, eff. Jan. 1, 2016; Laws 2017, c.

49, § 1, eff. Jan. 1, 2018; Laws 2017, c. 233, § 3, eff. Jan. 1, 2018; Laws 2017, c. 628, § 1,

eff. Jan. 1, 2018; Laws 2017, c. 634, § 16, eff. Jan. 1, 2018; Laws 2019, c. 311, § 5, eff. June

11, 2019; Laws 2019, c. 538, § 2a, eff. July 15, 2019; Laws 2019, c. 318, § 2, eff. Jan. 1,

2020; Laws 2021, c. 395, § 7, eff. June 23, 2021.  In 2021, the legislature added a new

section specifically addressing the question of release.  ORS 161.371 Laws 2021, c. 395, § 5,

eff. June 23, 2021.  This new law, having been effective for just over two months, should be

given the opportunity to work.

**2.  Whether the state executive branch can temporarily waive adherence to the
     time- period restrictions and entry requirements.**

There is no authority for the executive branch to unilaterally waive statutory

requirements.  The nearest analog would be the governor's authority under an emergency

declaration.   ORS 401.168.  Even during an emergency, the executive can only suspend

rules and regulations.  *Id.*  There is no authority to suspend statutory requirements.  *Elkhorn Baptist Church v. Brown*, 366 Or. 506, 525, 466 P.3d 30, 43 (2020).

**3. Whether, as Counsel represented at oral argument, (i) the measures sought are the only way to regain compliance with the 2002 injunction and (ii) the measures sought do not directly contravene state law as only a maximum is set.**

The measures sought would directly contravene state law.   In ORS 161.371 the legislature made specific choices regarding when a court should consider ordering release of individuals from the state hospital.  The hospital is required to cause the defendant to be evaluated within 60 days from arrival at the hospital to determine "whether there is a substantial probability that, in the foreseeable future, the defendant will have fitness to proceed."  ORD 161.371(1).  Based on the results of that review, the court can only order continued commitment if the court finds "a hospital level of care is necessary due to public safety concerns or the acuity of symptoms of the defendant's qualifying mental disorder, and . . . .that the appropriate community restoration services are not present and available in the community. . . ."  ORS 161.371(3)(c)(A).  The court is required to terminate the commitment if the court does not make the required finding.   ORS 161.371(3)(c)(B).  The proposed time limitations would directly contravene the legislative direction for when a commitment should be terminated.

## CONCLUSION

The counties support the portion of the Court's August 16, 2022, order [ECF 256] to the extent that it denies paragraphs 2 and 3 of Disability Right's Oregon's proposed Order to Implement Neutral Expert's Recommendations [ECF 252].  The counties respectfully request that amicus be included in the discussions required by paragraph one of the proposed order as

adopted. Given the short timeline for counties, we request more time to fully brief the legal

arguments presented herein.

DATED: August 25, 2022.

                                          _s/Thomas Carr_____
                                          Thomas Carr, OSB No. 212598
                                          Washington County Counsel
                                          tom_carr@co.washington.or.us
                                          Attorney for Amicus Washington County

                                          _s/Jane Vetto_____
                                          Jane E. Vetto, OSB No. 914564
                                          Marion County Counsel
                                          jvetto@co.marion.or.us
                                          Attorney for Amicus Marion County

,

Emily Cooper OSB# 182254
ecooper@droregon.org
Thomas Stenson OSB # 152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
**Levi Merrithew Horst PC**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241

*Counsel for Plaintiff, Metropolitan Public Defender*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | Case No. 3:02-cv-00339-MO (Lead Case)<br>Case No. 3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS |
| v. | |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants. | |

Page 1 -    PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
            EXPERT'S RECOMMENDATIONS
            131840778

| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, | Case No. 3:21-cv-01637-MO (Member Case) |
|---|---|

Plaintiffs,

v.

DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, PATRICK ALLEN, Director of the Oregon Health Authority, in his individual and official capacity,

Defendants.

## LR 7-1 CONFERRAL

Plaintiffs and Defendants, with the considerable assistance of the Court's neutral expert (Dr. Debra Pinals), have conferred extensively over the past eight months regarding the ongoing compliance with this Court's permanent injunction. This work has included data sharing, face-to-face meetings at least once a week, and working together to implement the neutral expert's recommendations. *See* Dkt. 238-1. As a result of those conferrals, Plaintiffs have limited their requests for relief in this motion by taking into consideration the Defendants' clinical and policy knowledge and experience. Defendants do not oppose the relief requested by this motion. Defendants have reviewed the form of proposed order submitted by Plaintiffs and do not object to it.

## MOTION

Plaintiffs move this Court for an Order that:

(1)     The Oregon State Hospital, the Oregon Health Authority, Disability Rights Oregon, and Metropolitan Public Defenders implement the recommendations in Dr. Debra Pinals' January and June 2022 reports. If necessary to comply with paragraph three (3) of this order, Dr. Pinals may grant extensions of other deadlines in her recommendations after conferring with the parties. Any such

Page 2 -     PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS

131840778

extensions shall be documented in Defendants' monthly progress reports.

(2)     The Oregon State Hospital shall not admit patients except as provided for by the recommendations in the Neutral Expert's January and June 2022 reports or as otherwise provided by this Court.  Namely, Aid and Assist ("A&A") and Guilty Except Insane ("GEI") persons shall be admitted according to their place on the admissions wait list or pursuant to the relevant expedited admissions policy.[1] In addition, the Oregon State Hospital:

a.  may admit PSRB GEI revocations and persons pursuant to ORS 426.701 (extremely dangerous persons);

b.  shall not admit persons civilly committed unless they meet the criteria in the civil admission expedited admissions policy;[2]

c.  shall not admit transfers from the Oregon Youth Authority except as provided by ORS 179.473(1)(c), OAR 309-120-0080 and OAR 416-425-0020; and

d.  shall not admit transfers from the Oregon Department of Corrections unless they meet expedited admissions standards as articulated in the expedited admissions policy.[3]

(3)     The Oregon State Hospital shall immediately implement the maximum time for inpatient restoration in the Neutral Expert's June 2022 report as follows:

---

[1] *See* OSH Forensic Expedited Admission Policy available at https://www.oregon.gov/oha/OSH/LEGAL/Documents/Expedited_Consultation_for_Patients_Under_FORENSIC_Commitments_revised_Jun_2022.pdf (last accessed August 5, 2022).

[2] *See* OSH Civil Expedited Admission Policy available at https://www.oregon.gov/oha/OSH/LEGAL/Documents/Expedited_Admission_for_Patients_Under_CIVIL_Commitments.pdf (last accessed August 5, 2022).

[3] *See* OSH Forensic Expedited Admission Policy available at https://www.oregon.gov/oha/OSH/LEGAL/Documents/Expedited_Consultation_for_Patients_Under_FORENSIC_Commitments_revised_Jun_2022.pdf (last accessed August 5, 2022).

Page 3 -    PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS
131840778

a. For patients whose most serious charge is a misdemeanor, the maximum duration of commitment for restoration shall be the lesser of the maximum permissible sentence for the underlying offense or 90 days;

b. For patients whose most serious charge is a felony, the maximum duration of commitment for restoration shall be six (6) months, unless the felony meets the definition of a "violent felony" under ORS 135.240(6) in which case the maximum duration of commitment for restoration shall be one year.

c. For purposes of this Order, restoration across multiple charges shall be consolidated and contiguous consecutive periods of restoration should be eliminated unless there are new charges incurred after an initial period of restoration has ended.

d. Before a patient reaches this maximum duration of commitment for restoration under this Order and remains unfit to proceed, OSH shall notify the committing court of the patient's impending discharge 30 days before the date on which the hospital is required to discharge the patient pursuant to this Order.

e. From the date of this Order, for patients who, at the time of this Order, are already past the maximum length of restoration set out herein, Defendants shall provide the 30-day notice to committing courts before discharging such patients pursuant to this Order; and

f. No later than March 15, 2023, patients currently admitted at OSH who have exceeded the length of restoration set forth in this Order shall be discharged from their restoration commitment and from the hospital.

g. Defendants shall consult with the Neutral Expert regarding operational and clinical aspects of implementing these limitations on the duration of inpatient restoration.

Page 4 -  PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
EXPERT'S RECOMMENDATIONS
131840778

(4)     This Order terminates upon Dr. Pinals reporting to this Court that OSH/OHA has timely admitted A&A and GEI patients for at least three consecutive months, and that the termination of this Order would not cause the Defendants to fall back out of compliance.  For purposes of this Order "timely admission" means within seven days of a State Court order delivered to OSH ordering that the patient be admitted.

## MEMORANDUM

## I.    INTRODUCTION

Over the course of eight months, Dr. Pinals worked collaboratively with the parties to develop a clear set of recommendations for Defendants to reach and maintain compliance with this Court's permanent injunction. See Dkt. 238-1. Plaintiffs recognize that the Defendants have worked diligently to implement each of those recommendations. Those efforts, if maintained, combined with the legislature's substantial investment in behavioral health, will hopefully transform Oregon's system over the long term, leading to sustained compliance and better overall outcomes for people living with mental illness, which is better for the community overall. However, in the short term, the number of days it takes to admit someone to the state hospital is bad and getting worse. Wait times are approximately 40 days and have been steadily increasing every month. No one has any realistic hope that compliance will be regained in the short term if the Defendants only have the tools available to them under existing state law. In order to get back into compliance in the short term and give the Defendants the necessary breathing room to implement the long-term fixes, Plaintiffs respectfully request this Court to order the Defendants to both impose the stay limitations recommended in Dr. Pinals' report and strictly adhere to the admission recommendations in that report. This requested action comports both with this Court's authority as well as the Court's neutral expert's compliance recommendations.

Plaintiffs are concerned that people with mental illness continue to lack sufficient

Page 5 -   PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS

131840778

community behavioral health resources including those ordered for civil commitment languishing in local hospitals.  However, an over reliance on the state hospital is not the answer. Unlike the multiple civil commitment units throughout the state, Oregon State Hospital (OSH) is the only hospital where inpatient competency restoration or GEI commitment exists in the state. OSH's finite bed capacity is why there are currently 90 individuals waiting in punitive jail conditions for admissions to the state hospital.  Further, OSH Civil Expedited Admission Policy will help address any clinical risks to those individuals awaiting a state hospital bed for civil commitment.

The relief Plaintiffs seek represents a conservative first step with minimal negative impacts to address the competency restoration crisis. The parties will re-assess at the next benchmark and, in consultation with Dr. Pinals, may return to the Court with additional requests to ensure compliance with this Court's order, mitigate the harm caused by prolonged jail confinement, and safeguard the right to timely receipt of court ordered restoration services.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The *Mink* Injunction

In 2002, this Court issued a permanent injunction (the Mink Injunction) pursuant to the Fourteenth Amendment's substantive due process clause requiring OSH "to ensure that persons who are declared unable to proceed to trial pursuant to ORS 161.370(2) be committed to the custody of the superintendent of a state hospital . . . as soon as practicable. . . . These admissions must be done in a reasonably timely manner, and completed not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial because of mental incapacities under ORS 161.370(2)." *Oregon Advocacy Ctr. et al. v. Mink et al.*, 2002 WL 35578910, *7 (D. Or. 2002). Due to the sustained increase in admissions orders, hospital staffing issues, discharge barriers, lack of alternatives to state hospital admission, and other

Page 6 -    PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
             EXPERT'S RECOMMENDATIONS
             131840778

challenges, Defendants have been unable to comply with the seven-day timeframe for admitting Aid and Assist patients ordered committed to OSH by state courts under the *Mink* Injunction.

Before November 2021, the greatest number of commitment orders ever received in any given month was 82. *See* Dr. Pinals' January 2022 Report at p. 7. The average number of commitment orders per month in 2021 was 68.9 orders, which was a substantial increase from the average number in any year prior. *Id.* OSH received 100 commitment orders signed in November 2021. (This means that the average was 71 orders per month in 2021.) *Id.* This tidal wave of new commitment orders overwhelmed all of the steps OSH had taken to return to a seven-day timeframe required by the *Mink* Injunction.

Against this backdrop, on December 21, 2021, this Court entered an order appointing Dr. Debra Pinals as a neutral expert in granting a Stipulated Motion from OHA, OSH and Plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon (DRO), Metropolitan Public Defender Services (MPD), Inc., and A.J. Madison. Dkt. 240. The Court's order also consolidated two cases, *Bowman et al v. Matteucci et al* (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink et al* (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. *Id.* This Court further ordered that Dr. Pinals should "make recommendations to address capacity issues at the Oregon State Hospital." *Id.* at ¶ 2. That order directed that the first report from Dr. Pinals shall include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." *Id.* at ¶ 8. The Court further ordered a second report by the neutral expert that should include "report and recommendations for a proposed long-term compliance plan for OSH." *Id.* at ¶ 9.

### B. Dr. Pinals' Recommendations

In January and June of 2022, respectively, Dr. Pinals issued the reports ordered by this Court and the parties have agreed to implement all of the recommendations in those reports. The

Page 7 -   PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
       EXPERT'S RECOMMENDATIONS
       131840778

recommendations provide that OSH should admit in-custody defendants, which includes Aid and Assist patients and GEI defendants, in the order in which the commitment orders are signed or as provided for according to an expedited admissions protocol. *See* Dr. Pinals' January 2022 Report at p. 17; Dr. Pinals' June 2022 Report at p. 24.[4]  In addition, among other things, Dr. Pinals' recommendations include a broad array of systemic improvements regarding admissions and discharges to and from OSH, capacity building in the community, including legislation where needed to address state-law barriers.

Dr. Pinals' June 2022 Report also includes benchmarks for average wait time to admission as of specified dates, at which times the parties have agreed to consider whether additional recommendations may be warranted.  Those benchmarks are as follows:

- By August 1, 2022 – Average wait time to admission 22 days or fewer
- By October 1, 2022 – Average wait time to admission 17 days or fewer
- By January 1, 2023 – Average wait time to admission 11 days or fewer
- By February 14, 2023 – Average wait time to admission 7 days or fewer

As of August 1, 2022, the average wait time to admission is 39.2 days, which prompted Dr. Pinals and Plaintiffs to consider additional measures to move OSH towards compliance, including that this Court issue the Order requested by this motion.

## III.    ANALYSIS

### A.    This Court has authority under the Supremacy Clause to order Defendants to take actions that may conflict with state law if necessary and suitably tailored to achieve compliance with the *Mink* Injunction.

A federal district court has the inherent power to enforce compliance with an order of the court. *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also Stone v. City and County of*

---

[4] Dr. Pinals January and June 2022 reports are respectively available at
https://static1.squarespace.com/static/5d645da3cf8e4c000158e55a/t/61fae4fc94933f4b4566f36c/1643832573252/Oregon+Mink-Bowman+Neutral+Expert+Pinals+Report+1.30.22.pdf and
https://static1.squarespace.com/static/5d645da3cf8e4c000158e55a/t/62a10f8b83e85f09b0a1e1f2/1654722445714/Oregon-Mink-Bowman-2nd-Neutral-Expert-Pinals-Report-6.5.22.pdf

*San Francisco*, 968 F.2d 850, 861-62 (9th Cir.1992) (affirming court's "broad equitable remedial power" to authorize sheriff to override state law); *Brown v. Plata*, 563 U.S. 493 (2011) (imposing prison population limit); *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947) ("The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter.").  "[A] court has an affirmative duty to protect the integrity of its decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree." *Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 557 (6th Cir.1982), *rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts*; 467 U.S. 561 (1984) (footnote omitted) (discussing cases); *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985).

Put simply, "otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 862 (9th Cir. 1992).  And it is well established that if a federal court order is "necessary to remedy a constitutional violation," it may supersede conflicting state law. *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010).

In these consolidated cases, despite implementing all of Dr. Pinals' recommendations to date and continuing all efforts previously reported to this Court, OSH remains unable to perform its obligations to timely admit in-custody Aid and Assist persons as is constitutionally required by the *Mink* Injunction. As a result, this Court has authority to order OSH to take additional steps—even if they may contravene state law—to move OSH toward compliance with the *Mink* Injunction.  As explained below (and consistent with Dr. Pinals' recommendations), there are two barriers under state law that are presently impeding OSH's ability to comply with the *Mink* Injunction – the types of patients who can be ordered to the state hospital and the length of time patients can be held there - which this Court can address under its Supremacy Clause powers.

Page 9 -    PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
             EXPERT'S RECOMMENDATIONS
             131840778

**B.      State court actions and state law outside of Defendants' control are impeding Defendants' ability to comply with the *Mink* Injunction.**

**1.      State contempt proceedings are interfering with Dr. Pinals' recommendations.**

There are three types of patients who can receive services at Oregon State Hospital: 1) A&A, 2) GEI, and 3) civilly committed. Given the increase in A&A referrals over the past few years, more and more OSH bed capacity has been reserved for A&A and, as of January 2022, GEI patients to comply with the constitution and this Court's injunction. *See* Dkt. 240. This shift has resulted in local hospitals serving the vast majority of civilly committed patients. Over the last several years, Plaintiffs understand that OHA and OSH have spent extraordinary resources defending against dozens of contempt (and similar) actions filed in circuit courts throughout the state. As Dr. Pinals noted in her reports, there are often several hearings per week addressing individual court contempt findings for failure to timely admit individuals. *See* Dr. Pinals' January 2022 Report at p. 8. For each of these contempt hearings, there is a resource of testimony required from clinical and administrative staff who are then unable to perform the oversight and treatment functions that would expedite other admissions. *Id.*

Plaintiffs also understand that Defendants plan on filing a Request for Judicial Notice to provide this Court with judicially noticeable facts regarding the most recent contempt (and similar) actions in which Oregon state courts are holding hearings about whether OHA and OSH should be held in contempt (or other sanction) for failing to admit individuals to OSH. Plaintiffs also understand that one state court judge has even threated to confine an OHA official, in jail as a sanction for not admitting a civilly committed patient. This OHA official is critical to implementing Dr. Pinals' recommendations and cannot do so if in jail. Moreover, these state court actions seek to require OSH to admit Aid and Assist or civilly committed patients ordered contrary to the admissions protocol in Dr. Pinals' recommendations.

While Plaintiffs can appreciate and often share in the frustration that individual litigants and state court judges have expressed in these actions, these contempt orders have become an impediment to the systemic reforms necessary to move the Defendants toward compliance for

Page 10 -   PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
            EXPERT'S RECOMMENDATIONS

131840778

everyone who needs these services.  Ultimately, Plaintiffs seek both sustained compliance with this Court's injunction and the related systemic reform that will create a full continuum of behavioral health services for all Oregonians with mental illness to serve them in their homes and communities rather than overly relying on civil commitment, aid and assist, or other facility-based treatment.  Until we get there, however, Plaintiffs seek this Court's relief to limit the types of patients who can be committed to OSH to A&A, GEI, and civil commitment patients who meet the expedited admission criteria.

> **2.    Extended restoration time periods permitted by Oregon statute for Aid & Assist patients are interfering with OSH's ability to timely admit Aid & Assist and GEI patients.**

ORS 161.370 provides for length of inpatient restoration of Aid and Assist patients as follows:

> (10) [I]n no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter:
>
> (A) Three years; or
>
> (B) A period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted.

Dr. Pinals recommends the following legislative changes regarding time limits on inpatient restoration: (1) For misdemeanors, the lesser of the maximum permissible sentence for the underlying offense or 90 days; and (2) for felonies, the lesser of the maximum permissible sentence for the underlying offence or six (6) months, unless the felony involves serious violence in which case an option for an additional six-month period of restoration could be sought for a total not to exceed one (1) year; and (3) for serious violent felonies, after the initial six-month period of restoration and a finding that the defendant remains unable to Aid and Assist but restorable, a further period of restoration should require an affirmative request by a party to the litigation.  Dr. Pinals' June 2022 Report at p. 28. These recommended changes were extensively supported by peer-reviewed clinical research, OSH's own data, and a comparison to other state laws. Limiting the available period of restoration services also has the benefit of being able to

Page 11 -  PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
             EXPERT'S RECOMMENDATIONS
             131840778

rely on existing state law and hospital procedures to determine what to do with patients who have met or exceeded the stay limitation. State law allows for the institution of civil commitment procedures for those who remain dangerous yet not competent. For felonies, the proposed order simplifies the distinction between ordinary felonies and serious violent felonies by relying on existing state law to defines violent felonies. It does require any findings by the individual state courts to extend the time period for violent felonies to one year in order to avoid the prospect of this federal court imposing rules on state courts unless it is absolutely necessary.

The proposed order also deals with the fact that there are approximately 100 patients who currently exceed the maximum stay limitations proposed in this motion. It provides for a process to move these individuals toward discharge in a manner that will be as least disruptive as possible. Once again, the proposed method laid out in this Order was developed through conferral with the Defendants and their knowledge of their own internal processes and staffing limitations.   It allows Defendants to work collaboratively with Dr. Pinals to implement these new stay limitations.

Plaintiffs believe that, based on the average wait time at the August 1, 2022, benchmark, this recommendation should be implemented by federal court order now. Of the available options for moving the Defendants more quickly into compliance, it is the least disruptive and best supported from both a clinical and policy perspective.  As noted by the Court's Neutral Expert, such relief also comports with U.S. Supreme Court holding that indefinite restoration confinement violates the constitutionally protected liberty interest.  *See Jackson v. Indiana*, 406 U.S. 715 (1972) and Dr. Pinals' June 2022 Report at p. 29.

**C.     Plaintiffs' proposed Order governing admissions of patients to OSH and limiting restoration time periods is necessary and suitably tailored to enable OSH to return to compliance with the *Mink* Injunction.**

As explained above, the numbers at the state hospital are unacceptably high and are not going to decline significantly if the Defendants have to try and achieve compliance using only the tools available to them under existing state law. The *Mink* Injunction requires admission

Page 12 -   PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS
131840778

within seven days of the order. The current wait time is nearly 40 days, worse than it has been at virtually any time since the injunction was imposed. There are essentially four levers available to pull to reduce those wait times: 1) increase capacity; 2) reduce the number of admissions; 3) shorten the amount of time people stay in the hospital; and 4) reduce the amount of time it takes to discharge people. Each of these options is addressed in Dr. Pinals' reports.

Increasing capacity is not truly an option in the short term. The legislature has made substantial investments to expand capacity in the community for community restoration. That takes time. Even if the hospital had 100 more beds, they would be unable to hire the necessary staff to fill those beds. Reducing admissions may be an option that Plaintiffs ask this Court to implement in the future if necessary. The parties believe this option would be more disruptive and could have unintended consequences because it would not fit neatly into existing state law. The parties continue to discuss this option and Plaintiffs would craft any future request for relief based around these concerns. Shortening the amount of time it takes to discharge people from the hospital raises similar concerns, and once again the parties continue to study this issue and it may be something that Plaintiffs seek in the future to ensure all necessary intervention is being taken.

This request is narrowly tailored to the problem and is precisely calculated to be the least intrusive means of attempting to achieve compliance. It is not truly in conflict with existing state law because state law only provides maximum times for restoration. However, without this Order, the parties believe that circuit courts around the state will continue to use their contempt powers to attempt to force the Defendants to hold patients longer.

## IV.    CONCLUSION

Plaintiffs believe that the relief requested by this Motion is absolutely necessary for the Defendants to have any chance at achieving compliance within the next six months. Indeed, even with this Order, the Defendants may not meet the benchmarks, and Plaintiffs may return requesting further relief. However, Plaintiffs are limiting their request for relief at this point to

allow these limited changes to take effect while the parties continue to study how to reduce any
unintended consequences of more disruptive changes. Plaintiffs request that the Court adopt the
proposed order without delay.

DATED August 15, 2022.

LEVI MERRITHEW HORST PC

/s Jesse Merrithew
Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

*Counsel for Plaintiffs Metropolitan Public Defender,*
*Jarrod Bowman, and Joshawn Douglas-Simpson*

DISABILITY RIGHTS OREGON

/s Emily Cooper
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Tel:     (503) 243 2081
FAX:   (503) 243 1738

*Counsel for Plaintiff Disability Rights Oregon*

Page 14 -  PLAINTIFFS' UNOPPOSED MOTION FOR ORDER TO IMPLEMENT NEUTRAL
           EXPERT'S RECOMMENDATIONS
131840778

Emily Cooper OSB# 182254
ecooper@droregon.org
Thomas Stenson OSB # 152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
**Levi Merrithew Horst PC**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241

*Counsel for Plaintiff, Metropolitan Public Defender*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| **DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., & A.J. MADISON,** Plaintiffs, v. **PATRICK ALLEN,** in his official capacity as head of the Oregon Health Authority, **DOLORES MATTEUCCI**, in her official capacity as Superintendent of the Oregon State Hospital, Defendants. | Case No. 3:02-cv-00339-MO (Lead Case) Case No. 3:21-cv-01637-MO (Member Case) **[PROPOSED] ORDER TO IMPLEMENT NEUTRAL EXPERT'S RECOMMENDATIONS** |

| | |
|---|---|
| **JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON**, | Case No.  3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | |
| v. | |
| **DOLORES MATTEUCCI**, Superintendent of the Oregon State Hospital, in her individual and official capacity, **PATRICK ALLEN**, Director of the Oregon Health Authority, in his individual and official capacity, | |
| Defendants. | |

THIS MATTER comes before the Court on Plaintiffs' Unopposed Motion to Implement Neutral Expert's Recommendations.  Having reviewed the papers filed in support of this motion, the Court takes judicial notice that circuit courts throughout the state of Oregon have been holding hearings on whether the Oregon State Hospital and/or the Oregon Health Authority should be held in contempt under Oregon law for not admitting persons to the Oregon State Hospital and grants the Plaintiffs' motion.  Accordingly, the Court finds that Defendants are not in compliance with this Court's permanent injunction in *Mink* and ORDERS the following which are necessary to move Defendants towards compliance with that injunction:

(1)     The Oregon State Hospital, the Oregon Health Authority, Disability Rights Oregon, and Metropolitan Public Defenders shall implement the recommendations in the Court's Neutral Expert's January and June 2022 reports. If necessary to comply with paragraph three (3) of this order, Dr. Pinals may grant extensions of other deadlines in her recommendations after conferring with the parties.  Any such extensions shall be documented in Defendants' monthly progress reports.

[Proposed] Order to Implement Neutral Expert's Recommendations
Page 2

**ER - 215**

(2)     The Oregon State Hospital shall not admit patients except as provided for by the recommendations in the Neutral Expert's January and June 2022 reports or as otherwise provided by this Court.  Namely, Aid and Assist ("A&A") and Guilty Except Insane ("GEI") persons shall be admitted according to their place on the admissions wait list or pursuant to the relevant expedited admissions policy.[1] In addition, the Oregon State Hospital:

a.   may admit PSRB GEI revocations and persons pursuant to ORS 426.701 (extremely dangerous persons);

b.   shall not admit persons civilly committed unless they meet the criteria in the civil admission expedited admissions policy;[2]

c.   shall not admit transfers from the Oregon Youth Authority except as provided by ORS 179.473(1)(c), OAR 309-120-0080 and OAR 416-425-0020; and

d.   shall not admit transfers from the Oregon Department of Corrections unless they meet expedited admissions standards as articulated in the expedited admissions policy.[3]

(3)     The Oregon State Hospital shall immediately implement the maximum time for inpatient restoration in the Neutral Expert's June 2022 report as follows:

a.   For patients whose most serious charge is a misdemeanor, the maximum duration of commitment for restoration shall be the lesser of the maximum permissible sentence for the underlying offense or 90 days;

---

[1] *See* OSH Forensic Expedited Admission Policy available at
https://www.oregon.gov/oha/OSH/LEGAL/Documents/Expedited_Consultation_for_Patients_Under_FORENSIC_Commitments_revised_Jun_2022.pdf (last accessed August 5, 2022).
[2] *See* OSH Civil Expedited Admission Policy available at
https://www.oregon.gov/oha/OSH/LEGAL/Documents/Expedited_Admission_for_Patients_Under_CIVIL_Commitments.pdf (last accessed August 5, 2022).
[3] *See* OSH Forensic Expedited Admission Policy available at
https://www.oregon.gov/oha/OSH/LEGAL/Documents/Expedited_Consultation_for_Patients_Under_FORENSIC_Commitments_revised_Jun_2022.pdf (last accessed August 5, 2022).

[Proposed] Order to Implement Neutral Expert's Recommendations
Page 3

b. For patients whose most serious charge is a felony, the maximum duration of commitment for restoration shall be six (6) months, unless the felony meets the definition of a "violent felony" under ORS 135.240(6) in which case the maximum duration of commitment for restoration shall be one year.

c. For purposes of this Order, restoration across multiple charges shall be consolidated and contiguous consecutive periods of restoration should be eliminated unless there are new charges incurred after an initial period of restoration has ended.

d. Before a patient reaches this maximum duration of commitment for restoration under this Order and remains unfit to proceed, OSH shall notify the committing court of the patient's impending discharge 30 days before the date on which the hospital is required to discharge the patient pursuant to this Order.

e. From the date of this Order, for patients who, at the time of this Order, are already past the maximum length of restoration set out herein, Defendants shall provide the 30-day notice to committing courts before discharging such patients pursuant to this Order; and

f. No later than March 15, 2023, patients currently admitted at OSH who have exceeded the length of restoration set forth in this Order shall be discharged from their restoration commitment and from the hospital.

g. Defendants shall consult with the Neutral Expert regarding operational and clinical aspects of implementing these limitations on the duration of inpatient restoration.

(4) This Order shall terminate upon the Neutral Expert reporting to this Court that OSH/OHA has timely admitted A&A and GEI patients for at least three consecutive months, and that the termination of this Order would not cause the Defendants to fall back out of compliance. For purposes of this Order "timely

admission" means within seven days of a State Court order delivered to OSH ordering that the patient be admitted.

DATED this _____ day of August 2022 in Portland, Oregon.

_____
Hon. Michael W. Mosman
United States District Judge

Respectfully Submitted by:

Emily Cooper OSB# 182254
Thomas Stenson OSB # 152894
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
ecooper@droregon.org
tstenson@droregon.org
*Counsel for Plaintiff Disability Rights Oregon*

Jesse Merrithew OSB # 074564
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
jesse@lmhlegal.com
*Counsel for Plaintiff, Metropolitan Public Defender*

ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT #054725
SHEILA H. POTTER #993485
Senior Assistant Attorneys General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.state.or.us
          Sheila.Potter@doj.state.or.us
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, <br><br> Defendants. | ORDER CONSOLIDATING CASES AND APPOINTING A NEUTRAL EXPERT <br><br><br><br> Case No.  3:02-cv-00339-MO (Lead Case) |
| JARROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON <br><br> Plaintiffs, <br><br> v. <br><br> DOLORES MATTEUCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, PATRICK ALLEN, Director of the Oregon Health Authority, in his individual and official capacity, <br><br> Defendants. | <br><br><br><br> Case No.  3:21-cv-01637-HZ (Member Case) |

1—ORDER CONSOLIDATING CASES AND APPOINTING A NEUTRAL EXPERT

This matter comes before me on the parties' Stipulated Motion to Appoint Neutral Expert. [ECF 238] (No. 3:02-cv-00339-MO); [ECF 18] (3:21-cv-01637-HZ). I GRANT the parties stipulated motion. Accordingly, consistent with the parties' stipulation and agreement:

1. I consolidate the above-captioned *Mink* (3:02-cv-00339-MO) and *Bowman* (3:21-cv-01637-HZ) cases. *Mink* is designated as the lead case. Any future filings or other docket activities related to either case must appear in the *Mink* CM/ECF docket.

2. I hereby appoint Dr. Debra Pinals as a neutral expert in this matter, to make recommendations to address capacity issues at the Oregon State Hospital.

3. If Dr. Pinals becomes unavailable, the parties shall agree upon another neutral expert to serve in the same role.

4. I direct the Oregon Health Authority to enter into a contract with Dr. Pinals and provide for her payment for the work involved.

5. Defendants will provide Dr. Pinals with monthly reports throughout her engagement.  Defendants first report is due January 3, 2022, and must include a summary of their recent actions to achieve compliance, actions planned to achieve compliance, and barriers to completing those actions.

6. In addition to the information that Defendants are required to provide to Dr. Pinals under this order, Defendants shall provide to Dr. Pinals any other information that Dr. Pinals informs Defendants is necessary for her to fully review Defendants' actions and advise the Court.

7. Dr. Pinals shall not be employed or otherwise retained by any of the parties in any capacity except as provided for in this Order.

8. Dr. Pinals shall review the monthly reports that the Defendants are required to prepare under this Court's order.  Dr. Pinals's first report and recommendation is due to the Court by January 31, 2022. That report shall include suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under

2—ORDER CONSOLIDATING CASES AND APPOINTING A NEUTRAL EXPERT

ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients).

9.      Dr. Pinals's second report is due to this Court by April 29, 2022, and shall include a short report and recommendations for a proposed long-term compliance plan for OSH.

DATED:   ___12/21/2021_____

*Michael W. Mosman*
HONORABLE MICHAEL W. MOSMAN
U. S. District Court Judge

Submitted by: Carla A. Scott
              Senior Assistant Attorney General
              Attorneys for Defendants

3—ORDER CONSOLIDATING CASES AND APPOINTING A NEUTRAL EXPERT

Emily Cooper OSB# 182254
Thomas Stenson OSB # 152894
Sarah Radcliffe OSB # 064775
Kathleen L. Wilde OSB # 971053, *Active Pro Bono*
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
ecooper@droregon.org
tstenson@droregon.org
sradcliffe@droregon.org
wildekathy01@gmail.com
*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC.,** & **A.J. MADISON,** Plaintiffs, <br><br> v. <br><br> **PAT ALLEN,** in his official capacity as head of the Oregon Health Authority, & **DOLORES MATTEUCCI**, in her official capacity as Superintendent of the Oregon State Hospital, Defendants. | Case No.:  02-00339 <br><br> PLAINTIFF DISABILITY RIGHTS OREGON'S MOTION TO JOIN AND TO SUPPLEMENT PLAINTIFF METROPOLITAN PUBLIC DEFENDER SERVICES' MOTION FOR A RULE TO SHOW CAUSE WHY THE DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT <br><br> ORAL ARGUMENT REQUESTED <br><br> EXPEDITED HEARING REQUESTED |

## I.    NOTICE OF EFFORTS TO COMMUNICATE (LR 7-1)

Plaintiff Disability Rights Oregon and Defendants have met to discuss this Court's orders

and the steps necessary for compliance.  Declaration of Sarah Radcliffe ("Radcliffe Decl.") Ex.

A-C.  These discussions did not result in compliance nor agreed upon steps to reach compliance.

Radcliffe Decl. Exs. B, C.  Today, attorneys for the Plaintiff Disability Rights Oregon called

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 1

**ER - 222**

attorneys for the Defendants to announce its intent to file this motion. The parties were not able

to strike an agreement to avoid this filing.

## II.    PLAINTIFF DISABILITY RIGHTS OREGON'S MOTION TO JOIN AND TO SUPPLEMENT PLAINTIFF METROPOLITAN PUBLIC DEFENDER SERVICES' MOTION FOR A RULE TO SHOW CAUSE

For the reasons stated below, this Plaintiff joins Metropolitan Public Defender Services'

("MPD") May 10, 2019, motion and respectfully asks this Court to hold the Defendants in

contempt for the reasons stated in both motions.  Plaintiff Disability Rights Oregon (DRO),

formerly the Oregon Advocacy Center, and MPD were co-plaintiffs in filing the original

complaint in this matter though attorneys from DRO litigated the matter through trial and on

appeal at the Ninth Circuit Court of Appeals. DRO asks this court to order an expedited hearing

at which the Defendants must show cause why they should not be held in contempt of court for

violating the District Court's order to admit detainees declared unable to assist their counsel

within seven days of the order. 18 U.S.C. § 401. Because of the serious and irreparable harm

done to seriously mentally ill detainees by protracted detention in jail, the hearing should be held

on an expedited basis.

The Defendants' own records and admissions show that detainees protected by the *Mink*

order are being held far longer than the 7-day rule established in this case.  Radcliffe Decl. Exs.

B, D.  *Mink* detainees are individuals who have been found to be unable to aid and assist in their

defense and court ordered for competency restoration services provided by the Defendants.  In

2002, this Court "ordered admissions to be done in a reasonably timely manner, and completed

not later than seven days after the issuance of an order determining a criminal defendant to be

unfit to proceed to trial because of mental incapacities under ORS § 161.370(2)."  (Dkt. 51). The

Court's order is unambiguous and there is no factual dispute that the Defendants are in contempt

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender
Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 2

**ER - 223**

of this Court's Order. The Court should hold a hearing and determine whether to hold the

Defendants in contempt and order appropriate relief to address the ongoing constitutional

violations inflicted upon the class.

### III.   MEMORANDUM OF LAW

The Defendants have publicly conceded that, as of April 30, 2019, fifty-three (53)

detainees were awaiting transport and admission to the Oregon State Hospital. (Dkt. 87-1, at 24).

The Defendants' own data show that wait times for admission to the hospital for detainees

currently exceed three weeks.  Radcliffe Decl. Ex. D.  At the time of this filing, the number of

*Mink* detainees waiting in local jails for competency restoration services is greater than it was at

the time of trial in this matter in 2002. Thus, the Defendants are out of compliance with the

original judgment in this case.

This Court has previously recognized and the Ninth Circuit recently affirmed, that

Defendants' delays in providing competency restoration services to detainees violate the

constitutional rights of detainees. *See Oregon Advocacy Center v. Mink,* 322 F.3d 1101, 1120

(9th Cir. 2003)("[p]retrial detainees, whether or not they have been declared unfit to proceed,

have not been convicted of any crime. Therefore, constitutional questions regarding the . . .

circumstances of their confinement are properly addressed under the due process clause of

the Fourteenth Amendment. . . ."); *see also Trueblood v. Washington State Dep't of Soc.*

*& Health Servs.*, 822 F.3d 1037, 1043 (9th Cir. 2016).

### A.  There is No Material Dispute Regarding Defendants Lack of Compliance and Defendants Should Be Held in Contempt

In 2002, this Court ordered the Oregon State Hospital Superintendent and the Oregon

Health Authority Director to admit detainees "not later than seven days after the issuance of an

order" finding them unable to aid and assist in their own defense. (Dkt. 51 at 2.)  The current

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender
Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 3

**ER - 224**

facts of contempt are essentially undisputed and admitted by the Defendants. Radcliffe Decl. Exs. B, D. The Defendants must now answer why they should not be held in contempt.

If Defendants fail to show cause why they have violated these court orders, Plaintiff requests this Court to order Defendants to issue a plan for compliance for this Court's review. Such plan must be designed to ensure the timely provision of restoration services consistent with this Court's Orders and may consider the following short and long term solutions: (1) establish aggressive benchmarks to reach compliance, (2) hire an expert to provide direction in addressing the reform of the mental health system (3) take action to educate state courts and to intervene in state courts to ensure that court orders are timely addressed, patients promptly transported, and patients who can be appropriately discharged are discharged, (4) address prolonged lengths of stay for patients who can be released due to no longer meeting hospital levels of care and (5) expand community-based competency restoration services.

This Court has "wide latitude" in determining whether a party is in contempt of its orders. *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984). As such, it is up to the court to determine whether an entity is in contempt, and that decision is subject to abuse of discretion review. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999). The moving party has the burden of proving contempt by clear and convincing evidence. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Once this burden is met, it "then shifts to the contemnors to demonstrate why they were unable to comply." *Affordable Media*, 179 F.3d at 1239. A party should be found in contempt of a court order when 1) a person named in the order, or a person acting in concert with or participating with a named person, 2) violates the explicit terms of the order, 3) after having actual notice of the order. *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787, 789 (9th Cir. 1989).

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 4

Here, the Court's order is unambiguous and requires that state hospital "admissions must be done in a reasonably timely manner, and completed not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial because of mental incapacities under ORS § 161.370(2)." (Dkt. 51). The Defendants openly concede a lengthy waiting list for hospital admission has subjected dozens of criminal Defendants found unfit to proceed to weeks of waiting. A total of 259 detainees were admitted to the hospital more than seven days after an order of commitment to the state hospital from October 2018 to April 2019, primarily due to the hospital's waitlist. (Dkt. 87-1, at 124). Defendants waitlist data dated May 13, 2019, also establishes their lack of compliance. Radcliffe Decl. Ex. D. As for notice, the Defendants have not only admitted notice of the order but relied in state court on their potential liability for noncompliance with this Court's order. (Dkt. 87-1, at 3). Since the Plaintiffs have shown a prima facie case that the substituted Defendants had notice of and violated the order, it falls to the Defendants to rebut the Plaintiffs' arguments or come into compliance.

**B. The Court Should Consider Equitable Factors in Deciding Whether to Hold the Defendants in Contempt and the Extent of Any Relief Ordered**

There are several equitable factors this Court should consider in contemplating relief including the harm to the class, Defendants failure to timely notify this Court regarding their lack of compliance, and the scope of this constitutional crisis.

1. Detainees Forced to Languish in Local Jails Suffer Irreparable Harm

The decision regarding contempt and the scope of any order on contempt requires consideration of the equities in this matter. The Court should consider that the continued detention of individuals with serious mental illness in local jails when detainees are in acute crisis and are at risk of serious, irreparable harm. It is "well-recognized that detention in a jail is

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 5

**ER - 226**

no substitute for mentally ill detainees who need therapeutic evaluation and treatment."
*Trueblood v. Washington State Dep't of Soc. & Health Servs*., 822 F.3d 1037, 1039 (9th Cir. 2016). Many seriously mentally ill detainees are put in isolation in local jails, which some psychologists and psychiatrists describe as akin to torture. *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 946 (N.D. Cal. 2015) (discussing the relationship between suicide and isolation in local jails). "[B]ecause jails are inherently punitive and not therapeutic institutions, the mental health of detainees further erodes with each additional day of wait time, especially when those detainees are held in solitary confinement." *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 73 F. Supp. 3d 1311, 1316 (W.D. Wash. 2014) *aff'd in part, rev'd in part* 822 F.3d 1037 (9th Cir. 2016).

Detainees who are in psychiatric crisis and need evaluation and treatment are extremely vulnerable to suicide in jail. *Atayde v. Napa State Hosp*., 255 F. Supp. 3d 978, 998 (E.D. Cal. 2017) (holding failure to transfer in a timely manner a detainee awaiting restoration who then committed suicide stated a claim for Section 1983 purposes). As an Oregon example, Janelle Butterfield was admitted to the Josephine County Jail in July 2018 on charges of resisting arrest and interfering with a police officer. On August 28, 2018, she was court-ordered for an evaluation under ORS 161.365. Before she could be evaluated, she hanged herself in her cell on September 5.[1]  While she did not live long enough to be evaluated, found unable to aid and assist, and ordered to the hospital, she is typical of the type of vulnerable individual affected by these orders and prolonged jail delays. Protracting the time detainees like Janelle spend in jail before treatment will only increase the risk of suicide.

---

[1] Conrad Wilson, "*Suicide in the Leading Cause of Death in Oregon and Washington Jails,*" Oregon Public Broadcasting, April 4, 2019, *available at* https://www.opb.org/news/article/suicide-oregon-washington-jails-death-investigation/

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 6

ER - 227

A mental health provider in Tillamook County witnessed first-hand the harm that delays and protracted jail stays inflict on individuals with serious mental illness. She witnessed the decompensation of two detainees, R.T. and R.B., in the Tillamook County Jail. Decl. of Tami Long.

R.T. spent months in jail on one case in 2018, which resulted an order for his placement at the Oregon State Hospital. *Id.* at ¶7.  He waited more than a month for a bed at the state hospital from the time of that order. *Id.* at ¶7. After his return and the dismissal of the first case in January 2019, law enforcement and the local DA instituted new charges which further prolonged his stay. *Id.* at ¶8. During both stays in custody, she saw him severely decompensate. *Id.* at ¶7-¶9. At times, he was so afraid that he would refuse to leave his cell when the door was opened. *Id.* at ¶11. He would go without bathing and eating as a result of his decompensation. *Id.* at ¶11.

R.B. was arrested in March 2019 and incarcerated. *Id.* at ¶14. On April 12, 2019, the local court ordered him evaluated for his capacity to aid and assist his attorney. *Id.* at ¶15. On April 24, 2019, the local court found him unable to aid and assist and ordered him transferred to the state hospital. *Id.* at ¶ 16. He remains in Tillamook County Jail as of today and on the waiting list for transfer to the Oregon State Hospital. *Id.* at ¶18. As a result of his severe mental illness, he "declines rapidly" when incarcerated and experiences greatly increased delusions. *Id.* at ¶17.

A violation of a constitutional right may constitute per se irreparable harm. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir. 1984)("When an alleged deprivation of a constitutional rights is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also Huston v. Burpo,* C94–20771, 1995 WL 73097, at *5 (N.D.Cal. Feb.13, 1995) ("a violation of a constitutional right would constitute an irreparable injury."); *Elrod v. Burns,* 427 U.S. 347,

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 7

**ER - 228**

373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (in the context of free speech, the Supreme Court held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Here, *Mink* detainees are not only harmed by punitive jail conditions they are also deprived of their constitutional liberty rights while they languish for weeks or months in jail awaiting court ordered competency restoration services.

2. <u>Defendants Failed to Inform the Court of the Violations or Seek Redress by Motion</u>

The Defendants, as parties subject to a court order, owed a duty of compliance to this Court. Upon discovering that the state hospital was substantially out of compliance with the order and unlikely to come back into compliance any time soon, the Defendants could have and should have immediately alerted the court to its noncompliance. If the Defendants had any compliance plan, they could have offered it to this Court in a motion to modify. *See Hook v. Arizona Department of Corrections*, 107 F.3d 1396, 1404 (9th. Cir. 1997) (declining to consider arguments from director of Department of Corrections that could have been advanced in a motion to modify prior to violation of the order). When a defendant believes he cannot comply with an order, "the proper response [is] to inform the court of that fact, not to ignore orders until a contempt motion [is] brought." *Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F.Appx. 419, 425 (5th Cir. 2013). In considering whether to hold the Defendants in contempt and grant relief, the Court should consider that the Defendants made no effort to contact the Court or move to modify the order prior to the Plaintiffs' filing of contempt motions.

3. <u>The Court Has Broad Authority to Enforce Its Orders and Grant Relief to Remediate the Constitutional Interests of Detainees</u>

A district court has the inherent power to hold a party in civil contempt in order to enforce compliance with an order of the court or to compensate for losses or damages. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). *See also United States v. United Mine Workers*, 330

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 8

**ER - 229**

(189 of 269), Page 189 of 269
Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 189 of 269
Case 3:02-cv-00339-MO   Document 91   Filed 05/14/19   Page 9 of 11

U.S. 258, 303-04 (1947). Civil contempt is defined as "a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014) (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)).

Courts may impose civil contempt sanctions for the purpose of coercing a defendant to comply with its order. *See In'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard."). Courts may also consider other broad remedial measures to address noncompliance. *Stone*, 968 F.2d at 861-62 (affirming court's power to authorize sheriff to override state law). *See also, e.g.*, *Brown v. Plata*, 563 U.S. 493 (2011) (imposing prison population limit); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th. Cir. 1987) (affirming appointment of a Special Master). When the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. *Stone*, 968 F.2d at 861 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978)).

Here, while the Plaintiff has filed its first motion for contempt in this case, the information provided by Defendants establish both a lack of compliance and an increasing number of referrals that may require systemic relief on behalf of the class. For example, this Court may consider less restrictive alternatives to ensure compliance with the Court's orders; namely, community based restoration services. These services exist, but on a small scale that does not meet then need. Expanding community based restoration services would implement the

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender
Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 9

**ER - 230**

Americans with Disabilities Act (ADA) and the integration mandate to serve individuals with disabilities in the least restrictive environment.  *See* 28 C.F.R. § 35.130(d); *Olmstead v. L.C.*, 527 US 581, 602 (1999).

The Defendants have admitted through counsel and in open court that they "have no solution" and that they are "out of ideas."[2]  Defendants' longstanding failure to comply with this Court's unambiguous orders and the extreme harm created by long-term detention gives this Court broad remedial authority to determine the equitable method to enforce its orders. Plaintiff respectfully moves the Court to direct Defendants to issue a plan for compliance including providing aggressive and definitive benchmarks.

Plaintiff Disability Rights Oregon further requests that any remedy be drafted in a manner consistent with the legal principle that people with disabilities should be served in the most integrated setting consistent with their needs. *Id.*  Providing mental health services to inmates in jails and psychiatric hospitals is extremely expensive, often less effective, and inconsistent with the guarantees of federal nondiscrimination law, including the Americans with Disabilities Act and Rehabilitation Act.  42 U.S.C. § 12131; 29 U.S.C. § 794. To maximize the resources for mental health services and reduce the intake of new detainees in psychiatric crisis, the relief from this Court should be crafted specifically to favor community-based preventive services and restoration wherever clinically feasible.

## IV.    CONCLUSION

Defendants have failed to provide detainees with restoration services within seven days in violation of this Court's orders.  If Defendants fail to show cause why they have violated these

---

[2] Gordon Friedman, '*We Have No Solution': Grim State of Oregon Mental Health System Laid Bare in Court*, The Oregonian, April 24, 2019, *available at* https://www.oregonlive.com/news/2019/04/we-have-no-solution-grim-state-of-oregon-mental-health-system-laid-bare-in-court.html

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 10

**ER - 231**

court orders, Plaintiffs request the Court to use its broad authority and order Defendants to

submit a plan for compliance for this Court's review. Such compliance plan must be designed to

ensure the timely provision of restoration services consistent with this Court's Orders and may

consider the following short and long term solutions: (1) establish aggressive benchmarks to

reach compliance, (2) hire an expert to provide direction in addressing the reform of the mental

health system (3) take action to educate state courts and to intervene in state courts to ensure that

court orders are timely addressed, patients promptly transported, and patients who can be

appropriately discharged are discharged, (4) address prolonged lengths of stay for patients who

can be released due to no longer meeting hospital levels of care and (5) expand community-

based competency restoration services. Last, the overall compliance plan should ensure that

individual detainees receive services in the most integrated setting appropriate to their needs.

DATED this 14th day of May, 2019.

<div align="center">

DISABILITY RIGHTS OREGON

</div>

/s/ Emily Cooper
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
Sarah Radcliffe OSB # 064775
sradcliffe@droregon.org
Kathleen L. Wilde OSB # 971053, *Active Pro Bono*
wildekathy01@gmail.com
511 SW 10th, Suite 200
Portland OR 97205
Tel:    (503) 243 2081
FAX:   (503) 243 1738
*Counsel for Plaintiff*

Plaintiff Disability Rights Oregon's Motion to Join and Supplement Plaintiff Metropolitan Public Defender
Services' Motion for a Rule to Show Cause Why the Defendants Should Not Be Held in Contempt
Page 11

**ER - 232**

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

Attorney for Plaintiff,
Metropolitan Public Defender Services, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **OREGON ADVOCACY CENTER, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON**, <br><br> Plaintiffs, <br><br> v. <br><br> **BOBBY MINK, Director of the Department of Human Services, in his official capacity, and, STANLEY MAZUR-HART, Superintendent of the Oregon State Hospital, in his official capacity**, <br><br> Defendants. | Case No.: 3:02-cv-00339-PA <br><br><br> **PLAINTIFF METROPOLITAN PUBLIC DEFENDER SERVICES'S MOTION FOR FINDING OF CONTEMPT, TO ALLOW DISCOVERY, AND FOR EXPEDITED HEARING** |

## LR 7-1 CERTIFICATION

Undersigned counsel conferred with counsel for the parties to be substituted (Patrick Allen and Dolores Matteucci), Renee Stineman. The parties were not able to resolve this dispute.

Page 1 – PLAINTIFF METROPOLITAN PUBLIC DEFENDER SERVICES'S MOTION FOR FINDING OF CONTEMPT, TO ALLOW DISCOVERY, AND FOR EXPEDITED HEARING

## MOTION

Plaintiff Metropolitan Public Defender Services, Inc. (hereinafter "MPD") moves this Court for a finding of contempt for violating this Court's permanent injunction (Dkt. No. 51). Defendants' successors-in-interest have admitted in sworn testimony that they have been violating this Court's injunction since October 2018.[1] Defendants conceded that they continue to violate this Court's injunction and that there is little hope that they will cease violating this Court's injunction in the near future. Defendants also admitted that they are aware of this Court's injunction, aware that they were violating that injunction for the past seven months, and yet have made no effort to return to this Court and ask that the injunction be modified. Therefore, MPD moves this Court to:

1. Find defendants in contempt based upon their sworn statements;

2. Allow plaintiff to obtain limited discovery from defendants in advance of a hearing, and;

3. Set an expedited hearing to determine:

   a. The necessary remedial sanctions to punish the defendants and compensate plaintiffs and those effected by their contempt for their injuries;

   b. The necessary remedy to stop the ongoing violations, prevent future violations, and compensate any victims of future violations.

---

[1] *See* plaintiff's concurrently filed *Motion to Substitute Defendants*. Except where necessary to explain historical facts, plaintiff refers to "defendants" throughout this brief as the new defendants: Patrick Allen and Dolores Matteucci.

Page 2 –PLAINTIFF METROPOLITAN PUBLIC
DEFENDER SERVICES'S MOTION FOR FINDING OF
CONTEMPT, TO ALLOW DISCOVERY, AND FOR
EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

## BACKGROUND

In 2002, plaintiffs filed a complaint against Bobby Mink, then the directory of the

Department of Human Services[2], and Stanley Mazur-Hart, then the superintendent of the Oregon

State Hospital ("OSH")[3]. They sued the defendants in their official capacities only, seeking

injunctive relief. Their claim was that the defendants were violating the due process rights of

criminal defendants who had been ordered committed to the state hospital, but were being held in

jail awaiting transport for inordinate amounts of time. Following a court trial (Dkt. No. 37),

Judge Panner agreed. *See Findings of Fact & Conclusions of Law*, Dkt. No. 47 (hereinafter

"Findings"). Judge Panner entered a permanent injunction, requiring defendants to admit patients

"not later than seven days after the issuance of [the] order… ." *Judgment*, Dkt. No. 51. Judge

Panner retained jurisdiction in this Court to enforce the injunction. *Id.*

Defendants requested a stay of the order. Dkt. No. 49. Judge Panner denied that request.

Dkt. No. 65. Defendants appealed to the Ninth Circuit, and the Ninth Circuit upheld the

judgment in all respects. *Or. Advocacy Ctr. v. Mink*, 332 F.3d 1101 (9th Cir. 2003). At no time

since have the defendants or any of their successors in interest returned to this Court to seek

modification of the injunction. The law established in *Mink* is now the settled law of this circuit.

*See, e.g., Trueblood v. Wash. Dep't. Social & Health Serv.*, 822 F.3d 1037 (2016).

While the law has not changed since this Court issued its injunction, our understanding of

the damage done to individuals suffering from mental illness and going untreated in jails has. At

---

[2] At the time plaintiffs filed their complaint, DHS was the agency in charge of the state hospital. That portion of DHS's duties was carved out with the creation of the Oregon Health Authority in 2009. The current director of the Oregon Health Authority is Patrick Allen.

[3] The current superintendent of OSH is Dolores "Dolly" Matteucci.

Page 3 –PLAINTIFF METROPOLITAN PUBLIC DEFENDER SERVICES'S MOTION FOR FINDING OF CONTEMPT, TO ALLOW DISCOVERY, AND FOR EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

this time of the injunction, Judge Panner noted in his findings that imprisonment of people with untreated mental illness "exacerbates their mental illness," *Findings*, at 6, that the "population has a high suicide risk, and psychosis can be an emergency requiring immediate treatment," *id.* at 7, and that "[d]epriving them of necessary medical treatment increases the likelihood that they may decompensate and suffer unduly." *Id.* at 8. While all of that remains true, our understanding of the long term damage being done to this population of people has deepened and crystallized over the past 15 years.

It is now a matter of scientific consensus that failing to treat psychosis leads to worse long-term prognoses for treatment. *See, e.g.,* McKenzie, Kwame, *How Does Untreated Psychosis Lead to Neurological Damage?*, 59 Can. J. Psych. 511 (Oct. 2014); Clarke, et. al., *Untreated Illness and Outcome of Psychosis*, 189 British J. Psych. 235 (2006); Drake, et. al., *Causes and Consequences of Duration of Untreated Psychosis in Schizophrenia*, 177 British J. Psych. 511 (2000); Penttilä, et. al., *Duration of Untreated Psychosis as Predictor of Long-Term Outcome in Schizophrenia: Systematic Review and Meta-Analysis*, 205 British J. Psych. 88 (2014). While scientists continue to examine and debate the precise mechanism by which this damage occurs, there is no debate that the damage is being done. *Id.* In simple terms, we now know that by failing to treat psychosis, you are not only causing a person to "suffer unduly," but you are actually causing brain damage which may prevent the person from ever recovering.

Meanwhile, the conditions of confinement for mentally ill prisoners in Oregon's county jails have not improved, nor has the quality of mental health care afforded them. A recent comprehensive analysis conducted by Oregon Public Broadcasting found that the rate of suicide among prisoners in county jails has increased over the past decade. *See* Conrad Wilson, Tony

Page 4 –PLAINTIFF METROPOLITAN PUBLIC
DEFENDER SERVICES'S MOTION FOR FINDING OF
CONTEMPT, TO ALLOW DISCOVERY, AND FOR
EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

Schick, Austin Jenkins, and Sydney Brownstone, *Booked and Buried: Northwest Jails' Mounting Death Toll* (April 2, 2019) available online: https://www.opb.org/news/article/jail-deats-oregon-washington-data-tracking. That same study found that 70% of jail deaths in Oregon and Washington were pretrial detainees. *Id*. Isolation exacerbates the risk of self-harm. Kaba, et. al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104(3) Am. J. Pub. Health 442 (March 2014). That is likely because isolation itself causes psychological harm. Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol. 325 (Jan. 2006).

Beginning in approximately October of 2018, criminal defense lawyers and judges around the state began noticing that it was taking longer for defendants to be transported to OSH. Due to the nature of Oregon's court and defense system, the total scale of the problem was not immediately apparent. That changed this spring when criminal defense lawyers in Washington County (including plaintiff's employees) asked the presiding judge of that county, Charles Bailey, to hold hospital officials (defendants here) in contempt for failing to abide by the individual orders issued in criminal cases to transport within seven days. Judge Bailey held a series of hearings, eventually ordering defendants to come to his court and explain why he should not hold them in contempt. *See State of Oregon v. Eric Gilbreth*, Washington County Case Nos. 18CR84318 & 19CR06058; *State of Oregon v. Gale Merrill*, 18CR65775; *State of Oregon v. Dustin Lee Wood*, 17CR75655; and *State of Oregon v. Carlos Zamora-Skaar*, 18CR79052 & 18CR84154. In response to Judge Bailey's order, the defendants, through counsel at the Oregon Department of Justice, submitted sworn declarations, outlining the shear breadth of their violations. *Id*.; *Declaration of Jesse Merrithew*, Ex. A (hereinafter "ODOJ Memo").[4]

---

[4] The entire submission by ODOJ is included as Exhibit A.

Page 5 –PLAINTIFF METROPOLITAN PUBLIC
DEFENDER SERVICES'S MOTION FOR FINDING OF
CONTEMPT, TO ALLOW DISCOVERY, AND FOR
EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

ER - 237

According to their own sworn declarations, OSH is now violating the injunction in nearly 100% of all new cases. *Id*. at 124. At the time this Court entered its injunction, the defendants were transporting 18% of people within seven days of an order. Findings, at 7 ¶ 15. At the time of their declarations, there were 53 people who had been ordered into the custody of the superintendent but were still incarcerated in county jails around the state. *ODOJ Memo*, at 21. By contrast, at the time this Court entered its injunction, there were only eleven people held in jails around the state and awaiting transport. *See Findings*, at 3-4. Although defendants did not provide state wide data regarding how long people were waiting in jail to be transported, the anecdotal evidence suggests that delays today mirror those at the time of the injunction. Judge Panner found that the average wait time was 31.98 days in 2002. *Id*. at 7. MPD attorneys report that recently their recent clients are taking approximately one month to be transported. *Declaration of Carl Macpherson*. Also similar to the situation in 2002, the outlier cases are particularly egregious. Mr. Zamora-Skaar, one of the defendants discussed above, has been waiting 119 days as of this writing in the Washington County Jail waiting to be transported to the state hospital. *Compare, Findings*, at 7 ¶ 15.

Also unchanged since 2002 is the defendants' defense of their actions: to claim poverty. This Court specifically and categorically rejected this defense. "There is no rationalization that passes constitutional muster for unreasonably detaining person found unfit to proceed in county jails. The lack of funds, staff or facilities cannot justify defendants' failure to provide persons found unfit with the treatment that is necessary to attempt restoration of competency." *Findings*, at 12.

Page 6 –PLAINTIFF METROPOLITAN PUBLIC
DEFENDER SERVICES'S MOTION FOR FINDING OF
CONTEMPT, TO ALLOW DISCOVERY, AND FOR
EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

## ARGUMENT

This Court has broad inherent authority to enforce its orders. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In addition, this Court has explicit statutory authority to enforce its orders through contempt. *See* 18 U.S.C. § 401(3). Neither willfulness nor intent is required, and good faith is not a defense to a civil contempt finding. *In re Dual Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Virtually the only defense available to a defendant seeking to avoid a contempt finding is that they have taken "every reasonable step" to comply with the court's order and yet have been unable to do so. *Stone v. City & County of San Francisco*, 968 F.2d 850, 856-57 (9th Cir. 1992). Defendants cannot make such a showing here.

Procedurally, plaintiff bears the initial burden of showing by clear and convincing evidence that defendants violated a specific and definite order of this Court. *See Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). Once that burden is met, the burden shifts to defendants to show that they have taken all reasonable steps to avoid violating that order. *Id*.

In this case, defendants flatly admit that they are repeatedly violating a specific and definite order of this Court and have been doing so for seven months. Their sworn declarations are sufficient proof to show this by clear and convincing evidence. The question, therefore, is whether defendants can prove that they have taken all reasonable steps to avoid violating that order. Defendants cannot do so.

The first, and most obvious reasonable step they could have taken to avoid violating this Court's order would have been to ask this Court to modify its judgment. *See* Fed. R. Civ. P. 60(b)(5); *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) (describing procedures and showing to modify injunction). The failure to attempt that reasonable step should be sufficient to

Page 7 –PLAINTIFF METROPOLITAN PUBLIC
DEFENDER SERVICES'S MOTION FOR FINDING OF
CONTEMPT, TO ALLOW DISCOVERY, AND FOR
EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

ER - 239

defeat any claim that defendants are not in contempt. If the Court believes that defendants may still be able to prove that they took all reasonable steps, despite their failure to ask the Court to modify the injunction, it should set an expedited contested hearing on this issue. However, what is "reasonable" needs to placed within the context of the seriousness of the injunction.

This Court set an outside limitation of seven days to transport people to OSH because delays of any longer than seven days violate that person's due process rights. Every single time OSH waits more than seven days to transport someone, it is violating the constitution. Compliance with the constitution is the first and highest duty of every public official. Every other obligation, goal, mandate, or preference is inferior to the obligation to comply with the constitution. Therefore, unless the defendants claim that their decision not to transport people in compliance with this Court's injunction is because doing so would violate other constitutional obligations they hold, their reasons are insufficient.

## CONCLUSION

MPD views defendants' contemptuous delays as creating a medical and moral emergency for its clients. As Judge Panner rightly observed, staffing and funding levels simply pale in comparison to the suffering and damage done to a person with untreated mental illness, locked in a cage for 23 hours a day. MPD implores this Court to act quickly to end the suffering, mitigate the damage, and prevent future violations.

**DATED** this 10th day of May, 2019.

**LEVI MERRITHEW HORST PC**

By:    _/s/ Jesse Merrithew_____

              **Jesse Merrithew**, OSB No. 074564
              Email: jesse@lmhlegal.com

Page 8 –PLAINTIFF METROPOLITAN PUBLIC
DEFENDER SERVICES'S MOTION FOR FINDING OF
CONTEMPT, TO ALLOW DISCOVERY, AND FOR
EXPEDITED HEARING

LEVI MERRITHEW HORST PC
610 SW Alder Street, Ste 415
Portland, Oregon 97205

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| Oregon Advocacy Center, Metropolitan | ) | |
| Public Defender Services, Inc., and | ) | |
| A.J. Madison, | ) | Civ. No. 02-339-PA |
| | ) | |
| Plaintiffs, | ) | JUDGMENT |
| | ) | |
| | ) | |
| Bobby Mink, Director of the Department | ) | |
| of Human Services, in his official capacity, | ) | |
| and Stanley Mazur-Hart, Superintendent of | ) | |
| Oregon State Hospital, in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

PANNER, Judge:

Based on this court's findings of fact and conclusions of law, judgment is entered for plaintiffs.

This court retains continuing jurisdiction to enforce the injunction entered.

This court orders defendants to ensure that persons who are declared unable to proceed to trial

pursuant to ORS § 161.370(2) be committed to the custody of the superintendent of a state hospital

designated by the Department of Human Services as soon as practicable. This shall be fulfilled by

providing full admission of such persons into a state mental hospital or other treatment facility so

1 - JUDGMENT

designated by the Department of Human Services, in accordance with Oregon's existing applicable

statutory provisions.  These admissions must be done in a reasonably timely manner, and completed not

later than seven days after the issuance of an order determining a criminal defendant to be unfit to

proceed to trial because of mental incapacities under ORS § 161.370(2).

DATED this 15th day of May,  2002.


 /s/ Owen M. Panner

Owen M. Panner
United States District Court Judge


2 - JUDGMENT


ER - 242

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| Oregon Advocacy Center, Metropolitan | ) | |
| Public Defender Services, Inc., and | ) | |
| A.J. Madison, | ) | CV. NO. 02-339-PA |
| | ) | |
| Plaintiffs, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| | ) | |
| Bobby Mink, Director of the Department | ) | |
| of Human Services, in his official capacity, | ) | |
| and Stanley Mazur-Hart, Superintendent of | ) | |
| Oregon State Hospital, in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

PANNER, Judge:

Plaintiffs bring this action seeking an order compelling defendants to expeditiously provide

hospital admission and medical treatment for criminal defendants who are determined by the Circuit

Courts within Oregon to be unfit to proceed to trial because of mental incapacities. I held a court trial

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

on April 8, 2002. After consideration of the evidence adduced and the arguments submitted, these are

my Findings of Fact and Conclusions of Law:

<center>Findings of Fact</center>

1. Plaintiff Oregon Advocacy Center ("OAC") is a federally funded non-profit law office

representing the rights of people with disabilities. Under the Protection and Advocacy for the Mentally

Ill Act, 42 U.S.C. § 10805, OAC is charged with the authority to protect the rights of individuals with

mental illness. Some criminal defendants are determined by the Circuit Courts of Oregon to be unfit to

proceed to trial because of mental incapacities (hereinafter referred to simply as being "unfit" or "unable

to proceed"). *See* ORS § 161.370(2). These "unfit to proceed" defendants fall within the scope of

OAC's mandate, and are its constituents.

2. Plaintiff OAC represents people with mental illness and provides the means to protect their

collective interests. The organization advocates for those found unable to proceed to trial in various

ways, including representing individual clients and litigating to establish limits on the amount of time

people may be held at state hospitals because they have been found unfit to proceed.

3. Plaintiff Metropolitan Public Defender Services, Inc., ("MPD") is a non–profit corporation

representing indigent criminal defendants in Multnomah and Washington Counties in Oregon. Because

of defendants' delays in accepting custody of persons found unfit to proceed, MPD suffers ongoing

injury because its ability to represent its clients' interests is impaired, and because the delays compel

MPD to expend additional resources to effectively represent clients who are incarcerated while

awaiting hospitalization. As a result of delays of weeks and months in getting a client admitted to the

state hospital, MPD is forced to use its limited resources to attempt to keep the client advised of his or

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

her status, address difficult questions from the client's family, stay in contact with the jail personnel regarding the limited psychiatric treatment that may be available, and attend additional court calls to explain to the judge that the client is still awaiting the court-ordered placement and treatment. These responsibilities deprive MPD attorneys of time and energy needed for other cases, draining MPD's resources and frustrating its mission. Similarly, John Connors, Multnomah County Director for MPD, is required to repeatedly address the problems created by defendants' delays in providing the court-ordered hospitalization of his clients, thereby diverting him from his other duties.

4. Plaintiff A.J. Madison was incarcerated in the Multnomah County Jail on March 5, 2002, the date he was found unable to aid and assist. He was charged with assaulting his mother with a sledge hammer, a crime that by itself is indicative of serious mental illness. Madison did not understand why he was in jail or the severity of the charges against him, and suffered severe anxiety because he was not being treated properly. He was not admitted to Oregon State Hospital ("OSH") until March 28, 2002, 23 days after he was found unfit to proceed.

5. Madison's psychological evaluation indicates he cannot participate in an appropriate exchange of information, and cannot reason well enough to make proper decisions        about relevant information. In order for him to return to competency to stand trial at a later date, Madison requires specialized medications and treatment.

6. Plaintiffs provided a list of other clients experiencing significant delays in obtaining transfer and treatment. Defendants did not dispute the assertions that clients have suffered, and are suffering, delays of weeks and months before being admitted into the state hospital. As of March 25, 2002, the

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

hearing date for plaintiffs' motions for a temporary restraining order and a preliminary injunction, OSH had a list of 11 "unable to proceed" defendants awaiting transport.

7. Oregon law provides that "if the court determines that the defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended. . . and the court shall commit the defendant to the custody of the superintendent of a state mental hospital designated by the Department of Human Services." ORS §161.370(2). The law permitted the Mental Health Division to designate a state mental hospital "or other treatment facility" for commitment. Oregon has forensic units at both OSH and Eastern Oregon Psychiatric Center, and Oregon's state hospitals provide locked wards. The Eastern Oregon Psychiatric Center houses forensic patients (those who have been charged or convicted of crimes). The Division never designated a facility other than OSH for admission of "unable to proceed" defendants, however. The law formerly provided "the defendant shall be transported to the hospital or treatment facility as soon as practicable. Transport shall be completed within seven days after the court's determination unless doing so would jeopardize the health or safety of the defendant or others." ORS §161.370(3). The current statute is silent on how quickly transport must occur.

8. Plaintiffs' clients are incarcerated in various county jails in Oregon while awaiting transfer to OSH. These jails have a varying, limited capacity to accommodate these clients.

Deschutes County Jail has an inmate population of 200, and has one full-time psychologist and a psychiatrist who comes in once a week to review medication. There is a single location in the facility at which inmates can be monitored visually.

4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Lincoln County Jail has 150 inmates, one full-time inmate counselor, and a psychiatric nurse practitioner who comes in four hours per week for medication management. The jail's ability to care for mentally ill inmates is rudimentary.

Washington County Jail houses approximately 485 people, and staffs a psychiatric nurse practitioner who does pharmacology, and a social worker and community liaison. The jail lacks people who are trained to care for mentally ill people.

The Clackamas County Jail has 494 inmates, and one psychologist who comes into the jail five days a week for eight hours to provide counseling. A psychiatrist works four hours a week, a nurse practitioner works four hours a week, and a psychiatric nurse works eight hours per week.

Lane County Jail houses 451 inmates, and staffs one consulting psychiatrist who comes in once a week to provide medication management, and a full-time mental health specialist who provides crisis management.

Josephine County Jail houses approximately 170 inmates. There is virtually no mental health treatment in the jail. Until recently, the only available treatment was crisis intervention services from outside the jail. Medication is available through a clinic, but an inmate cannot be involuntarily medicated. The jail has standard restraints, including a restraint chair, and a control technician to monitor prisoners every 15 minutes when necessary.

The Multnomah County Jails house a population of approximately 1,800 persons, and maintain a mental health services staff consisting of a half-time psychiatrist, who functions as psychiatric medical director; a full-time psychiatric nurse practitioner, a contract nurse practitioner, another psychiatrist who works eight hours per week on a contractual basis, and 10 additional mental health staff, composed

5 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

primarily of psychiatric nurses or mental health consultants.  The Multnomah County Sheriff's Office provides some mental health treatment, but its primary responsibility is jail safety.  It lacks expertise and resources to provide treatment designed to care for the mentally ill and to restore competency.

9.  Jails can provide medication management for people who are willing to take medications, but cannot administer medication involuntarily, except in a life-threatening emergency.  When resources permit, treatment for "unfit to proceed" defendants may possibly include basic clinical psychiatry and intervention.  Such treatment is designed to stabilize the inmate.  However, some inmates, particularly those with personality disorders, refuse or do not respond to medication, and do not otherwise respond to the treatment the jails can provide.

10.  None of the jails in which these persons are held is able to provide treatment designed to restore a person found unfit to proceed to competency.  People found unfit to proceed are often overtly psychotic and require special housing or segregation.  They are unpredictable and disruptive, taking up valuable resources needed for the care of other inmates.  If they refuse to take medications, they often decompensate rapidly.  They often are confined in their cells for 22 to 23 hours a day because of their behavior.  This exacerbates their mental illness.

11.  Necessarily, the jails' only system for controlling inmates is disciplinary, which is behavior-driven.  Such a system is ineffective for mentally ill persons, and possibly harmful.

12.  Unlike the county jails, OSH has the capacity to treat a person's mental illness.  Each of the units housing persons found unfit to proceed is staffed by a full-time psychiatrist, a psychologist, a mental health specialist, a recreation counselor, a social worker, a mental health technician and nurses.

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

13.  In addition to assessment, medication evaluation and management, and individual and group psychotherapy, OSH provides legal skills training three times a week to assist patients in learning about the law, pleas, and returning to court.  This treatment is designed to enable a person to regain fitness to proceed to trial.

14.  The Oregon State Hospital provides status reports to OAC each time a person is evaluated as to his or her continued unfitness to proceed.  The report contains a copy of the order finding the person unfit to proceed, and indicates the date on which the person was accepted by OSH.  These records have been compiled by OAC since October, 2001.

15.  A review of 105 records reveals that persons found unfit to proceed in 2001 and 2002 spent an average of 31.98 days awaiting transport to OSH.  Only 19 persons were transported within seven days or less; 48 people were held for 30 days or more, and nine people were held for 60 days or more.  The ten longest periods of time people were held in this period are as follows:  166 days, 102 days, 84 days, 82 days, 78 days, 68 days, 65 days, 63 days, and 57 days.

16.  The delays experienced by some persons who were found unfit to proceed in 2001 and 2002 and detained in Multnomah County Jails between July 1 and October 15, 2001, are representative.  Eleven inmates who were found unfit to proceed were held for a total of 471 days awaiting transport to OSH; the longest wait lasted 111 days, the next 102 days, and the next 81 days.  The shortest period of time was seven days.  As recently as February 15, 2002, one client had waited 87 days for placement.

17.  Promptly admitting persons found unfit to proceed is critical.  This population has a high suicide risk, and psychosis can be an emergency requiring immediate treatment.

7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

18.  Indefinitely imprisoning persons deemed unfit to proceed without adequate treatment is unjust and inhumane.  Depriving them of necessary medical treatment increases the likelihood that they may decompensate and suffer unduly.  The delays also hamper efforts to provide effective representation regarding their criminal prosecution.

19.  The delays also result in possible injury to a defendant's procedural rights.  Under state law, a re-evaluation must take place within 60 days of the time defendant is committed to the custody of the state hospital.  However, as the client spends weeks and months in jail awaiting hospitalization, that evaluation is delayed.  Relatedly, people have a right to have their cases tried within 60 days of being charged, if they are in custody.  However, for people declared to be unable to aid and assist, delays in the subsequent evaluative process can postpone the opportunity for a trial for much longer than 60 days.

20.  The jails have the capacity to transport inmates to a treatment facility within 24 hours. The reason they do not transport the inmates is because defendants refuse to accept them.

21.  Sheriff Noelle attempted to implement a policy of transporting "unable to proceed" persons to the state hospital within 72 hours.  There is no dispute this policy has failed because defendants have refused to accept custody.  Jail personnel are compelled to incarcerate these persons until the hospital agrees to admit them.  As a result, the court-ordered admissions are delayed until the jails are notified that a hospital bed is available.

22.  Every day of delay in transport harms those found unfit to proceed and hampers their ability to defend themselves.  Attorneys and investigators are impaired by having to prepare a case months after the incident has occurred.  The treatment-deprived client cannot provide information to the

8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

attorney, a defense cannot be prepared, and witnesses who may be critical to the case cannot be

identified and may be unavailable at a later time.  Trials, pleas and other means of resolving

prosecutions are delayed while these defendants are incarcerated and awaiting eventual hospital

admission and treatment.

\\\

Conclusions of Law

1.  Plaintiff OAC has standing to represent the interests of persons who are presently or may in

the future be unfit to stand trial, and to seek a permanent injunction and declaratory judgment

establishing the time frames within which due process requires that they be transported from county jails

to a treatment facility.  *See United Food and Commercial Workers Union Local 751 v. Brown*

*Group, Inc.*, 517 U.S. 544, 552-53 (1996); *Hunt v. Washington State Apple Advertising*

*Commission*, 432 U.S. 333, 343 (1977) (an association may bring suit on behalf of its members or

constituents despite the fact that individual members have not actually brought suit themselves); *Warth*

*v. Seldin*, 422 U.S. 490, 511 (1975) (even in the absence of injury to itself, an association may have

standing solely as the representative of its members); *see also Fair Housing of Marin v. Combs*, 285

F.3d 899, 904-05 (9th Cir. 2002) (Ninth Circuit upholds "organizational standing" for nonprofit fair

housing organization suing an apartment owner for discriminatory conduct; direct standing to sue is

appropriate because the agency showed a drain on its resources from both a diversion of its resources

and frustration of its mission); *Doe v. Stincer*, 175 F.3d 879, 882-84 (11th Cir. 1999) (it has "long

been settled that an organization has standing to sue to redress injuries suffered by its members without

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

a showing of injury to the association itself and without a statute explicitly permitting associational standing;" a protective and advocacy organization "may sue on behalf of its constituents during the course of their treatment or within ninety days after being discharged from a treatment facility pursuant to § 10805(a)(1)(B), (C), subject. . . to the requirements of Article III as laid out in *Hunt* and its progeny").

2.   Plaintiff MPD has organizational standing to represent its own interests, and to obtain permanent injunctive and declaratory relief because of injury to itself resulting from defendants' practice of delaying admission of persons found unfit to proceed.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

3.   Constitutional questions regarding the conditions and circumstances of pretrial confinement are properly addressed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 683 (9th Cir. 2001) (liberty is protected from unlawful state deprivation by the Due Process Clause), quoting *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (*en banc*).

4.   An individual has a liberty interest in being free from incarceration absent a criminal conviction.  *See Baker v. McCollan*, 443 U.S. 137, 144 (1979) (Supreme Court recognizes individual has liberty interest in being free from incarceration absent a criminal conviction; no unlawful deprivation where a person was deprived of this liberty for a period of days by means of due process).  A court must consider the constitutionality of a detention in light of the detention's purpose, determine whether the detention is based on permissible goals, and, if it is, evaluate whether the detention is excessive in relation to those goals.  *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("due process requires

10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed").

5.  In determining the appropriate due process due to incompetent detainees, the United States Supreme Court has held due process requires, at a minimum, some rational relation between the nature and duration of confinement and its purpose. *See Jackson*, 406 U.S. at 730 (condemning petitioner to "permanent institutionalization" without requisite showing for commitment or the opportunity for release deprived petitioner of equal protection of the laws under the Fourteenth Amendment).

6.  The "purpose" of holding someone unfit to stand trial in custody arises from his or her confirmed mental illness.  The state's interest in such detentions is to assist in restoring competency, not to punish the person. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law).

7.  A determination of constitutionally adequate treatment for plaintiffs' clients must be measured not by that which must be provided to the general prison population, but that which must be provided to those committed for mental incapacity. *See Ohlinger v. Watson*, 652 F.2d 775, 777 (9th Cir. 1981) (persons held due to mental illness have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve mental condition).

8.  Institutionalized persons have a substantive due process liberty interest in reasonable care and safety, reasonably non-restrictive confinement conditions, and such treatment as may be required to comport fully with the purposes of confinement. *Youngberg v. Romeo*, 457 U.S. 307, 319 (1982)

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

(mentally retarded individual committed in state institution has liberty interests requiring state to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint).

9.  The county jails in Oregon have no capacity to provide mental health treatment that is designed to rehabilitate a person or restore the person to competency.  The treatment the jails offer to persons found unfit to proceed is the same treatment offered to any jail inmate.  Such treatment is constitutionally inadequate.  *See Lynch v. Baxley*, 744 F.2d 1452, 1458 (11th Cir. 1984) (temporary confinement in jail is particularly harmful to those who are mentally ill, exacerbating the mental problems of people detained, and lengthening treatment duration).

10.  The care Oregon State Hospital is able to offer is tailored to the needs of persons found unfit to stand trial, and fulfills constitutional requirements.  The hospital has the capacity to medicate patients, and has specially trained staff and staffing levels and programs sufficient to treat patients' mental incapacity.

11.  Persons who are found unfit to stand trial and remain in jail suffer constitutionally cognizable harm, and are entitled to prompt treatment in a rehabilitative facility.  Even short periods of incarceration of these persons can cause cognizable harm.  *See Lynch*, 744 F.2d at 1458.

12.  There is no rationalization that passes constitutional muster for unreasonably detaining persons found unfit to proceed in county jails.  The lack of funds, staff or facilities cannot justify defendants' failure to provide persons found unfit with the treatment that is necessary to attempt restoration of competency.  *See Ohlinger*, 652 F.2d at 779.  Defendants found to be unfit to proceed must be transferred as soon as practicable to a treatment facility, and should be detained only for that

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

period of time necessary to identify the person, determine the appropriate legal status, and effectuate transport.

13.  Persons found unfit to proceed and held in county jails for more than a brief period suffer delays in receiving restorative treatment, which delays their return to competency, prolonging their criminal cases and making it difficult for their attorneys to learn from their clients about the crime or crimes charged, to identify witnesses, and to enter into plea negotiations.  It also delays the statutorily mandated competency review (required to be held within 60 days of entering the hospital). Accordingly, defendants' procedures and practices also violate the procedural due process rights of persons found unfit to proceed.

14.  Defendants are aware their policies and conduct results in delays (which are sometimes substantial) in fulfilling court orders directing the hospitalization of persons found unable to proceed, and they are aware that such persons receive inadequate care and are possibly harmed while detained in county jails awaiting admission.  Nevertheless, defendants have refused to pursue or adopt policies to ensure prompt admission and treatment for these persons.  This demonstrates a deliberate indifference to these persons' health, safety and constitutional rights.  *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  Moreover, defendants' policies are a substantial departure from professionally accepted minimum standards for treatment of incompetent individuals for whom defendants are responsible.  *See Youngberg*, 457 U.S. at 323; *see also Turay v. Seling*, 108 F. Supp. 2d 1148 (W.D. Wash. 2000), *aff'd sub nom. Sharp v. Weston*, 233 F.3d 1166 (9th Cir. 2000).

15.  This court concludes defendants have violated, and are violating, the due process rights of criminal defendants who are determined by the Circuit Courts of Oregon to be unfit to proceed to trial

13 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

because of mental incapacities under ORS § 161.370(2).  Such persons have a right to a reasonably

timely transport to a treatment facility pursuant to the expectations and directions of the court issuing

findings and orders under that statute.

**ACCORDINGLY, IT IS SO ORDERED:**

This court orders defendants to ensure that persons who are declared unable to proceed to trial

pursuant to ORS § 161.370(2) be committed to the custody of the superintendent of a state hospital

designated by the Department of Human Services as soon as practicable.  This shall be fulfilled by

providing full admission of such persons into a state mental hospital or other treatment facility so

designated by the Department of Human Services, in accordance with Oregon's existing applicable

statutory provisions.  These admissions must be done in a reasonably timely manner, and completed not

later than seven days after the issuance of an order determining a criminal defendant to be unfit to

proceed to trial because of mental incapacities under ORS § 161.370(2).

DATED this 9th  day of May, 2002.


/s/ Owen M. Panner
_____
          Owen M. Panner
United States District Court Judge


14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

(216 of 269), Page 216 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 216 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 1 of 54

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF OREGON

 3   OREGON ADVOCACY CENTER,      )
     et al.,                      )
 4                                )
             Plaintiffs,          )   Case No. 3:02-cv-00339-MO
 5                                )
        v.                        )
 6                                )
     PATRICK ALLEN, et al.,       )   May 6, 2020
 7                                )
             Defendants.          )   Portland, Oregon
 8   _____)

 9

10

11

12

13

14

15              Telephone Oral Argument

16              TRANSCRIPT OF PROCEEDINGS

17   BEFORE THE HONORABLE MICHAEL W. MOSMAN

18     UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25
```

2

```
 1

 2                              APPEARANCES

 3

 4   FOR THE PLAINTIFFS:       Mr. Thomas Stenson
                               Ms. Emily R. Cooper
 5                             Disability Rights Oregon
                               511 S.W. Tenth Avenue, Suite 200
 6                             Portland, OR 97205

 7

 8                             Mr. Jesse A. Merrithew
                               Levi Merrithew Horst LLP
 9                             610 S.W. Alder Street, Suite 415
                               Portland, OR 97205
10

11

12   FOR THE DEFENDANTS:       Ms. Sheila H. Potter
                               Ms. Carla Scott
13                             Oregon Department of Justice
                               Trial Division
14                             100 S.W. Market Street
                               Portland, OR 97201
15

16

17

18   COURT REPORTER:           Bonita J. Shumway, CSR, RMR, CRR
                               United States District Courthouse
19                             1000 S.W. Third Ave., Room 301
                               Portland, OR  97204
20                             (503) 326-8188

21

22

23

24

25
```

(218 of 269), Page 218 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 218 of 269
Case 3:02-cv-00339-AN   Document 169   Filed 06/05/20   Page 3 of 54

3

```
 1              (P R O C E E D I N G S)

 2              (May 6, 2020; 11:05 a.m.)

 3                 * * * * * * * * * *

 4        THE COURTROOM DEPUTY:  Good morning, counsel.  This

 5   is the time and place set for a telephone oral argument in Case

 6   No. 3:02-cv-339-MO, Oregon Advocacy Center, et al., versus

 7   Mink, et al.

 8        We do have a court reporter recording these

 9   proceedings, so we ask that when you are not speaking, you need

10   to mute your phone.  Otherwise it creates background noise that

11   is distracting.  Also, when you are speaking, we need for you

12   to identify yourself and not use the speaker phone.  Thank you

13   very much.

14        And here is Judge Mosman.

15        THE COURT:  Thank you all for briefing this matter.

16   I have some specific questions, but I'd like to first start

17   with whether there's something you wish to add to what you've

18   submitted in writing.

19        The moving party here is the defendant, so I'll start

20   with defendant.

21        MS. POTTER:  Thank you, Your Honor.  Sheila Potter

22   for the State.

23        We are happy to answer the Court's questions.  We had

24   some responses to the points that were made in the opposition,

25   but I don't know if they're necessary, so my inclination is to
```

(219 of 269), Page 219 of 269       Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 219 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 4 of 54

4

1    hold back on making those until I know whether those are

2    something you want us to respond to.

3            THE COURT:  Thank you.

4            Same question for plaintiff.

5            MR. STENSON:  Your Honor, good morning.  This is Tom

6    Stenson from Disability Rights Oregon.

7            I think the crux of our argument is that the Supreme

8    Court said in *Rufo* that a modification must not create or

9    perpetuate a constitutional violation.  Because this order that

10    the defendant seeks to modify was tailored precisely to address

11    a specific constitutional violation, the Court should resist

12    this effort to reduce the scope of the order down to a

13    constitutional floor -- or a constitutional subbasement in this

14    case.

15            THE COURT:  All right.  I'm lost in your metaphor.

16    What do you mean by reduced to a constitutional subbasement?

17            MR. STENSON:  So in 2002, Judge Panner found that the

18    only -- the only remedy for the extensive delay was to set this

19    boundary for -- this deadline for seven days for admission of

20    people to the hospital.  This is -- the scope of the order goes

21    directly to the constitutional violation in this case, and it

22    is prohibited by the Supreme Court to lower a -- the scope of

23    an injunction on a modification order to a level that is a

24    constitutional violation.

25            THE COURT:  So --

5

```
 1              MR. STENSON:  Judge Panner has already found that
 2    altering the order beyond the seven days violates the
 3    Constitution, and it is necessary to have this order to protect
 4    the constitutional rights of individuals.  And since it goes
 5    directly to the constitutional rights of the individuals
 6    protected, it cannot be modified.
 7              THE COURT:  Thank you.
 8              So I want to say at the outset that I appreciate the
 9    wisdom of Judge Panner's order, and it is a carefully thought
10    out solution to a constitutional problem, but I thought we
11    would probably all be in agreement that the seven-day aspect of
12    that order is a prophylactic rule, a bright line designed to
13    solve the problem by way of an order but not to define
14    numerically the scope of the constitutional right at issue, so
15    that six and a half days never violates the Constitution and
16    eight days always does.
17              Do you disagree with that?
18              MR. STENSON:  Well, I think we don't necessarily need
19    to get to that point, because the State's requested
20    modification would say that they don't need to abide by any
21    time deadlines whatsoever until the Health Authority in its own
22    wisdom decides that they wish to come under the scope of the
23    order again.  So I don't know whether we need to decide whether
24    their -- I'm sure that there are individual circumstances
25    where, you know, an eight-day window wouldn't violate the
```

6

```
 1    Constitution, you know, such as where there was, you know, a
 2    massive -- a natural disaster that prevented -- a flood or
 3    something that prevented the people from leaving the jail, but
 4    I don't know that we need to reach the exact limits of the
 5    Constitution in this discussion.
 6              THE COURT:  Well, let's assume for the moment that
 7    before I decide whether to modify the order so that seven days
 8    is not what's required but some other number, I have to decide
 9    whether seven days embodies a constitutional principle or a
10    prophylactic one, a pragmatic one enforcing an undergirding
11    constitutional principle.
12              In that case, what is your answer?  Which is it?
13              MR. STENSON:  Which is what -- I'm not sure what I'm
14    choosing between.
15              THE COURT:  Choosing between whether seven days
16    embodies the constitutional principle in place, such that
17    choosing a different number per se violates the Constitution,
18    or whether seven days was a wise time frame designed to
19    implement by court order and injunction an underlying
20    constitutional principle that doesn't necessarily come with a
21    number of days attached.
22              So which of the two do you think is in play here?
23              MR. STENSON:  I think seven days is a wise benchmark
24    to use in this case, and that was determined by Judge Panner at
25    a full trial.
```

(222 of 269), Page 222 of 269, Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 222 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 7 of 54

7

1          And I'll note under Supreme Court jurisprudence,

2     under *Horn v. Florida*, one cannot use a motion to modify an

3     injunction, to challenge the underlying legal conclusion upon

4     which a prior judgment or order rests.  And that was

5     specifically the heart of Judge Panner's decision making, that

6     the seven days was the boundary that was appropriate under the

7     Constitution.

8          THE COURT:  I don't view this challenge today as a

9     challenge to the underlying order on its own terms, and if it

10    were, I would reject that for the principles you've already

11    written about and just referred to.  So I agree with you there.

12         So the question is whether the COVID-19 issues

13    surrounding this pandemic represent something like the flood

14    you referenced, something that requires a temporary new

15    schedule and response to what would otherwise be the seven-day

16    order that we return to as soon as possible.

17         And so if it is -- so I guess my next question then

18    becomes a question about plaintiffs' position.  Are you

19    asserting that in fact the 14-day quarantining, which is at the

20    heart of defendants' motion here, is a necessary or unnecessary

21    response to the potential pandemic in the institutions in

22    Oregon?

23         MR. STENSON:  You're asking me if the 14-day

24    quarantine of individuals at the Oregon State Hospital is

25    unconstitutional?  No, I would say not, because those people

(223 of 269), Page 223 of 269      Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 223 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 8 of 54

8

```
1    have arrived at the hospital.  The gravamen of this case I
2    think is that dozens of patients who should be in the hospital
3    and who aren't getting treatment, who aren't getting
4    quarantined, and who are in a jail cell decompensating, not
5    getting treatment, not being protected.  I don't think the
6    question we had focused on is whether or not the Court can
7    quarantine people on their own grounds, it's a question of
8    whether they can leave people in jail, which is the same
9    question Judge Panner decided in 2002.
10            THE COURT:  Do you have your response handy?
11            MR. STENSON:  I do.
12            THE COURT:  All right.  So I think I understand what
13   you're saying here, but I want to make sure I'm not
14   misunderstanding it.  I'm looking at page 12, and the middle of
15   the page.  It's sort of the thesis sentence of an argument you
16   develop over all of page 11 and maybe even part of page 10
17   about the wisdom of focusing on incoming patients and
18   quarantining them, as opposed to focusing more on the movements
19   and freedom of the staff members to move about the community
20   and come and go from the institution.
21            And on page 12 you say, "OHA's self-imposed closed-
22   or cracked-door policy is not a necessary or appropriate
23   response in and of itself to the pandemic."
24            So I guess same question there.  I can't tell if
25   you're suggesting that the quarantining is not a necessary or
```

(224 of 269), Page 224 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 224 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 9 of 54

9

| | |
|---|---|
| 1 | appropriate response or just something further down the chain |
| 2 | of consequences, the leaving people in jail longer is not |
| 3 | necessary or appropriate.  Which is it? |
| 4 | MR. STENSON:  Yes.  To be clear, the policy that |
| 5 | we're addressing was on -- excuse me.  On May 16th the Health |
| 6 | Authority announced that they would not admit any |
| 7 | aid-and-assist defendants to the hospital from jails except |
| 8 | those fitting the highly restricted -- |
| 9 | THE COURT:  I'm sorry, the word "restricted," you cut |
| 10 | out.  I haven't heard you since. |
| 11 | (No response.) |
| 12 | Mr. Stenson, can you hear me? |
| 13 | MS. COOPER:  Your Honor, this is Emily Cooper.  It's |
| 14 | possible there has been an interference with Mr. Stenson's |
| 15 | answer to your question.  I'm trying to get him back on the |
| 16 | line. |
| 17 | MR. STENSON:  I'm sorry, here I am.  I apologize.  I |
| 18 | got disconnected for a moment.  I'm not sure what happened. |
| 19 | THE COURT:  Why don't you start over. |
| 20 | MR. STENSON:  So the specific policy we are |
| 21 | challenging was the March 16th -- or rather the one that the |
| 22 | State is seeking to retroactively ratify was the policy on |
| 23 | March 16th to -- to stop admitting all .370 patients to the |
| 24 | hospital except on -- except those who fit their exceptional |
| 25 | admissions criteria.  We have never questioned that the |

(225 of 269), Page 225 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 225 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 10 of 54

10

1    hospital has the right to quarantine people within the

2    hospital.  It's people who are left in jail, who are not

3    admitted to the hospital, in violation of Judge Panner's

4    orders.

5         Now, recently they've announced a new policy whereby

6    they're going to slowly admit people to quarantine units but at

7    a rate that would put them in violation of the order as well.

8    Both of those policies are the ones that we challenge, that the

9    hospital can appropriately violate Judge Panner's order or that

10   Judge Panner's order should be modified to allow patients to be

11   admitted in more than seven days.

12        THE COURT:  All right.  So, again, I'm still trying

13   to make sure I understand your argument's parameters.  So if we

14   accept the need for a 14-day quarantine for incoming patients,

15   including patients subject to the injunction here, and if that

16   has some unavoidable consequence on the number of beds

17   available and the time periods in which they become available,

18   then I think I understood your argument to be that if that's

19   all true, then it's on the State to come up with alternative

20   placements out of jail and somewhere else until, because of the

21   quarantining, a bed becomes available at OSH.

22        Is that the core of your argument here?

23        MR. STENSON:  I don't think that we are trying to

24   whittle the defendant down to a single outcome.  There are

25   multiple steps that the defendants could take that certainly

(226 of 269), Page 226 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 226 of 269
Case 3:02-cv-00339-AN   Document 169   Filed 06/05/20   Page 11 of 54

11

```
 1    they have not proven are unavailable based on the evidence
 2    submitted, including placing other patients at the hospital in
 3    other settings, to open up more units, could involve placing
 4    people who are in jail at other units or other community
 5    placements.  It could involve testing people on entry so that
 6    they can bypass the need for quarantine.  It could involve
 7    increased use of personal protective equipment.  There's any
 8    number of ways that the State Hospital could respond to that,
 9    and in fact every other hospital in the state, as far as one
10    can tell, is doing that.  Ordinary hospitals are allowing
11    patients to come in the front door.  They're allowing people to
12    come into the emergency department.  In fact, just the other
13    day, the governor's order was amended to allow non-urgent and
14    elective procedures to go forward.
15          So we have -- there are many different ways in which
16    the continued treatment of the most acutely ill people in the
17    state could continue.  We're not asking the Court to order any
18    particular outcome or to hold that the State should have done
19    A, B, or C.  But we do think that the State has not shown that
20    they've met their burden to get the modification.
21          THE COURT:  Thank you.
22          I appreciate that it's probably not your problem to
23    come up with the precise solution, but your argument does
24    depend upon there being some alternative, right?  If
25    quarantining happens and that delays entry, and in a
```

(227 of 269), Page 227 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 227 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 12 of 54

12

1    hypothetical world there were literally no other alternatives,

2    we'd be kind of stuck, wouldn't we?

3         MR. STENSON:  I would slightly amend the way Your

4    Honor framed that, which is that it is the State's burden to

5    show that there were no other alternatives.  It is not the

6    burden of the plaintiffs -- this is not their motion -- to show

7    any particular outcome.  The State has wide authority to do all

8    sorts of things.  The State can, under the Oregon Statute

9    161.370, it can designate any facility it chooses to receive

10   people who are unable to aid and assist their attorneys.  They

11   have a wide variety of resources.  The question is not have the

12   plaintiffs affirmatively shown that there was some particular

13   fix that does that -- have the defendants, excuse me, proven

14   that there was no fix.

15        THE COURT:  I thought that's how I led my comment

16   off, but I agree with you that it's not your burden to come up

17   with an alternative.  I was asking whether you understood it to

18   be the case that your argument would be on a different footing

19   if the State successfully met its burden to show no other

20   alternative.  We'd be stuck, wouldn't we?

21        MR. STENSON:  I agree that would be a different and

22   more challenging argument.

23        THE COURT:  Thank you very much.

24        I've tried to make sure I understood your argument.

25   Do you feel I've missed anything here?

(228 of 269), Page 228 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 228 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 13 of 54

13

1          MR. STENSON:  No.  I think that's the crux of it.

2    Thank you, Your Honor.

3          THE COURT:  Thank you very much.

4          So I'll turn back to the State.  Just to lay the

5    groundwork for my question, I guess, I'm going to accept for

6    the moment as necessary some degree of quarantining, although

7    we'll talk about alternatives to that in a moment.  And that

8    tees up some built-in delay for which there either is or isn't

9    a solution.  I agree that the case would be on radically

10   different footing if it were as simple as we need a 14-day

11   quarantine that turns seven days into 21 days before we can get

12   people in, we're asking for temporary relief, there's no other

13   answer.

14         I really think the State's position turns on the last

15   proposition being true, that there is no other answer.  And

16   although it's not plaintiffs' burden to come up with other

17   answers, they've suggested some, and there may be others.

18         So what can you tell me in defense of the proposition

19   that the only answer here is to delay the time period built

20   into the injunction by 14 days?

21         MS. POTTER:  Thank you, Your Honor.  And for the

22   record, this is Sheila Potter.

23         We have looked at the alternatives.  We had some

24   discussions with the bureau and FPD before we brought this

25   motion.

(229 of 269), Page 229 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 229 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 14 of 54

14

1          With respect to the community placements that they

2     suggested, courts can only commit .370 patients to the hospital

3     if the patients require a hospital level of care that the

4     community placements, by definition, don't provide.  So the

5     hospital does not have the authority to say, we'll just put

6     them in this lower level.  Courts have found they need the kind

7     of care that is only available in a psychiatric hospital.

8          I'm not sure that increased PPE -- that's something

9     Mr. Stenson mentioned.  The staff are wearing PPE.  Psychiatric

10    patients, the plan cannot be that the patients will all be

11    wearing masks and gloves perfectly and keeping six feet away

12    from each other, because that's not something that you can

13    assume is always going to happen with patients.  The staff are

14    all wearing them, and have been since early March, and the

15    hospital began making its own so that it could ensure that it

16    would have them.

17         As the Court will have read, testing has been hard to

18    come by.  I can tell the Court that the state stockpile looks

19    as though the State Hospital is going to start being able to

20    get regular infusions of tests, which they believe will allow

21    them to actually move patients through faster, so that the new

22    plan, assuming that these tests come through, would be that

23    once the patients have been taken in in the course of a week,

24    they need four days to be observed, because if someone comes in

25    who has, you know, just been infected, and begins infecting

1    other people, a test wouldn't show that right away.  So after

2    four days, anyone who is infected should be now effectively

3    infected in such a way that a test would show that.

4          If we can get those tests, that would allow us then

5    to test all of the patients, to then move the healthy patients

6    into -- into the other units in the population of the hospital,

7    to clean the units that they were in, and then be ready to take

8    new patients the following week.

9          So what that comes down to is that instead of a

10   21-day cycle, we would be on a 14 -- a 14-day cycle.  So we've

11   been doing 15 and 19, and then a week off.  This week we'll be

12   taking another 15, next week another 19.  If we can keep it up

13   at this rate, this will allow us then after the week of 19 to

14   go and take another 15, rather than having a week when we're

15   sort of watching people for symptoms.

16          THE COURT:  What is the --

17          MS. POTTER:  The suggestion, Mr. Stenson said we

18   could place other patients at the hospital in other settings.

19   I'm not sure what that means.  I believe the patients who can

20   be moved elsewhere to make room for .370s have all been moved.

21   The hospital has done everything it can to make as much room as

22   possible for the .370s.

23          In terms of other structures, the work that it would

24   take to either, you know, build a new facility or convert

25   something that is not currently a psychiatric hospital into

16

1    something that can serve as a psychiatric hospital and to get

2    staff necessary to serve them would take vastly longer than the

3    plan that the hospital has put into place, as outlined in

4    Mr. Wehr's declaration.

5            THE COURT:  What do you understand to be the delay

6    between today and regular almost immediate testing of new

7    entrants?

8            MS. POTTER:  I believe the -- and another thing,

9    immediate testing I believe is not medically warranted because

10   you need a little bit of time for the virus to sort of get into

11   the system where it can be detected in testing.  My

12   understanding is that the tests should be coming.  Now that

13   there is a state stockpile, we have been working on getting

14   tests out of that stockpile.  There obviously are a whole lot

15   of demands for those tests because nationally no one has

16   enough.  But I believe at this point the hospital has succeeded

17   in arguing that it should be one of the priorities here.

18           THE COURT:  So if, for example, we prioritize

19   patients that need to be tested pursuant to a court injunction,

20   you would have available from the state stockpile enough tests

21   to test within the first four days everyone who comes in, as

22   opposed to quarantining some and testing others?

23           MS. POTTER:  I believe the way that it would work is

24   that they would bring people in over the course of -- say over

25   the course of this week, we would have admitted 15 people by

(232 of 269), Page 232 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 232 of 269
Case 3:02-cv-00339-AN   Document 169   Filed 06/05/20   Page 17 of 54

17

1    tomorrow.  We then need those four days for the incubation

2    period, so we could test on -- so Thursday is the 11th.  We

3    test on the 11th.  The results should come back two to three

4    days after that.  We don't have the instantaneous tests that

5    are available to the White House and some others.  There's a

6    delay between doing the test and then getting the results.

7            At that point they could transfer the patients into

8    whatever the appropriate unit, whether it is the COVID-positive

9    unit or the other units within the hospital, the unit -- the

10   admission unit, and then start again on the 18th rather than

11   waiting until the 26th.

12           THE COURT:  Thank you.

13           I understand there are a lot of moving parts, but you

14   seem not entirely sure whether the hospital has moved all the

15   non-.370 patients elsewhere in order to make maximum room for

16   .370 patients.  Do you know the answer or do you need to find

17   that out?

18           MS. POTTER:  I cannot tell you the answer to that

19   question for sure.  I certainly made that assumption because I

20   know that has been Mr. Wehr's focus since 2017 -- I'm sorry,

21   since 2018 perhaps.  I can double-check with him, but I -- if

22   there were any other place to put a .370 patient, I am

23   confident Mr. Wehr would have found it, but I can let the Court

24   know if I'm wrong about that.

25           THE COURT:  All right.  Thank you.

(233 of 269), Page 233 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 233 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 18 of 54

18

1          We've discussed the options that the plaintiff has

2   mentioned, although plaintiff has made clear, and I agreed

3   several times it's not really plaintiffs' burden to solve this

4   problem.

5          Are there other options you're exploring that we

6   haven't mentioned here today?

7          MS. POTTER:  We have not been able to -- there's been

8   a lot of work to develop other options.  This option has been

9   the only one people can come up with that can get patients in

10  the door as quickly and as safely as possible, and it will

11  have a -- as the declaration shows, if our predictions are

12  right, we should be caught up sometime next month.

13         THE COURT:  "This option" meaning the testing option?

14         MS. POTTER:  Right.  And the -- well, actually, the

15  14-day -- the quarantine option.  But the testing option may

16  allow us to move a little bit faster than the projected end of

17  June.

18         THE COURT:  All right.  Thank you.

19         MS. POTTER:  And, Your Honor, I do have Mr. Wehr's

20  phone number if you would like him to join the hearing and

21  address the question of whether we've done -- if there is

22  anything else we can do to move patients around.  I can ask him

23  to call in.

24         THE COURT:  I'm going to give you a homework

25  assignment when we're done, so you'll have a chance to meet and

(234 of 269), Page 234 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 234 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 19 of 54

19

1    talk with him.

2         MS. POTTER:  Okay.  Thank you, Your Honor.

3         THE COURT:  For plaintiff, any further response?  I

4    know it's not your motion, but any sort of reply to what you've

5    heard?

6         MR. STENSON:  A couple points, Your Honor, that I

7    wanted to clarify or address.

8         First, the State's requested order doesn't ask for

9    just a 14-day window.  It says that -- the proposed order that

10   was submitted says that OSH can continue temporarily limiting

11   admissions to its own schedule and by its own decision making,

12   as long as OSH has determined that it's safe for all patients,

13   meaning that it's not safe for other patients, for other

14   admissions.  So there's no -- the State has not proposed a

15   particular numerical window.

16        I think the second thing I wanted to point out is

17   that under ORS 161.370, as recently amended, it's not correct

18   that every person that ends up at the hospital absolutely needs

19   a hospital level of care.  The new version, revised .370

20   statute does allow for community placement but only for people

21   who are both suitable for community placement and for whom

22   their attorney or the Court is able to find a community-based

23   placement.  So a person who needs restoration but not

24   necessarily a hospital level of care, who can't find a

25   community-level placement, would, in fact, end up going to the

(235 of 269), Page 235 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 235 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 20 of 54

20

1    hospital.  So one of the ways that OSH or the Health Authority

2    could assist is by helping to create temporary community

3    placements for people who don't need a hospital level of care.

4    It's not correct to say that every single person admitted to

5    the hospital under 161.370 is in need of a hospital level of

6    care.

7              And I just -- I strongly resist the idea that the

8    State has to show its burden that these steps, that this action

9    was the only way to address this.  I mean, the CDC, SAMHSA, the

10   Center for Medicaid & Medicare Services have all said that it's

11   very important that our health care facilities, including our

12   psychiatric hospitals, remain open and continue to accept the

13   most acute level of care patient.  Where they have said it's

14   important to reduce numbers is on the back end.  It's with less

15   acute cases, cases that can be channeled throughout patient

16   services, patients that can be handled through telemedicine,

17   not the people we're talking about or in many cases the most

18   acutely in need.

19              There's no guidance anywhere in the United States

20   that the defendants have produced that says the thing to do

21   with people who are acutely psychiatrically ill is to leave

22   them in jail and to close your doors to the admission of

23   acutely psychiatrically ill people.  They've produced no

24   competent evidence on this point.  They've produced only

25   opinions on this matter which are not supported by expert-level

(236 of 269), Page 236 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 236 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 21 of 54

21

1   foundation, which don't show the methodology or the reasons for

2   that decision making.

3           So it's curious to me that there isn't a single

4   guidance anywhere in the United States or any of the hospitals

5   that the State can point to that says that what you should do

6   in response to COVID is to the shut the front doors of your

7   psychiatric hospitals to seriously ill people who otherwise

8   would remain in jail.  I think that is inconsistent with the

9   mission of the hospital with the health care of the community,

10  and most importantly, with the Constitution and Judge Panner's

11  order.

12          THE COURT:  Thank you.

13          MR. MERRITHEW:  Your Honor.

14          THE COURT:  Yes.  Who is speaking?

15          MR. MERRITHEW:  This is Jesse Merrithew, counsel for

16  Metropolitan Public Defender.

17          I want to make sure, if I may.  One of your questions

18  to opposing counsel led me to believe that we didn't adequately

19  explain the factual circumstances on the ground.  I just want

20  to make sure that the Court is clear on what's happening, if I

21  may.

22          THE COURT:  Yes.

23          MR. MERRITHEW:  Thank you.

24          What the hospital has done is to convert two of its

25  units that were previously serving patients into quarantine

(237 of 269), Page 237 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 237 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 22 of 54

22

1    units.  So they've reduced their capacity.  And what that led

2    to is a backlog of people waiting in jail.  As of their

3    response -- or their motion date, there was 50 people waiting

4    in jails around the state.  And ultimately what we're looking

5    at for any individual who is committed under .370, they're

6    looking at a delay of a month or more before they are

7    transferred to the hospital, and then there's a 14-day

8    quarantine period at the hospital.

9            If it were the case that people were being

10   transferred out of local jails and into the hospital within

11   seven days for a 14-day quarantine period, we would not be

12   here.  The Metropolitan Public Defender would not be opposing

13   the State taking those steps.  The reason we're opposing the

14   modification is because of the delay inside the jail.  It's not

15   that they're getting out within seven days and there's just a

16   delayed treatment.  It's that they're being delayed for more

17   than a month inside the jail.  So I just want to make sure that

18   point was clear.

19           THE COURT:  It was clear.  Thank you.

20           MR. MERRITHEW:  Thank you.

21           THE COURT:  So there are important competing

22   principles here, the most important of which is this

23   undergirding constitutional provision that people deemed, for

24   example, not to be competent are entitled to get out of a jail

25   facility and into -- typically hospital, but at least some form

(238 of 269), Page 238 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 238 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 23 of 54

23

1    of treatment within the requirements of due process.  Here with

2    Judge Panner's order, that's in seven days.  And that's a

3    vitally important principle that needs to be honored.

4         There is, in this current crisis, a very important

5    competing concern.  It's a concern held by people for whom we

6    are attempting to restore competency or otherwise treat who are

7    in the State Hospital already and everyone else throughout the

8    chain not to be subjected to COVID-19 in such a way that puts

9    them at risk of their lives.  And so that has to be taken very

10   seriously into account and represents, on the facts of this

11   case, truly a crisis and not merely an opportunity to get out

12   from under an onerous order.

13        I think it inaccurate to say that what the State has

14   done here is close its doors to such patients in response to

15   this crisis.  Instead, it has slowed entry to allow quarantine,

16   which is a widely accepted response in many settings, including

17   across the Bureau of Prisons, for example, the Federal Bureau

18   of Prisons to this crisis, and recognized widely as an

19   important and effective tool to reduce the risk to people at

20   the incoming facility.  So I reject the idea that what has

21   happened here is Oregon State Hospital has simply closed its

22   doors.

23        I further accept as an accurate argument by the State

24   that since staff there are using personal protective equipment,

25   that we should just expect in a psychiatric hospital setting

(239 of 269), Page 239 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 239 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 24 of 54

24

1    that the patients will all always wear their masks and other

2    equipment so that that, while it in an ideal world might

3    otherwise somewhat reduce the risk, is not an acceptable total

4    solution to the risk posed by new people entering, and in any

5    event, likely, even if it were done perfectly, wouldn't

6    acceptably reduce the risk.

7            I'm requiring the State to get back to me by Monday

8    with an answer to what has actually happened for what

9    represents the most rapid solution to a shortage of beds, and

10   that is moving non-.370 patients elsewhere whenever possible in

11   order to create space.  So I'd like a description from the

12   State about what the State Hospital is doing to create empty

13   beds there both by moving patients and by utilizing procedures

14   that we've discussed in past hearings at the back end to get

15   folks into community placement after they've had time at the

16   State Hospital as quickly as possible.  I --

17           MS. POTTER:  Thank you, Your Honor.

18           THE COURT:  I accept as generally true for folks who

19   need a hospital level of care that simply sending them from the

20   jail to a community placement is an inadequate answer, and it's

21   not only inadequate in terms of the level of care they need,

22   but creates an additional transport with additional attendant

23   risks, potentially fatal risks to everyone involved by their

24   movement.  But I agree that there may well be -- and I want to

25   hear from the State what it is doing to identify those folks

(240 of 269), Page 240 of 269 Case: 24-2229 08/28/2024, DktEntry: 27.3, Page 240 of 269
Case 3:02-cv-00339-AN Document 169 Filed 06/05/20 Page 25 of 54

25

1   designated for admission to OSH under 161.370 who could and do

2   qualify for community placement either in the interim or

3   entirely, so that they can get out of jail and into actual

4   treatment more rapidly.  What is being done to identify them?

5   Are they being sent to community placement instead of OHS?  So

6   that's assignment number two for the State.

7          Any question about that second assignment?

8          MS. POTTER:  No, Your Honor.  Thank you.

9          MS. COOPER:  Your Honor, this is Emily Cooper of

10  Disability Rights Oregon.  In particular, I would be curious to

11  know about the community restoration.  Those are programs that

12  already exist in our state that allow aid-and-assist

13  individuals to go straight from jail to these placements.

14  They're designed as an alternative to the State Hospital for

15  folks who don't need hospital level of care and can get

16  aid-and-assist restoration in the community, and there's

17  already a statute that allows this to happen and there are

18  already programs open in our state.

19         THE COURT:  Thank you.

20         MS. COOPER:  So that was one of the solutions we

21  wanted to hear back from the State of why, you know, at the

22  front door, why not expand community restoration for folks who

23  would meet the criteria for that program.

24         THE COURT:  Thank you.  That's helpful.  That's been

25  briefed, so the State is aware of it, and it's precisely

1    encompassed in my second homework assignment.

2              Third, if quarantining imposes, even despite these

3    other two efforts -- that is, moving other patients and sending

4    some to community level of care, if quarantining necessarily is

5    still required to prevent mortal risk, then that's replaced by

6    testing.  What I hear today tells me that the State has a

7    stockpile of a sufficient number of tests, such that if they

8    were dedicated to this cause, the State Hospital would be able

9    to test everyone who came in.  And it's my view that, absent

10   further information, these folks who could be tested but

11   currently aren't being tested perhaps because of the

12   competition among competing state agencies for tests, are at

13   the most critical level and, in any event, are under a court

14   order to take every step necessary to obey the constitutional

15   command here.

16             So I'll hear from the State also on Monday as to why

17   I shouldn't order everyone to be tested instead of quarantined,

18   thereby reducing by at least half, if not more, the delay.  And

19   assuming for today's purposes that the answer is that they can

20   all be tested if I order it, then I want the State to submit a

21   new proposed modification grounded not in quarantining but in

22   testing, to tell me the kinds of delays they think that will

23   involve.

24             And I will add that I agree with plaintiff that what

25   I want from the State is not we're in a crisis, we need an

(242 of 269), Page 242 of 269    Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 242 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 27 of 54

27

```
 1    undefined period of time for delayed entry into the State
 2    Hospital but rather the time that takes into specific account
 3    the number of days additional to seven required by a testing
 4    regimen.
 5            And so I'll wait until Monday to fully decide this
 6    issue.  My inclination is to allow a modification that is
 7    grounded in testing, order testing, and allow only the degree
 8    of further time necessary to do the testing and get the results
 9    in a medically sound way, on top of an order that moves any
10    patients that aren't moved that are not .370 patients, and
11    sends into community treatment or placement those who don't
12    need to be sent directly to the State Hospital.
13            I'd like to hear from the State on that on Monday,
14    unless that's just an impossible time period in which to do
15    this.  But I want to do this with all deliberate speed.
16            Any problem with that for the --
17            MS. POTTER:  Thank you.
18            THE COURT:  Any problem with meeting that deadline
19    for the defendant?
20            MS. POTTER:  Not to my knowledge.  We'll certainly
21    let the Court know right away if we experience any impediment
22    to us getting all of that information to you by Monday.  But as
23    I sit here today, I think that's something that we can get
24    done.
25            THE COURT:  For plaintiff, I'll have this on Monday.
```

```
 1   I'll -- I could hold a hearing on Tuesday or I can wait for you
 2   to file a written response and then hold a hearing a couple
 3   days later.  Do you have a preference?
 4           MR. STENSON:  I'll wait for any of my colleagues to
 5   quibble with me, but I think our prior determination to move
 6   this forward as quickly as possible continues to adhere.  So
 7   we're at the Court's disposal, and we can respond orally,
 8   unless one of my colleagues jumps in.
 9           THE COURT:  Let's do this.  I'll set a hearing for
10   Tuesday.  And then if you wrap up end of the day Monday or wake
11   up Tuesday morning and think that it would be much better to
12   have a written response and hearing a couple days later, I'll
13   do that.
14           MR. STENSON:  I think that's an excellent option, but
15   I think for now let's plan on holding a hearing on Tuesday.
16           THE COURT:  So we'll set this for further hearing at
17   10:00 Tuesday.
18           Will that work for all counsel for all plaintiffs?
19           MS. POTTER:  It works for the defendants, Your Honor.
20   Thank you.
21           THE COURT:  For plaintiff, does it work,
22   10:00 Tuesday?
23           MR. STENSON:  I think that will work, Your Honor.
24           MR. MERRITHEW:  It works for me.  Thank you, Your
25   Honor.
```

(244 of 269), Page 244 of 269 Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 244 of 269
Case 3:02-cv-00339-AN    Document 169    Filed 06/05/20    Page 29 of 54

29

1           THE COURT:  All right.  Then I'll await with interest

2    what the State provides, and we'll meet together again at

3    10:00 on Tuesday.

4           Thank you all.  Good day.

5           (Proceedings concluded at 11:52 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30

1

2                                    --o0o--

3

4          I certify, by signing below, that the foregoing is a

5    correct transcript of the record of proceedings in the

6    above-entitled cause.   A transcript without an original

7    signature or conformed signature is not certified.

8

9
     /s/Bonita J. Shumway                June 1, 2020
10   _____            _____
     BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MR. MERRITHEW: [5]** 21/12 21/14 21/22 22/19 28/23

**MR. STENSON: [19]** 4/4 4/16 4/25 5/17 6/12 6/22 7/22 8/10 9/3 9/16 9/19 10/22 12/2 12/20 12/25 19/5 28/3 28/13 28/22

**MS. COOPER: [3]** 9/12 25/8 25/19

**MS. POTTER: [15]** 3/20 13/20 15/16 16/7 16/22 17/17 18/6 18/13 18/18 19/1 24/16 25/7 27/16 27/19 28/18

**THE COURT: [40]**

**THE COURTROOM DEPUTY: [1]** 3/2

**-**

**--o0o [1]** 30/2

**.**

**.370 [9]** 9/23 14/2 17/15 17/16 17/22 19/17 22/3 24/10 27/10

**.370s [2]** 15/20 15/22

**/**

**/s/Bonita [1]** 30/9

**1**

**10 [1]** 8/16

**100 [1]** 2/14

**1000 [1]** 2/19

**10:00 on [1]** 29/3

**10:00 Tuesday [2]** 28/17 28/22

**11 [1]** 8/16

**11:05 [1]** 3/2

**11:52 [1]** 29/5

**11th [2]** 17/2 17/3

**12 [2]** 8/14 8/21

**14 [2]** 13/20 15/10

**14-day [9]** 7/19 7/23 10/14 13/10 15/10 18/15 19/9 22/7 22/11

**15 [4]** 15/11 15/12 15/14 16/25

**161.370 [4]** 12/9 19/17 20/5 25/1

**16th [3]** 9/5 9/21 9/23

**18th [1]** 17/10

**19 [5]** 7/12 15/11

**19/10 22/5 24/10 27/2 27/5 28/12 28/18 29/11**

**2**

**200 [1]** 2/5

**2002 [2]** 4/17 8/9

**2017 [1]** 17/20

**2018 [1]** 17/21

**2020 [3]** 1/6 3/2 30/9

**21 [1]** 13/11

**21-day [1]** 15/10

**26th [1]** 17/11

**3**

**301 [1]** 2/19

**326-8188 [1]** 2/20

**3:02-cv-00339-MO [1]** 1/4

**3:02-cv-339-MO [1]** 3/6

**4**

**415 [1]** 2/9

**5**

**50 [1]** 22/3

**503 [1]** 2/20

**511 [1]** 2/5

**6**

**610 [1]** 2/9

**8**

**8188 [1]** 2/20

Case 3:02-cv-00339-AN Document 478 Filed 06/05/2017 Page 32 of 34

**9**

97204 [1] 2/19

97205 [2] 2/6 2/9

**A**

a.m [2] 3/2 29/5

abide [1] 5/20

able [4] 14/19 18/7 19/22 26/8

about [10] 7/11 7/18 8/17 8/19 13/7 17/24 20/17 24/12 25/7 25/11

above [1] 30/6

above-entitled [1] 30/6

absent [1] 26/9

absolutely [1] 19/18

accept [5] 10/14 13/5 20/12 23/23 24/18

acceptable [1] 24/3

acceptably [1] 24/6

accepted [1] 23/16

account [2] 23/10 27/2

accurate [1] 23/23

across [1] 23/17

action [1] 20/8

actual [1] 25/3

actually [3] 14/21

acute [2] 20/13 20/15

acutely [4] 11/16 20/18 20/21 20/23

add [2] 3/17 26/24

additional [3] 24/22 24/22 27/3

address [4] 4/10 18/21 19/7 20/9

addressing [1] 9/5

adequately [1] 21/18

adhere [1] 28/6

admission [4] 4/19 17/10 20/22 25/1

admissions [3] 9/25 19/11 19/14

admit [2] 9/6 10/6

admitted [4] 10/3 10/11 16/25 20/4

admitting [1] 9/23

ADVOCACY [2] 1/3 3/6

affirmatively [1] 12/12

after [4] 15/1 15/13 17/4 24/15

again [4] 5/23 10/12 17/10 29/2

agencies [1] 26/12

agree [6] 7/11

ago [1] 12/16 13/9 24/24 26/24

agreed [1] 18/2

agreement [1] 5/11

aid [4] 9/7 12/10 25/12 25/16

aid-and-assist [3] 9/7 25/12 25/16

al [4] 1/3 1/6 3/6 3/7

Alder [1] 2/9

all [26] 3/15 4/15 5/11 8/12 8/16 9/23 10/12 10/19 12/7 14/10 14/14 15/5 15/20 17/14 17/25 18/18 19/12 20/10 24/1 26/20 27/15 27/22 28/18 28/18 29/1 29/4

ALLEN [1] 1/6

allow [11] 10/10 11/13 14/20 15/4 15/13 18/16 19/20 23/15 25/12 27/6 27/7

allowing [2] 11/10 11/11

allows [1] 25/17

almost [1] 16/6

already [6] 5/1 7/10 23/7 25/12 25/17

Case: 24-2229, 08/28/2024, DktEntry: 27.3, Page 248 of 269

Case 3:02-cv-00339-AN    Document 214-2   Filed 04/24/08   Page 333 of 354

**A**

already... [1]  25/18
also [2]  3/11 26/16
altering [1]  5/2
alternative [5]
  10/19 11/24 12/17
  12/20 25/14
alternatives [4]
  12/1 12/5 13/7
  13/23
although [3]  13/6
  13/16 18/2
always [3]  5/16
  14/13 24/1
am [2]  9/17 17/22
amend [1]  12/3
amended [2]  11/13
  19/17
among [1]  26/12
announced [2]  9/6
  10/5
another [4]  15/12
  15/12 15/14 16/8
answer [11]  3/23
  6/12 9/15 13/13
  13/15 13/19 17/16
  17/18 24/8 24/20
  26/19
answers [1]  13/17
any [19]  5/20 9/6
  11/7 11/17 12/7
  12/9 17/22 19/3

19/4 21/4 22/5 24/4
25/7 26/13 27/9
27/16 27/18 27/21
28/4
anyone [1]  15/2
anything [2]  12/25
  18/22
anywhere [2]  20/19
  21/4
apologize [1]  9/17
APPEARANCES
  [1]  2/2
appreciate [2]  5/8
  11/22
appropriate [5]  7/6
  8/22 9/1 9/3 17/8
appropriately [1]
  10/9
are [40]
aren't [4]  8/3 8/3
  26/11 27/10
arguing [1]  16/17
argument [11]  1/15
  3/5 4/7 8/15 10/18
  10/22 11/23 12/18
  12/22 12/24 23/23
argument's [1]
  10/13
around [2]  18/22
  22/4
arrived [1]  8/1
as [36]

asked [3]  3/9 18/22
  19/8
asking [4]  7/23
  11/17 12/17 13/12
aspect [1]  5/11
asserting [1]  7/19
assignment [4]
  18/25 25/6 25/7
  26/1
assist [5]  9/7 12/10
  20/2 25/12 25/16
assume [2]  6/6
  14/13
assuming [2]  14/22
  26/19
assumption [1]
  17/19
attached [1]  6/21
attempting [1]  23/6
attendant [1]  24/22
attorney [1]  19/22
attorneys [1]  12/10
authority [5]  5/21
  9/6 12/7 14/5 20/1
available [6]  10/17
  10/17 10/21 14/7
  16/20 17/5
Ave [1]  2/19
Avenue [1]  2/5
await [1]  29/1
aware [1]  25/25
away [3]  14/11 15/1

## A

away... [1]  27/21

## B

back [8]  4/1 9/15
 13/4 17/3 20/14
 24/7 24/14 25/21
background [1]
 3/10
backlog [1]  22/2
based [2]  11/1
 19/22
be [46]
because [11]  4/9
 5/19 7/25 10/20
 14/12 14/24 16/9
 16/15 17/19 22/14
 26/11
become [1]  10/17
becomes [2]  7/18
 10/21
bed [1]  10/21
beds [3]  10/16 24/9
 24/13
been [13]  9/14
 14/14 14/17 14/23
 14/25 15/11 15/20
 16/13 17/20 18/7
 18/7 18/8 25/24
before [5]  1/17 6/7
 13/11 13/24 22/6
began [1]  14/15

begins [1]  14/23

being [9]  8/5 11/24
 13/15 14/19 22/9
 22/16 25/4 25/5
 26/11
believe [7]  14/20
 15/19 16/8 16/9
 16/16 16/23 21/18
below [1]  30/4
benchmark [1]
 6/23
better [1]  28/11
between [4]  6/14
 6/15 16/6 17/6
beyond [1]  5/2
bit [2]  16/10 18/16
Bonita [3]  2/18
 30/9 30/10
both [3]  10/8 19/21
 24/13
boundary [2]  4/19
 7/6
briefed [1]  25/25
briefing [1]  3/15
bright [1]  5/12
bring [1]  16/24
brought [1]  13/24
build [1]  15/24
built [2]  13/8 13/19
built-in [1]  13/8
burden [8]  11/20
 12/4 12/6 12/16

12/19 13/3 16
 20/8
bureau [3]  13/24
 23/17 23/17
bypass [1]  11/6

## C

call [1]  18/23
came [1]  26/9
can [35]
can't [2]  8/24 19/24
cannot [4]  5/6 7/2
 14/10 17/18
capacity [1]  22/1
care [13]  14/3 14/7
 19/19 19/24 20/3
 20/6 20/11 20/13
 21/9 24/19 24/21
 25/15 26/4
carefully [1]  5/9
Carla [1]  2/12
case [11]  1/4 3/5
 4/14 4/21 6/12 6/24
 8/1 12/18 13/9 22/9
 23/11
cases [3]  20/15
 20/15 20/17
caught [1]  18/12
cause [2]  26/8 30/6
CDC [1]  20/9
cell [1]  8/4
CENTER [3]  1/3
 3/6 20/10

Case 3:02-cv-00339-AN Document 45-8 Filed 02/2... ...ge 11 of 14

C

certainly [3] 10/25
17/19 27/20
certified [1] 30/7
certify [1] 30/4
chain [2] 9/1 23/8
challenge [4] 7/3
7/8 7/9 10/8
challenging [2]
9/21 12/22
chance [1] 18/25
channeled [1]
20/15
check [1] 17/21
chooses [1] 12/9
choosing [3] 6/14
6/15 6/17
circumstances [2]
5/24 21/19
clarify [1] 19/7
clean [1] 15/7
clear [5] 9/4 18/2
21/20 22/18 22/19
close [2] 20/22
23/14
closed [2] 8/21
23/21
colleagues [2] 28/4
28/8
come [13] 5/22 6/20
8/20 10/19 11/11
11/12 11/23 12/16

17/3 18/9
comes [3] 14/24
15/9 16/21
coming [1] 16/12
command [1] 26/15
comment [1] 12/15
commit [1] 14/2
committed [1] 22/5
community [19]
8/19 11/4 14/1 14/4
19/20 19/21 19/22
19/25 20/2 21/9
24/15 24/20 25/2
25/5 25/11 25/16
25/22 26/4 27/11
community-based
[1] 19/22
community-level
[1] 19/25
competency [1]
23/6
competent [2]
20/24 22/24
competing [3]
22/21 23/5 26/12
competition [1]
26/12
concern [2] 23/5
23/5
concluded [1] 29/5
conclusion [1] 7/3

confident [1] 17/23
conformed [1] 30/7
consequence [1]
10/16
consequences [1]
9/2
Constitution [7]
5/3 5/15 6/1 6/5
6/17 7/7 21/10
constitutional [17]
4/9 4/11 4/13 4/13
4/16 4/21 4/24 5/4
5/5 5/10 5/14 6/9
6/11 6/16 6/20
22/23 26/14
continue [3] 11/17
19/10 20/12
continued [1] 11/16
continues [1] 28/6
convert [2] 15/24
21/24
Cooper [3] 2/4 9/13
25/9
core [1] 10/22
correct [3] 19/17
20/4 30/5
could [14] 10/25
11/3 11/5 11/6 11/8
11/17 14/15 15/18
17/2 17/7 20/2 25/1
26/10 28/1
counsel [4] 3/4

**C**

counsel... [3]  21/15 21/18 28/18

couple [3]  19/6 28/2 28/12

course [3]  14/23 16/24 16/25

court [20]  1/1 1/18 2/18 3/8 4/8 4/11 4/22 6/19 7/1 8/6 11/17 14/17 14/18 16/19 17/23 19/22 21/20 26/13 27/21 30/11

Court's [2]  3/23 28/7

Courthouse [1] 2/18

courts [2]  14/2 14/6

COVID [4]  7/12 17/8 21/6 23/8

COVID-19 [2]  7/12 23/8

COVID-positive [1] 17/8

cracked [1]  8/22

cracked-door [1] 8/22

create [4]  4/8 20/2 24/11 24/12

creates [2]  3/10 24/22

crisis [5]  23/4 23/11 23/15 23/18 26/25

criteria [2]  9/25 25/23

critical [1]  26/13

CRR [2]  2/18 30/10

crux [2]  4/7 13/1

CSR [2]  2/18 30/10

curious [2]  21/3 25/10

current [1]  23/4

currently [2]  15/25 26/11

cut [1]  9/9

cv [2]  1/4 3/6

cycle [2]  15/10 15/10

**D**

date [2]  22/3 30/10

day [16]  5/11 5/25 7/15 7/19 7/23 10/14 11/13 13/10 15/10 15/10 18/15 19/9 22/7 22/11 28/10 29/4

days [26]  4/19 5/2 5/15 5/16 6/7 6/9 6/15 6/18 6/21 6/23 7/6 10/11 13/11 13/11 13/20 14/24 15/2 16/21 17/1 17/4 22/11 22/15

cross [2]  23/4 28/3 28/12

deadline [2]  4/19 27/18

deadlines [1]  5/21

decide [4]  5/23 6/7 6/8 27/5

decided [1]  8/9

decides [1]  5/22

decision [3]  7/5 19/11 21/2

declaration [2] 16/4 18/11

decompensating [1] 8/4

dedicated [1]  26/8

deemed [1]  22/23

defendant [5]  3/19 3/20 4/10 10/24 27/19

defendants [7]  1/7 2/12 9/7 10/25 12/13 20/20 28/19

defendants' [1] 7/20

Defender [2]  21/16 22/12

defense [1]  13/18

define [1]  5/13

definition [1]  14/4

degree [2]  13/6 27/7

**D**

delay [8]  4/18 13/8 13/19 16/5 17/6 22/6 22/14 26/18
delayed [3]  22/16 22/16 27/1
delays [2]  11/25 26/22
deliberate [1]  27/15
demands [1]  16/15
department [2]  2/13 11/12
depend [1]  11/24
description [1]  24/11
designate [1]  12/9
designated [1]  25/1
designed [3]  5/12 6/18 25/14
despite [1]  26/2
detected [1]  16/11
determination [1]  28/5
determined [2]  6/24 19/12
develop [2]  8/16 18/8
didn't [1]  21/18
different [5]  6/17 11/15 12/18 12/21 13/10
directly [3]  4/21 5/5

Disability [3]  2/5 4/6 25/10
disagree [1]  5/17
disaster [1]  6/2
disconnected [1]  9/18
discussed [2]  18/1 24/14
discussion [1]  6/5
discussions [1]  13/24
disposal [1]  28/7
distracting [1]  3/11
DISTRICT [4]  1/1 1/2 1/18 2/18
Division [1]  2/13
do [23]  3/8 4/16 5/17 6/22 8/10 8/11 11/19 12/7 12/25 16/5 17/16 17/16 18/19 18/22 20/20 21/5 25/1 27/8 27/14 27/15 28/3 28/9 28/13
does [6]  5/16 11/23 12/13 14/5 19/20 28/21
doesn't [2]  6/20 19/8
doing [5]  11/10 15/11 17/6 24/12

don't [15]  3/25 5/18 5/20 5/23 6/4 7/8 8/5 9/19 10/23 14/4 17/4 20/3 21/1 25/15 27/11
done [9]  11/18 15/21 18/21 18/25 21/24 23/14 24/5 25/4 27/24
door [4]  8/22 11/11 18/10 25/22
doors [4]  20/22 21/6 23/14 23/22
double [1]  17/21
double-check [1]  17/21
down [4]  4/12 9/1 10/24 15/9
dozens [1]  8/2
due [1]  23/1

**E**

each [1]  14/12
early [1]  14/14
effective [1]  23/19
effectively [1]  15/2
effort [1]  4/12
efforts [1]  26/3
eight [2]  5/16 5/25
eight-day [1]  5/25
either [3]  13/8 15/24 25/2

## E

elective [1]  11/14
else [3]  10/20 18/22 23/7
elsewhere [3]  15/20 17/15 24/10
embodies [2]  6/9 6/16
emergency [1]  11/12
Emily [3]  2/4 9/13 25/9
empty [1]  24/12
encompassed [1]  26/1
end [5]  18/16 19/25 20/14 24/14 28/10
ends [1]  19/18
enforcing [1]  6/10
enough [2]  16/16 16/20
ensure [1]  14/15
entering [1]  24/4
entirely [2]  17/14 25/3
entitled [2]  22/24 30/6
entrants [1]  16/7
entry [4]  11/5 11/25 23/15 27/1
equipment [3]  11/7 23/24 24/2

3/7
even [3]  8/16 24/5 26/2
event [2]  24/5 26/13
every [4]  11/9 19/18 20/4 26/14
everyone [5]  16/21 23/7 24/23 26/9 26/17
everything [1]  15/21
evidence [2]  11/1 20/24
exact [1]  6/4
example [3]  16/18 22/24 23/17
excellent [1]  28/14
except [3]  9/7 9/24 9/24
exceptional [1]  9/24
excuse [2]  9/5 12/13
exist [1]  25/12
expand [1]  25/22
expect [1]  23/25
experience [1]  27/21
expert [1]  20/25
expert-level [1]  20/25
explain [1]  21/19

exploring [1]  18/5
extensive [1]  4/18

## F

facilities [1]  20/11
facility [4]  12/9 15/24 22/25 23/20
fact [4]  7/19 11/9 11/12 19/25
facts [1]  23/10
factual [1]  21/19
far [1]  11/9
faster [2]  14/21 18/16
fatal [1]  24/23
Federal [1]  23/17
feel [1]  12/25
feet [1]  14/11
file [1]  28/2
find [3]  17/16 19/22 19/24
first [3]  3/16 16/21 19/8
fit [1]  9/24
fitting [1]  9/8
fix [2]  12/13 12/14
flood [2]  6/2 7/13
floor [1]  4/13
Florida [1]  7/2
focus [1]  17/20
focused [1]  8/6
focusing [2]  8/17 8/18

Case 3:02-cv-00339-AN    Document 191-6    Filed 06/05/20    Page 39 of 54

**F**

folks [6]  24/15 24/18 24/25 25/15 25/22 26/10
following [1]  15/8
footing [2]  12/18 13/10
foregoing [1]  30/4
form [1]  22/25
forward [2]  11/14 28/6
found [4]  4/17 5/1 14/6 17/23
foundation [1]  21/1
four [4]  14/24 15/2 16/21 17/1
FPD [1]  13/24
frame [1]  6/18
framed [1]  12/4
freedom [1]  8/19
front [3]  11/11 21/6 25/22
full [1]  6/25
fully [1]  27/5
further [6]  9/1 19/3 23/23 26/10 27/8 28/16

**G**

generally [1]  24/18
get [17]  5/19 9/15 11/20 13/11 14/20 18/9 22/24 23/11 24/7 24/14 25/3 25/15 27/8 27/23
getting [7]  8/3 8/3 8/5 16/13 17/6 22/15 27/22
give [1]  18/24
gloves [1]  14/11
go [4]  8/20 11/14 15/14 25/13
goes [2]  4/20 5/4
going [6]  10/6 13/5 14/13 14/19 18/24 19/25
good [3]  3/4 4/5 29/4
got [1]  9/18
governor's [1]  11/13
gravamen [1]  8/1
ground [1]  21/19
grounded [2]  26/21 27/7
grounds [1]  8/7
groundwork [1]  13/5
guess [3]  7/17 8/24 13/5
guidance [2]  20/19 21/4

**H**

had [4]  3/23 8/6 13/23 24/15
half [2]  5/15 26/18
handled [1]  20/16
handy [1]  8/10
happen [2]  14/13 25/17
happened [3]  9/18 23/21 24/8
happening [1] 21/20
happens [1]  11/25
happy [1]  3/23
hard [1]  14/17
has [28]  5/1 9/14 10/1 10/16 11/19 12/7 14/17 14/25 15/21 16/3 16/15 16/16 17/14 17/20 18/1 18/2 18/8 19/12 19/14 20/8 21/24 23/9 23/13 23/15 23/20 23/21 24/8 26/6
have [36]
have a [1]  18/11
haven't [2]  9/10 18/6
having [1]  15/14
health [5]  5/21 9/5 20/1 20/11 21/9

## H

healthy [1] 15/5
hear [6] 9/12 24/25 25/21 26/6 26/16 27/13
heard [2] 9/10 19/5
hearing [7] 18/20 28/1 28/2 28/9 28/12 28/15 28/16
hearings [1] 24/14
heart [2] 7/5 7/20
held [1] 23/5
helpful [1] 25/24
helping [1] 20/2
here [19] 3/14 3/19 6/22 7/20 8/13 9/17 10/15 10/22 12/25 13/19 16/17 18/6 22/12 22/22 23/1 23/14 23/21 26/15 27/23
highly [1] 9/8
him [5] 9/15 17/21 18/20 18/22 19/1
hold [4] 4/1 11/18 28/1 28/2
holding [1] 28/15
homework [2] 18/24 26/1
Honor [16] 3/21 4/5 9/13 12/4 13/2 13/21 18/19 19/2 25/8 25/9 28/19 28/23 28/25
HONORABLE [1] 1/17
honored [1] 23/3
Horn [1] 7/2
Horst [1] 2/8
hospital [52]
hospitals [4] 11/10 20/12 21/4 21/7
House [1] 17/5
how [1] 12/15
hypothetical [1] 12/1

## I

I'd [3] 3/16 24/11 27/13
I'll [11] 3/19 7/1 13/4 26/16 27/5 27/25 28/1 28/4 28/9 28/12 29/1
I'm [18] 4/15 5/24 6/13 6/13 8/13 8/14 9/9 9/15 9/17 9/18 10/12 13/5 14/8 15/19 17/20 17/24 18/24 24/7
I've [2] 12/24 12/25
idea [2] 20/7 23/20
ideal [1] 24/2
identify [3] 3/12

ill [4] 11/16 20/21 20/23 21/7
immediate [2] 16/6 16/9
impediment [1] 27/21
implement [1] 6/19
important [7] 20/11 20/14 22/21 22/22 23/3 23/4 23/19
importantly [1] 21/10
imposed [1] 8/21
imposes [1] 26/2
impossible [1] 27/14
inaccurate [1] 23/13
inadequate [2] 24/20 24/21
inclination [2] 3/25 27/6
including [4] 10/15 11/2 20/11 23/16
incoming [3] 8/17 10/14 23/20
inconsistent [1] 21/8
increased [2] 11/7 14/8

**I**

incubation [1]  17/1
individual [2]  5/24
22/5
individuals [4]  5/4
5/5 7/24 25/13
infected [3]  14/25
15/2 15/3
infecting [1]  14/25
information [2]
26/10 27/22
infusions [1]  14/20
injunction [6]  4/23
6/19 7/3 10/15
13/20 16/19
inside [2]  22/14
22/17
instantaneous [1]
17/4
instead [4]  15/9
23/15 25/5 26/17
institution [1]  8/20
institutions [1]  7/21
interest [1]  29/1
interference [1]
9/14
interim [1]  25/2
involve [4]  11/3
11/5 11/6 26/23
involved [1]  24/23
is [94]
isn't [2]  13/8 21/3

**Issue [2]  13/14 27/6**
issues [1]  7/12
it [45]
it's [24]  8/7 8/15
9/13 10/2 10/19
11/22 12/16 13/16
18/3 19/4 19/12
19/13 19/17 20/4
20/10 20/13 20/14
21/3 22/14 22/16
23/5 24/20 25/25
26/9
its [10]  5/21 7/9
12/19 14/15 19/11
19/11 20/8 21/24
23/14 23/21
itself [1]  8/23

**J**

jail [16]  6/3 8/4 8/8
9/2 10/2 10/20 11/4
20/22 21/8 22/2
22/14 22/17 22/24
24/20 25/3 25/13
jails [3]  9/7 22/4
22/10
Jesse [2]  2/8 21/15
join [1]  18/20
JUDGE [13]  1/18
3/14 4/17 5/1 5/9
6/24 7/5 8/9 10/3
10/9 10/10 21/10
23/2

**judgment [1]  7/4**
jumps [1]  28/8
June [2]  18/17 30/9
jurisprudence [1]
7/1
just [13]  7/11 9/1
11/12 13/4 14/5
14/25 19/9 20/7
21/19 22/15 22/17
23/25 27/14
Justice [1]  2/13

**K**

keep [1]  15/12
keeping [1]  14/11
kind [2]  12/2 14/6
kinds [1]  26/22
know [16]  3/25 4/1
5/23 5/25 6/1 6/1
6/4 14/25 15/24
17/16 17/20 17/24
19/4 25/11 25/21
27/21
knowledge [1]
27/20

**L**

last [1]  13/14
later [2]  28/3 28/12
lay [1]  13/4
least [2]  22/25
26/18
leave [2]  8/8 20/21

# L

leaving [2]  6/3 9/2
led [3]  12/15 21/18 22/1
left [1]  10/2
legal [1]  7/3
less [1]  20/14
let [2]  17/23 27/21
let's [3]  6/6 28/9 28/15
level [15]  4/23 14/3 14/6 19/19 19/24 19/25 20/3 20/5 20/13 20/25 24/19 24/21 25/15 26/4 26/13
Levi [1]  2/8
like [5]  3/16 7/13 18/20 24/11 27/13
likely [1]  24/5
limiting [1]  19/10
limits [1]  6/4
line [2]  5/12 9/16
literally [1]  12/1
little [2]  16/10 18/16
lives [1]  23/9
LLP [1]  2/8
local [1]  22/10
long [1]  19/12
longer [2]  9/2 16/2
looked [1]  13/23

looking [5]  8/14 22/4 22/6
looks [1]  14/18
lost [1]  4/15
lot [3]  16/14 17/13 18/8
lower [2]  4/22 14/6

# M

made [3]  3/24 17/19 18/2
make [9]  8/13 10/13 12/24 15/20 15/21 17/15 21/17 21/20 22/17
making [5]  4/1 7/5 14/15 19/11 21/2
many [3]  11/15 20/17 23/16
March [3]  9/21 9/23 14/14
March 16th [2]  9/21 9/23
Market [1]  2/14
masks [2]  14/11 24/1
massive [1]  6/2
matter [2]  3/15 20/25
maximum [1]  17/15
may [8]  1/6 3/2 9/5 13/17 18/15 21/17

May 16th [1]  9/5
maybe [1]  8/16
me [12]  7/23 9/5 9/12 12/13 13/18 21/3 21/18 24/7 26/6 26/22 28/5 28/24
mean [2]  4/16 20/9
meaning [2]  18/13 19/13
means [1]  15/19
Medicaid [1]  20/10
medically [2]  16/9 27/9
Medicare [1]  20/10
meet [3]  18/25 25/23 29/2
meeting [1]  27/18
members [1]  8/19
mentioned [3]  14/9 18/2 18/6
merely [1]  23/11
Merrithew [3]  2/8 2/8 21/15
met [2]  11/20 12/19
metaphor [1]  4/15
methodology [1]  21/1
Metropolitan [2]  21/16 22/12
MICHAEL [1]

## M

MICHAEL... [1]  1/17
middle [1]  8/14
might [1]  24/2
Mink [1]  3/7
missed [1]  12/25
mission [1]  21/9
misunderstanding [1]  8/14
MO [2]  1/4 3/6
modification [7]  4/8 4/23 5/20 11/20 22/14 26/21 27/6
modified [2]  5/6 10/10
modify [3]  4/10 6/7 7/2
moment [4]  6/6 9/18 13/6 13/7
Monday [7]  24/7 26/16 27/5 27/13 27/22 27/25 28/10
month [3]  18/12 22/6 22/17
more [8]  8/18 10/11 11/3 12/22 22/6 22/16 25/4 26/18
morning [3]  3/4 4/5 28/11
mortal [1]  26/5
MOSMAN [2]  1/17

most [7]  11/16 20/13 20/17 21/10 22/22 24/9 26/13
motion [6]  7/2 7/20 12/6 13/25 19/4 22/3
move [6]  8/19 14/21 15/5 18/16 18/22 28/5
moved [4]  15/20 15/20 17/14 27/10
movement [1]  24/24
movements [1]  8/18
moves [1]  27/9
moving [5]  3/19 17/13 24/10 24/13 26/3
Mr [2]  2/4 2/8
Mr. [8]  9/12 9/14 14/9 15/17 16/4 17/20 17/23 18/19
Mr. Stenson [3]  9/12 14/9 15/17
Mr. Stenson's [1]  9/14
Mr. Wehr [1]  17/23
Mr. Wehr's [3]  16/4 17/20 18/19

msaid [2] 2/12 2/12
much [5]  3/13 12/23 13/3 15/21 28/11
multiple [1]  10/25
must [1]  4/8
mute [1]  3/10
my [11]  3/25 7/17 12/15 13/5 16/11 26/1 26/9 27/6 27/20 28/4 28/8

## N

nationally [1]  16/15
natural [1]  6/2
necessarily [4]  5/18 6/20 19/24 26/4
necessary [10]  3/25 5/3 7/20 8/22 8/25 9/3 13/6 16/2 26/14 27/8
need [23]  3/9 3/11 5/18 5/20 5/23 6/4 10/14 11/6 13/10 14/6 14/24 16/10 16/19 17/1 17/16 20/3 20/5 20/18 24/19 24/21 25/15 26/25 27/12
needs [3]  19/18 19/23 23/3
never [2]  5/15 9/25

# N

new [9]  7/14 10/5 14/21 15/8 15/24 16/6 19/19 24/4 26/21
next [3]  7/17 15/12 18/12
no [16]  1/4 3/6 7/25 9/11 12/1 12/5 12/14 12/19 13/1 13/12 13/15 16/15 19/14 20/19 20/23 25/8
noise [1]  3/10
non [3]  11/13 17/15 24/10
non-.370 [2]  17/15 24/10
non-urgent [1]  11/13
not [58]
note [1]  7/1
now [4]  10/5 15/2 16/12 28/15
number [9]  6/8 6/17 6/21 10/16 11/8 18/20 25/6 26/7 27/3
numbers [1]  20/14
numerical [1]  19/15
numerically [1]

# O

o0o [1]  30/2
obey [1]  26/14
observed [1]  14/24
obviously [1]  16/14
off [2]  12/16 15/11
Official [1]  30/11
OHA's [1]  8/21
OHS [1]  25/5
Okay [1]  19/2
once [1]  14/23
one [12]  6/10 6/10 7/2 9/21 11/9 16/15 16/17 18/9 20/1 21/17 25/20 28/8
onerous [1]  23/12
ones [1]  10/8
only [11]  4/18 4/18 13/19 14/2 14/7 18/9 19/20 20/9 20/24 24/21 27/7
open [3]  11/3 20/12 25/18
opinions [1]  20/25
opportunity [1]  23/11
opposed [2]  8/18 16/22
opposing [3]  21/18 22/12 22/13
opposition [1]  3/24

option [6]  18/8 18/13 18/13 18/15 18/15 28/14
options [3]  18/1 18/5 18/8
oral [2]  1/15 3/5
orally [1]  28/7
order [32]
orders [1]  10/4
Ordinary [1]  11/10
OREGON [12]  1/2 1/3 1/7 2/5 2/13 3/6 4/6 7/22 7/24 12/8 23/21 25/10
original [1]  30/6
ORS [1]  19/17
OSH [5]  10/21 19/10 19/12 20/1 25/1
other [28]  6/8 11/2 11/3 11/4 11/4 11/9 11/12 12/1 12/5 12/19 13/12 13/15 13/16 14/12 15/1 15/6 15/18 15/18 15/23 17/9 17/22 18/5 18/8 19/13 19/13 24/1 26/3 26/3
others [3]  13/17 16/22 17/5
otherwise [5]  3/10

# O

otherwise... [4]
7/15 21/7 23/6 24/3
our [7]  4/7 18/11
20/11 20/11 25/12
25/18 28/5
out [11]  5/10 9/10
10/20 16/14 17/17
19/16 22/10 22/15
22/24 23/11 25/3
outcome [3]  10/24
11/18 12/7
outlined [1]  16/3
outset [1]  5/8
over [4]  8/16 9/19
16/24 16/24
own [6]  5/21 7/9
8/7 14/15 19/11
19/11

# P

page [5]  8/14 8/15
8/16 8/16 8/21
pandemic [3]  7/13
7/21 8/23
Panner [4]  4/17 5/1
6/24 8/9
Panner's [7]  5/9 7/5
10/3 10/9 10/10
21/10 23/2
parameters [1]
10/13

parmcel [1] 18/16
particular [5]
11/18 12/7 12/12
19/15 25/10
parts [1]  17/13
party [1]  3/19
past [1]  24/14
patient [3]  17/22
20/13 20/15
patients [37]
PATRICK [1]  1/6
people [33]
per [1]  6/17
perfectly [2]  14/11
24/5
perhaps [2]  17/21
26/11
period [6]  13/19
17/2 22/8 22/11
27/1 27/14
periods [1]  10/17
perpetuate [1]  4/9
person [3]  19/18
19/23 20/4
personal [2]  11/7
23/24
phone [3]  3/10 3/12
18/20
place [5]  3/5 6/16
15/18 16/3 17/22
placement [9]
19/20 19/21 19/23

19/23 24/15 24/20
25/2 25/5 27/11
placements [6]
10/20 11/5 14/1
14/4 20/3 25/13
placing [2]  11/2
11/3
plaintiff [7]  4/4
18/1 18/2 19/3
26/24 27/25 28/21
plaintiffs [5]  1/4
2/4 12/6 12/12
28/18
plaintiffs' [3]  7/18
13/16 18/3
plan [4]  14/10
14/22 16/3 28/15
play [1]  6/22
point [7]  5/19 16/16
17/7 19/16 20/24
21/5 22/18
points [2]  3/24 19/6
policies [1]  10/8
policy [5]  8/22 9/4
9/20 9/22 10/5
population [1]  15/6
Portland [5]  1/7 2/6
2/9 2/14 2/19
posed [1]  24/4
position [2]  7/18
13/14
positive [1]  17/8

# P

possible [7] 7/16 9/14 15/22 18/10 24/10 24/16 28/6

potential [1] 7/21

potentially [1] 24/23

Potter [3] 2/12 3/21 13/22

PPE [2] 14/8 14/9

pragmatic [1] 6/10

precise [1] 11/23

precisely [2] 4/10 25/25

predictions [1] 18/11

preference [1] 28/3

prevent [1] 26/5

prevented [2] 6/2 6/3

previously [1] 21/25

principle [5] 6/9 6/11 6/16 6/20 23/3

principles [2] 7/10 22/22

prior [2] 7/4 28/5

priorities [1] 16/17

prioritize [1] 16/18

Prisons [2] 23/17 23/18

probably [2] 5/11

problem [6] 5/10 5/13 11/22 18/4 27/16 27/18

procedures [2] 11/14 24/13

proceedings [4] 1/16 3/9 29/5 30/5

process [1] 23/1

produced [3] 20/20 20/23 20/24

program [1] 25/23

programs [2] 25/11 25/18

prohibited [1] 4/22

projected [1] 18/16

prophylactic [2] 5/12 6/10

proposed [3] 19/9 19/14 26/21

proposition [2] 13/15 13/18

protect [1] 5/3

protected [2] 5/6 8/5

protective [2] 11/7 23/24

proven [2] 11/1 12/13

provide [1] 14/4

provides [1] 29/2

provision [1] 22/23

psychiatric [7] 14/7 14/9 15/25 16/1 20/12 21/7 23/25

psychiatrically [2] 20/21 20/23

Public [2] 21/16 22/12

purposes [1] 26/19

pursuant [1] 16/19

put [4] 10/7 14/5 16/3 17/22

puts [1] 23/8

# Q

qualify [1] 25/2

quarantine [12] 7/24 8/7 10/1 10/6 10/14 11/6 13/11 18/15 21/25 22/8 22/11 23/15

quarantined [2] 8/4 26/17

quarantining [10] 7/19 8/18 8/25 10/21 11/25 13/6 16/22 26/2 26/4 26/21

question [14] 4/4 7/12 7/17 7/18 8/6 8/7 8/9 8/24 9/15 12/11 13/5 17/19 18/21 25/7

questioned [1] 9/25

# Q

**questions [3]** 3/16
3/23 21/17
**quibble [1]** 28/5
**quickly [3]** 18/10
24/16 28/6

# R

**radically [1]** 13/9
**rapid [1]** 24/9
**rapidly [1]** 25/4
**rate [2]** 10/7 15/13
**rather [4]** 9/21
15/14 17/10 27/2
**ratify [1]** 9/22
**reach [1]** 6/4
**read [1]** 14/17
**ready [1]** 15/7
**really [2]** 13/14
18/3
**reason [1]** 22/13
**reasons [1]** 21/1
**receive [1]** 12/9
**recently [2]** 10/5
19/17
**recognized [1]**
23/18
**record [2]** 13/22
30/5
**recording [1]** 3/8
**reduce [5]** 4/12
20/14 23/19 24/3

**reduced [2]** 4/16
22/1
**reducing [1]** 26/18
**referenced [1]** 7/14
**referred [1]** 7/11
**regimen [1]** 27/4
**regular [2]** 14/20
16/6
**reject [2]** 7/10
23/20
**relief [1]** 13/12
**remain [2]** 20/12
21/8
**remedy [1]** 4/18
**replaced [1]** 26/5
**reply [1]** 19/4
**reporter [3]** 2/18
3/8 30/11
**represent [1]** 7/13
**represents [2]**
23/10 24/9
**requested [2]** 5/19
19/8
**require [1]** 14/3
**required [3]** 6/8
26/5 27/3
**requirements [1]**
23/1
**requires [1]** 7/14
**requiring [1]** 24/7
**resist [2]** 4/11 20/7

**resources [1]** 12/11
**respect [1]** 14/1
**respond [3]** 4/2
11/8 28/7
**response [13]** 7/15
7/21 8/10 8/23 9/1
9/11 19/3 21/6 22/3
23/14 23/16 28/2
28/12
**responses [1]** 3/24
**restoration [4]**
19/23 25/11 25/16
25/22
**restore [1]** 23/6
**restricted [2]** 9/8
9/9
**rests [1]** 7/4
**results [3]** 17/3
17/6 27/8
**retroactively [1]**
9/22
**return [1]** 7/16
**revised [1]** 19/19
**right [13]** 4/15 5/14
8/12 10/1 10/12
11/24 15/1 17/25
18/12 18/14 18/18
27/21 29/1
**rights [5]** 2/5 4/6
5/4 5/5 25/10
**risk [6]** 23/9 23/19
24/3 24/4 24/6 26/5

# R

risks [2]  24/23 24/23
RMR [2]  2/18 30/10
room [4]  2/19 15/20 15/21 17/15
Rufo [1]  4/8
rule [1]  5/12

# S

S.W [4]  2/5 2/9 2/14 2/19
safe [2]  19/12 19/13
safely [1]  18/10
said [4]  4/8 15/17 20/10 20/13
same [3]  4/4 8/8 8/24
SAMHSA [1]  20/9
say [8]  5/8 5/20 7/25 8/21 14/5 16/24 20/4 23/13
saying [1]  8/13
says [4]  19/9 19/10 20/20 21/5
schedule [2]  7/15 19/11
scope [5]  4/12 4/20 4/22 5/14 5/22
Scott [1]  2/12
se [1]  6/17

second [5]  19/16 25/7 26/1
seeking [1]  9/22
seeks [1]  4/10
seem [1]  17/14
self [1]  8/21
self-imposed [1] 8/21
sending [2]  24/19 26/3
sends [1]  27/11
sent [2]  25/5 27/12
sentence [1]  8/15
seriously [2]  21/7 23/10
serve [2]  16/1 16/2
services [2]  20/10 20/16
serving [1]  21/25
set [4]  3/5 4/18 28/9 28/16
setting [1]  23/25
settings [3]  11/3 15/18 23/16
seven [16]  4/19 5/2 5/11 6/7 6/9 6/15 6/18 6/23 7/6 7/15 10/11 13/11 22/11 22/15 23/2 27/3
seven-day [2]  5/11 7/15
several [1]  18/3

Sheila [3]  2/12 3/21 13/22
shortage [1]  24/9
should [11]  4/11 8/2 10/10 11/18 15/2 16/12 16/17 17/3 18/12 21/5 23/25
shouldn't [1]  26/17
show [7]  12/5 12/6 12/19 15/1 15/3 20/8 21/1
shown [2]  11/19 12/12
shows [1]  18/11
Shumway [3]  2/18 30/9 30/10
shut [1]  21/6
signature [2]  30/7 30/7
signing [1]  30/4
simple [1]  13/10
simply [2]  23/21 24/19
since [6]  5/4 9/10 14/14 17/20 17/21 23/24
single [3]  10/24 20/4 21/3
sit [1]  27/23
six [2]  5/15 14/11
slightly [1]  12/3

## S

slowed [1]  23/15
slowly [1]  10/6
so [52]
solution [5]  5/10
11/23 13/9 24/4
24/9
solutions [1]  25/20
solve [2]  5/13 18/3
some [14]  3/16 3/24
6/8 10/16 11/24
12/12 13/6 13/8
13/17 13/23 16/22
17/5 22/25 26/4
someone [1]  14/24
something [11]
3/17 4/2 6/3 7/13
7/14 9/1 14/8 14/12
15/25 16/1 27/23
sometime [1]  18/12
somewhat [1]  24/3
somewhere [1]
10/20
soon [1]  7/16
sorry [3]  9/9 9/17
17/20
sort [4]  8/15 15/15
16/10 19/4
sorts [1]  12/8
sound [1]  27/9
space [1]  24/11
speaker [1]  3/12

speaking [3]  3/6
3/11 21/14
specific [4]  3/16
4/11 9/20 27/2
specifically [1]  7/5
speed [1]  27/15
staff [5]  8/19 14/9
14/13 16/2 23/24
start [5]  3/16 3/19
9/19 14/19 17/10
state [47]
State's [4]  5/19
12/4 13/14 19/8
STATES [5]  1/1
1/18 2/18 20/19
21/4
statute [3]  12/8
19/20 25/17
Stenson [5]  2/4 4/6
9/12 14/9 15/17
Stenson's [1]  9/14
step [1]  26/14
steps [3]  10/25 20/8
22/13
still [2]  10/12 26/5
stockpile [5]  14/18
16/13 16/14 16/20
26/7
stop [1]  9/23
straight [1]  25/13
Street [2]  2/9 2/14
strongly [1]  20/7

structures [1]
15/23
stuck [2]  12/2
12/20
subbasement [2]
4/13 4/16
subject [1]  10/15
subjected [1]  23/8
submit [1]  26/20
submitted [3]  3/18
11/2 19/10
succeeded [1]  16/16
successfully [1]
12/19
such [6]  6/1 6/16
15/3 23/8 23/14
26/7
sufficient [1]  26/7
suggested [2]  13/17
14/2
suggesting [1]  8/25
suggestion [1]
15/17
suitable [1]  19/21
Suite [2]  2/5 2/9
supported [1]
20/25
Supreme [3]  4/7
4/22 7/1
sure [13]  5/24 6/13
8/13 9/18 10/13
12/24 14/8 15/19

**S**

sure... [5]  17/14 17/19 21/17 21/20 22/17

surrounding [1]  7/13

symptoms [1]  15/15

system [1]  16/11

**T**

tailored [1]  4/10

take [6]  10/25 15/7 15/14 15/24 16/2 26/14

taken [2]  14/23 23/9

takes [1]  27/2

taking [2]  15/12 22/13

talk [2]  13/7 19/1

talking [1]  20/17

tees [1]  13/8

telemedicine [1]  20/16

telephone [2]  1/15 3/5

tell [6]  8/24 11/10 13/18 14/18 17/18 26/22

tells [1]  26/6

temporarily [1]

temporary [3]  7/14 13/12 20/2

Tenth [1]  2/5

terms [3]  7/9 15/23 24/21

test [8]  15/1 15/3 15/5 16/21 17/2 17/3 17/6 26/9

tested [5]  16/19 26/10 26/11 26/17 26/20

testing [14]  11/5 14/17 16/6 16/9 16/11 16/22 18/13 18/15 26/6 26/22 27/3 27/7 27/7 27/8

tests [10]  14/20 14/22 15/4 16/12 16/14 16/15 16/20 17/4 26/7 26/12

than [6]  10/11 15/14 16/2 17/10 18/16 22/17

Thank [26]  3/12 3/15 3/21 4/3 5/7 11/21 12/23 13/2 13/3 13/21 17/12 17/25 18/18 19/2 21/12 21/23 22/19 22/20 24/17 25/8 25/19 25/24 27/17

that [197]

that's [14]  10/18 12/15 13/1 14/8 14/12 23/2 23/2 25/6 25/24 25/24 26/5 27/14 27/23 28/14

their [13]  5/24 8/7 9/24 11/20 12/6 12/10 19/22 22/1 22/2 22/3 23/9 24/1 24/23

them [11]  8/18 10/7 14/6 14/14 14/16 14/21 16/2 20/22 23/9 24/19 25/4

then [17]  7/17 10/18 10/19 15/4 15/5 15/7 15/11 15/13 17/1 17/6 17/10 22/7 26/5 26/20 28/2 28/10 29/1

there [29]  5/24 6/1 7/11 8/24 9/14 10/24 11/15 11/24 12/1 12/5 12/12 12/14 13/8 13/15 13/17 16/13 16/14 17/13 17/22 18/5 18/21 21/3 22/3

# T

there... [6]  22/21 23/4 23/24 24/13 24/24 25/17
there's [10]  3/17 11/7 13/12 17/5 18/7 19/14 20/19 22/7 22/15 25/16
thereby [1]  26/18
these [6]  3/8 14/22 20/8 25/13 26/2 26/10
thesis [1]  8/15
they [23]  5/20 5/22 8/8 9/6 10/17 11/1 11/6 12/10 14/1 14/6 14/20 14/24 15/7 16/24 17/7 20/13 22/6 24/21 25/3 25/5 26/7 26/19 26/22
they're [7]  3/25 10/6 11/11 22/5 22/15 22/16 25/14
they've [7]  10/5 11/20 13/17 20/23 20/24 22/1 24/15
thing [3]  16/8 19/16 20/20
things [1]  12/8
think [22]  4/7 5/18 6/22 6/23 8/2 8/5

8/12 10/18 10/23 11/19 13/1 13/14 19/16 21/8 23/13 26/22 27/23 28/5 28/11 28/14 28/15 28/23
Third [2]  2/19 26/2
this [49]
Thomas [1]  2/4
those [13]  4/1 4/1 7/25 9/8 9/24 10/8 15/4 16/15 17/1 22/13 24/25 25/11 27/11
though [1]  14/19
thought [3]  5/9 5/10 12/15
three [1]  17/3
through [3]  14/21 14/22 20/16
throughout [2] 20/15 23/7
Thursday [1]  17/2
time [11]  3/5 5/21 6/18 10/17 13/19 16/10 24/15 27/1 27/2 27/8 27/14
times [1]  18/3
today [5]  7/8 16/6 18/6 26/6 27/23
today's [1]  26/19
together [1]  29/2

Tom [1]  4/5
tomorrow [1]  17/1
tool [1]  23/19
top [1]  27/9
total [1]  24/3
transcript [3]  1/16 30/5 30/6
transfer [1]  17/7
transferred [2] 22/7 22/10
transport [1]  24/22
treat [1]  23/6
treatment [7]  8/3 8/5 11/16 22/16 23/1 25/4 27/11
trial [2]  2/13 6/25
tried [1]  12/24
true [3]  10/19 13/15 24/18
truly [1]  23/11
trying [3]  9/15 10/12 10/23
Tuesday [7]  28/1 28/10 28/11 28/15 28/17 28/22 29/3
turn [1]  13/4
turns [2]  13/11 13/14
two [5]  6/22 17/3 21/24 25/6 26/3
typically [1]  22/25

**U**

unable [1]  12/10
unavailable [1]
11/1
unavoidable [1]
10/16
unconstitutional [1]
7/25
undefined [1]  27/1
under [11]  5/22 7/1
7/2 7/6 12/8 19/17
20/5 22/5 23/12
25/1 26/13
undergirding [2]
6/10 22/23
underlying [3]  6/19
7/3 7/9
understand [4]
8/12 10/13 16/5
17/13
understanding [1]
16/12
understood [3]
10/18 12/17 12/24
unit [4]  17/8 17/9
17/9 17/10
UNITED [5]  1/1
1/18 2/18 20/19
21/4
units [8]  10/6 11/3
11/4 15/6 15/7 17/9
21/25 22/1

unless [2]  27/14
28/8
unnecessary [1]
7/20
until [5]  4/1 5/21
10/20 17/11 27/5
up [13]  10/19 11/3
11/23 12/16 13/8
13/16 15/12 18/9
18/12 19/18 19/25
28/10 28/11
upon [2]  7/3 11/24
urgent [1]  11/13
us [5]  4/2 15/4
15/13 18/16 27/22
use [4]  3/12 6/24
7/2 11/7
using [1]  23/24
utilizing [1]  24/13

**V**

variety [1]  12/11
vastly [1]  16/2
version [1]  19/19
versus [1]  3/6
very [6]  3/13 12/23
13/3 20/11 23/4
23/9
view [2]  7/8 26/9
violate [2]  5/25
10/9
violates [3]  5/2 5/15
6/17

violation [6]  4/9
4/11 4/21 4/24 10/3
10/7
virus [1]  16/10
vitally [1]  23/3

**W**

wait [3]  27/5 28/1
28/4
waiting [3]  17/11
22/2 22/3
wake [1]  28/10
want [10]  4/2 5/8
8/13 21/17 21/19
22/17 24/24 26/20
26/25 27/15
wanted [3]  19/7
19/16 25/21
warranted [1]  16/9
was [21]  4/10 4/18
6/1 6/18 6/24 7/4
7/6 7/6 9/5 9/21
9/22 11/13 12/12
12/14 12/17 19/10
20/9 22/3 22/18
22/19 25/20
watching [1]  15/15
way [7]  5/13 12/3
15/3 16/23 20/9
23/8 27/9
ways [3]  11/8 11/15
20/1
we [49]

# W

we'd [2]  12/2 12/20
we'll [6]  13/7 14/5
15/11 27/20 28/16
29/2
we're [10]  9/5
11/17 13/12 15/14
18/25 20/17 22/4
22/13 26/25 28/7
we've [4]  15/10
18/1 18/21 24/14
wear [1]  24/1
wearing [3]  14/9
14/11 14/14
week [8]  14/23 15/8
15/11 15/11 15/12
15/13 15/14 16/25
Wehr [1]  17/23
Wehr's [3]  16/4
17/20 18/19
well [5]  5/18 6/6
10/7 18/14 24/24
were [12]  3/24 7/10
12/1 12/5 13/10
15/7 17/22 21/25
22/9 22/9 24/5 26/8
what [28]  3/17 4/16
6/12 6/13 6/13 7/15
8/12 9/18 13/18
15/9 15/16 15/19
16/5 19/4 21/5
21/24 22/1 22/4

23/11 23/20 24/8
24/8 24/12 24/25
25/4 26/6 26/24
29/2
what's [2]  6/8
21/20
whatever [1]  17/8
whatsoever [1]
5/21
when [4]  3/9 3/11
15/14 18/25
whenever [1]  24/10
where [4]  5/25 6/1
16/11 20/13
whereby [1]  10/5
whether [15]  3/17
4/1 5/23 5/23 6/7
6/9 6/15 6/18 7/12
8/6 8/8 12/17 17/8
17/14 18/21
which [17]  6/12
6/13 6/22 7/4 7/19
8/8 9/3 10/17 11/15
12/4 13/8 14/20
20/25 21/1 22/22
23/16 27/14
while [1]  24/2
White [1]  17/5
whittle [1]  10/24
who [29]  8/2 8/3
8/3 8/4 9/24 10/2
10/2 11/4 12/10

14/25 15/1 15/19
16/21 19/21 19/23
19/24 20/3 20/21
21/7 21/14 22/5
23/6 24/18 25/1
25/15 25/22 26/9
26/10 27/11
whole [1]  16/14
whom [2]  19/21
23/5
why [4]  9/19 25/21
25/22 26/16
wide [2]  12/7 12/11
widely [2]  23/16
23/18
will [10]  14/10
14/17 14/20 15/13
18/10 24/1 26/22
26/24 28/18 28/23
window [3]  5/25
19/9 19/15
wisdom [3]  5/9
5/22 8/17
wise [2]  6/18 6/23
wish [2]  3/17 5/22
within [6]  10/1
16/21 17/9 22/10
22/15 23/1
without [1]  30/6
word [1]  9/9
work [6]  15/23
16/23 18/8 28/18

## W

**work... [2]** 28/21
28/23
**working [1]** 16/13
**works [2]** 28/19
28/24
**world [2]** 12/1 24/2
**would [32]**
**wouldn't [5]** 5/25
12/2 12/20 15/1
24/5
**wrap [1]** 28/10
**writing [1]** 3/18
**written [3]** 7/11
28/2 28/12
**wrong [1]** 17/24

## Y

**Yes [3]** 9/4 21/14
21/22
**you [70]**
**you'll [1]** 18/25
**you're [4]** 7/23 8/13
8/25 18/5
**you've [3]** 3/17 7/10
19/4
**your [33]**
**yourself [1]** 3/12