```
         IN THE SUPERIOR COURT OF THE STATE OF OREGON
              IN AND FOR THE COUNTY OF MARION
```

| | | |
|---|---|---|
| STATE OF OREGON, | : | Case No. 20CR08901 |
| Plaintiff, | : | TRANSCRIPT |
| vs. | : | OF |
| CHARLY JOSH VELASQUEZ-SANCHEZ, | : | HEARING ON FITNESS |
| | : | TO PROCEED |
| Defendant. | : | |

```
              PLACE:   Marion County Courthouse
                       100 High Street NE
                       Salem, Oregon 97501

              DATE:    February 9, 2024
```

**BEFORE:**

    HON. AUDREY J. BROYLES, J.S.C.

**TRANSCRIPT ORDERED BY:**

    TAYLOR C. SHETINA, ESQ., (The Bopp Law Firm, P.C.)

**APPEARANCES:**

    EVELYN CENTENO, ESQ.
    Attorney for the State.

    MICHELLE VLACH-ING, ESQ.
    Attorney for the Defendant.

    ERIN K. OLSON, ESQ.
    Attorney for the Victims.

```
                    Transcriber: KATHLEEN PRICE, CET'D-325
                    Price Transcript Service
                    6 Trout Brook Road
                    Stanhope, NJ 07874
                    (973) 914-3080
                    www.pricetranscriptservice.com
```

**Ex. 2**

```
                                                              2
 1                 (Proceedings commence at 10:08 a.m.)
 2                 THE COURT:  All right.  Let's get on the
 3     record and then we can get started.  Thank you.
 4                 MS. CENTENO:  Yes, Your Honor.  Thank you.
 5     We are here in State of Oregon vs. Charly Velasquez-
 6     Sanchez, 20CR08901, 21CR46350, 23CR28431, 22CR35776.
 7     Mr. Velazquez-Sanchez is appearing in custody this
 8     morning represented by Ms. Michelle Vlach-Ing, the
 9     State by Evelyn Centeno.  Erin OLSON: is here
10     representing the victims.  The victims are here in
11     person and one is appearing over the phone, and we are
12     here for the Court to address the next steps for the
13     defendant after being -- relief.
14                 THE COURT:  Thank you.  And, Ms. Vlach-Ing, ,
15     are you prepared to resume where we left off last week?
16                 MS. VLACH-ING:  Yes, Your Honor.  It's
17     difficult to pronounce, it's Vlach-Ing.
18                 THE COURT:  Vlach-Ing.  Excuse me.
19                 MS. VLACH-ING:  No, not at all.  Yes, Your
20     Honor, we are ready to proceed.
21                 THE COURT:  Okay, thank you.  And, Ms. Olson,
22     now representing the victims in this case, are you
23     ready as well?
24                 MS. OLSON:  Yes, Your Honor.
25                 THE COURT:  Okay, thank you.  Before we get
```

```
                                                              3
 1     started, I'm just going to go through a brief
 2     procedural history of this case.  Mr. Velasquez-Sanchez
 3     was sent to the state hospital, or I signed an order
 4     sending him to the state hospital, on July 12th of last
 5     year.
 6                 Six months later, he came back to the jail
 7     based on the Mosman end of jurisdiction notice on
 8     January 18th, where he has remained at the jail.
 9                 On January 18th, he requested a release to
10     his father.  That request was denied.  We set this
11     matter for February 1st for the State to, at that time,
12     contest the most recent finding of the defendant being
13     unable.
14                 When we came to court on February 1st, the
15     State withdrew its opposition to the unable finding,
16     and we moved on to a proposed release to community
17     restoration that was presented.
18                 At the time of that hearing last week, one of
19     the victims in the current case was present and was
20     given an opportunity to be heard.  She opposed the
21     defendant's release and the Court then took the matter
22     under advisement, and we continued the matter to today.
23                 And so today, we continue the hearing to
24     discuss the appropriate path for Mr. Velazquez-Sanchez,
25     and I'm going to then start with the parties again to
```

```
                                                                    4
 1        give their position on what we do in light of the
 2        Mosman restrictions.  And I'll start first with Ms.
 3        Centeno.
 4                MS. CENTENO:  Thank you, Your Honor.  First,
 5        we'd like to report that we did review the latest able
 6        to assist report very carefully, and we had an
 7        evaluator review that report.  That evaluator is both
 8        trusted by the State and defense counsel.  He has
 9        previously interviewed the defendant.
10                When he read that report, and upon my
11        consultation with me, we do not believe that a high
12        good-faith basis to ask Your Honor to find him able to
13        assist on what we had, which leaves us in this
14        predicament of the Mosman order.
15                As the Court is aware, Ms. Clarkson is one of
16        the three DAs in the State of Oregon to have filed into
17        the Federal Court suit, and while she may have had some
18        successes in getting a safe eval for the violent
19        felonies, they are still trying to Judge Mosman that
20        this order needs to be further modified because it does
21        release dangerous offenders into our community.
22                As the Court is aware in Marion County, we
23        have had multiple attempts and we've tried to send
24        people back to the state hospital.  A court has ordered
25        a defendant back to the state hospital when the
```

```
                                                                    5
 1        hospital did not provide services to that defendant and
 2        Judge Mosman ruled against us.
 3                This summer, the Court once again tried to
 4        send an individual who required a hospital level of
 5        care to the state hospital.  Judge Mosman again ruled
 6        against the Circuit Court and further singled out
 7        Marion County for not falling in line with his order,
 8        which leaves us with today where the defendant is
 9        unable to aid and assist and requires a hospital level
10        of care.  And he is now at the jail because he spent
11        the 180 days per the Mosman time line.
12                To be clear, the office, the DA's office does
13        not agree with the Mosman order.  This Mosman order
14        makes our communities and our victims less safe.  The
15        victims in this case do not want this defendant
16        released.  They feel less safe in the community with
17        him being released, and we would never agree to release
18        Mr. Velasquez-Sanchez but because of the Mosman order,
19        the only proposition we have at this point for the
20        Court would be to release him to community restoration
21        with a community restoration monitor, a GPS monitor,
22        and a treatment bed with PCC.
23                And unless the Court has further questions,
24        that's all I have.
25                THE COURT:  Thank you.
```

6

1  MS. CENTENO: Thank you.
2  THE COURT: Ms. Vlach-Ing?
3  MS. VLACH-ING: Thank you, Your Honor. We
4  agree in many ways with the State's position. Mr.
5  Velasquez-Sanchez has been in and out of the State
6  Hospital, and the 180 days does not provide -- did not
7  provide him the ability to be completely restored. And
8  so to have him go in and out of the state hospital for
9  various alleged crimes sometimes takes away from his
10  ability to become completely restored so that he is
11  able to aid and assist.
12  I have indicated that this is a case that is
13  likely ripe for a change of plea, but we can't take his
14  plea if he is unable to aid and assist. No offense to
15  our Sheriff, our Sheriff does a wonderful job, but the
16  Community Correctional Facility at Marion County is not
17  the place for somebody who has a mental health crisis
18  to be working toward restoration.
19  It would be in Mr. Velasquez-Sanchez's better
20  interest if he is able to be housed at the state
21  hospital, complete his restoration, be found able to
22  aid and assist, or some other issue, and then we
23  address these matters but to shoe -- or to force these
24  -- force these issues back to the court and on to Mr.
25  Velazquez-Sanchez as well, if he's unable, he can't

7

1  fully take accountability if that is the route he
2  chooses or if he doesn't choose that route, he's still
3  unable to stand trial.
4  And so the solution that we came up with, as
5  best we can, if sending him to the Psychiatric Crisis
6  Center with an ankle monitor is the best we can do,
7  then maybe that's the best that we can do. He still
8  needs to -- we still need to ensure that he is on his
9  medication, that he takes his proper medication. His
10  medication costs quite a bit of money, and so who's
11  going to bear that cost is another question that we
12  have.
13  Thank you, Judge.
14  THE COURT: Thank you, Ms. Vlach-Ing. Ms.
15  Olson?
16  MS. OLSON: Thank you, Your Honor. As you
17  know, I'm fairly new to this case so I'll do my best.
18  It's taken a while to get up to speed on the
19  issues that are before this Court because those issues
20  involve victims, and by my count, this is the eighth or
21  ninth set of criminal incidents in the last five years,
22  most or all of which have had named victims, some of
23  which didn't have named victims but they clearly had
24  victims.
25  The case before the Court today has three

8

1　　named victims but there were twenty schoolchildren who
2　　were at risk of the defendant's behavior and who
3　　witnessed their school librarian and two beloved school
4　　faculty -- or not faculty members but school members
5　　being attacked viciously.
6　　　　　And I bring that up because at the beginning
7　　when the district attorney called the case, there were
8　　a number of case numbers.  Those are the cases
9　　remaining from the eight that the defendant has been
10　　involved in, in the last five years, and many of those
11　　did have victims.
12　　　　　That is significant because I have read most
13　　of the pleadings in the Federal case and in none of the
14　　orders is the victim "victim" mentioned.  That is
15　　significant because for forty years, victims have been
16　　struggling to get the constitutional rights that
17　　finally in 2008 were made enforceable in the Oregon
18　　Constitution.
19　　　　　Those constitutional rights include the right
20　　to reasonable protection from offenders.  That's
21　　Article I, Section 43.  They include the right to be
22　　treated with dignity and respect.  That's Article I,
23　　Section 42, and the right to be informed of critical
24　　stage proceedings.  That's Article I, Section 42.
25　　　　　This is a critical stage proceeding.  It

9

1　　might not be defined as such specifically in Chapter
2　　147 of the enabling legislation, but this is
3　　undoubtedly a critical stage proceeding because this
4　　Court is deciding whether to release the defendant back
5　　into the community.
6　　　　　Victims have constitutional rights under the
7　　Oregon constitution which were ignored in the
8　　discussion in Federal Court of what should happen when
9　　a violent offender gets to the 180-day mark of his
10　　Oregon State Hospital stay.
11　　　　　Public safety has barely been mentioned, not
12　　in the orders, and certainly by the prosecutors, and by
13　　OPDS for that matter, but public safety is paramount in
14　　this case after eight In this case, after eight
15　　criminal cases, which involved violent or somehow
16　　endangering behavior.
17　　　　　And I want to read from a police report in
18　　one of the cases.  This case was charged as a
19　　disorderly conduct, but it involved the defendant
20　　placing several people in fear when he went to River
21　　Road Park and was cussing, throwing an axe and pointing
22　　at adults and children, while holding the axe.
23　　　　　This is a case that was charged as a Class B
24　　or whatever it is, misdemeanor, but it -- what behavior
25　　could be more dangerous than going to playgrounds where

10

children are present and wielding an axe or assaulting the people who are there to protect the children. I can't imagine anything, and the idea that this defendant who nobody disputes is severely mentally ill and should be treated as such, he should not be released to the community.

The victims are going to speak about what happened to them and their feelings on the idea of release, but it is time for somebody to acknowledge the fact that crime victims have constitutional rights in the State of Oregon. They are trumped by Federal Constitutional rights, and I understand the due process rights at issue in this case involving this defendant, but due process rights are individual, and an individual evaluation of whether or not this defendant should be released back to the community has to result in him being detained until he is able to able to behave in a non-violent way in our community.

My client, Laurie Miller, who's on the phone; Ashley Rochetto who is present in the courtroom, and Andrew Limbeck who is also present in the courtroom wish to address the Court. And I want to point out that all three of these staff people, these people protecting school children, were injured; one of them seriously. Andrew Limbeck, had shoulder surgery and

11

suffered a cracked hip. So the injuries sustained go beyond just a bruise or anything like that. Their invention resulted in unconsciousness, a potential traumatic brain injury, and serious injuries involving surgical intervention in the case of Mr. Limbeck.

So I would ask the Court to start perhaps with Ms. Miller on the phone and then call up Ms. Rochetto and Mr. Limbeck to address the Court.

THE COURT: Okay.
MS. OLSON: Thank you.
THE COURT: Thank you, Ms. Olson. Ms. Miller, good morning.
MS. MILLER: Good morning.
THE COURT: What would you like to tell me today about the incident or your feelings with respect to release of Mr. Velazquez-Sanchez into the community?
MS. MILLER: Well, Your Honor, some of this comes from after the assault, and the whole trauma of the children being present, the fact that he was taking out the adult presence, the protection of the children, and specifically going after these innocent little kids. I mean, they were third and fourth-graders, so nine and ten-year-olds.

He came onto our property with the intent to do harm. He came towards me first. And our protocol

12

1  at Highland Elementary, when you're on the playground
2  with students, whether it's parents or people walking
3  through the campus, because at that time the campus was
4  open, we would just simply ask someone who veered off
5  the sidewalk path to please remain on the sidewalk, you
6  know, and that is what I did.  I saw him coming.  He
7  was crossing into the playground, and I asked him to
8  please use the sidewalk.  We had children out and would
9  he please stay on the sidewalk.
10          He did not respond to me.  He had a very
11 blank look on his face and continued to come towards
12 me.  I was the one closest to him when he entered the
13 school property, and the children were scattered
14 throughout the playground area.
15          At that time, I asked him again to please use
16 the sidewalk, and -- you know, in a very calm and
17 professional manner.  And, at that point, he began to
18 run towards me, and he physically assaulted me,
19 striking me numerous times in the head, knocking off my
20 glasses.  I stumbled and fell.  You know, it was pretty
21 chaotic.
22          When I gathered myself, I turned around and I
23 saw him assaulting Ashley, Ms. Rochetto.  He had her on
24 the ground, and he was hitting and kicking her.  We had
25 both called for help with our walkie-talkies, you know,

13

1  following all the protocol that we have, safety
2  protocols, to keep the kids out of danger and then I
3  saw the kids running, and we were trying to get kids to
4  the front doors.  And, at that time, there were three
5  male staff that came running out separately.  One was
6  Andrew, and we were able to get him off of Ashley.
7           He had chased the children.  They reported
8  this all to us later.  They were very traumatized.  Our
9  school went into lockdown.  No -- I mean, it wasn't
10 that class that was in trauma.  If you've ever been in
11 a school when it goes into lockdown, every child and
12 every teacher is affected by that because it's --
13 there's a leveled system to tell you, you know, kind of
14 what's going on and we were at a level three lockdown,
15 which is the highest that can be, which is the
16 potential that a person is coming into the building,
17 that means you lock everything up. You keep kids right
18 where they are, and we were able to get inside, we were
19 able to get the kids inside because the adult staff
20 males were in pursuit of him.
21          And these kids were beyond traumatized.  Like
22 they had seen me get assaulted.  They had seen Ashley
23 get assaulted.  They had witnessed all of it.  We were
24 without -- there's nothing we could have done.  I could
25 not have fought back against this man.

14

```
 1              And I realize, Your Honor, that he has a
 2     mental illness and I've dealt with mental illness in my
 3     family.  So I have compassion on him.  I want him to
 4     get the best care that he can but letting him back out
 5     into the community with what I understand with the PCC
 6     bed and all that, really it's minor monitoring if he
 7     should choose not to charge his ankle bracelet or he
 8     goes outside of his designated area.  What's the
 9     response time going to be for that.  Is he going to
10     have enough time to go and hurt someone else before
11     police officers and law enforcement can get there.
12              I don't feel that he should be released.  My
13     goal in this from the start is that the community would
14     be safe, the kids would be safe, not just at Highland
15     Elementary but at any school that he has access to.  My
16     understanding is he drove from Kaiser to our school and
17     entered our property.  So he had ill intention for our
18     students.
19              And I don't see that this solution is a
20     solution, really.  I feel like mental health in Oregon
21     is lacking.  I speak from personal experience having a
22     child who went through some mental health crisis, and
23     we could never find a bed for her.
24              So I think it's a bigger problem that needs
25     to be addressed on why we aren't helping people that
```

15

```
 1     have this kind of mental illness.  I don't totally
 2     understand the Federal versus state and all of that,
 3     but hopefully there can be a solution where Mr.
 4     Velazquez-Sanchez can get the help that he needs so
 5     that he can become a productive member of society.
 6              THE COURT:  All right.  Thank you very much,
 7     Ms. Miller.  And then, Ms. Rochetto, would you like to
 8     say something?  I'm sorry.  Good morning.
 9              MS. ROCHETTO:  Good morning.  I just wanted
10     to start kind of giving you a picture of what the day
11     was like.  It was the last day of school.  The last day
12     of school is always super fun.  The teachers have like
13     a bunch of fun things planned.  You're packing up,
14     getting everything cleaned up.
15              At the time, I was one on one with a medical
16     student, a student who has medical needs, and that
17     morning was super fun.  I helped all the kids pack up,
18     and then it was time to go to library.  And Laurie
19     Miller, our librarian, she had planned for the kids to
20     pick out a couple books to take home, and then for the
21     last half of library go out on the playground and just
22     give them extra time to play.
23              So I went out with her.  We were on just a
24     small part of the playground where the big play
25     structure is, and she was moving to Tennessee over the
```

```
                                                                  16
 1      summer, and so as we were watching the kids, I was
 2      talking to her about how I was excited that she had an
 3      offer on her house.  That was the last thing I remember
 4      talking about.
 5              And then next thing we know, Charly was
 6      walking down the sidewalk and turned onto our property
 7      and Laurie, like she said, she asked if he could go
 8      walk on the sidewalk, and didn't respond, just looked
 9      at us, blank stare.  And she asked again, and when she
10      asked again, he was probably from me to you, and at
11      first, when she had asked and there was no response, I
12      took out my radio and I radioed to Keith who's back
13      there, and I said I need you to come out to the front
14      of the playground right away, and then once he was
15      about this distance, he ran as fast as he could towards
16      Laurie and started punching her.
17              And that moment, I will never forget.  It was
18      like -- like we planned for people to show up with guns
19      in our school and shoot our kids but something like
20      this -- we haven't planned for this.  Like -- ah, it
21      was -- ugh.
22              So then I held out my radio and I -- the
23      office has radios, principals, administrator-type
24      staff, and I said call 911, call 911.  And from my
25      point of view, Charly had to take out Laurie to get to
```

```
                                                                  17
 1      me because I was using my radio to call for help.  And
 2      so I -- once he started running towards me, I looked
 3      around.  All the kids were freaking out, running,
 4      hiding, going behind bushes, going behind anything that
 5      they could find to hide.
 6              And I looked around.  I -- kids were running
 7      away, doing what they're supposed to, and he started
 8      running towards me, pushing me on my back to the
 9      ground.  When I fell to the ground, I just remember
10      everything went black, and I thought something hit your
11      head, protect your head, protect your head.
12              And I don't know how long I was on the ground
13      being assaulted for.  The only reason that I have an
14      idea of maybe what happened was students watching from
15      inside from the windows.  My best friend at work
16      watching me get assaulted.
17              And then the students outside.  They -- from
18      their point of view, they thought he was choking me.
19      He was not.  But just thinking that that's what they
20      thought they saw.  So anyways, once the men came
21      outside yelling get the F up, get off of her, that's
22      what I came back to and I looked around, and I started
23      yelling at the kids get the F inside, get inside, run
24      as fast as you can, run.  And they ran as far as they
25      could.  When you're trying to run as fast as you can,
```

```
                                                                    18
 1       it feels like you're walking.
 2                 THE COURT:  Mm-hmm.
 3                 MS. ROCHETTO:  And I -- the -- I had the
 4       medical student with me, and she has a big device that
 5       we carry around everywhere.  So I walked back out to
 6       make sure all the kids were inside, grabbed the
 7       machine, and ran inside.
 8                 And as soon as I ran inside, I just started
 9       screaming, like uncontrollably, like held it together
10       for a minute while we were trying to get inside and --
11       it was horrifying.
12                 Once we got inside, people were asking me if
13       he had a gun because some kids thought that that's what
14       he saw --
15                 THE COURT:  Mm-hmm.
16                 MS. ROCHETTO:  And, from what I knew, he did
17       not.  So that's when we called 911 and I spoke to the
18       police, told them what had happened.  And then they
19       came and asked me information.  I gave them the wrong
20       address, wrong phone number.  I was totally not there
21       completely although I remember all of it.
22                 And, since then, I am still at the same
23       school because I love the kids and the staff and my
24       job.  I've had to do some exposure therapy over the
25       summer so that I could go back.  I had panic attacks at
```

```
                                                                    19
 1       least once a week for the first couple of months going
 2       back.  Luckily, everyone was like extra-alert, and they
 3       put in some safety protocols at the school to make it
 4       more safe and secure.
 5                 But I -- there's so many things that I need
 6       to do take care of myself in the situation, too.  I
 7       understand that he needs care, but a lot of the victims
 8       do, too.  I'm going to have to do speech therapy.  I
 9       never had problems with speech before.  I've done LENS
10       treatments.  I don't know if you know what that is, but
11       it has to do with your brain and making connections and
12       improving from traumatic brain injuries, counseling,
13       upped my meds.
14                 I traveled to Australia by myself before
15       this, and I was not scared.  I felt safe, but now I'm
16       constantly checking behind my back, making sure I have
17       enough time to react to something if something were to
18       happen.
19                 I know that Your Honor are in a place and
20       I've done as much as research as I can to understand
21       what's going on, but nobody else needs to get hurt.
22       Hearing the story about other things that he's done, it
23       makes me just want to fall apart.  I can't believe that
24       other people have had to experience the trauma from
25       incidents like that.
```

20

```
 1                Thank you.
 2                THE COURT:  Thank you.  And Mr. Limbic?
 3                MS. VLACH-ING:  Your Honor --
 4                THE COURT:  Yes.
 5                MS. VLACH-ING:  -- Mr. Limbeck is coming up
 6     but --
 7                THE COURT:  Okay.
 8                MS. OLSON:  -- I don't know if he'll say it
 9     but he's a behavioral intervention trainer for the
10     school district --
11                THE COURT:  Oh, okay.
12                MS. OLSON:  -- he's trained in dealing with
13     people who act out behavioraloy, and so I think that's
14     important to note in understanding his experience, too.
15                THE COURT:  Great.  Thank you. Good morning.
16                MR. LIMBECK:   Good morning.  So, yes, my
17     name is Andrew Limbeck.  I'm a behavior intervention
18     trainer.  Part of my job is to ensure the safety of the
19     people that are in our buildings, not just students but
20     staff as well.
21                I have a special needs brother myself.  I
22     have lots of empathy and compassion for mental health
23     issues.  It's part of why I do the work I do.
24                When I was there that day, I support fourteen
25     schools across the district, all levels, up to
```

21

```
 1     community transition programs, with students that are
 2     twenty-one years of age.  So I see extreme behavior
 3     from elementary all the way up.  And I've been in some
 4     pretty intense situations myself.
 5                I was at the school visiting last day of
 6     school.  It should also be a positive experience for
 7     everybody.   And we got the call that there was help.
 8     We don't hesitate. Me and Keith, the behavior
 9     specialist, heard that call and instantly responded.
10                As soon as we left the front entrance, Keith
11     is bigger than me, he's in front of me, but I look
12     around the side of him and I see Ashley on the ground
13     getting to her knees and yelling, and Charly here
14     standing over top of her, postured over top of her, and
15     I asked did he hit her, and Keith is like yes, get him.
16                Okay.  He turned then -- Charly turned and
17     was postured towards us like he was ready to fight.
18     Upon seeing us, he turned and ran.  My intent was to
19     not let him get away, and to call the authorities after
20     we had him because he attacked multiple people, and we
21     know -- I mean, like if he got away, he would have been
22     out there.  He's close enough to come onto school
23     property and to act in that way.
24                So, upon chasing him, when you play it back
25     in your head, there are things I could have done to
```

22

1  take him down in a more violent way, but that wasn't my
2  intent.  It was just to apprehend him.
3              I reached to grab him and right where it was,
4  I lost my footing and I fell in the worst way possible.
5  It was on a curb into a flowerbed and there's a metal
6  sprinkler head, and I landed very hard on it, fractured
7  my hip.  It punctured my side, almost punctured into my
8  bowels.  And I tore my labrum in my shoulder.  And I
9  knew as soon as I landed I'm hurt but I got up and I
10 was going to start running again, but thankfully, there
11 was another person responding with me and he was able
12 to get there and stop Charly.
13             And so I was trying to move as fast as I
14 could.  I'm bleeding, I'm hurt, and we get to Charly,
15 and thankfully, another gentleman came out to help
16 assist, another instructional assistant, and I'm like
17 hey, help Keith.  They were able to apprehend him, had
18 him on the ground.
19             I called 911.  Police responded quickly.
20 They drove past us.  I waved them down.  They came and
21 we got him in and we knew we were safe.  Okay.,
22             That being said, I do have a lot of
23 compassion and empathy for those with mental health
24 issues but I also believe in the consequence of our
25 action.  I accept the consequences of my actions.  I

23

1  will never be the same.  My body is scarred.  My
2  shoulder will never be the same, but I would do it
3  again in a second to protect anybody that was under
4  that situation.
5              But I feel like there's consequences for his
6  actions.  And this has happened in multiple times in
7  different situations and one of my biggest fears is
8  going to school and seeing a violent attack on innocent
9  children and the people in that building.
10             Now, all of that happened, a call within
11 second we were responding and look how much damage he
12 inflicted.  If he doesn't follow the protocols and he
13 is out and able to be in the community, if he had had a
14 weapon -- I didn't know if he was armed when I went
15 after him but how much more damage could he do.
16             Right.  So I feel like we have a
17 responsibility to look at the safety of our
18 communities, the safety of our children, the safety of
19 our schools, anywhere this type of attack can happen. I
20 don't know what he's experiencing mentally but I know
21 what he did physically and I know what he's done
22 multiple times.
23             So I'm very concerned if he were to be
24 released that somebody could get hurt even worse or
25 die.  I don't know but that's what he's capable of.

```
                                                                24
 1        He's shown us multiple times.
 2                  So I think it's our responsibility to ensure
 3        that the community is safe and he needs the
 4        interventions to ensure that he's able to be safe in
 5        the community but I don't think that safe is releasing
 6        him.
 7                  That's all I have.
 8                  THE COURT:  Thank you very much.  Appreciate
 9        that.
10                  MS. OLSON:  Just a couple of concluding
11        things.  There are others in the courtroom who were at
12        the school that day who have chosen not to ask to
13        address the Court, but their presence should be
14        recognized.
15                  I mentioned that this was one of many cases
16        since Mr. Velasquez-Sanchez's first criminal
17        involvement which I see as February 17th of 2019.
18        After each of those, he was on some sort of release or
19        in most cases, some form of supervised probation with
20        mental health conditions because as this Court knows,
21        he has been back and forth to the state hospital.  He's
22        been found fit to proceed three prior occasions at
23        least.
24                  But he's nonetheless been unable -- his
25        behavior has not been able to be controlled in the
```

```
                                                                25
 1        community and the idea that he will be released to his
 2        father who I believe is one of the named victims in his
 3        -- one of his assault charges of the nine cases, I
 4        think that that is a plan that is set up for failure,
 5        and just because I think we are making a record in this
 6        case, since February 17th of 2019, Mr. Velazquez-
 7        Sanchez has been charged with hit and run involving a
 8        named victim in a vehicle that she was in or that was
 9        hers, hit and run.  He crushed into some part of the
10        jail; attempt to elude a police officer and reckless
11        driving; two counts of menacing and interfering with a
12        police officer; attempted assault four -- that was
13        against a victim named Jose Velazquez; assaulting a
14        public safety officer; assault in the fourth degree and
15        harassment, domestic violence offenses involving people
16        with the same surname in the presence of children;
17        disorderly conduct involving swinging an axe on a
18        playground with children and their parents present, and
19        then involving assault in the fourth degree, three
20        counts and criminal trespass on a school playground.
21                  I think that the plan of releasing him to one
22        of his victims and on a form of supervision that has
23        been given many opportunities to succeed and has not is
24        inviting tragedy.  Thank you.
25                  THE COURT:  Thank you, Ms. Olson.  And thank
```

```
                                                              26
 1     you to the victims and the other members of Highland
 2     School for being here today.  I appreciate your
 3     courage, all three of you, and Ms. Miller on the phone,
 4     for speaking today and coming forward and giving me
 5     information on how this has impacted you and what that
 6     day looked like for you.
 7              I have some comments before I make a ruling,
 8     and please bear with me because I have quite a bit to
 9     say.
10              Oregon state law provides that "when an
11     individual facing criminal charges is found by the
12     Court to be unable to aid and assist their attorney in
13     their defense, then they are to be restored to fitness
14     either in the community or in the state hospital based
15     on the level of care that is required and taking into
16     account public safety considerations. Those sent to the
17     state hospital rather than community restoration are
18     the most profoundly ill, the most dangerous to the
19     community or victim, and have the greatest need for the
20     most intensive supervision.
21              Our system does not contemplate a hybrid.
22     There is only one statutorily identified provider for
23     custodial restoration, and that is the Oregon State
24     Hospital.  This is important because since September of
25     2022, Oregon state courts have been thwarted by a
```

```
                                                              27
 1     Federal order by Judge Mosman that limits the time that
 2     individuals at the state hospital can receive
 3     treatment.
 4              Under Oregon law, individuals charged with
 5     felonies can remain at the state hospital for
 6     restoration to competency for up to three years and up
 7     to one year for misdemeanors.  The Federal order by
 8     Judge Mosman in Portland completely disregards our
 9     state statutes that we state court judges are sworn to
10     uphold.  This is why his order exists.
11              In a nutshell, twenty-plus years ago,
12     Disability Rights Oregon and the Metropolitan Public
13     Defenders in Portland, on behalf of individuals
14     incarcerated in jails, brought an action in Federal
15     Court against the state hospital, claiming their rights
16     were being violated due to a delay in their transfer
17     from the jail to the hospital for restoration services.
18              The Federal Court maintained involvement, and
19     over the last twenty-plus years, there have been
20     various levels of compliance and non-compliance in the
21     transport of defendants from the jails to the state
22     hospital.
23              Recently, the issue of timely transport to
24     the hospital came up again.  As a result, Judge Mosman
25     ordered, at the suggestion of an expert from Michigan,
```

28

1   a blanket proclamation. All person-only misdemeanors
2   can be sent to the state hospital for a maximum period
3   of ninety days for restoration, all felonies only
4   eighty days, and valid Measure 11 cases only up to one
5   year.
6           The problem with these arbitrary time lines
7   are many. These time lines are in no way connected to
8   the specific treatment needs of the individual. There
9   is no consideration of the complexity of symptoms or
10  complications that arise when controlled substances are
11  being used.
12          The time for restoration under Mosman is
13  completely divorced from the unique constellation of
14  symptoms manifesting in a particular person. The time
15  for restoration for each unique individual is not
16  controlled nor can it be dictated by the level or
17  severity of crime or conviction.
18          Therapeutic realities as applied to unique
19  individuals are completely absent from his time lines.
20          Additionally, there is no ability to consider
21  public safety except for very limited circumstances.
22  Under Judge Mosman's order, it doesn't matter if the
23  person coming out of the hospital based on his time
24  frames has been -- has none or ninety prior arrests or
25  convictions or hospitalizations. It doesn't matter

29

1   what the nature of the other charges have been or what
2   the current charges are.
3           Under the Mosman order, it is irrelevant
4   whether this particular defendant has previously been
5   restored under valid state time lines. Judge Mosman
6   doesn't allow courts across the state to consider any
7   of these things because his time line is an inflexible,
8   arbitrary time line set with no real understanding or
9   concern about our community safety or the safety of its
10  victims.
11          Another critical concern is that Judge
12  Mosman's order conspicuously fails to address issues of
13  victim rights in the criminal justice system. Oregon
14  law and its constitution guarantees victim rights
15  during all stages of criminal proceedings to include
16  release hearings.
17          I don't believe that any victim advocate
18  organizations were consulted when the expert gave her
19  recommendations to Judge Mosman. Dr. Pinals blatantly
20  disregarded the rights of victims when she put her
21  proposal together. As a result, we violate victims'
22  rights every time we go into court on one of these
23  hearings without their voice being considered.
24          Today, for the first time, I actually was
25  able to hear victim voices. That matters. They

30

1  matter. You matter.
2          The allegations in this case, as already
3  stated, are that law enforcement responded in June of
4  last year to Highland Elementary in the morning hours
5  to a report of an individual hitting, kicking, and
6  knocking people to the ground. One victim, the school
7  librarian, was watching the children at recess. She
8  observed the defendant walk onto campus. She told him
9  he needed to leave, at which time she said he attacked
10 her, punched her in the head at least four times until
11 another staff member came to intervene and he turned
12 his attention to her.
13         She, excuse me, told officers she ran. He
14 chased her, pushed her to the ground, began kicking and
15 punching her in the body and back. Another staff
16 member was injured during the course of the event
17 trying to assist.
18         When questioned, the defendant told the
19 officer he went to the school campus because a woman
20 was staring at him and he also wanted to, "get close to
21 the children because they are the truth." The
22 defendant was on probation at the time of these
23 allegations.
24         In closing, this is where we have been since
25 September 1, 2022, the date of the Mosman edict. When

31

1  a person times out of the state hospital because of the
2  Mosman Order, courts are left with two choices: Put
3  the person in community restoration or put them in
4  jail.
5          Our community restoration dockets here in
6  Marion County has tripled since the Mosman Order took
7  effect. We have taken people into community restoration
8  who are gravely ill, people who we would not otherwise
9  have considered before because they require a hospital
10 level of care or present too great a risk to our
11 community.
12         Now, under the Mosman order, we have no
13 options, but there simply are some who cannot be
14 released to community restoration and into society.
15 They are either too dangerous or require specialized
16 intensive care found only in a hospital setting.
17         The state has failed to provide adequate
18 treatment options for decades, and when these
19 individuals sit in jail without proper services, the
20 attorneys file motions to dismiss and there is very
21 little the Court can do about it.
22         I understand this. However, as a judge, I'm
23 duty bound to honor all aspects of our state
24 constitution, including those provisions that protect
25 victims and our community. A defendant can't be

32

1    warehoused indefinitely in the jail, and restoration
2    services are not available there.  They need to be at
3    the state hospital.
4              Judge Mosman's order prevents them from being
5    lodged at the hospital to access the treatment they
6    need and are entitled to, and prohibits the Court from
7    utilizing valid existing state law.
8              Some have said that civil commitment is an
9    option.  That is a fallacy.  Judge Mosman's order
10   prohibits state court judges from sending anyone to the
11   state hospital on a civil commitment as well.  We
12   literally, state court judges, have no options.
13             And I think the average citizen has no idea
14   that this is happening or its true impact or they would
15   be outraged.  Since the Mosman order, over 600
16   discharges have occurred without the defendant being
17   found fit.  Twenty-two ballot Measure 11 cases have
18   been dismissed outright across the state.  Over 200, or
19   one-third of those discharged, have new criminal cases.
20             Are we helping these people?  Is that our
21   goal?  Since the Mosman order, thirty-two percent of
22   those release cases have been dismissed.  Is that
23   justice?  Are our communities safer?  Are the
24   defendants healthier or just living on the street
25   somewhere?  So what are we accomplishing?  Are we just

33

1    satisfying some metric with a person in, a person out,
2    regardless of looking at that person and what they need
3    and the safety of the community?  Do we care that the
4    person goes on to commit a new offense one-third of the
5    time?
6              What are we gaining from this exercise?  The
7    ability to say people are entering the state hospital
8    at a faster pace?  And at whose expense?  The public?
9    The victim?  The defendant?  Are we just concerned
10   about freeing up a bed so that another person can take
11   its place?  That's a sad way to dispense justice to
12   anyone.
13             And the defendants certainly have rights,
14   too.  Maybe the defendant who is being transported into
15   the hospital is getting in quicker, but the one who is
16   untimely kicked out of the state hospital prematurely
17   prior to successful treatment and restoration and then
18   left to sit in jail or dumped out on the street corner
19   feels differently when his rights are not protected.
20             This really doesn't look like justice at all.
21             So, in conclusion, the issue before this
22   Court is whether the defendant is appropriate to -- for
23   community restoration pursuant to ORS 161.371, and if
24   not, what the appropriate course of action should be in
25   his particular case.  The defendant was returned to the

```
                                                              34
 1     jail after six months' stay at the hospital without a
 2     finding of able or unable as required by law.  He is
 3     charged with three counts of felony assault in the
 4     fourth degree and one count of criminal trespass in the
 5     second degree as well as probation violations.
 6               This Court finds that the defendant is a
 7     public safety risk and unable to engage in community
 8     restoration at this time pursuant to ORS 161.371.  The
 9     state hospital is the only entity required by statute
10     to provide restoration services to incarcerated
11     individuals.  The defendant has a statutory right to
12     access these services pursuant to law.
13               However, in light of the restrictions created
14     by Federal Court order, this Court orders the Marion
15     County Sheriff's Office to transport the defendant
16     every Friday to the state hospital at 10 a.m. beginning
17     next Friday -- no, Friday, February 16th, 2024, where a
18     custody will transfer for purposes of restoration
19     services until such time as the defendant completes
20     restorative services on that same day.
21               If the sheriff's office and the state
22     hospital can arrange a more convenient day and/or time,
23     then that will be an appropriate replacement.
24               This is done to create the least impact to
25     both the hospital and the sheriff's office while still
```

```
                                                              35
 1     affording Mr. Velasquez-Sanchez the restoration
 2     services he is entitled to.
 3               So what that means is Mr. Velasquez-Sanchez
 4     will stay in custody.  Once a week, he'll be
 5     transported by the sheriff to the state hospital, where
 6     he will not take up a bed, which is the thing that
 7     Judge Mosman is apparently concerned about but he will
 8     obtain services to get him to the point where he can
 9     assist his attorney to resolve his charges.  And then
10     he'll come back the same day, stay at the jail, and
11     then go back the next week and do the same thing until
12     he's able, and then he'll be able to have a trial,
13     plead guilty, do that.
14               But for the time being, we're going to try
15     that.  That satisfies both the issue about the Mosman
16     order and worrying about a person in, person out that
17     he's so concerned about but it doesn't have Mr.
18     Velasquez-Sanchez just languishing in jail without
19     moving forward on his restoration process.
20               Okay?  Ms. Centeno, I don't know if you want
21     to send me kind of a blank order and I can fill in what
22     I just read or how you want to make that work.
23               MS. CENTENO:  I'm happy to do that for Your
24     Honor.
25               THE COURT:  Okay.  That will be great.  And
```

```
                                                                  36
1       then anything else we need to do this morning?
2                MS. CENTENO:  When will we set our next
3       status?
4                THE COURT:  We can do that.  I don't have my
5       calendar in front of me but does it make sense to do it
6       in --
7                MS. CENTENO:  The week after to make sure
8       that his has occurred or --
9                THE COURT:  Sure.  I'll be gone that week but
10      -- you're gone that week.  Do you want to do it the
11      first week of March?  Okay.
12               MS. VLACH-ING:  I'm sorry.
13               THE COURT:  Maybe just a status the first
14      week of March.
15               MS. VLACH-ING:  March 7th is a Thursday.
16               THE COURT:  Is that the Thursday?  Okay,
17      March 7th at 8:45?
18               MS. VLACH-ING:  I am scheduled for trial.
19               THE COURT:  Okay.  Do you want to do it --
20      that's fine.  Ms. Olson, would you like to be appearing
21      at those statuses?
22               MS. OLSON:  I would like to be informed of
23      them but I can check the court computer for them.
24               THE COURT:  Okay.  Great.  So let's go ahead
25      and just do --
```

```
                                                                  37
1                MS. OLSON:  March 7th.
2                THE COURT:  Uh-huh.  We'll just do a check-in
3       or we could get you by phone or if you just want to do
4       email, Evelyn -- or Ms. Centeno, you can do the same.
5                MS. VLACH-ING:  And Mr. Velasquez-Sanchez
6       will not be transported for those statuses?
7                THE COURT:  He won't be transported but he
8       will be transported for the restoration trips.  Okay?
9       All right.  Thank you.  We'll be in recess.
10             (Proceedings concluded at 11:01:04 a.m.)
```

38

## CERTIFICATION

       I, Kathleen Price, the assigned transcriber, do hereby certify that the foregoing transcript proceedings in the Marion County Superior Court, digitally recorded on February 9, 2024, Index No. 10:08 a.m. to 11:01:04 a.m., is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded.

*Kathleen Price*

_____
KATHLEEN PRICE, CET'D-325
PRICE TRANSCRIPT SERVICE


Date:  June 19, 2024