No. 24-2229

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DISABILITY RIGHTS OREGON et al.,
*Plaintiffs-Appellees*,

v.

DAVID BADEN et al.,
*Defendants-Appellees*,

v.

MARION COUNTY
*Proposed Intervenor-Appellant.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:02-cv-00339-AN
Honorable Adrienne Nelson

---

**OPENING BRIEF OF MARION COUNTY**

---

James Bopp, Jr.,  Ind. Bar No. 2838-84
Joseph D. Maughon, Va. Bar No. 87799
Taylor C. Shetina, Ind. Bar. No. 37887-45
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434

*Counsel for Marion County*

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statutes and Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    II. Additional Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    I. Marion County meets the factors for intervention as of right
       and permissive intervention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       B. The district court erred in declining to consider Marion
          County's reply and in construing the Second Motion
          to Intervene as requesting reconsideration. . . . . . . . . . . . . . . 23

       C. Marion County's Second Motion to Intervene was timely filed. . 25

          1. The motion was for appeal purposes; therefore it was
             plainly timely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          2. The motion was timely under the non-appeal-purposes
             analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       D. Marion County meets the standards for intervention as of

i

right and permissive intervention. . . . . . . . . . . . . . . . . . . . . . 40

   1. Marion County satisfied the criteria for intervention as of
     right. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   2. Marion County satisfied the requirements for permissive
     intervention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

II. The district court erred in issuing its Supremacy Clause Order by
   failing to abstain under *Younger*. . . . . . . . . . . . . . . . . . . . . . . . . 47

   A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

   B. *Younger* Abstention Legal Standard. . . . . . . . . . . . . . . . . . . . . 47

   C. This case satisfies the requirements set forth in *Younger* for
     abstention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

     1. There are ongoing state criminal proceedings. . . . . . . . . 50
     2. Mr. Velasquez-Sanchez's proceedings implicate
       important state interests. . . . . . . . . . . . . . . . . . . . . . . . 52
     3. State court provides an adequate forum for constitutional
       challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
     4. The Supremacy Clause Order has the practical effect of
       enjoining the ongoing state criminal prosecution of
       Mr. Velasquez-Sanchez. . . . . . . . . . . . . . . . . . . . . . . . 61

   D. None of the exceptions to *Younger* abstention were applicable to
     the ongoing state criminal prosecution of Mr. Velasquez-
     Sanchez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

     1. The state criminal prosecution of Mr. Velasquez-Sanchez
       was not motivated by bad faith, harassment, or bias. . . 64
     2. There is no threat of irreparable harm to justify an
       exception to *Younger* abstention. . . . . . . . . . . . . . . . . 66

III. The Supremacy Clause Order is at odds with the due process purpose of
    the 2002 Order, modified existing orders, and should be reversed. . 67

   A. Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

B. The Supremacy Clause Order was a new injunction and it modified the Implementing Injunctions. . . . . . . . . . . . . . . . . . 68

C. The Supremacy Clause Order is not justified by the due process violation, but harms due process. . . . . . . . . . . . . . . . . . . . . . 71

IV. The Challenged Orders afford no deference to Marion County in the administration of its police powers and should be reversed. . . . . . . 78

A. Federal courts addressing police-power matters must abide by well-established boundaries. . . . . . . . . . . . . . . . . . . . . . . . . . . 78

B. The Challenged Orders unduly infringe on administration of custodial facilities, a police power. . . . . . . . . . . . . . . . . . . . . . 80

1. Binding precedent requires proper targeting. . . . . . . . . . . . 80
2. Binding precedent requires deference to jail administrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
3. The Challenged Orders burden jail administration, violating these requirements. . . . . . . . . . . . . . . . . . . . . . 83

C. Care for people with mental disabilities is a police power. . . . . . 84

V. No evidence was presented of a County violation or effect, so the Challenged Orders should be reversed. . . . . . . . . . . . . . . . . . . . . . . . 86

VI. The Supremacy Clause Order should be reversed because there was no Supremacy Clause violation. . . . . . . . . . . . . . . . . . . . . . . . . . . 88

A. Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

B. The February 2024 State Order did not conflict with the Implementing Injunctions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Certificate of Compliance (Form 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Cir. R. 28-2.7 Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

# Table of Authorities

## *Cases*

*Ala. Pub. Serv. Comm'n v. S. R. Co.*, 341 U.S. 341 (1951) . . . . . . . . . . . . . . 79, 80

*Arakaki v. Cayetano*, 324 F.3d 1078 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 41

*Arevalo v. Hennessy*, 882 F.3d 763 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . 48, 50

*Arroyo v. Rosas*, 19 F.4th 1202 (9th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . 46

*Bean v. Matteucci*, 986 F.3d 1128 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . 48, 61

*Bell v. Wolfish*, 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*Beltran v. California*, 871 F.2d 777 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 63

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349
(9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013
(9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Canatella v. State of Cal.*, 404 F.3d 1106 (9th Cir. 2005). . . . . . . . . . . . 47, 48, 58

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Commc'ns Telesystems Int'l v. Cal. Pub. Util.*, 196 F.3d 1011 (9th Cir. 1999) . . 57

*Cooper v. Newsom*, 13 F.4th 857 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . 40, 44

*Corey v. United States*, 375 U.S. 169 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Ctr. for Biological Diversity v. BLM*, 69 F.4th 588 (9th Cir. 2023) . . . . . . . . . . . 4

*Cty. of Fresno v. Andrus*, 622 F.2d 436 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . 41

iv

*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 41

*Dubinka v. Judges of the Superior Court*, 23 F.3d 218 (9th Cir. 1994) . . . . . . . 58

*Evans v. Synopsys, Inc.*, 34 F.4th 762 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . 4, 5

*Forest Conservation Council v. United States Forest Serv.*,
66 F.3d 1489 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Fresh Int'l Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353
(9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Gen. Mills, Inc. v. Jones*, 530 F.2d 1317 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . 88

*Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2004) . . . . . . . . . . . . . 47, 57, 61, 63

*Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir. 1989) . . . . . . . . . . . . . . . . . 5, 71

*Heller v. Doe*, 509 U.S. 312 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Herrera v. City of Palmdale*, 918 F.3d 1037 (9th Cir. 2019) . . . . . . . . . . . . . 53, 59

*Hicks v. Miranda*, 422 U.S. 332 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Higgins v. United States*, 205 F.2d 650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 85

*Hilao v. Estate of Marcos (In re Estate of Ferdinand E. Marcos Human
Rights Litig.)*, 536 F.3d 980 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hodgson v. United Mine Workers of America*, 473 F.2d 118
(D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . 68, 81, 82

*Howard v. McLucas*, 782 F.2d 956 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 29

*Hutto v. Finney*, 437 U.S. 678 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435 (9th Cir. 1987) . . . . . . 88

*In re Hunt*, 238 F.3d 1098 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ivie v. Astrazeneca Pharms. LP*, No. 21-35978, 2023 U.S. App.
LEXIS 12338 (9th Cir. May 19, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Kelly v. Washington*, 302 U.S. 1 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Kendrick v. Bland*, 740 F.2d 432 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 81

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*M&A Gabaee v. Cmty. Redevelopment Agency of L.A.*,
419 F.3d 1036 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Mann v. Jett*, 781 F.2d 1448 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 54, 62

*Martin v. Rains*, No. 5:20-cv-00883-FMO (AFM), 2020 U.S. Dist.
LEXIS 83853 (C.D. Cal. May 11, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Milliken v. Bradley*, 418 U.S. 717 (1974) ("***Milliken I***") . . . . . . . . . . . . . 71, 86, 87

*Milliken v. Bradley*, 433 U.S. 267 (1977) ("***Milliken II***") . . . . . . . . . . . . . . . 72, 77

*Miofsky v. Superior Court of Cal.*, 703 F.2d 332 (9th Cir. 1983) . . . . . . . . . . 54, 62

*Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Moore v. Sims*, 442 U.S. 415 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017) . . . 51, 52

*Olivier v. Baca*, 913 F.3d 852 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Or. Advoc. Ctr. v. Allen*, No. 23-35516, 2024 U.S. App. LEXIS 11426
(9th Cir. May 10, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) . . . 8, 68, 71, 73, 77, 82

*Oregon v. Velasquez-Sanchez*, Or.
S. Ct. Case No. S071004 (May 21, 2024) . . . . 12, 49, 50, 55-57, 59, 61, 63, 65, 66

*Page v. King*, 932 F.3d 898 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203 (9th Cir. 1995) . . . . . . . . . . . . 16

*Partington v. Gedan*, 961 F.2d 852 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . 66

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) . . . . . . . . . . . . . . . . . . . . . 53, 57

*Planned Parenthood Fed'n of Am., Inc. v. Gonzales*, 435 F.3d 1163
(9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Potrero Hills Landfill, Inc. v. Cty. of Solano*, 657 F.3d 876 (9th Cir. 2011) . . . . 53

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*,
754 F.3d 754 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 49, 61, 64

*S. Cal. Edison Co. v. Lynch*, 307 F.3d 794 (9th Cir. 2002) . . . . . . . . . . . . . . . . 41

*Shuai Su v. Lynch*, 655 F. App'x 591 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . 69

*Sierra Club v. United States EPA*, 995 F.2d 1478 (9th Cir. 1993) . . . . . . . . . 41-43

*Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843
(9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25, 26, 29–34, 36

*Smith v. Marsh*, 194 F.3d 1045 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 28

*Smith v. Plummer*, 458 F. App'x 642 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . 65

*Sprint Commc'ns., Inc. v. Jacobs*, 571 U.S. 69 (2013) . . . . . . . . . . . . . . . . . . . 50

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) . . . . . . . . . . . . . . 32, 33

*State ex rel. Lockyer v. United States*, 450 F.3d 436 (9th Cir. 2006) . . . . . . . . . 44

*Subscriber Holdings, LLC v. Brightstar Corp.*, No. 21-12985, 2022 U.S. App. LEXIS 35963 (11th Cir. Dec. 30, 2022) ................................. 23

*Thunderbird Downtown LLC v. City of Phx.*, No. CV-19-05287-PHX-JJT, 2021 U.S. Dist. LEXIS 172524 (D. Ariz. Sep. 10, 2021) ................... 51

*United States ex rel. Collins Plumbing*, No. 3:11-cv-2834-GPC-MDD, 2014 U.S. Dist. LEXIS 193881 (S.D. Cal. June 30, 2014) .................. 23

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142 (9th Cir. 2010) .......... 44

*United States v. Alisal Water Corp.*, 370 F.3d 915 (9th Cir. 2004). . . 22, 25, 41, 43

*United States v. City of Chicago*, 870 F.2d 1256 (7th Cir. 1989) ............. 29

*United States v. City of L.A.*, 288 F.3d 391 (9th Cir. 2002). .............. 40, 41

*United States v. Morros*, 268 F.3d 695 (9th Cir. 2001)..................... 48

*United States v. Oregon*, 913 F.2d 576 (9th Cir. 1990) ("**Oregon I**") ...... 29, 31

*United States v. Oregon*, 745 F.2d 550 (9th Cir. 1984) ("**Oregon II**")...... 32, 34

*United States v. Snyder*, 852 F.2d 471 (9th Cir. 1988) ................... 85, 86

*United States v. Washington*, 86 F.3d 1499 (9th Cir. 1996) .............. 26, 27

*W. Watersheds Project v. Haaland*, 22 F.4th 828 (9th Cir. 2022). ............. 28

*Westchester Fire Ins. Co v. Mendez*, 585 F.3d 1183 (9th Cir. 2009) .......... 27

*Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ....... 25, 40

*World Famous Drinking Emporium, Inc. v. Tempe*, 820 F.2d 1079 (9th Cir. 1987) ................................................. 66

*Yniguez v. Arizona*, 939 F.2d 727 (9th Cir. 1991)....................... 26, 27

*Younger v. Harris*, 401 U.S. 37 (1971) ....................... 47, 48, 54, 55

viii

*Statutes and Rules*

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

28 U.S.C. § 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Circuit Rule 28-2.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 40, 45, 46

Fed. R. Civ. P. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Or. Admin. R. 309-091-0050 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ORS 137.700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ORS 161.370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 42

ORS 161.371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ORS 430.640 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States District Court for the District of Oregon LR 29-1(b) . . . . . . . . . . 24

United States District Court for the District of Oregon LR 16-3(b) . . . . . . . . . . 24

*Other Authorities*

*Neutral Expert Eighth Report Regarding the Consolidated* Mink *and* Bowman
*Cases* ("***Eighth Report***") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 75

*Neutral Expert Second Report Regarding the Consolidated* Mink
*and* Bowman *Cases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 69, 75

Oregon Health Authority, *Advocating for Your Loved One During a Crisis: A
Guide for Parents and Caregivers While at the Hospital Emergency
Department* (Dec. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# Introduction

This case is about a federal court order prohibiting a state mental health hospital from providing adequate care for people charged with criminal offenses in order for them to stand trial ("**Due Process Treatment**") by imposing artificial time limits on inpatient and outpatient mental health care. This use of federal judicial power is contrary to the Constitution and foreign to American jurisprudence. This case began in 2002 with a noble and Constitutionally-required use of that power, when the district court fashioned an order ensuring that the due process rights of defendants adjudicated mentally unfit for trial ("**Unfit Defendants**") would be provided inpatient Due Process Treatment by Defendant Oregon State Hospital ("**OSH**") necessary for them to stand trial. Due process requires that confinement in mental hospitals of such individuals be rationally related to the purpose for which it is permitted: "to assist in restoring competency[.]" Findings of Fact and Conclusions of Law ("**F&C**"), 2-ER-253 (citations omitted). Thus, in order to ensure that Unfit Defendants were afforded their "substantive due process liberty interest in reasonable care . . . and such treatment as may be required to comport fully with" that restoration purpose, *id.*, the district court required OSH to act promptly in admitting such persons for inpatient services.

Two decades later, the Due Process Treatment purpose of this order was flipped on its head by a series of district court orders that *prohibited* OSH from providing inpatient Due Process Treatment to Unfit Defendant by imposing arbitrary time limits on such treatment. The district court ordered OSH to limit the provision of inpatient Due Process Treatment to Unfit Defendants to arbitrary time limits, based only on the criminal charges they faced, not whether the Unfit Defendants was actually restored to mental health sufficient to stand trial. Those orders resulted in still-unrestored Unfit Defendants frequently being denied *inpatient* services, being prematurely discharged, and returned to Proposed Intervenor-Appellant Marion County, Oregon ("**Marion County**") to sit indefinitely in jail unable to stand trial.

Most recently, the district court expanded its orders prohibiting Due Process Treatment to Unfit Defendants by prohibiting OSH from providing *outpatient* restorative treatment for Unfit Defendants who had been prematurely discharged from OSH because of the time limits on inpatient care. In so doing, the district court also voided, on purported Supremacy Clause grounds, state court orders—in a state court matter in which the district court should have abstained—from a Marion County court attempting to provide at least outpatient Due Process Treatment from OSH to Unfit Defendants. Despite all this, the district court denied intervention by Marion County.

Marion County appeals in order to be permitted intervention in this case and raise its challenges on appeal of the various orders that prohibit OSH from providing both inpatient and outpatient Due Process Treatment of Unfit Defendants required for inmates at the Marion County jail to stand trial on the charges against them.

## Jurisdictional Statement

This is a consolidated appeal from (**1**) an order of the United State District Court for the District of Oregon denying Marion County's motion to intervene, Opinion and Order (April 4, 2024) ("**Second Intervention Order**"), 1-ER-2; (**2**) an order voiding the order of a state court for outpatient Due Process Treatment at OSH on Supremacy Clause grounds, Opinion and Order (March 6, 2024) ("**Supremacy Clause Order**"), 1-ER-9—itself effectively an injunction; and (**3**) several orders prohibiting OSH from providing needed inpatient Due Process Treatment which provided the purported predicate to the Supremacy Clause Order. Order to Implement Neutral Expert's Recommendations ("**2022 Order**"), 1-ER-38; [First] Amended Order to Implement Neutral Expert's Recommendations, 1-ER-29, Second Amended Order to Implement Neutral Expert's Recommendations ("**Second Amended Order**"), 1-ER-12.[1]

---

[1]Collectively, these orders will be referred to as the "**Implementing Injunctions**." The Implementing Injunctions collectively with the Supremacy

The district court exercised jurisdiction over the case under 28 U.S.C. § 1331 and entered its Second Intervention Order on April 4, 2024. 1-ER-2. Marion County timely filed notice of appeal on April 5, 2024,[2] 3-ER-398, within the thirty-day requirement under Federal Rule of Appellate Procedure 4(a). This Court has jurisdiction to consider this appeal under 28 U.S.C. § 1291. *Ctr. for Biological Diversity v. BLM*, 69 F.4th 588, 592–93 (9th Cir. 2023) ("[D]enial of a motion to intervene . . . is a final, appealable order, so we typically have jurisdiction over appeals of such denials.").

Furthermore, the district court had entered its Supremacy Clause Order on March 6, 2024. On April 4, 2024, within the thirty-day requirement under Federal Rule of Appellate Procedure 4(a), Marion County timely filed a protective notice of appeal,[3] 3-ER-401. *See Evans v. Synopsys, Inc.*, 34 F.4th 762, 776 n.15 (9th Cir.

---

Clause Order will be referred to as the "**Challenged Orders**."

[2]Marion County also filed an Amended Notice of Appeal on April 12, 2024, 3-ER-392, in order to reflect that David Baden had been substituted for Patrick Allen and to include additional or corrected information on appellees' counsel due to inadvertent omissions in the original notice.

[3]Marion County also filed an Amended Protective Notice of Appeal on April 12, 2024, 3-ER-395, in order to reflect that 1-ER-29 (ECF 387) was being appealed, to replace reference to "ECF 204" (which reflected the docket number of the Second Amended Order in Member Case 3:21-cv-01637-AN) with "ECF 416," 1-ER-12 (Second Amended Order), and to include additional or corrected information on appellees' counsel due to inadvertent omissions in the original notice.

2022). This Court has jurisdiction to consider this appeal under 28 U.S.C. § 1291 or, if the Supremacy Clause Order is construed as non-final, under 28 U.S.C. § 1292(a)(1) as appealing an interlocutory order modifying injunctions. *See Gon v. First State Ins. Co.*, 871 F.2d 863, 866 (9th Cir. 1989) (finding 28 U.S.C. § 1292(a)(1) jurisdiction also for an apparent final order modifying an injunction).

     This Court also has jurisdiction to consider the orders modified by the Supremacy Clause Order (namely, the Implementing Injunctions), which gave its modifications retroactive effect. *Id.* at 866–67 ("[A] modification may be so fundamental to the original injunction, or may otherwise present issues so inextricable from the validity of the original injunction, that review must include the whole package.").

     Because Marion County has filed a protective notice of appeal concerning the merits, it is appropriate for this Court "to reach the merits of the appeal if th[e] [C]ourt reverses the denial of the motion to intervene." *Evans v. Synopsys, Inc.*, 34 F.4th at 776 n.15; *see also Hilao v. Estate of Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.)*, 536 F.3d 980, 987 (9th Cir. 2008) ("no point in remanding" after reversing denial of intervention, since merits were briefed).

## Statement of the Issues

I.    Whether the district court erred in denying Marion County's Second Motion to Intervene ("**Second Motion to Intervene**"), 2-

ER-51, because it was untimely.

II.     Whether the district court erred in the Supremacy Clause Order by failing to abstain under the *Younger* doctrine, given the ongoing state criminal proceedings against Mr. Velasquez-Sanchez that implicate important state interests and were effectively enjoined by the Supremacy Clause Order.

III.    Whether the district court erred in the Supremacy Clause Order by determining that the state court order of outpatient treatment violated the Supremacy Clause, despite the fact that none of the district court's orders related to outpatient treatment.

IV.     Whether the district court erred in the Challenged Orders by imposing relief that did not seek to remedy the due process violation found in its F&C, therefore exceeding its authority.

V.      Whether the district court erred in the Challenged Orders by failing to defer to local entities exercising police powers and enjoining them in the exercise of those powers, rather than targeting the violators, Oregon State Hospital and Oregon Health Authority.

VI.     Whether the district court erred in the Challenged Orders by enjoining Marion County when there was no evidence of an

unconstitutional violation by, or unconstitutional effect in,
Marion County.

## Statutes and Rules

In accordance with Circuit Rule 28-2.7, full versions of pertinent statutes
and rules are included in an Addendum to this Brief beginning on page A-1.

## Statement of the Case

### I. Procedural History

This litigation began in March 2002, when Plaintiffs Disability Rights
Oregon (then called Oregon Advocacy Center) and Metropolitan Public Defender
Services, Inc. (collectively, "**Advocacy Groups**") filed suit against Defendant-
Appellees, the Superintendent of OSH and the director of the Oregon Department
of Human Services.[4] The suit alleged that OSH's failure to promptly admit Oregon
state criminal defendants deemed unable to aid and assist in their own defense[5]

---

[4] In 2002, the Oregon Department of Human Services was in charge of the
state hospital. Later, the Oregon Health Authority ("**OHA**") was created and
assumed those duties. 2-ER-235 (n.2). David Baden was automatically substituted
under Fed. R. Civ. P. 25(d) for Patrick Allen as the head of the OHA. 2-ER-106.

[5] Such determinations are made by state courts pursuant to ORS 161.370.
State law imposes different criteria for determining whether hospital treatment is
required for adult defendants charged with felonies and those charged with
misdemeanors, but in either case, it must be determined that the "defendant
requires a hospital level of care[.]" ORS 161.370(3)(a)(A); 161.370(4)(a)(A)(i), -
(4)(a)(B).

violated the Fourteenth Amendment. Following a trial on the merits in May 2002, the district court entered an injunction requiring OSH to admit patients within seven days of being found "unfit to proceed." 2-ER-242. After affirmation on appeal, *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003), the case fell dormant for sixteen years. It was revived as what amounted to a new case in 2019 after OSH fell out of compliance and Advocacy Groups launched contempt proceedings. *See* 2-ER-233.

Advocacy Groups and OSH ultimately stipulated that Dr. Debra Pinals be appointed as "neutral expert" to review the situation and make recommendations about how to reduce admissions times. Dr. Pinals issued her recommendations in 2022, including proposed limitations on the maximum time that an Unfit Defendant could receive Due Process Treatment at OSH, based not on the amount of time necessary to treat a particular person with a particular ailment, but on the severity of the charged offense: 90 days for misdemeanors, 180 days for felonies, and one year for offenses described in ORS 137.700. *See* 2-ER-167; *see also* 1-ER-40–41.

Marion County was immediately concerned that these recommendations, if implemented, would burden both Marion County's already overstretched community restoration program ("**CR**") and the county jail, which houses Unfit Defendants needing restoration treatment. It therefore sought permission on

August 25, 2022, to appear as *amicus curiae*, 2-ER-192, which was granted, 2-ER-139. However, following an unopposed motion to implement the neutral expert's recommendations, 2-ER-200, the district court ordered their implementation on September 1, 2022, 2022 Order, 1-ER-38.

The district court permitted Marion County to take part in mediation and all major aspects of the case from the end of August 2022, *e.g.*, 2-ER-131 (permitting Marion County to respond to plaintiffs' motion for order requiring Marion County to transport Unfit Defendants); 3-ER-362:10 (inviting Marion County counsel to address, in oral argument, Plaintiffs' motion for a Supremacy Clause determination), including argument on potential amendment of the 2022 Order, *see* Transcript of Proceedings (March 31, 2023), 3-ER-335:8–13 (inviting litigants, including Marion County, to submit proposed amendments). As *amici*, Marion County (and other *amici*) became functionally adverse parties because they were the only ones to oppose the 2022 Order and apparently the only persons before the court experiencing significant harms arising from its orders. Furthermore, Advocacy Groups moved for an order to require the Marion County Sheriff transport Unfit Defendants, without providing a legal basis for such transport, 2-ER-132; 2-ER-127, and the district court indicated its potential willingness to do so, contingent on further briefing, 3-ER-335:8–336:10.

On May 10, 2023, the district court issued its [First] Amended Order to

Implement Neutral Expert's Recommendations, 1-ER-29, and shortly thereafter, on July 3, 2023, its Second Amended Order to Implement Neutral Expert's Recommendations, 1-ER-12. Importantly, this order stated explicitly what was already clear before, that the "maximum time" limits recommended by Dr. Pinals were for "inpatient" treatment. 1-ER-14.

Despite being treated as a party by having its own rights at issue in the proceedings, the *amicus* Marion County was not entitled to many of the important rights and protections afforded to parties, such as the rights to raise new issues, receive notice of filed documents, file a response absent leave, and seek appellate review. Accordingly, on June 8, 2023, Marion County filed its first motion to intervene in this matter. 2-ER-114 ("**First Motion to Intervene**"). After argument, the district court denied Marion County's motion, finding that it was untimely and did not meet the requirements for either mandatory or permissive intervention. 2-ER-108. This Court upheld that determination on appeal. *Or. Advoc. Ctr. v. Allen*, No. 23-35516, 2024 U.S. App. LEXIS 11426 (9th Cir. May 10, 2024). As Marion County has shown in this appeal, because the issues raised in the appeal of the First Motion to Intervene differed from those raised here, which concern a significant change in circumstances, the same result does not follow here. *See infra* 12, 23.

On February 9, 2024, Judge Audrey Broyles, Oregon Circuit Court Judge

for Marion County, issued an order directing the Marion County Sheriff's Office ("**MCSO**") to transport a defendant who had been found unfit for trial to OSH once a week for outpatient restoration treatment. *State v. Velasquez-Sanchez*, Feb. 9, 2024 Order ("**February 2024 State Order**").[6] The defendant, Charly Velasquez-Sanchez, a violent offender, is awaiting trial for a violent assault on several teachers at an elementary school. *State v. Velasquez*, February 9, 2024 Transcript, 7:25–8:5.[7] He has gone to OSH multiple times for unsuccessful treatment since 2020, had been provided 180 days of inpatient treatment, and, thus, under the 2022 Order, was not eligible for any further inpatient services. *See id.* at 5:10–11. OSH filed a petition for expedited ruling on the Supremacy Clause based on the February 2024 State Order. 2-ER-98.

On March 6, 2024, Judge Mosman issued the Supremacy Clause Order, blocking the February 2024 State Order from going into effect. This prevented OSH from providing outpatient treatment for Unfit Defendants who needed that treatment to stand trial, placing an enormous restoration services and public safety

---

[6]While it appears that both the February 2024 State Order and the transcript of the hearing leading to that order were made a part of the record at ECF 462, *see, e.g.*, 2-ER-79 (citing ECF 462 as referencing said Order); 2-ER-83 (citing ECF 462, 35 as quoting "[t]he transcript"), that document was filed under seal and is unavailable to counsel for Marion County. Accordingly, Marion County provides the February 2024 State Order and the *State v. Velasquez*, February 9, 2024 Transcript with its Motion for Judicial Notice, filed concurrently with this brief.

[7]*See supra* n.6.

**Opening Brief of Marion County**          11

burden on Marion County. As a result, Marion County promptly filed its Second Motion to Intervene, seeking to intervene in order to appeal the Supremacy Clause Order and its underlying predicate orders.

Marion County showed in its Response in Opposition to Advocacy Groups' Motion to Dismiss and for Summary Affirmance why this Court's determination on the First Motion to Intervene does not mean the same result should, in the present appeal, obtain on Marion County's Second Motion to Intervene, which concerns new facts following the significant change in circumstances wrought by the Supremacy Clause Order. D. 23.1; *see* D. 22.1. It also demonstrated that the Oregon Supreme Court's writ of mandamus to Judge Broyles, which was issued without opinion, *Oregon v. Velasquez-Sanchez*, Or. S. Ct. Case No. S071004 (May 21, 2024), therefore has no effect on this case. Advocacy Groups also argued in their Reply that the Oregon Supreme Court's amended writ of mandamus mooted this case. *See* D. 24.1, 8–9. Advocacy Groups admit that writ's brevity, *id.* at 8, which writ—also without opinion—for the same reason has no effect on this case. This Court denied Advocacy Groups' Motion to Dismiss. D. 25.1.

## II. Additional Facts

Although the 2022 Order did not explicitly mention Marion County or explicitly direct how its staff and employees needed to act, it in fact had a direct impact on Marion County and particularly its courts, CR, and MCSO.

State law accounts for the various possible outcomes of an OSH commitment under ORS 161.370, all of which are based on professional determinations tied directly to whether the defendant continues to require a hospital level of care and to public safety concerns. *See* ORS 161.371(3)(a), -(3)(b)(A), -4(a), -(4)(b)(A). Under state law, the determination of what is to be done with a defendant, whether continuing the commitment or otherwise—so long as consistent with "the defendant's constitutional rights to due process," ORS 161.371(3)(c)(B), -(4)(c)(B)—is vested in the state court. Court hearings and reports, notices, and recommendations from hospital and other health professionals are required at various intervals. ORS 161.371(3), -(4) (requiring notice, evaluation, recommendations, and court hearing when it is believed hospital level of care is no longer necessary); -(2) (requiring progress reports for those believed likely, "in the foreseeable future," to "gain or regain fitness to proceed"); -(7) (requiring either discharge or, for extreme circumstances, commitment proceedings under different section, for defendants unfit after maximum treatment duration or who are found unlikely to regain fitness in foreseeable future). State law prohibits commitment for longer than "the maximum sentence the court could have imposed if the defendant had been convicted," and in any event prohibits commitments longer than three years. ORS 161.371(5)(a). Thus, state courts and OSH are required to carefully attend to whether a defendant

has regained fitness to proceed or is unlikely to do so, and the court must act appropriately following a hearing to order whatever is required—hospital treatment, treatment elsewhere, release—to protect that person's right to due process.

In sum, state law ensures that, if *not* released from the hospital, there is ample reason for defendants to remain so that Due Process Treatment is assured, and *if* released, any treatment still needed to comply with due process is afforded and the community's safety is protected. Under state law, the buck stops with state courts in making these determinations, and they are vested with authority to place a defendant where that defendant needs to be in accordance with the defendant's due process rights.

Thus, as a direct result of the 2022 Order, a gravely important power once held by state courts, ensuring that Unfit Defendants needing ongoing inpatient hospital level of care were *given* that level of care, was effectively divested from the state courts and OSH is prohibited from providing that care to them by the federal court below. As a direct result of the 2022 Order, which thus effectively required Marion County CR to attempt to treat numerous defendants who should have remained at the hospital but were prohibited from doing so by the 2022 Order, Marion County's CR caseload tripled while placement options dwindled. Declaration of Ryan Matthews, 2-ER-111 ¶¶ 5, 7. Because Unfit Defendants who

are not even "relative[ly] stab[le]" are now discharged frequently from OSH because of the 2022 Order, and medications are often wholly unavailable as result of prescribers' liability concerns, "some individuals on community restoration simply receive no treatment to regain fitness to proceed." 2-ER-111–12 ¶ 9.

Meanwhile, the dwindling placement options harmed MCSO's jail operations, resulting in individuals with nowhere else to go, who nonetheless had to be released for OSH under the Implementing Injunctions, taking up valuable bed space and posing risks of harm to jail staff and liability to Marion County. *See* Declaration of Nick Hunter (March 28, 2024) ("**Hunter Decl.**"), 2-ER-77 ¶¶ 8–9. In fact, Dr. Pinals' very first report recognized—and second report reaffirmed— the likelihood of rehospitalization. 2-ER-150 (indicating that "the data reflects that many of the individuals especially in the AA process cycle back to the hospital multiple times," twice the rate of other populations).

Not only is it self-evident that requiring the cessation of Due Process Treatment for Unfit Defendants who have not been adequately treated will only increase recidivism rates, perpetuating this arrest-incarceration-rehospitalization "cycle" that drains jail and community resources, but the facts now bear out that self-evident truth, with post-hospitalization misdemeanors nearly *doubling*, and post-hospitalization felonies increasing significantly as well. *See Neutral Expert Eighth Report Regarding the Consolidated* Mink *and* Bowman *Cases* (Dec. 18,

2023) ("**Eighth Report**"), https://www.oregon.gov/oha/OSH/reports/Oregon-Mink-Bowman-8th-Neutral-Expert-Pinals-Report.pdf, 19 (noting Oregon Judicial Department comparisons of data from September 2021 through August 2022 and September 2022 through August 2023 showed that "[t]he number of new felony cases filed within six months of a defendant's commitment being terminated increased 15% (from 66 to 76)" and "[t]he number of new misdemeanor cases filed within six months of a defendant's commitment being terminated increased 46% (from 125 to 182)").[8]

Then, a new and different direct impact on Marion County was imposed by the Supremacy Clause Order, increasing the financial and administrative burdens on Marion County. While the Implementing Injunctions had limited how long an Unfit Defendant could be admitted to OSH as an inpatient, the Supremacy Clause Order prohibited outpatient treatment *afterward*. By prohibiting OSH outpatient services as an alternative to CR, it divested state courts of the last vestige of their

---

[8]This Court may take judicial notice of the contents of this report, even if never filed below, as "adjudicative fact" because, being publicly available on the government's own website, they are "generally known within the trial court's territorial jurisdiction," and being facts established by someone who all parties agreed was an expert and agreed to rely upon, they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Such 'judicial notice may be taken at any stage of the proceeding,' (Rule 201 ([d])) including on appeal." *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 n.5 (9th Cir. 1995) (citations omitted).

authority to ensure the provision of adequate Due Process Treatment to Unfit Defendants. *See* Declaration of Ryan Matthews (March 28, 2024) ("**Second Matthews Decl.**"), 2-ER-70 ¶ 10.

The Supremacy Clause Order thus ensured that Unfit Defendants would often remain housed in jail in mental distress, taking up valuable jail resources and in many cases posing risks of harm to themselves and Marion County employees and risk of liability to Marion County. Hunter Decl., 2-ER-77 ¶¶ 8–9. In addition, because they will now be denied outpatient services, these individuals will require a higher level of CR services which are much less likely to be effective in restoring their mental health and further burden Marion County's already strained resources. Second Matthews Decl., 2-ER-70 ¶ 11.

An increase in the number of Unfit Defendants returned to Marion County without adequate Due Process Treatment inevitably means an increase in the number of individuals remaining in jail, where they remain untreated, posing greater risk of harm and liability. Hunter Decl., 2-ER-77 ¶ 9. An increase in the number of individuals returned to Marion County needing further treatment has caused an increased number of individuals charged with violent crimes simply leaving CR services without receiving stabilizing treatment. Second Matthews Decl., 2-ER-70–71 ¶ 12. As of June 8, 2023, "10 individuals already ha[d] simply left [CR] without receiving stabilizing treatment" because "Marion County has no

means of preventing them from leaving services." Declaration of Ryan Matthews, 2-ER-112 ¶ 10. Even when patients stay, inability to adequately treat them remains a problem, Second Matthews Decl., 2-ER-70 ¶ 9, and under the Supremacy Clause Order, "those that require[] hospital-level care . . . will be turned away from even outpatient hospital care," 2-ER-70 ¶ 11. Further, per the court's own expert, as discussed above, leaving violent, untreated defendants to roam *does* lead to further crimes. This further strains jail resources. Finally, there are obvious fiscal consequences to Marion County from the increase in services that is caused by turning individuals away from outpatient services. 2-ER-71 ¶ 16. Thus, due to the Supremacy Clause Order's exacerbating effect on the problems resulting from the Implementing Injunctions, Marion County faces a public health and safety crisis even more intense than what prompted its first effort to intervene in 2023. The State of Oregon has specific statutory and constitutional obligations to address this crisis. Marion County seeks to intervene so that it may ensure adequate Due Process Treatment for Unfit Defendants to relieve their mental health distress, safeguard its resources and minimize risks to inmates and its staff and risks of liability.

There can be little question that these harms were a direct result of the district court's orders. In 2021, the year before the 2022 Order, 56.9% of defendants at OSH were restored to competency, but in the year immediately

following that order, from September 2022 through October 2023, this percentage dropped to 39.4%. *Eighth Report* 15–16. Put another way, in 2021, 43.1% of defendants were not restored, and after the 2022 Order, 60.6% were not restored. The number of defendants not restored thus increased by over 40%. Similarly, OSH's success in making any conclusive determination (e.g., a "never able" determination, indicating "there is no substantial probability that the patient will gain or regain fitness to proceed," Or. Admin. R. 309-091-0050(1)(b)) dropped in this period, with a 2.7% reduction in never-able findings and a 1.1% reduction in med-never-able[9] findings. *Eighth Report* 15–16. And while previously less than a third (31.3%) of defendants were discharged prior to a dischargeable finding being reached, today more than half (52.6%) suffer that fate. *Id.*; *see also id.* at 19 (noting Oregon Judicial Department comparisons of data from September 2021 through August 2022 and September 2022 through August 2023 showed that "[t]he number of defendants with commitment terminated without regaining fitness more than doubled (from 334 to 695)"); *Amici* Judges' Resp. to Pet. for Expedited Ruling on Supremacy Clause Issue, 2-ER-89–90 (noting the same facts and statistics summarized in the foregoing paragraph).

---

[9] This refers to a finding "that a defendant cannot be restored unless . . . involuntarily medicated." Oregon Health Authority, *Federal Order Frequently Asked Questions* (Aug. 9, 2023), at 9, https://www.oregon.gov/oha/ OSH/reports/MINK-BOWMAN-FAQ.pdf

# Summary of the Argument

The district court erred in denying intervention, in failing to abstain under *Younger*, and in numerous ways regarding the merits of its orders.

Specifically, the district court erred in its Second Intervention Order by finding that Marion County's motion to intervene was untimely, because Marion County filed its motion to intervene promptly, within the timeframe for filing appeal, after issuance of the Supremacy Clause Order, which significantly harmed Marion County in new ways.

The district court erred in its Supremacy Clause Order by failing to abstain under the *Younger* doctrine, which requires federal courts to refrain from interfering with ongoing, state criminal proceedings absent extraordinary circumstances. The state criminal proceeding against Mr. Velasquez-Sanchez is ongoing, implicates important state interests, provides an adequate opportunity to raise constitutional challenges, and was effectively enjoined by the Supremacy Clause Order. The absence of extraordinary circumstances, such as bad faith, harassment, or irreparable injury, renders the federal court's intervention unjustified. By failing to properly apply *Younger* in its Supremacy Clause Order, the district court violated fundamental principles of equity and comity that are essential to the proper functioning of our federal system.

The district court additionally erred on the merits in the Supremacy Clause Order by determining that the state court violated the Supremacy Clause by ordering outpatient treatment, because none of the district court's orders or findings related to outpatient treatment.

The district court erred concerning the merits in the Challenged Orders. First, although injunctive relief must seek to relieve the constitutional violation alleged, the Challenged Orders did not seek to *stop* OSH's failure to *timely* provide Due Process Treatment, but instead *prohibited* it from providing such treatment beyond the time-limits imposed. Second, although federal courts must, when possible, avoid directing injunctive relief against local agencies wielding police powers when they are not the violator, and must grant them deferential latitude even when they are, narrowly targeting the violation's source, the Challenged Orders nonetheless placed the burden of OSH's due-process responsibilities on Marion County with *no* deference to its police powers. Third, although injunctive burdens may only be directed to a party against whom there is adequate evidence of violation or effect, the Challenged Orders place those burdens on Marion County, against whom no such evidence was adduced.

Accordingly, this Court should reverse the district court's denial of intervention in its Second Intervention Order, reach the merits of the Challenged Orders, and reverse those orders.

# Argument

## I. Marion County meets the factors for intervention as of right and permissive intervention.

In determining, in its Second Intervention Order, that the Second Motion to Intervene was not timely, the district court committed clear factual errors and failed to properly apply analytical rules in numerous ways.

### A. Standard of Review.

This Court reviews the denial of intervention as of right *de novo*, except where a denial is for untimeliness, which is reviewed under an abuse of discretion standard. *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1019 (9th Cir. 2022). This Court reviews the denial of a motion for permissive intervention for abuse of discretion. *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1352 (9th Cir. 2013).

An abuse of discretion occurs when the district court bases its decision on "clearly erroneous findings of fact," *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004), or "fails to apply the correct legal rule or standard. . . . And even if the trial court identified the correct legal rule, [this Court] may find an abuse of discretion if the  court's application of that rule was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 853–54 (9th Cir. 2016) ("*LAUSD*")

(cleaned up; citations omitted). Finally, the district court must not only identify the correct rule, but "follow . . . basic principle[s]" relating to *how* the rule is to be applied. *See id.* at 854.

**B. The district court erred in declining to consider Marion County's reply and in construing the Second Motion to Intervene as requesting reconsideration.**

As a threshold matter, the district court erred in striking Marion County's reply supporting the Second Motion to Intervene, 2-ER-44, as discussed in Marion County's Response in Opposition to Advocacy Groups' motion to dismiss, D. 23.1 ("**Dismissal Response**"). As shown there, Marion County had timely filed its reply, 2-ER-44, under the local rules, prior to the grant of expedited ruling. Nonetheless, the district court struck it, 2-ER-43, retroactively applying a new deadline, 1-ER-8. Dismissal Response at 9. Striking the reply—which, as cited below, directly addressed issues the court ultimately relied upon in denying the Second Motion to Intervene—was therefore an abuse of discretion.[10]

---

[10]As Marion County has shown, a proposed order is inoperative until entered. Dismissal Response at 9 n.6 (citing *In re Hunt*, 238 F.3d 1098, 1101 (9th Cir. 2001); *Ivie v. Astrazeneca Pharms. LP*, No. 21-35978, 2023 U.S. App. LEXIS 12338, at *5 (9th Cir. May 19, 2023) (unpub.); *United States ex rel. Collins Plumbing*, No. 3:11-cv-2834-GPC-MDD, 2014 U.S. Dist. LEXIS 193881, at *14 (S.D. Cal. June 30, 2014)). Although this Circuit seemingly has not addressed directly whether a district court has discretion to retroactively apply a scheduling order, the Eleventh Circuit has, finding that "the district court . . . abused its discretion in entering a retroactive scheduling order." *Subscriber Holdings, LLC v. Brightstar Corp.*, No. 21-12985, 2022 U.S. App. LEXIS 35963, at *19 (11th Cir. Dec. 30, 2022). Because the prejudice to Marion County by retroactive imposition

Additionally, the district court relied on *City of Los Angeles* to conclude that it was divested of jurisdiction to grant Marion County's Second Motion to Intervene "to the extent the County is asking this Court to reconsider the decision to deny its first motion to intervene." 1-ER-4-5 (citing *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885-86 (9th Cir. 2001)). However, Marion County did not ask for any reconsideration of that decision. It is unclear how the district court came to the conclusion that Marion County sought such reconsideration. While the court stated that "[Marion] County reiterates many arguments already made in its June 2023 motion to intervene," it did not cite such arguments, and none are to be found in the Second Motion to Intervene.

As explained in the Dismissal Response, Marion County did recite many of the same *factual* circumstances it had noted in its First Motion to Intervene because that was necessary to show the *effect* of the Supremacy Clause Order on the circumstances existing before its issuance, but expressly noted that the change in circumstances justified a different ruling concerning the Second Motion to Intervene. Dismissal Resp. at 10–11 (citing 2-ER-59). Marion County has also explained the precision

---

of a scheduling order to strike its timely arguments is plain, this Court should hold the same, as it did in *Ivie* in reference to equally prejudicial retroactive orders. This is particularly true here, because the district court's rules provide that even *agreed* extensions of "deadline[s] established by . . . local rules" are ineffectual without court order. LR 29-1(b); LR 16-3(b). *A fortiori*, *opposed* reductions in time surely do not take effect unless and until the court so orders.

with which the Second Motion to Intervene targeted its discussion to the Supremacy Clause Order's effects, covering it on nearly every full page. *Id.* at 11, 11 n.7. Therefore, for the district court to construe the Second Motion to Intervene as requesting any reconsideration of its earlier decision, and to deny the motion on that ground, was clear legal and factual error.[11]

## C. Marion County's Second Motion to Intervene was timely filed.

The district court abused its discretion by concluding that the Second Motion to Intervene was not timely. 1-ER-8. "[T]he requirements of intervention are broadly interpreted in favor of intervention." *Alisal Water Corp.*, 370 F.3d at 919. This is no mere passing suggestion: this Court has "repeatedly instructed" courts to heed this "'liberal policy in favor of intervention.'" *LAUSD*, 830 F.3d at 853 (quoting *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir.

---

[11]As discussed later in this brief, Marion County does appeal the Implementing Injunctions because they are inextricably intertwined with the Supremacy Clause Order that modified them. *Infra* Part III.B. This did not render the Second Motion to Intervene a request for reconsideration, but even if construed as such, the *City of Los Angeles* case goes on to indicate the opposite position of the one chosen by the district court, stating that while "[a] trial court may not . . . reconsider a question decided by an appellate court. . . 'as long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.'" *Id*. at 888–89 (internal citations omitted). At the time the Second Intervention Order was issued, this Court had not ruled on Marion County's previous appeal and therefore there was no conflict between a decision of this Court and the district court's "inherent procedural power" to modify an order.

2011) (en banc)). Accordingly, "[t]o the extent there is any doubt as to [a]ppellants' establishment of th[e] factor[s]" weighed in determining whether intervention should be granted, this policy requires "resolution of it in favor of intervention." *Id.* at 864.

**1. The motion was for appeal purposes; therefore it was plainly timely.**

The Federal Rules of Civil Procedure provide for intervention as of right and permissive intervention. Fed. R. Civ. P. 24(a)–(b). To intervene under either subsection, a party must demonstrate that its motion was timely filed. While the text of Rules 24(a) and (b) does not address the unusual circumstance of intervention to file an appeal, the district court properly recognized that "'[a] motion to intervene seeking only to participate in the appeal is timely if filed within the time allowed for filing an appeal.'" 1-ER-5 (quoting *United States v. Washington*, 86 F.3d 1499, 1505 (9th Cir. 1996)); *see also Yniguez v. Arizona*, 939 F.2d 727 (9th Cir. 1991), *vacated and remanded on other grounds* (recognizing propriety of same when "traditional standing criteria" is satisfied) (internal citations omitted). This should have resolved the issue since Marion County (**1**) did file its motion within that timeframe and (**2**) stated clearly, both in its memorandum and the motion itself, that it sought intervention only in order to appeal: "The County respectfully requests this Court grant its Second Motion to Intervene so that it may appeal the March 2024 Mosman Order," 2-ER-53

(memorandum); *see also* 2-ER-51 (motion, referencing simultaneously-filed motion to expedite ruling "so that [Marion County] may file the Notice of Appeal"). Further, Marion County included its proposed notice of appeal as an exhibit, 2-ER-64, further evincing its appeal purpose.[12] This was therefore amply clear, but nonetheless, Marion County stated in its erroneously struck reply brief, "Plaintiffs also argue that the County does not appropriately limit the scope of its intervention to appeal. That argument misreads the County's Second Motion to Intervene." 2-ER-45–46.

Despite this clarity, the district court incorrectly inferred that Marion County sought broader intervention than that needed to file an appeal, on the grounds that "the County s[ought] to intervene to address 'particularized harms.'" 1-ER-5. As Marion County has explained, because particularized harm is required by "traditional standing criteria," *Yniguez*, 939 F.2d at 731 (quoted source omitted), this cannot support the district court's determination. Dismissal Resp. at 10. Therefore, the district court's declining to find the Second Motion to Intervene timely since it was "filed within the time allowed for filing an appeal," *Washington*, 86 F.3d at 1505, was clear error.

_____

[12]Even if this Court did find a mismatch between Rule 24(c) and the Notice of Appeal as attached, such a circumstance would amount to merely a "'purely technical' defect which does not result in the 'disregard of any substantial right.'" *Westchester Fire Ins. Co v. Mendez*, 585 F.3d 1183, 1188 (9th Cir. 2009) (citation omitted).

**2. The motion was timely under the non-appeal-purposes analysis.**

Even ignoring the proper appeal-purpose framework and applying instead the non-appeal-purposes analysis, the Second Motion to Intervene was nonetheless timely. This determination involves three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene [("**Stage Factor**")]; (2) the prejudice to other parties [("**Prejudice Factor**")]; and (3) the reason for and length of the delay [("**Delay Factor**")]." *Smith v. Marsh*, 194 F.3d 1045, 1050 (9th Cir. 1999).

The district court erred in its application of all three factors. It failed to apply the proper legal analysis and reached its conclusion based on erroneous factual findings that did not adequately consider the change in circumstances resulting for Marion County from Supremacy Clause Order, prompting the County's effort to intervene. Ultimately, the district court decided that Marion County's Second Motion to Intervene was untimely, declining to analyze the other factors for intervention by right or permissive intervention. 1-ER-8.

First, regarding the Stage Factor, "the mere lapse of time, without more, is not necessarily a bar to intervention." *W. Watersheds Project v. Haaland*, 22 F.4th 828, 836 (9th Cir. 2022). As a result, to deem Marion County's motion untimely, the district court needed to find that factors other than time-lapse alone supported a finding of untimeliness. Indeed, "[w]here a change of circumstances occurs, and that change is the 'major reason' for the motion to intervene, the stage of

proceedings factor should be analyzed by reference to the change in circumstances, and not the commencement of the litigation." *LAUSD*, 830 F.3d at 854 (citation omitted). Thus, as Marion County explained in its erroneously-struck reply brief, 2-ER-46–47, this Court has approved intervention in the late phase of a case, especially where the ordered relief "had an unexpected effect on a nonparty," *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990) ("***Oregon I***") (citing *United States v. City of Chicago*, 870 F.2d 1256, 1259–60 (7th Cir. 1989)). Other circuits have similarly permitted intervention during the remedial phase. *E.g.*, *Howard v. McLucas*, 782 F.2d 956, 959–60 (11th Cir. 1986); *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) (remedial phase of labor dispute).

In this case, litigation commenced originally in 2002, while the remedial phase of the case commenced in 2019; these dates were the only dates the district court considered in its analysis of this factor, *see* 1-ER-5–6, which was clear error under *LAUSD* because the "change in circumstances" wrought by the Supremacy Clause Order was "the 'major reason'" Marion County, a non-party, filed its Second Motion to Intervene. *See* 830 F.3d at 854. Marion County was clear therein about this change in circumstance, in which the Supremacy Clause Order unexpectedly effected Marion County, going further than any of the previous remedial orders which prohibited only inpatient services, heightening the existing

burdens and imposing new ones by now prohibiting outpatient services, *supra* Additional Facts, including interfering with an Oregon Circuit Court order. Marion County documented these ways in which the Supremacy Clause Order represented such a sea change throughout its brief, *see* 2-ER-51, *passim*, yet—contrary to *LAUSD*—the Second Intervention Order does not even address that change in its discussion of the Stage Factor, *see* 1-ER-5–6.[13]

The closest the district court came to stating why it considered the 2019 commencement of the "current stage" to be the relevant analytical date ("at the very [latest]") is that it concerned "enforcement of the injunction." *Id.* Again, this simply ignores Marion County's explicit argument that "the . . . Second Motion to Intervene is timely because of the *significant change in circumstances* wrought by the [Supremacy Clause] Order." 2-ER-59 (emphasis added). Thus, the district court failed to apply the analytical framework required by this Court in determining timeliness. Accordingly, the district court abused its discretion in

---

[13]Regardless of the *LAUSD* rule, tying the Stage Factor to the *commencement* of the remedial stage of the case would still be erroneous because it was not until late 2022 that Advocacy Groups shifted from demanding OSH comply with the original 2002 permanent injunction—which Marion County favors—to consenting to token compliance achieved by shifting OSH's duty of providing *full* treatment, *see infra* Part III, to Marion County. And as discussed further below in this section, it was not until much later that the particular interest at issue here—hospital-level outpatient treatment for Unfit Defendants— was threatened. Accordingly, the commencement of the remedial phase of the case was decidedly not the proper date on which to anchor the timeliness analysis.

determining that the Stage Factor weighed against finding that the Second Motion to Intervene was timely.[14]

In light of the clear and significant change in circumstances that the Supremacy Clause Order constituted, the district court erred in failing to find the Second Motion to Intervene timely under *LAUSD*.

The district court's determination on the Prejudice Factor was also erroneous. Relying on *Oregon I*, the district court found that "allowing the County to intervene at this point would cause substantial prejudice by disrupting the 'delicate balance the parties have achieved.'" 1-ER-6 (quoting 913 F.2d at 588–89). But prejudice arising from prospective intervention's "threat[]" to such a "delicate balance," even one achieved only through "protracted negotiations," is relevant only if it "flows from a prospective intervenor's failure to intervene after he knew, or reasonably should have known, that his interests were not being adequately represented," not simply because "including another party in the case might make resolution more difficult." *LAUSD*, 830 F.3d at 857 (cleaned up; citations omitted). This Court quoted approvingly the Fifth Circuit's determination

---

[14]While, as discussed below, the district court did consider some (but far from all) of these facts in reference to the Delay Factor, that discussion centers on whether the parties could or should have *anticipated* such a change, not whether such change actually occurred, so it is not relevant to the Stage Factor. So the Delay Factor discussion does not excuse the district court's failure to properly analyze the Stage Factor. Further, as shown below, the court erroneously analyzed the facts under that factor.

in *Stallworth v. Monsanto Co.* that the district court had applied the "incorrect legal standard" when it only made a *general* consideration of "how much prejudice would result from allowing intervention," rather than the specific consideration of "how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case." *Id.* (quoting 558 F.2d 257, 267 (5th Cir. 1977)).

In short, a "finding of prejudice [that is] untethered to any prejudice which was caused by Appellants' delay" is *not* the sort of prejudice that weighs against finding timeliness. *Id.* at 857–58. As explained further below, no problem concerning outpatient treatment had arisen before the Supremacy Clause Order and the district court was incorrect in surmising that any earlier order implicated outpatient treatment after the completion of treatment (or, under the Implementing Injunctions, discharge without completion thereof)—so the Prejudice Factor was not triggered. Dismissal Resp. at 15 (citing *U.S. v. Oregon*, 745 F.2d 550, 553 (9th Cir. 1984) ("***Oregon II***"); *LAUSD*, 830 F.3d at 857).

Accordingly, this case is once more akin to *LAUSD*: "[w]hen our inquiry is properly narrowed to the prejudice attributable to [Marion County's] delay in moving to intervene after the time [it] knew . . . that [its] interests were not being adequately represented by existing parties, the prejudice to existing parties becomes nominal at best." 830 F.3d at 859–60. Marion County could not have

known that its interest in insuring that Unfit Defendants continue to receive hospital-level Due Process Treatment after discharge was "not being adequately represented" by the parties when the Implementing Injunctions had nothing to say about post-discharge outpatient treatment, and when, by all accounts, OSH and Advocacy Groups represent a desire for Unfit Defendants to be restored. It therefore follows that there is *no* prejudice attributable to delay, since Marion County filed its Second Motion to Intervene promptly after the issuance of the Supremacy Clause Order.

Thus, by tethering its prejudice analysis *only* to potential disruption of the parties' "meticulously mediated agreement," 1-ER-6, rather than such disruption *resulting from* undue delay (which was not present here), the district court applied the "incorrect legal standard." *LAUSD*, 830 F.3d at 857 (quoting *Stallworth*, 558 F.2d at 267). Therefore, the district court committed clear error in finding that the Prejudice Factor weighed against a finding of timeliness.

The district court also erred in finding that the Delay Factor weighed against timeliness. Marion County did not delay in filing its Second Motion to Intervene, but did so within the short window for filing an appeal following issuance of the Supremacy Clause Order that created the change in circumstance that Marion County seeks to address through intervention. The district court's determinations

concerning delay not only relied on inaccurate characterizations of the facts, but also applied the incorrect legal standard.

The Delay Factor contemplates "the length of [] delay" only *after* "the time at which [p]roposed [i]ntervenors were reasonably on notice that their interests were not being adequately represented," which correlates to the timing of "the change in circumstances that prompted . . . [the] motion to intervene." *LAUSD*, 830 F.3d at 860 (analogizing to *Oregon II* and analyzing delay in both cases from the time the change in circumstances occurred). In other words, the "interest" at issue in the Delay Factor is not a generalized interest in the litigation, but an interest in the specific issue for which intervention is sought. *See id.* (finding that "the district court erred . . . certainly to the extent" that "it measured the length of Appellants' delay by reference to events . . . predating the change in circumstances that prompted" their motion to intervene); *Oregon II*, 745 F.2d at 552 (finding that a "change of circumstance" "indicate[d] that the . . . reason for delay [] factor[] . . . militate[d] in favor of granting" motion to intervene).

While the remedial phase of this case began in 2019, it was not until much later that Marion County's interests began to be implicated at all, and even later its interest in ensuring hospital-level Due Process Treatment continued to be provided to Unfit Defendants via *outpatient* care. Specifically, August 15, 2022, is when Advocacy Groups filed their motion (unopposed by the no-longer-adverse OSH)

to implement Dr. Pinals' recommendations, *see* 2-ER-200; 2-ER-175, including the recommendation to limit the length of admissions to OSH, 2-ER-200. Conversely, at the commencement of the remedial stage of the litigation, Advocacy Groups *wanted* OSH to meet its funding, staffing, and—particularly relevant—*treatment* obligations, *see* 2-ER-222, which would not have resulted in outpatient care being necessary, as discharge would not have regularly occurred before treatment was complete.

Thus, it is not relevant that Marion "County is seeking to intervene over four years after the current stage of proceedings began," *contra* 1-ER-6. August 15, 2022, was the first time that Advocacy Groups shifted from demanding OSH comply with the original 2002 permanent injunction, to consenting to token compliance achieved by shifting OSH's duty of providing *full* treatment, *see infra* Part III, to Marion County. Therefore, that was the earliest date Marion County could have known that no party was aligned with its interests *in general*. Accordingly, it had moved to participate in the case as *amicus curiae* on August 25, 2022 (ten days after Advocacy Groups' motion to implement Dr. Pinals' recommendations), and once it learned of certain proposed amendments (which ultimately resulted in the Second Amended Order) that would render it a de facto party to the case by requiring county sheriffs to transport Unfit Defendants to OSH, Marion County promptly filed its First Motion to Intervene on June 8, 2023.

Outpatient treatment, however, was not a subject of any of that litigation. Because the Delay Factor does not measure alignment with *general* interests in the litigation, but with the *specific* interest triggered by "the change in circumstances that prompted Appellant['s] current motion to intervene," *LAUSD*, 830 F.3d at 860, the interest prompting the First Motion to Intervene is not at issue in the Delay Factor. The Supremacy Clause Order, which was issued during the time Marion County's appeal from the denial of its First Motion to Intervene was pending before this Court, is what created the extraordinary change in circumstances prompting the Second Motion to Intervene. That new order not only significantly increased the burdens on Marion County, but modified the existing Implementing Injunctions, *infra* Part III.B, making it the most significant change in circumstances to date. Once more, it rendered Marion County a de facto party to the case by further shifting CR burdens onto Marion County, effectively prohibiting it from delivering Unfit Defendants to OSH for necessary outpatient treatment at a hospital level as due process requires, tacitly directing its personnel, and requiring Marion County to violate a lawful order of the Oregon Circuit Court. *Supra* Procedural History. Marion County promptly filed its Second Motion to Intervene to challenge the Supremacy Clause Order.

In finding that Marion County did not have a sufficient explanation for its purported delay in filing the Second Motion to Intervene, the district court

erroneously claimed that the Supremacy Clause Order did not present a significant change in circumstances. It summarily stated, "If the County had an interest in obtaining outpatient services for detainees, it should have known that that interest was not being protected since the first injunction was put in place," citing that injunction's requirement that "[Commitment] shall be fulfilled by providing *full admission* of such persons into a state mental hospital or other treatment facility." 1-ER-7 (quoting 2-ER-241 (modification in original)). But Marion County has explained how this identifies precisely the problem, since the 2002 Order did not force discharge before treatment was complete, and thus did not result in a need for further treatment on an outpatient basis or implicate outpatient treatment in any other way. Dismissal Resp. 13. Therefore, to claim that Marion County would have had any notion that the 2002 Order affected outpatient treatment following discharge is simply to ignore the facts of the case, virtually in toto. Such a claim therefore constitutes clear factual and legal error.

Additionally, the district court disregarded the facts of jail resource usage. While the Implementing Injunctions required jail beds to be taken up by those released before restoration, the Supremacy Clause Order ensured that those beds would *continue* to be taken while state courts determine where to send Unfit Defendants who have been catapulted from OSH and, under the Supremacy Clause Order, have little chance for timely restoration. Were outpatient hospital treatment

permitted, restoration would likely still be possible. In its absence, Unfit Defendants with little chance for restoration in the community will continue to take up jail resources with the most likely means of restoration—and thus, discontinuation of jail resource use—off the table.[15] The district court did not consider these significant burdens on Marion County's police powers, but simply brushed them away, claiming with little explanation that they were a "contradiction" of Marion County's other arguments. 1-ER-8. It is difficult to understand how pointing out the harm to jail resources arising from the denial of outpatient treatment (which treatment would speed restoration and thus release from jail, freeing up jail resources)—a fact established by declaration, Hunter Decl., 2-ER-77 ¶¶ 8–9—contradicts Marion County's desire that jail resources stop being needlessly drained.

Finally, the district court did not even address Marion County's contentions, supported by declarations, that "because [Unfit Defendants] will now be denied outpatient services, these individuals will require a higher level of services, further burdening the County's already strained resources," that this would "result in an increased number of individuals charged with violent crimes simply leaving

---

[15]Neither state law nor due process permits Unfit Defendants to remain in jail indefinitely. Nonetheless, when, for example, violent offenders are discharged prematurely from OSH under the Implementing Injunctions, they must remain in jail while awaiting availability of adequate placement. *See* Hunter Decl., 2-ER-77 ¶ 8.

services without receiving stabilizing treatment," and that "there are obvious fiscal consequences to the County from the increase in services that is caused by turning individuals away from outpatient services." 2-ER-52–53 (citations omitted); *see also* 2-ER-55, 57, 60–61. Because the district court's underlying determination that the 2002 Order implicated outpatient treatment was erroneous, its failure to consider these examples of how the Supremacy Clause Order constituted a significant change in circumstances compounds that error.

The district court abused its discretion when it concluded Marion County's motion was untimely and when it disregarded the facts concerning jail resource burdens and the many other burdens newly imposed upon Marion County by the Supremacy Clause Order. Therefore, the district court erroneously held that the Second Intervention was untimely.

In sum, the Second Motion to Intervene was timely because it clearly sought intervention only for purposes of appeal and was filed within the timeframe for that appeal. However, even if otherwise construed, all three timeliness factors weigh in favor of finding the motion timely filed. The district court erred in finding otherwise in its Second Intervention Order.

## D. Marion County meets the standards for intervention as of right and permissive intervention.

### 1. Marion County satisfied the criteria for intervention as of right.

As a result of its error in finding the Second Motion to Intervene untimely, the district court also erroneously declined to reach the remaining factors for intervention. *See* 1-ER-8. Federal Rules of Civil Procedure 24(a) and (b) govern intervention, as of right and permissive. Under Rule 24(a)(2), intervention as of right must be allowed if three elements are met: (1) "the applicant must claim a 'significantly protectable' interest relating to the [subject] property or transaction . . . ;" (2) "the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest;" and (3) "the applicant's interest must be inadequately represented by the parties to the action." *Cooper v. Newsom*, 13 F.4th 857, 864 (9th Cir. 2021).

Within this circuit, courts construe these Rule 24(a)(2) elements broadly "in favor of proposed intervenors." *Wilderness Soc.*, 630 F.3d at 1179 (internal citations omitted). This "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *United States v. City of L.A.*, 288 F.3d 391, 400 (9th Cir. 2002).

Marion County satisfied the requirements for intervention as of right. For purposes of the rule, "An applicant has a 'significant[ly] protectable interest' in an

action if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998).

A prospective intervenor is not required to show that the interest it seeks to protect is one "protected by the statute under which the litigation is brought." *Arakaki v. Cayetano*, 324 F.3d 1078, 1085 (9th Cir. 2003). Indeed, the interest analysis "is not a bright-line rule." *Alisal Water Corp.*, 370 F.3d at 919. A movant may meet the requirements of the interest test by showing the rights asserted are "are among those traditionally protected by law." *Sierra Club v. United States EPA*, 995 F.2d 1478, 1482 (9th Cir. 1993), *overruled in part on other grounds by Wilderness Soc.*, 630 F.3d at 1178; *City of L.A.*, 288 F.3d at 398 ("no specific legal or equitable interest need be established [to intervene]").

The relationship between a protected interest and a claim is satisfied where "the resolution of the plaintiff's claims actually will affect the applicant." *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) (internal quotation marks omitted). The interest test is essentially "a threshold one." *Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980). Because it is not a "determinative criteria . . . [the test serves as] primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.*

Here, Marion County satisfies the "significantly protectable interest" test. The interests it claims are found both in Oregon statutes and "traditionally protected by law." *Sierra Club*, 995 F.2d at 1482. Specifically, ORS 161.370(3)(a)(A) stipulates that when a court finds a criminal defendant unable to aid and assist in his own defense and in need of hospital-level care, the Unfit Defendant "shall" be committed "to the custody of the superintendent of a state mental hospital." This simply ensures the constitutional right to Due Process Treatment, which Marion County has a constitutional duty to provide. This statute does not permit a defendant to remain in a local jail following commitment, because jails lack the resources, personnel, and specialized training needed to provide necessary restoration services. Additionally, Oregon law provides that "when a county is unable to provide a [mental health] service essential to public health and safety, OHA must do so "on a temporary basis." ORS 430.640(1)(c).

More generally, Marion County's right to manage its municipal resources is a traditionally protected legal interest. Moreover, Marion County is an Oregon municipal corporation subject to the Oregon Constitution, Oregon statutes, and the orders of the Oregon state court system. Therefore, the Supremacy Clause Order implicates these traditionally protected legal interests by tacitly directing Marion County's personnel and forcing Marion County to violate an Oregon Circuit Court order that would force it to litigate contempt proceedings in state court.

Non-speculative economic interests are sufficient to support intervention as of right, so long as such interests are concrete and the subject matter of litigation. *See Alisal Water Corp.*, 370 F.3d. 919. In *Sierra Club*, this Court considered a situation in which the City of Phoenix sought to intervene in a lawsuit that would require the EPA to change the conditions of wastewater treatment facility permits. 995 F.2d at 1482. Because Phoenix owned several treatment facilities that would need to change their operations if relief was granted in the lawsuit, this Court reasoned that an owner's right to freely use property is part of "the class of interests traditionally protected by law," so Phoenix had an interest sufficient to allow intervention as of right. *Id.*

Like the wastewater treatment facilities in *Sierra Club* that amounted to a sufficient interest for Phoenix to intervene as of right, this case squarely implicates Marion County's rights to manage and control its own property. Marion County faces dramatically increased demands for jail and CR services that amounts to an actual, concrete impact on the County, as well as direct interference with its personnel and conflict with a lawful state court order. As a result, Marion County satisfies both parts of the "significantly protectable interest" requirement. Intervention as of right is warranted when an applicant meets the second requirement: disposition of the action may as a practical matter impair or impede the applicant's ability to protect its interests. When a party has a significantly

protectable interest, it follows that "disposition of [the] action may impair or impede those interests," particularly where there are no other means to protect those interests. *See United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1152 (9th Cir. 2010); *see also State ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006).

Here, because Marion County has a significantly protectable interest, it correctly follows that the disposition of this matter affects its interests. There are no available alternative means for Marion County to protect its interests. Even if it filed a separate lawsuit, it would not be able to modify the underlying district court Orders from the remedial phase of this case that implicate Marion County's interests. *See Aerojet Gen. Corp.*, 606 F.3d at 1152 (finding intervention warranted where a separate case did not give adequate opportunity to challenge a court order). Filing a separate case would also go against this Court's preference for consolidated actions to further judicial economy. *See Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995).

Finally, a party seeking intervention as of right must be "inadequately represented by the parties to the action." *Cooper*, 13 F.4th at 864. Here, the parties to the case do not adequately represent Marion County's interest. OSH has agreed to each of the district court's Orders since the time of the 2022 Order, strongly indicating that the parties are no longer opposed and instead prefer to shift the

burdens of restoration for Unfit Defendants onto Marion County. Rather than press for adequate treatment for Unfit Defendants, Advocacy Groups agreed to Dr. Pinals' recommendations. Thus, Marion County satisfies this final requirement. The district court erroneously denied Marion County intervention as of right and this Court should reverse the district court's Second Intervention Order.

### 2. Marion County satisfied the requirements for permissive intervention.

In addition to erroneously holding that Marion County did not satisfy the requirements for intervention as of right, the district court also abused its discretion by denying Marion County permissive intervention in this case, rejecting permissive intervention in cursory fashion after concluding the County's Second Motion to Intervene was untimely. For permissive intervention, a movant must share "a common question of law or fact with the main action." Fed. R. Civ. P. 24(b)(1)(B). Here, Marion County overlaps with Advocacy Groups' original claim because it wants OSH to provide statutorily required treatment to Unfit Defendants. The only difference the original issues in the case and those raised by Marion County is that Marion County focuses foremost on the impact of OSH's actions on the County.

The second requirement for permissive intervention is that the district court has an independent basis for jurisdiction over the claims in the case. Supplemental

jurisdiction applies where the district court has original jurisdiction over at least one claim. 28 U.S.C. § 1367. One claim is part of the same "case or controversy" as another if they both "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Arroyo v. Rosas*, 19 F.4th 1202, 1209 (9th Cir. 2021). Because Marion County's claims all stem from the remedial phase of the original case, in which the district court had jurisdiction, the second element is met.

Finally, the district court must exercise its discretion to permit intervention based on whether it "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). As outlined previously, because Marion County has been involved in every major aspect of the case for nearly two years, the parties to the case are aware of Marion County's interests and therefore are unlikely to be prejudiced or face any undue delay if Marion County is permitted to intervene. Rather, judicial economy favors permitting Marion County to resolve its issues as part of this case. The requirements for permissive intervention are met and the district court erred in denying Marion County's motion in its Second Intervention Order.

## II. The district court erred in issuing its Supremacy Clause Order by failing to abstain under *Younger*.

### A. Standard of Review.

This Court's standard of review for *Younger* abstention is de novo.
*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014) (citing *Gilbertson v. Albright*, 381 F.3d 965, 982 n.19 (9th Cir. 2004) (en banc)).

### B. *Younger* Abstention Legal Standard.

The *Younger* abstention doctrine addresses the critical question of whether a federal court should abstain from exercising its jurisdiction in deference to ongoing state proceedings. *Younger v. Harris*, 401 U.S. 37 (1971). This doctrine is not merely discretionary but rather "imposes mandatory limits on the federal courts' ability to exercise jurisdiction." *Canatella v. State of Cal.*, 404 F.3d 1106, 1113 (9th Cir. 2005). The core principle underlying *Younger* abstention is to allow state courts to adjudicate state cases without interference from federal courts. *Younger*, 401 U.S. at 43.

The importance of this doctrine cannot be overstated, as it stems from dual policy objectives in recognizing the "constraints of equity jurisdiction and the concern for comity in our federal system." *Gilbertson*, 381 F.3d at 970. In essence, "the policy objective behind *Younger* abstention is to avoid unnecessary conflict

between state and federal governments." *U.S. v. Morros*, 268 F.3d 695, 707 (9th Cir. 2001). Absent extraordinary circumstances, federal courts are prohibited from enjoining or otherwise interfering with pending state criminal proceedings on constitutional grounds; instead, the federal court must abstain and allow the state court to adjudicate both state and federal claims. *Younger*, 401 U.S. at 49.

This Court has made it abundantly clear that under *Younger*, "when specific legal standards are met," district courts must decline to exercise jurisdiction; "there is no discretion vested in the district courts to do otherwise." *Canatella*, 404 F.3d at 1113 (quoted source omitted).

To determine the applicability of *Younger* abstention, courts must analyze whether: "(1) there is an ongoing state judicial proceeding; (2) the proceeding implicates important state interests; (3) there is an adequate opportunity in the state proceedings to raise constitutional challenges; and (4) the requested relief seeks to enjoin or has the practical effect of enjoining the ongoing state judicial proceeding." *Bean v. Matteucci*, 986 F.3d 1128, 1133 (9th Cir. 2021). If all four prongs are satisfied, abstention is required unless "bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate" is demonstrated. *Arevalo v. Hennessy*, 882 F.3d 763, 766 (9th Cir. 2018).

The mandatory standard of dismissal for cases that clearly fall under *Younger*'s scope, *Fresh Int'l Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353,

1356 (9th Cir. 1986), underscores the gravity of the *Younger* doctrine and its role in maintaining the balance between state and federal power.

**C. This case satisfies the requirements set forth in *Younger* for abstention.**

The district court erred in the Supremacy Clause Order by failing to abstain under the *Younger* doctrine.

Mr. Velasquez-Sanchez's case involves a parallel, pending state criminal proceeding, thus triggering *Younger* analysis. Three distinct categories of cases trigger the application of *Younger* abstention: "(1) parallel, pending state criminal proceedings; (2) state civil proceedings that are akin to criminal prosecutions; and (3) state civil proceedings that implicate a state's interest in enforcing the orders and judgments of its courts." *ReadyLink*, 754 F.3d at 759.

The February 2024 State Order, issued in a parallel, pending state criminal proceeding, addressed Mr. Velasquez-Sanchez's competency to stand trial and required weekly outpatient treatment at OSH.[16] The order was a core issue in managing the ongoing criminal prosecution, not a standalone civil matter. With charges still pending and the state court actively adjudicating Mr. Velasquez-Sanchez's competency, his criminal proceeding is one of the "exceptional

---

[16] Courts within this circuit have recognized that *Younger* abstention applies with full force to state proceedings concerning the commitment of defendants to state hospitals for restoration. *See Martin v. Rains*, No. 5:20-cv-00883-FMO (AFM), 2020 U.S. Dist. LEXIS 83853 at *7 (C.D. Cal. May 11, 2020) (collecting cases affirming applicability of *Younger* abstention in such matters).

circumstances" that *Younger* is designed to protect from undue federal interference. *See Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 82 (2013).

**1. There are ongoing state criminal proceedings.**

The ongoing state criminal proceedings against Mr. Velasquez-Sanchez strongly support applying *Younger* abstention. The first prong of *Younger* requires an ongoing state judicial proceeding when the federal action is initiated. *Arevalo*, 882 F.3d at 765. For *Younger* purposes, criminal proceedings are considered ongoing until a final judgment—the sentence—is entered. *Page v. King*, 932 F.3d 898, 902 (9th Cir. 2019); *Corey v. United States*, 375 U.S. 169, 174 (1963).

Here, the facts indisputably demonstrate that no final judgment had been entered in Mr. Velasquez-Sanchez's criminal case at the time OSH petitioned to void the February 2024 State Order on Supremacy Clause grounds. Mr. Velasquez-Sanchez was arrested on June 20, 2023 for the related criminal proceeding. *See* Declaration of Erin K. Olson (Feb. 21, 2024) ("**Olson Decl.**"), 2-ER-95–96 ¶ 2. In the February 2024 State Order, Judge Broyles directed MCSO to transport Mr. Velasquez-Sanchez to OSH once a week for outpatient restoration treatment. *State v. Velasquez-Sanchez*, Feb. 9, 2024 Order. On February 15, 2024, OSH then filed its petition for an expedited ruling on the Supremacy Clause issue 2-ER-98 ("**Expedited Petition**"), leading to the Supremacy Clause Order blocking the February 2024 State Order.

Throughout this timeline, no final judgment was entered in Mr.
Velasquez-Sanchez's criminal case. He had not been convicted, much less
sentenced, on any of the pending charges. The charges against him remained
unresolved, with the state court actively engaged in the process of determining his
competency to stand trial. No final judgment has been entered in Mr. Velasquez-
Sanchez's criminal proceedings, rendering his case "plainly ongoing" for purposes
of *Younger*. *Page*, 932 F.3d at 902.

The *Younger* analysis remains unchanged even though OSH filed the
Expedited Petition after the initiation of the overarching federal litigation. State
proceedings are "ongoing" if they are initiated "before any proceedings of
substance on the merits have taken place in the federal court." *Nationwide
Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 728 (9th Cir. 2017); *see also, e.g.*,
*M&A Gabaee v. Cmty. Redevelopment Agency of L.A.*, 419 F.3d 1036, 1041 (9th
Cir. 2005) (holding *Younger* abstention applied where substantive state eminent
domain proceeding began after the federal action challenging the taking had been
filed); *Thunderbird Downtown LLC v. City of Phx.*, No. CV-19-05287-PHX-JJT,
2021 U.S. Dist. LEXIS 172524, at *18-20 (D. Ariz. Sep. 10, 2021) (the federal
court applied the "fact-specific inquiry" required under *Nationwide* to determine
that even though it had "addressed the merits of Plaintiff's First Amended
Complaint" before the state action was filed, it had *not* addressed *new* issues

raised in a later complaint that was filed only after the new issues were already

pending in a state court, so the state action was ongoing under *Younger*). In this

case, no substantive proceedings on the merits of the outpatient treatment issue

had occurred in the federal case before the state criminal proceeding against Mr.

Velasquez-Sanchez began. The Expedited Petition marked the district court's first

encounter with the outpatient services issue. Consequently, the Supremacy Clause

Order represented the district court's initial substantive engagement with this

distinct issue, long after the state criminal case was underway.

Under these circumstances, *Younger* "should apply in full force" to preclude

federal interference in the state proceeding. *Nationwide*, 873 F.3d at 738. This

federal intervention on a new substantive issue occurred well after the state

proceeding was underway, directly implicating the *Younger* abstention doctrine.

The district court should have refrained from enjoining the state court's

management of the parallel criminal prosecution of Mr. Velasquez-Sanchez.

## 2. Mr. Velasquez-Sanchez's proceedings implicate important state interests.

The state criminal prosecution of Mr. Velasquez-Sanchez involves Oregon's

vital interests in enforcing its criminal laws, ensuring due process for Unfit

Defendants through competency restoration, and safeguarding the public. The

second prerequisite for *Younger* abstention requires that the state judicial

proceeding in question implicates important state interests. *Herrera v. City of Palmdale*, 918 F.3d 1037, 1044 (9th Cir. 2019). The state has a crucial interest in enforcing its criminal laws and safeguarding "the authority of the judicial system, so that its orders and judgments are not rendered nugatory." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13 (1987). Moreover, "[w]here the state is in an enforcement posture in the state proceedings, the important state interest requirement is easily satisfied, as the state's vital interest in carrying out its executive functions is presumptively at stake." *Potrero Hills Landfill, Inc. v. Cty. of Solano*, 657 F.3d 876, 883–84 (9th Cir. 2011) (cleaned up). These interests are central to the state's police powers and its essential role within the federal system.

The ongoing state criminal proceedings against Mr. Velasquez-Sanchez directly implicate Oregon's interest in enforcing its criminal laws. Mr. Velasquez-Sanchez faces multiple serious charges stemming from an alleged violent assault against several elementary school teachers while on supervised probation for two prior felony assault convictions and pretrial release for a disorderly conduct charge. *State v. Velasquez*, February 9, 2024 Transcript, 24:15–25; 25:1–20. The state has a compelling interest in prosecuting these offenses and ensuring that individuals who engage in such violent and dangerous conduct are held accountable under the law.

This Court has recognized that *Younger* abstention aims to prevent federal

interference with state criminal prosecutions, which would disrupt the state's essential function of "enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and Constitution." *Miofsky v. Superior Court of Cal.*, 703 F.2d 332, 336 (9th Cir. 1983) (quoting *Younger*, 401 U.S. at 51–52). By blocking the February 2024 State Order and preventing OSH from providing court-ordered outpatient restoration services, the federal court has effectively hindered Marion County's efforts to restore Mr. Velasquez-Sanchez to competency and bring him to trial. This interference is precisely the type of federal interference with ongoing state criminal proceedings that *Younger* abstention is designed to prevent. *See Mann v. Jett*, 781 F.2d 1448, 1449 (9th Cir. 1986) (holding that *Younger* abstention was appropriate in a § 1983 action brought by a criminal defendant who alleged his counsel was constitutionally ineffective, because the federal action would have substantially disrupted the ongoing state criminal proceedings against him).

Oregon's interest in prosecuting Mr. Velasquez-Sanchez and other defendants found unfit to aid and assist in their own defense remains strong and vital. The state's interest in determining the competency of criminal defendants and restoring their competency, where feasible, is closely intertwined with its prosecutorial interests. Rather than being merely ancillary, providing restorative treatment to unfit defendants is essential for the state to prosecute criminal law

violations while safeguarding individual due process rights. As such, it implicates the state's "important and necessary" role in administering its criminal justice system. *Younger*, 401 U.S. at 51–52. The Supremacy Clause Order impeded Marion County's ability to ensure Mr. Velasquez-Sanchez received his statutorily and constitutionally mandated treatment; it directly impacted Oregon's ability to navigate this critical stage of his criminal case.

The state's interest in protecting public safety by responsibly managing Unfit Defendants who pose risks to the community is equally vital. It is critical for the state to administer solutions that both uphold the rights of Unfit Defendants and address public safety concerns. This point is underscored by the ongoing state court proceedings aimed at facilitating Mr. Velasquez-Sanchez's restoration to competency. Mr. Velasquez-Sanchez has been ordered to OSH for competency restoration treatment four times since 2020. *See* Olson Decl., 2-ER-95–96 ¶ 2. After each of his first three stays at OSH, lasting three to four months, his competency was restored. *Id.* However, following his most recent stay, which was cut short by the Supremacy Clause Order limiting treatment duration, Mr. Velasquez-Sanchez was returned to Marion County without having been restored to competency. *State v. Velasquez*, February 9, 2024 Transcript, 33:25, 34:1–2.

In response to this situation, Judge Broyles issued the February 2024 State Order directing that Mr. Velasquez-Sanchez be transported to OSH for weekly

outpatient restoration services. *State v. Velasquez-Sanchez*, Feb. 9, 2024 Order. The order was based on the finding that Mr. Velasquez-Sanchez remained "a public safety risk and unable to engage in community restoration at this time." *Id.* The February 2024 State Order aimed to facilitate Mr. Velasquez-Sanchez's restoration to competency, while ensuring public safety in light of his documented history of violent behavior.[17]

Mr. Velasquez-Sanchez's criminal proceedings directly implicate Oregon's important interests, which the federal courts are required to respect under the *Younger* doctrine. The district court failed to abstain in the face of these interests, disregarding the principles of federalism and comity that underlie the *Younger* abstention doctrine.

### 3. State court provides an adequate forum for constitutional challenges.

The state criminal proceedings against Mr. Velasquez-Sanchez and other Unfit Defendants provide an adequate opportunity to raise constitutional

---

[17] *See* Olson Decl., 2-ER-93–96 (chronicling an extensive history of arrests and alarming conduct, including. *inter alia*: multiple incidents in 2019 of failing to perform statutory duties of a driver; an August 2019 arrest for eluding police while driving under the influence; an August 2019 arrest for menacing police officers; an October 2019 arrest for "Attempted Assault in the Fourth Degree, perpetrated against his brother"; a February 2020 arrest for "an assault on a Marion County Sheriff's Deputy"; a September 2021 arrest "for assaulting his brother and pushing his mother in the presence of his six year-old niece"; a June 2022 arrest for causing alarm to park patrons by "cussing, throwing an axe, and pointing [it] at adults and children"; and a June 2023 arrest for "assaulting three school employees on an elementary school playground.").

challenges. As this Court has consistently recognized, "state courts are competent to adjudicate federal constitutional claims." *Gilbertson*, 381 F.3d at 972 (citing *Moore v. Sims*, 442 U.S. 415, 430–32 (1979)). *Younger* requires "no more than an opportunity for the presentation of federal constitutional claims in the state proceeding" *id.*, and "only the absence of 'procedural bars' to raising a federal claim in the state proceedings." *Commc'ns Telesystems Int'l v. Cal. Pub. Util.*, 196 F.3d 1011, 1020 (9th Cir. 1999). Absent "unambiguous authority to the contrary," state court proceedings are presumed adequate for raising federal claims. *Pennzoil*, 481 U.S. at 15. Here, there is no indication that Mr. Velasquez-Sanchez or any other Unfit Defendant is procedurally barred from raising constitutional challenges in the state criminal proceedings against them.

To the contrary, the February 2024 State Order demonstrates Marion County's willingness and ability to consider and address the constitutional dimensions of these cases. This order demonstrates that the state court is not only willing but able to grapple with the complex constitutional issues raised by cases involving Unfit Defendants. Judge Broyles carefully considered the interplay between Mr. Velasquez-Sanchez's statutory and constitutional rights, the federal court's previous orders, and the practical constraints faced by state and local entities in crafting her order. *State v. Velasquez*, February 9, 2024 Transcript 34:24-25; 35:15-19. This nuanced consideration of constitutional issues is

precisely what the *Younger* doctrine presumes state courts are competent to

undertake, reflecting the doctrine's fundamental principles of federalism and

comity.

Furthermore, to the extent Mr. Velasquez-Sanchez or any other Unfit

Defendants believe their constitutional rights are being violated, they have the

opportunity to raise those challenges through the state appellate process. Oregon's

appellate courts are fully competent to consider and rectify any constitutional

infirmities in the state criminal proceedings. As this Court has previously held,

defendants in a pending state criminal case have an adequate opportunity to raise

their constitutional challenges, as they are not procedurally barred from doing so.

*See Dubinka v. Judges of the Superior Court*, 23 F.3d 218, 225 (9th Cir. 1994).

The state appellate process provides a robust and comprehensive avenue for

addressing constitutional concerns, ensuring that the rights of Unfit Defendants

are protected while respecting the principles of federalism and comity that

underlie the *Younger* doctrine.

The Supreme Court has recognized that *Younger* applies where parties,

though not directly involved in state proceedings, have interests "intertwined"

with those of the state court defendants. *Hicks v. Miranda*, 422 U.S. 332, 348–49

(1975). This Court has treated parties with "a sufficiently close relationship or

sufficiently intertwined interests" as proper for *Younger* abstention. *Canatella*,

404 F.3d at 1116; *see Herrera*, 918 F.3d at 1046–47 (affirming *Younger* abstention where federal plaintiffs were not defendants in state nuisance proceeding but their interests were "intertwined" with those of the state court parties).

Although Mr. Velasquez-Sanchez is not a named party in the federal action, his interests are sufficiently intertwined with those of Advocacy Groups and OSH to warrant *Younger* abstention. Advocacy Groups' interest in ensuring timely and adequate competency restoration treatment for individuals found unfit to stand trial aligns directly with Mr. Velasquez-Sanchez's interest in receiving the necessary treatment to restore his competency and proceed with his criminal case. Likewise, OSH's interest in the federal litigation is closely tied to its role in providing competency restoration treatment to individuals like Mr. Velasquez-Sanchez. The Supremacy Clause Order directly impacts OSH's ability to provide court-ordered outpatient restoration treatment to Mr. Velasquez-Sanchez and other Unfit Defendants.

The Supremacy Clause Order's very basis was the February 2024 State Order in Mr. Velasquez-Sanchez's criminal case. This order, which directed OSH to provide outpatient restoration treatment to Mr. Velasquez-Sanchez, precipitated the federal litigation, rendering the federal case inextricably intertwined with the ongoing state criminal proceedings against Mr. Velasquez-Sanchez. Essentially,

the federal case represents OSH's attempt to obtain relief from a state court order issued in Mr. Velasquez-Sanchez's criminal case. The fact that Mr. Velasquez-Sanchez is not a named party in the federal action does not alter the case's fundamental nature as an intervention in ongoing state criminal proceedings.

Where the interests of the federal parties are so closely aligned with those of the defendant in ongoing state criminal proceedings, *Younger* abstention is appropriate. To hold otherwise would allow parties to circumvent the *Younger* doctrine by strategically naming parties in the federal action, even when the federal case fundamentally intervenes in ongoing state criminal proceedings.[18] The close interconnection between the interests of Advocacy Groups, OSH, and Mr. Velasquez-Sanchez in the competency restoration process, and the direct link between the federal litigation and the state court order in Mr. Velasquez-Sanchez's criminal case, demonstrate that the federal and state cases are sufficiently intertwined to warrant *Younger* abstention.

The district court erred in failing to recognize the adequacy of the state proceedings and in intervening in a manner that disrupts the state court's careful

---

[18]*See Kowalski v. Tesmer*, 543 U.S. 125, 133 (2004) (rejecting attorneys' attempt to assert third-party standing on behalf of indigent defendants to challenge a state law, despite parallel state court proceedings where the constitutional claims could be raised, reasoning that such "forum shopping" to evade *Younger* abstention is not a permissible basis for third-party standing).

balancing of interests. *Younger* abstention is warranted to allow the state courts to fulfill their constitutional role without undue federal interference.

### 4. The Supremacy Clause Order has the practical effect of enjoining the ongoing state criminal prosecution of Mr. Velasquez-Sanchez.

The Supremacy Clause Order has the practical effect of enjoining the ongoing state criminal prosecution of Mr. Velasquez-Sanchez. For *Younger* to apply, the final element requires that "[t]he requested relief must seek to enjoin—or have the practical effect of enjoining—ongoing state proceedings." *ReadyLink*, 754 F.3d at 758; *Bean*, 986 F.3d at 1133. "A federal action that would have the practical effect of enjoining the state proceeding would interfere with it in a way that *Younger* disapproves." *Gilbertson*, 381 F.3d at 978.

Here, the Supremacy Clause Order has precisely the effect that *Younger* seeks to avoid. The order directly blocks the implementation of the February 2024 State Order, which required MCSO to transport Mr. Velasquez-Sanchez to OSH for weekly outpatient restoration treatment. By preventing this court-ordered treatment from taking place, the Supremacy Clause Order effectively enjoins the state criminal proceedings against Mr. Velasquez-Sanchez.

The injunction's practical impact is severe and far-reaching. As prescribed in the February 2024 State Order, Mr. Velasquez-Sanchez "is a public safety risk and unable to engage in community restoration at this time." *State v. Velasquez-*

*Sanchez*, Feb. 9, 2024 Order. Because outpatient treatment was the last remaining option for the hospital-level treatment that Mr. Velasquez-Sanchez needs, the only remaining option absent same is his release into the community without adequate protection for the public and the victims of his past violent behavior. *See supra* Procedural History; *State v. Velasquez*, February 9, 2024 Transcript 5:12–22. Indeed, the proposed plan called to have Mr. Velasquez-Sanchez released to live with the very family members he has repeatedly assaulted in the past, a situation that is not only dangerous but also directly undermines the state court's careful efforts[19] to strike a delicate balance between public safety and Mr. Velasquez-Sanchez's right to competency restoration treatment. *State v. Velasquez*, February 9, 2024 Transcript 3:9–17, 25:1–4 The federal court's intervention in this matter has effectively thwarted the state court's ability to administer justice while safeguarding the community, a result that runs counter to the principles of federalism and comity that underlie the *Younger* doctrine.

This Court has consistently held that federal intervention is inappropriate under *Younger* when it would have the practical effect of enjoining state proceedings in this manner. *See Mann*, 781 F.2d at 1449; *see also Miofsky*, 703 F.2d at 336 (noting that *Younger* "was borne of the concern that federal court

---

[19] *See State v. Velasquez*, February 9, 2024 Transcript 31:22–25 ("However, as a judge, I'm duty bound to honor all aspects of our state constitution, including those provisions that protect victims and our community.").

injunctions might unduly hamper a state in its prosecution of criminal laws"). These concerns are directly implicated here, where a determination that "constitutional rights have been violated would have the same practical effect as a declaration or injunction on pending state proceedings." *Gilbertson*, 381 F.3d at 968. The Supremacy Clause Order does not merely second-guess the state court's decision-making; it actively prevents the state court from implementing the carefully considered February 2024 State Order that is essential to the ongoing criminal proceedings against Mr. Velasquez-Sanchez. This Court has previously required abstention under *Younger* in similar circumstances. *See Gilbertson*, 381 F.3d at 984 (holding that abstention was required where the plaintiff sued regarding due process and equal protection violations in connection with an ongoing state court proceeding); *see also Beltran v. California*, 871 F.2d 777, 782 (9th Cir. 1988) (holding that abstention was required in an action seeking declaratory relief regarding constitutional claims raised in connection with a matter already being litigated in state court).

The present case merits the same outcome. The Supremacy Clause Order brought the state prosecution to a standstill by depriving the state court of the only available means to render Mr. Velasquez-Sanchez fit to proceed. This constitutes not merely a potential for interference but an active intrusion into the state court's ability to enforce its criminal laws, leaving the state proceeding paralyzed. By

failing to abstain despite the clear applicability of *Younger* to this case, the district court overstepped the boundaries of appropriate federal intervention into state criminal matters, disregarding the fundamental principles of federalism and comity that underlie our system of government. The district court's actions represent a significant encroachment upon the state's sovereign authority to administer its criminal justice system, undermining the balance of power between the federal and state judiciaries.

**D. None of the exceptions to *Younger* abstention were applicable to the ongoing state criminal prosecution of Mr. Velasquez-Sanchez.**

The final inquiry in determining whether a federal court should abstain under *Younger* is to assess whether any exception to the doctrine applies. *ReadyLink*, 754 F.3d at 759. No exception applies here. The district court's failure to abstain under *Younger* was not justified by any extraordinary circumstances, as the state criminal proceedings against Mr. Velasquez-Sanchez do not evidence bad faith, harassment, or irreparable injury.

**1. The state criminal prosecution of Mr. Velasquez-Sanchez was not motivated by bad faith, harassment, or bias.**

This case falls far short of establishing the extraordinary circumstances necessary to justify a departure from the *Younger* abstention doctrine. This Court has made clear that federal injunctive relief against pending state prosecutions is appropriate only when "there is a showing of 'bad faith' or 'harassment' by state

officials responsible for the prosecution" or "where there exist other 'extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." *Smith v. Plummer*, 458 F. App'x 642, 643 (9th Cir. 2011).

The facts of this case do not meet this high standard. Mr. Velasquez-Sanchez has been charged with serious felony offenses for allegedly assaulting several elementary school teachers, while on probation for prior felony assault convictions and pretrial release for a disorderly conduct charge involving threatening behavior with an axe. *See State v. Velasquez*, February 9, 2024 Transcript, 24:15–25; 25:1–20. These facts provide ample basis for the state's criminal charges and belie any suggestion that the proceedings were initiated in bad faith or without hope of obtaining a valid conviction.

Moreover, there is no evidence that the state court proceedings have been conducted in a harassing manner or with any improper motive. The February 2024 State Order demonstrates a careful and measured approach to balancing the competing interests at stake, reflecting a good-faith effort to facilitate Mr. Velasquez-Sanchez's restoration to competency while protecting public safety and complying with the constraints imposed by the district court's prior orders.

This Court has recognized that bad faith in the *Younger* context might arise in cases involving repeated harassment by enforcement authorities with no

intention of securing a conclusive resolution or where there is evidence of pecuniary bias by the tribunal. *See Partington v. Gedan*, 961 F.2d 852, 861–62 (9th Cir. 1992). Neither of these circumstances is present here, as the state court has taken active steps to facilitate the restoration of defendants to competency so that their cases can proceed to a resolution on the merits, and there is no evidence of bias on the part of the state tribunal.

### 2. There is no threat of irreparable harm to justify an exception to *Younger* abstention.

The facts of this case do not support a finding of irreparable harm that would justify an exception to *Younger* abstention. This Court has recognized that extraordinary circumstances warranting an exception to *Younger* abstention exist "where the danger of irreparable loss is both great and immediate." *World Famous Drinking Emporium, Inc. v. Tempe*, 820 F.2d 1079, 1082 (9th Cir. 1987). While the violation of constitutional rights inherently constitutes irreparable harm, the February 2024 State Order was designed to facilitate Mr. Velasquez-Sanchez's restoration to competency, ensuring hospital-level treatment to which he has a firmly-established due process right, *infra* Part III, while preserving his liberty. There is no indication that the complete vindication of his rights requires action before his state court trial, as the state court has demonstrated its commitment to safeguarding his rights throughout the pretrial competency restoration process.

Ironically, the federal court's intervention via the Supremacy Clause Order threatens to cause irreparable harm to Mr. Velasquez-Sanchez by blocking the implementation of the carefully crafted outpatient treatment order and effectively denying him the due process of access to the necessary competency restoration services. Marion County has demonstrated its commitment to safeguarding the rights of Unfit Defendants, and the district court's intervention, far from preventing irreparable harm, threatens to cause such harm by interfering with the state court's balanced approach.

This case presents a paradigmatic example of when *Younger* abstention is not just appropriate, but necessary. The federal court's unwarranted intrusion into the state's ongoing efforts to manage a complex criminal prosecution, absent any bad faith or irreparable harm, is precisely what the *Younger* doctrine aims to prevent. The principles of federalism and comity demand that the state court be afforded the first opportunity to navigate the challenging issues raised by Mr. Velasquez-Sanchez's case without premature federal interference.

### III. The Supremacy Clause Order is at odds with the due process purpose of the 2002 Order, modified existing orders, and should be reversed.

### A. Standard of review.

Because the Supremacy Clause Order drastically expands the scope of injunctive relief and purports to modify that relief, those aspects of the order are

subject to the standard of review for injunctive relief. The broad discretion held by federal courts to impose equitable remedies "is not unchecked." *Hoptowit v. Ray*, 682 F.2d 1237, 1245–46 (9th Cir. 1982). Because the decision to grant injunctive relief "involves factual, legal, and discretionary components," "several different standards" apply. *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011) (cleaned up; citation omitted). This Court reviews "legal conclusions underlying the decision de novo, factual findings for clear error, and the scope of injunctive relief for an abuse of discretion." *Id.*

## B. The Supremacy Clause Order was a new injunction and it modified the Implementing Injunctions.

Straightforwardly recognizing what Due Process Treatment requires, this Court has stated in this very litigation that a "[l]ack of funds, staff or facilities cannot justify . . . failure to provide . . . the treatment necessary for rehabilitation." *Mink*, 322 F.3d at 1121 (internal citations and quotation marks omitted). Nonetheless, the district court effectively ordered, in the Implementing Injunctions, that the hospital *not* provide a reasonably full course of treatment in many cases. Then, with the Supremacy Clause Order, it prohibited even *outpatient* hospital treatment, the last remaining option to provide a hospital level of care to Unfit Defendants whose restoration requires such treatment. For this and other reasons, both the Supremacy Clause Order and the Implementing Injunctions

erred and should be reversed. Further, the Supremacy Clause Order should additionally be reversed on the grounds that none of the Implementing Injunctions related to outpatient treatment.

The district court expanded the scope of restrictions imposed on the treatment available for Unfit Defendants by claiming that its earlier orders imposed a "maximum duration of restoration treatment by OSH," 1-ER-10. It had previously stated *explicitly* that the "maximum time" limits recommended by Dr. Pinals were for "inpatient" treatment. Second Amended Order, 1-ER-14. The Implementing Injunctions imposed neither such a generalized "maximum duration," *see generally, e.g.*, Second Amended Order, 1-ER-12,[20] nor any restrictions on outpatient treatment, *see, e.g.*, Second Amended Order, 1-ER-14

---

[20]The closest this order, like the 2022 Order, comes to such a generalized restriction is prohibiting OSH from "admit[ting] patients except as provided for by the recommendations in the Neutral Expert's Reports or as otherwise provided by [the district court]." 1-ER-13. But the Supremacy Clause Order recognizes that outpatient treatment does not require admission, asserting outpatient *staffing* issues rather than the *capacity* issues that had been the focus of the litigation, as discussed below. Lest there be any question, OHA itself defines "outpatient" treatment as "treatment . . . without being admitted to a hospital," including, *inter alia*, "the emergency department," Oregon Health Authority, *Advocating for Your Loved One During a Crisis: A Guide for Parents and Caregivers While at the Hospital Emergency Department* (Dec. 2021), at 24, https://sharedsystems.dhsoha. state.or.us/DHSForms/Served/le8282.pdf, and both OHA and Dr. Pinals tie "admissions" to bed availability, which outpatient care would not affect. *See id.* at 8; Neutral Expert Second Report, 2-ER-151. This Court has similarly recognized that outpatient treatment typically does not require admission. *E.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Gonzales*, 435 F.3d 1163, 1168 n.6 (9th Cir. 2006); *Shuai Su v. Lynch*, 655 F. App'x 591, 591 (9th Cir. 2016).

(requiring only "maximum time for inpatient restoration"). Nor were outpatient care concerns ever raised, since the problem asserted was OSH "capacity"—that is, room for individuals *staying* at the hospital. *See, e.g.*, Order, 2-ER-219 (appointing "expert . . . to address capacity issues"). It was on this basis that the Implementing Injunctions were formed. *See* 2022 Order, 1-ER-38; Second Amended Order, 1-ER-13-14. So there was no rational basis to claim that the Second Amended Order governs *outpatient* treatment after the "maximum duration" for *inpatient* treatment is reached. *See* Supremacy Clause Order, 2, 1-ER-10.

Nonetheless, that is precisely what the district court found in declaring that the state court order's requirement of outpatient treatment violated the Supremacy Clause. The district court's cursory statement, "if every county . . . adopted Judge Broyles's approach, there would be no one left at OSH to provide inpatient services," 1-ER-10, does not meaningfully address this problem. First, outpatients do not stay at the hospital, so it ignores the primary issue at OSH, a lack of bed space. Second, the order cites no evidence on which to base the notion that outpatient treatment *and* inpatient treatment is impossible (i.e., that outpatient treatment would necessarily take up 100% of OSH staff's time) or that the same staff would be assigned to both outpatients and inpatients. So the "every county" concern is neither rational nor based in any evidence. Further, it imposes an

improper legal standard, since *Mink*, which controls and Marion County rightfully relies upon, prohibits denial of Due Process Treatment on the basis of low staff. 322 F.3d at 1121. So there was no reason for anyone, including the state court, to think the Implementing Injunctions governed outpatient treatment.

Nonetheless, the Supremacy Clause Order did not hold that the maximum treatment duration would *thereafter* apply to outpatient treatment, but that it already *did* so apply. As such, it not only, effectively, constitutes a *new* injunction, but also modified the Implementing Injunctions, and gave that modification retroactive effect. Accordingly, this "modification [is] so fundamental to the [earlier] injunction[s]," and "present[s] issues so inextricable from the validity of the [earlier] injunction[s], that review must include the whole package." *Gon*, 871 F.2d at 866–67.

## C. The Supremacy Clause Order is not justified by the due process violation, but harms due process.

It is axiomatic that equitable remedies for constitutional violations may only aim "to correct . . . the condition that offends the Constitution," and "federal remedial power may be exercised only on the basis of a constitutional violation[.]" *Milliken v. Bradley*, 418 U.S. 717, 738 (1974) ("***Milliken I***"). Conversely, remedies that arise in cases concerning constitutional violations, but fail to address those violations, exceed court authority. *Milliken v. Bradley*, 433 U.S. 267,

281–82 (1977) ("***Milliken II***") ("decrees exceed appropriate limits . . . if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation . . . .").

Neither the Supremacy Clause Order's new injunctive relief nor the Implementing Injunctions aim at protecting the due process rights identified as the basis of injunctive relief—rights that Marion County, through its police powers of caring for the mentally disabled, must ensure when such individuals are in the hands of Marion County. They all therefore exceed court authority under *Milliken I* and *II*.

The 2002 Order required hospital admission within seven days, 2-ER-241–42, based on the due process right to timely admission for "such treatment as may be required" for the purpose of "restoring competency." 2-ER-245–247 ¶¶ 6, 8. Thus, timely *admission* was the remedy for the violation, but the basis for that remedy was the due process right to timely admission *for adequate treatment*. Admission untethered to adequate treatment efforts is pointless and is not protected by due process. "The 'purpose' of holding someone unfit to stand trial . . . is *to assist in restoring competency*, not to punish the person." 2-ER-253 ¶ 6 (emphasis added). The due process interest is "such *treatment as may be*

*required to comport fully with*" *that purpose.* 2-ER-253 ¶ 8.[21] In short, the 2002

Order was based not on a due process right to simple admission, but on ensuring

due process-required treatment, whose purpose is restoring competency.

As noted, this Court has stated in this case that such an admission-without-

full-treatment-efforts construction of these due process rights is not constitutional.

"[A] realistic opportunity to be cured or improve" (which cannot exist under

blanket duration limits) is what is required, *Mink*, 322 F.3d at 1121 (internal

citations and quotation marks omitted)—that is, Due Process Treatment. Lacking

"funds, staff or facilities" do not excuse "failure to provide . . . *treatment*

*necessary for rehabilitation*." *Id.* (emphasis added).

Whether there exists a right to admission untethered to full treatment was

not addressed below—none of the argument, briefing, or orders identified a due

process right to admission *not* tied to the purpose of confinement, which is Due

Process Treatment, rather than treatment foregone when restoration proves

lengthy—yet the Supremacy Clause Order inverts the 2002 Order's due process

purpose. It *prohibits* the completion of Due Process Treatment. *See, e.g.*, *supra*

Additional Facts (noting, *inter alia*, alarming increase in release of those not

restored to competency).

---

[21]Further, the court found transport delay impermissible *because* it
"delays . . . return to competency" and that OSH's violation consisted in failing "to
ensure prompt admission *and treatment*," 2-ER-255 (emphasis added).

Non-hospital treatment is not adequate. The original district court litigation led to a finding that OSH (1) can offer "care . . . tailored to the needs of persons found unfit to stand trial, [which] fulfills constitutional requirements," and (2) "has the capacity to medicate patients, and has specially trained staff and staffing levels and programs sufficient to treat patients' mental incapacity." F&C, 2-ER-254 (Conclusions of Law ¶ 10). While not addressing CR, the court did address jails' capacities for treatment: "[Jails] have no capacity to provide mental health treatment that is designed to rehabilitate a person or restore the person to competency. The treatment the jails offer . . . is constitutionally inadequate." 2-ER-254 (Conclusions of Law ¶ 9). The 2002 Order's designation of OSH as the proper treatment facility, then, was based on its *unique* ability to treat Unfit Defendants.

Neither the Supremacy Clause Order nor the Implementing Injunctions were based on any evidence that non-OSH treatment at the level of care required for Unfit Defendants is now available otherwise. Quite the opposite: the district court had found that a "hospital level of care" is not available in "community placement," which is "inadequate," and that such placement creates additional, "potentially fatal" risks. Tr. of Proceedings (May 6, 2020), 2-ER-280:18–24. Dr. Pinals also recognized the unique nature of the level of care that a hospital provides, indicating, for example, that "[m]any of these [misdemeanants] need

hospital level of care." Neutral Expert Second Report, 2-ER-171. So it was clearly established below that OSH provides a unique and necessary level of care.

The facts demonstrate two important things in this respect. First, what was once simply a plain logical conclusion that the district court's orders would lead to the discharge of defendants who have not been fully afforded their right to Due Process Treatment is now a proven fact. *Supra* Additional Facts (noting increases in release of those not restored to competency and in releases with no conclusive determination). Second, it remains true that CR *cannot* provide the necessary, unique treatment OSH provides. *Supra* Additional Facts (noting, *inter alia*, that because Unfit Defendants who are not even "relative[ly] stab[le]" are now discharged frequently from OSH, medications are often wholly unavailable, resulting in "no treatment" being available).

Accordingly, far from *remedying* the constitutional violation forming the jurisdictional basis for this case, the Challenged Orders directly hinder due process. They not only permit, but *require*, the release of still-unwell patients, regardless of restoration status, after a maximum of six months (or one year for rare, superlatively egregious offenses).[22] A compulsory nexus (not one found in a

---

[22]While limited exceptions exist for extensions relating to discharge planning and violent felony charges, their use is rare relative to the number of Unfit Defendants released from OSH under the Challenged Orders. *See Eighth Report* 15 (in three-month span, only seven extensions for violent felonies and 11 for discharge planning). This is, of course, to be expected, since extensions are

discretionary exception) between discharge and restoration status is surely required by due process, as the 2002 Order inherently recognized. Requiring OSH to simply cease treatment, ignoring the due process right to *restoration* on which the 2002 Order was based, is adverse to that right.

Under the Implementing Injunctions (prior to the Supremacy Clause Order's retroactive modification of same), Marion County's last means of ensuring Unfit Defendants had any possibility of receiving Due Process Treatment was to deliver them to OSH for outpatient treatment, the only facility equipped to provide the level of treatment necessary.[23] As such, the Supremacy Clause Order and the orders retroactively modified thereby eliminated Marion County's last option to ensure Unfit Defendants are afforded due process. Thus, those orders are constitutionally impermissible because they deprive defendants who are, after the

_____

highly disincentivized by the very nature of the goal (unopposed by the parties) of creating more bed-space by *discharging* patients. More to the point, (a) the discharge planning extension does not relate to Due Process Treatment (it hinges on placement *availability*, rather than placement *adequacy*—only OSH can provide hospital level treatment) and (b) both exceptions have plainly been insufficient both to protect Marion County from unsustainable strain and to ensure due process to Unfit Defendants. *Supra* Additional Facts.

[23]Marion County does not concede that outpatient treatment is sufficient for due process, but only that it was the best remaining option. Indeed, because the district court had not established that due process permits cutting inpatient treatment of Unfit Defendants short, it is clear that this Court should vacate the Implementing Injunctions regardless of their modification by the Supremacy Clause Order. However, it is clearer still that it should vacate them as modified to prohibit even outpatient treatment.

maximum duration of OSH treatment, still unfit, of Due Process Treatment and because they leave Marion County with no option to fulfill its duty to ensure due process is provided.

Meanwhile, the "condition" of receiving treatment for more than six months "does not violate the Constitution"—contrarily, as recognized in the 2002 Order, it is *required* by the Constitution if necessary to restore competency—and the Supremacy Clause Order and Implementing Injunctions therefore "exceed appropriate limits," *see Milliken II*, 433 U.S. at 281–82. This Court's holding that "'treatment necessary for rehabilitation'" is required even if resources are lacking, *Mink*, 322 F.3d at 1121 (citation omitted), readily demonstrates that the Supremacy Clause Order, which justifies banning necessary treatment at OSH on the *basis* of a lack of beds, exceeded the court's authority. What's worse, while in other situations, imposing a "back end" to due process rights in order to cure a "front end" violation might result in a net zero for due process, the Supremacy Clause Order actually results in a negative. That is, while OSH's failure to comply with the 2002 Order meant that due process treatment was *delayed*, the Supremacy Clause Order often results in due process *denied*, since it functions to frequently prohibit complete Due Process Treatment.

The Supremacy Clause Order does not aim to correct the condition that caused the violation, but in fact makes that condition worse. It is beyond the scope

of the district court's authority, relies on clear factual and legal error in suggesting the Implementing Injunctions implicated outpatient treatment at all, and legally errs in excusing OSH from treatment—both inpatient and outpatient—on the basis of lacking resources, which *Mink* prohibits. Furthermore, it modifies the Implementing Injunctions, which were already beyond the district court's authority pre-modification, with retroactive effect to make them even *more* restrictive of Due Process Treatment. Accordingly, all Challenged Orders should be overturned.

### IV. The Challenged Orders afford no deference to Marion County in the administration of its police powers and should be reversed.

The Challenged Orders also exceed the district court's discretion by prohibiting Marion County from exercising its police powers, rendering the order's relief too broad in scope.[24]

### A. Federal courts addressing police-power matters must abide by well-established boundaries.

> [M]any [courts] have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges . . . have a natural tendency to believe that their individual solutions to often intractable problems are better . . . than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question . . . [is] in what branch of the Government is lodged the authority to initially devise the plan. . . . [T]he inquiry of federal courts

_____

[24]The standard of review for injunctive relief, described *supra* Part III, applies here.

into prison management must be limited to the issue of whether a
particular system violates any prohibition of the Constitution.

*Bell v. Wolfish*, 441 U.S. 520, 562 (1979).[25]

Thus, when federal courts exercise jurisdiction in matters traditionally

falling under local police powers, they must respect well-established boundaries.

The areas in which the Supreme Court instructs courts to stay their hand over

matters that are "'primarily the concern of the state,'" *Ala. Pub. Serv. Comm'n v.*

*S. R. Co.*, 341 U.S. 341, 346, 350–51 (1951) (citations omitted), are numerous. As

such, although *Alabama Public Service Commission* concerned review of an

administrative order, it demonstrates that these boundaries apply to Fourteenth

Amendment due process claims where "adequate state court review" is available

and the matter involves "predominantly local factors," rendering federal

intervention "not necessary for the protection of federal rights," *id.* at 349.

In order to act in such instances, a federal court must, with "scrupulous

regard for the rightful independence of state governments," be

> convinced that the asserted federal right cannot be preserved except by
> granting the extraordinary relief of an injunction . . . . Considering that
> few public interests have a higher claim upon the discretion of a federal
> chancellor than the avoidance of needless friction with state policies, the
> usual rule of comity must govern the exercise of equitable jurisdiction
> by the District Court in this case.

---

[25]These principles also apply to local mental health administration. *Infra*
Part IV.C.

*Id.* at 349–50 (quotation marks and citations omitted) (holding, "Whatever rights appellee may have are to be pursued through the state courts.").

In the context of federal remedial orders that affect local police powers, these principles are largely applicable even under a federal court's broad authority to correct the violation of an *existing* order. *See infra* Part IV.B.2. Marion County has police power over the administration of jails and care for the mentally disabled (also the County's parens patriae duty, *Higgins v. United States*, 205 F.2d 650, 653). Because the Supremacy Clause Order forecloses the only remaining option for the meaningful exercise of these powers, it violates these principles.

## B. The Challenged Orders unduly infringe on administration of custodial facilities, a police power.

First, the administration of custodial facilities is a police power. Numerous cases address the need for federal courts to maintain a hands-off approach in this area, ensuring orders are tailored closely to violation and violator themselves.

### 1. Binding precedent requires proper targeting.

Under *Bell*, a federal remedial order addressing a constitutional violation in penal custody institutions "must" target the "particular system" responsible for the violation and "be limited to" that. 441 U.S. at 562. In short, courts addressing such issues must strive to avoid punishing innocent parties and must instead "impose

the least intrusive remedy available." *Kendrick v. Bland*, 740 F.2d 432, 438 (6th Cir. 1984) (citing *Hoptowit*, 682 F.2d at 1247).

That the court may be addressing "violations of past court orders," *Hoptowit*, 682 F.2d at 1247, does not change this. While the court may, in such instances, craft a remedy that addresses more than "the specific violation," *id.* (citing *Hutto v. Finney*, 437 U.S. 678, 687 (1978)), this does not mean the court may craft remedies that simply relieve the actual violator of its duties, thrusting those duties on others. The authority in which *Hoptowit* lies provides just the opposite: when the court's authority is thus expanded, its remedy must still be limited to the "element[s] contributing to the violation" in order to "insure against the risk of inadequate compliance." *Hutto*, 437 U.S. at 687. *Hoptowit* itself held that while "a particular violation may be the result of several contributing factors[,] . . . 'the court[] . . . may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct [constitutional] violations.'" 682 F.2d at 1247 (citation omitted). *Relieving* OSH of providing treatment, the one thing it is tasked with doing, after three to six months, by thrusting that responsibility on Marion County, punishes the County for OSH's violation—precisely what this rule prohibits. It also ignores the violation: if more beds or staff are needed at OSH to timely admit new patients while still maintaining the Due Process Treatment purpose of admission, then the inadequate

room or staffing, and the actors responsible for fixing it, are the source of the violation. *See Mink*, 322 F.3d at 1121. Punishing Marion County, an entity totally unrelated to it, does not address that.

### 2. Binding precedent requires deference to jail administrators.

Beyond proper targeting, deference is *still* owed to jail administrators even when a jail *is* the violator—all the more so when the court's action will impact jail security. *E.g.*, *Olivier v. Baca*, 913 F.3d 852, 858 (9th Cir. 2019) (holding that security concerns may justify "'retraction of the . . . constitutional rights of . . . pretrial detainees.'" (citation omitted)); *Hoptowit*, 682 F.2d at 1247 (courts must consider "cost of compliance," "security needs," and "bona fide steps that prison officials are taking," "defer[ing] to the policy choices made by prison officials and order[ing] a remedy consistent with the basic approach taken" thereby. (citations omitted)). Logically, since such strong deference is required when the jail *is* the violator, even stronger deference should have been afforded here, where jail security is at risk and the jail bears *no* responsibility for any violation.

In sum, federal courts addressing violations of existing orders are required to defer significantly to jail officials. In *Olivier*, for example, this Court favorably quoted the district court's statement that "[a] sudden, extreme rise in inmate population" may justify changes detrimental to inmates' constitutional rights. 913 F.3d 852, 859 (9th Cir. 2019) (noting also that these principles apply to the pretrial

context). If jail administrators cannot be faulted for constitutional harms resulting

from emergencies at their own facilities, they certain cannot be held responsible

for constitutional harms resulting from the negligence of entirely different entities,

including the state hospital.

### 3. The Challenged Orders burden jail administration, violating these requirements.

As established above, the Implementing Injunctions caused harms to the

Marion County jail, and the Supremacy Clause Order furthered them by

preventing outpatient treatment, which means that—as the court's own expert's

evaluation shows—the cycle of arrest has increased. *Supra* Additional Facts.

Moreover, as noted above, *supra* Part I, the Supremacy Clause Order, by rendering

OSH outpatient treatment unavailable, ensured that jail beds would *continue* to be

taken, with even less chance of restoration than under the Implementing

Injunctions, while state courts determine where to send Unfit Defendants who

have been catapulted from OSH.

These two new burdens imposed by the Supremacy Clause Order on Marion

County's jail administration demonstrate the district court's failure to abide by

precedentially-required restraints. The Supremacy Clause Order cannot be justified

by claiming these burdens are merely incidental, since the district court's excusing

OSH from fully treating patients is their immediate cause, resulting directly in

those patients being thrust back on Marion County and its populace. Instead of accepting the solutions of the state court, which is more keenly aware of and sensitive to local concerns, the district court voided its order. Instead of ensuring that the entity responsible for delay in treating patients took the necessary steps to correct its unconstitutional deficiencies, it simply relieved OSH of fully doing so.

And just as the district court thereby failed to address its remedy to the *violator*, it similarly failed to address it to the *violation*. The violation was failure to timely admit for adequate treatment. By declining to require OSH to take *proper* steps to fix its admission delays—steps that do not harm the very Due Process Treatment the original injunction sought to ensure—the district court causes Marion County to continue bearing the burden of OSH's violation. And finally, the district court did not demonstrate any deference to Marion County in its jail administration. These errors constitute clear errors of fact (declining to recognize the harms suffered by Marion County, despite those harms having been pointed out), and law (declining to properly (1) avoid enmeshing local police power administrators and (2) to defer to them, in an order that should punish only the violator, as required by binding precedent), resulting in an abuse of discretion.

## C. Care for people with mental disabilities is a police power.

Care for people with mental disabilities is also a police power, and it includes doing so in a manner that protects the community from those who are

dangerous. *Heller v. Doe*, 509 U.S. 312, 332 (1993); *Higgins v. United States*, 205 F.2d 650, 652–53 (9th Cir. 1953). When it comes to care for Unfit Defendants, and the duties owed them by those vested with administering mental health treatment, the relevant concerns are analogous to jail administration, of which the Supreme Court stated, "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures[.]" *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973).

The state circuit court attempted to fashion an order that resorted to the last option available under which Marion County could adequately perform these important duties, providing for transport from the Marion County jail for hospital-level outpatient treatment. This still allowed needed treatment to be provided to Unfit Defendants as well as protection for the community. The CR required by the district court cannot reliably treat such defendants and has resulted only in imposing impossible burdens on Marion County CR. *Supra* Additional Facts. Indeed, numerous individuals receive no adequate treatment because it is not available there, while others simply leave their placements. *Supra* Additional Facts. Thus, the Supremacy Clause Order removed the last vestiges of Marion County's ability to exercise this state police power properly and denied their rightful recourse to the state court.

Thus, for the same reasons listed above in reference to jail administration,

the Supremacy Clause Order's failure to consider these harms to Marion County's police power in caring for the mentally handicapped, and its choice to instead to burden the County in this regard by relieving OSH of its duties, also constitutes a violation of binding precedent.

Of course, the precedential requirements noted above flow from the core tenet that federal courts have no authority to interfere in the "exercise of [] police powers" unless the "action" in question "intrudes on any of the spheres in which the federal government itself enjoys the power to regulate." *See United States v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988). The *action* in question is the *hospital*'s violation. Thus, the court had constitutional authority to enjoin OSH, but—just as it should not have punished MCSO—it may not tacitly enjoin Marion County's CR services, the only option left when hospital inpatient *and* outpatient treatment are unavailable, by relieving OSH of its duties. Because the district court abused its discretion in the Supremacy Clause Order and the Implementing Injunctions that it modified, the Challenged Orders should be struck down.

### V. No evidence was presented of a County violation or effect, so the Challenged Orders should be reversed.[26]

Even if Marion County had been alleged to have some tie to OSH's violation, that would not, on its own, justify the Challenged Orders: *Milliken*

---

[26]The standard of review for injunctive relief, described *supra* Part III, applies here.

*I* additionally counsels that when there is "no showing of significant violation by" a non-party who is targeted by a federal court's order, and no evidence of any constitutionally impermissible effect thereon arising from the violations of others, such a remedy "would impose on the [non-parties], not shown to have committed any constitutional violation, a wholly impermissible remedy based on a standard not hinted at in . . . any holding of th[e] [Supreme] Court." 418 U.S. at 745.

This brief has explored at length the implications of the fact that the district court let OSH off the hook for its due process violations, relieving it of its duty to provide Due Process Treatment and saddling Marion County with the fallout by issuing an order that requires Marion County's CR program to handle a vastly increased case-load and requires the jail to continue suffering the consequences of housing Unfit Defendants—both unavoidable results of the Challenged Orders. This requirement from *Milliken I* shows another implication of these shortcomings. The record contains "no evidence of any [Marion County] violation or effect" putting Marion County into any sort of unconstitutional status. *Id.* Indeed, the "effect" highlighted below is the direct effect of the Challenged Orders themselves, denying Unfit Defendants Due Process Treatment. Accordingly, the remedy imposed is "wholly impermissible." *Id.* They should accordingly be struck down.

## VI. The Supremacy Clause Order should be reversed because there was no Supremacy Clause violation.

### A. Standard of review.

The Supremacy Clause Order's decision concerning the effect of the Supremacy Clause itself is subject to de novo review. *See In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1444 (9th Cir. 1987) (stating that in Supremacy Clause analysis, "[t]he question whether federal law preempts state law is an issue of law which [is] review[ed] de novo.").

### B. The February 2024 State Order did not conflict with the Implementing Injunctions.

It is all too clear in light of the above considerations that the state court's order of outpatient treatment did not violate the Supremacy Clause. "[T]he exercise by the State of its police power, . . . is superseded [by federal action] only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" *Kelly v. Washington*, 302 U.S. 1, 10 (1937); *Gen. Mills, Inc. v. Jones*, 530 F.2d 1317, 1325 (9th Cir. 1975) (quoting *Kelly*). The state court's action to *ensure* Marion County could exercise its police powers in order to provide Due Process Treatment cannot rationally be said to "direct[ly] and positive[ly]" conflict with either (1) the very provision it aimed to satisfy, the Due Process Clause of the Fourteenth Amendment, or (2) as explained above, any of the district court's Implementing Injunctions, which

explicitly applied only to inpatient treatment, *supra* Part III.B. In applying a

different legal standard (or failing to recognize the fact that its previous orders had

nothing to do with outpatient treatment) the district court committed clear legal

(and factual) error.

Accordingly, the district court erred in its Supremacy Clause Order and the

Implementing Injunctions should be overturned.

## Conclusion

For the reasons stated above, Marion County's Second Motion to Intervene

should be granted, and the Second Intervention Order overturned, because it was

timely and Marion County satisfied the requirements for both mandatory and

permissive intervention.

This Court should also overturn the Supremacy Clause Order, since the

district court should have abstained under *Younger* from intervening in state court

matters and because the state court order on outpatient treatment did not clearly

contradict the district court's Implementing Injunctions and thus did not violate

the Supremacy Clause.

Furthermore, the Challenged Orders should be overturned because (1) they

did not remedy the due process violation originally found by the district court, (2)

they improperly enjoined Marion County in the exercise of its police powers, (3)

they shifted OSH's responsibilities to remedy its due process violations to Marion

County, heavily burdening it despite no finding that it was a due process violator,

and (4) there was no Supremacy Clause violation.

Dated: August 28, 2024                    Respectfully submitted,

                                          /s/ James Bopp, Jr.
                                          James Bopp, Jr., Ind. Bar No. 2838-84
                                          Joseph D. Maughon, Va. Bar No. 87799
                                          Taylor C. Shetina, Ind. Bar. No. 37887-45
                                          THE BOPP LAW FIRM, PC
                                          The National Building
                                          1 South 6th Street
                                          Terre Haute, Indiana 47807
                                          Telephone: (812) 232-2434
                                          Facsimile: (812) 235-3685
                                          jboppjr@aol.com
                                          jmaughon@bopplaw.com
                                          tshetina@bopplaw.com
                                          *Counsel for Marion County*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-2229

I am the attorney or self-represented party.

**This brief contains** | 21,081 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

⬤ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/James Bopp, Jr. | **Date** | August 28, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

*CIRCUIT RULE 28-2.7 ADDENDUM*

# Table of Contents

**Federal Statutes:**
28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
28 U.S.C. § 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4

**State Rules and Statutes:**
ORS 161.370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
ORS 161.371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
ORS 430.640 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18
Or. Admin. R. 309-091-0050(1)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21

**Rules:**
Federal Rule of Civil Procedure 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
Federal Rule of Appellate Procedure 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-23

## 28 U.S.C. § 1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1292

**(a)** Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

> **(1)** Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or

refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

**(2)** Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

**(3)** Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

**(b)** When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

**(c)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

**(1)** of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

**(2)** of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

**(d)**

**(1)** When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order,

includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(2)** When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(3)** Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

**(4)**

> **(A)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

> **(B)** When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon

the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

**(e)** The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

## 28 U.S.C. § 1331

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C. § 1367

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)** The district courts may decline to exercise supplemental jurisdiction over a

claim under subsection (a) if—

**(1)** the claim raises a novel or complex issue of State law,

**(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

**(3)** the district court has dismissed all claims over which it has original jurisdiction, or

**(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

**(d)** The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

**(e)** As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

## ORS 161.370

**(1)**

**(a)** When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court.

**(b)** If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed under ORS 161.365 (Procedure for determining issue of fitness to proceed), the court may make the determination on the basis of the report. If the finding is contested, the court shall hold a hearing on the issue. If the report is received in evidence in the hearing, the party who contests the finding has the right to summon and to cross-examine any certified evaluator who submitted the report and to offer evidence upon the issue. Other evidence regarding the defendant's fitness to proceed may be introduced by either party.

**(2)**

    **(a)** If the court determines that the defendant lacks fitness to proceed, the criminal proceeding against the defendant shall be suspended and the court shall proceed in accordance with this subsection.

    **(b)** After making the determination under paragraph (a) of this subsection, the court shall receive a recommendation from a community mental health program director or the director's designee, and from any local entity that would be responsible for treating the defendant if the defendant were to be released in the community, concerning whether appropriate community restoration services are present and available in the community.

    **(c)** If the parties agree as to the appropriate action under this section, the court may, after making all findings required by law, enter any order authorized by this section. If the parties do not agree as to the appropriate action, the court and the parties shall, at a hearing, consider an appropriate action in the case, and the court shall make a determination and enter an order necessary to implement the action. In determining the appropriate action, the court shall consider the primary and secondary release criteria as defined in ORS 135.230 (Definitions for ORS 135.230 to 135.290), the least restrictive option appropriate for the defendant, the needs of the defendant and the interests of justice. Actions may include but are not limited to:

        **(A)** Commitment for the defendant to gain or regain fitness to proceed under subsection (3) or (4) of this section;

        **(B)** An order to engage in community restoration services, as recommended by the community mental health program director or designee, under subsection (6) of this section;

        **(C)** Commencement of a civil commitment proceeding under ORS 426.070 (Initiation) to 426.170 (Delivery of certified copy of record), 426.701 (Commitment of "extremely dangerous" person with qualifying mental disorder) or 427.235 (Notice to court of need for commitment) to 427.290 (Determination by court of need for commitment);

        **(D)** Commencement of protective proceedings under ORS chapter

125; or

**(E)** Dismissal of the charges pursuant to ORS 135.755 (Dismissal on motion of court or district attorney).

**(d)** If the court, while considering or ordering an appropriate action under this subsection, does not order the defendant committed to a state mental hospital or other facility, but finds that appropriate community restoration services are not present and available in the community, for any defendant remaining in custody after such determination, the court shall set a review hearing seven days from the date of the determination under paragraph (a) of this subsection. At the review hearing, the court shall consider all relevant information and determine if commitment to the state mental hospital or other facility is appropriate under subsection (3) or (4) of this section, or if another action described in paragraph (c) of this subsection is appropriate. At the conclusion of the hearing the court shall enter an order in accordance with the defendant's constitutional rights to due process.

**(e)** If the court determines that the appropriate action in the case is an order for the defendant to engage in community restoration services, but the defendant has a pending criminal case, warrant or hold in one or more other jurisdictions, the other jurisdictions shall, within two judicial days of becoming aware of the proceeding under this section, communicate with the court and the other jurisdictions, if applicable, to develop a plan to address the interests of all jurisdictions in the defendant in a timely manner.

**(3)**

**(a)** If the most serious offense in the charging instrument is a felony, the court shall commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age, if the court makes the following findings:

**(A)** The defendant requires a hospital level of care due to public safety concerns if the defendant is not hospitalized or in custody or the acuity of symptoms of the defendant's qualifying mental disorder;

and

**(B)** Based on the findings resulting from a consultation described in ORS 161.365 (Procedure for determining issue of fitness to proceed) (1), if applicable, from any information provided by community-based mental health providers or any other sources, and primary and secondary release criteria as defined in ORS 135.230 (Definitions for ORS 135.230 to 135.290), the appropriate community restoration services are not present and available in the community.

**(b)** If the defendant is committed under this subsection, the community mental health program director, or director's designee, shall at regular intervals, during any period of commitment, review available community restoration services and maintain communication with the defendant and the superintendent of the state mental hospital or director of the facility in order to facilitate an efficient transition to treatment in the community when ordered.

**(c)** If the court does not order the commitment of the defendant under this subsection, the court shall proceed in accordance with subsection (2)(c) of this section to determine and order an appropriate action other than commitment.

**(4)**

**(a)** If the most serious offense in the charging instrument is a misdemeanor, the court may not commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age, unless the court:

**(A)**

**(i)** Receives a recommendation from a certified evaluator that the defendant requires a hospital level of care due to the acuity of symptoms of the defendant's qualifying mental disorder; and

**(ii)** Receives a recommendation from a community mental health program director, or director's designee, that the appropriate community restoration services are not present and available in the community; or

**(B)** Determines that the defendant requires a hospital level of care after making all of the following written findings:

**(i)** The defendant needs a hospital level of care due to the acuity of the symptoms of the defendant's qualifying mental disorder;

**(ii)** There are public safety concerns; and

**(iii)** The appropriate community restoration services are not present and available in the community.

**(b)** If at the time of determining the appropriate action for the case, the court is considering commitment under paragraph (a)(A) of this subsection and:

**(A)** Has not received a recommendation from a certified evaluator as to whether the defendant requires a hospital level of care due to the acuity of symptoms of the defendant's qualifying mental disorder, the court shall order a certified evaluator to make such a recommendation.

**(B)** Has not received a recommendation from the community mental health program director or designee concerning whether appropriate community restoration services are present and available in the community, the court shall order the director or designee to make such a recommendation.

**(c)** If the court does not order the commitment of the defendant under this subsection, the court shall proceed in accordance with subsection (2)(c) of this section to determine and order an appropriate action other than commitment.

**(d)** If the defendant is committed under this subsection, the community mental health program director, or director's designee, shall at regular

intervals, during any period of commitment, review available community restoration services and maintain communication with the defendant and the superintendent of the state mental hospital or director of the facility in order to facilitate an efficient transition to treatment in the community when ordered.

**(5)** If the most serious offense in the charging instrument is a violation, the court may not commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age.

**(6)**

    **(a)** If the court does not order the commitment of the defendant under subsection (3) or (4) of this section, if commitment is precluded under subsection (5) of this section or if the court determines that care other than commitment would better serve the defendant and the community, the court shall release the defendant, pursuant to an order that the defendant engage in community restoration services, until the defendant has gained or regained fitness to proceed, or until the court finds there is no substantial probability that the defendant will, within the foreseeable future, gain or regain fitness to proceed. The court may not order the defendant to engage in community restoration services in another county without permission from the other county.

    **(b)** The court may order a community mental health program director coordinating the defendant's treatment in the community to provide the court with status reports on the defendant's progress in gaining or regaining fitness to proceed. The director shall provide a status report if the defendant is not complying with court-ordered restoration services.

    **(c)** A community mental health program director coordinating the defendant's treatment in the community shall notify the court if the defendant gains or regains fitness to proceed. The notice shall be filed with the court and may be filed electronically. The clerk of the court shall cause copies of the notice to be delivered to both the district attorney and the counsel for the defendant.

**(d)** When a defendant is ordered to engage in community restoration services under this subsection, the court may place conditions that the court deems appropriate on the release, including the requirement that the defendant regularly report to a state mental hospital or a certified evaluator for examination to determine if the defendant has gained or regained fitness to proceed.

**(7)** The Oregon Health Authority shall establish by rule standards for the recommendation provided to the court described in subsection (2) of this section.

## ORS 161.371

**(1)** The superintendent of a state mental hospital or director of a facility to which the defendant is committed under ORS 161.370 (Determination of fitness to proceed) shall cause the defendant to be evaluated within 60 days from the defendant's delivery into the superintendent's or director's custody, for the purpose of determining whether there is a substantial probability that, in the foreseeable future, the defendant will have fitness to proceed. In addition, the superintendent or director shall:

> **(a)** Immediately notify the committing court if the defendant, at any time, gains or regains fitness to proceed or if there is no substantial probability that, within the foreseeable future, the defendant will gain or regain fitness to proceed.

> **(b)** Within 90 days of the defendant's delivery into the superintendent's or director's custody, notify the committing court that:

>> **(A)** The defendant has present fitness to proceed;

>> **(B)** There is no substantial probability that, in the foreseeable future, the defendant will gain or regain fitness to proceed; or

>> **(C)** There is a substantial probability that, in the foreseeable future, the defendant will gain or regain fitness to proceed. If the probability exists, the superintendent or director shall give the court an estimate of the time in which the defendant, with appropriate treatment, is expected to gain or regain fitness to proceed.

**(c)** Notify the court if court-ordered involuntary medication is necessary for the defendant to gain or regain fitness to proceed and, if appropriate, submit a report to the court under ORS 161.372 (Involuntary administration of medication for fitness to proceed).

**(2)**

**(a)** If the superintendent of the state mental hospital or director of the facility to which the defendant is committed determines that there is a substantial probability that, in the foreseeable future, the defendant will gain or regain fitness to proceed, unless the court otherwise orders, the defendant shall remain in the superintendent's or director's custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain fitness to proceed. In keeping with the notice requirement under subsection (1)(b) of this section, the superintendent or director shall, for the duration of the defendant's period of commitment, submit a progress report to the committing court, concerning the defendant's fitness to proceed, at least once every 180 days as measured from the date of the defendant's delivery into the superintendent's or director's custody.

**(b)** A progress report described in paragraph (a) of this subsection may consist of an update to:

**(A)** The original examination report conducted under ORS 161.365 (Procedure for determining issue of fitness to proceed); or

**(B)** An evaluation conducted under subsection (1) of this section, if the defendant did not receive an examination under ORS 161.365 (Procedure for determining issue of fitness to proceed).

**(3)**

**(a)** Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a felony, and the superintendent of the state mental hospital or director of the facility to which the defendant is committed determines that a hospital level of care is no longer necessary due to present public safety concerns and the acuity of symptoms of the defendant's qualifying mental disorder, the superintendent or director may

file notice of the determination with the court. Upon receipt of the notice, the court shall order that a community mental health program director or the director's designee, within five judicial days:

>   **(A)** Consult with the defendant and with any local entity that would be responsible for providing community restoration services, if the defendant were to be released in the community, to determine whether community restoration services are present and available in the community; and

>   **(B)** Provide the court and the parties with recommendations from the consultation.

**(b)** Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a felony, and the community mental health program director determines that community restoration services that would mitigate any risk posed by the defendant are present and available in the community, the community mental health program director may file notice of the determination with the court. Upon receipt of the notice, the court shall order that the superintendent of the state mental hospital or director of the facility to which the defendant is committed, within five judicial days:

>   **(A)** Evaluate the defendant to determine whether a hospital level of care is no longer necessary due to present public safety concerns, or no longer necessary due to the acuity of symptoms of the defendant's qualifying mental disorder; and

>   **(B)** Provide the court and the parties with recommendations from the evaluation.

**(c)** Within 10 judicial days of receiving the recommendations described in paragraph (a) or (b) of this subsection, the court shall hold a hearing to determine an appropriate action in accordance with ORS 161.370 (Determination of fitness to proceed) (2)(c) as follows:

>   **(A)** If, after consideration of the factors and possible actions described in ORS 161.370 (Determination of fitness to proceed) (2)(c) and any recommendations received under paragraph (a) or (b)

of this subsection, the court determines that a hospital level of care is necessary due to public safety concerns or the acuity of symptoms of the defendant's qualifying mental disorder, and that based on the consultation or evaluation described in paragraph (a) or (b) of this subsection, any information provided by community-based mental health providers or any other sources, primary and secondary release criteria as defined in ORS 135.230 (Definitions for ORS 135.230 to 135.290), and any other information the court finds to be trustworthy and reliable, the appropriate community restoration services are not present and available in the community, the court may continue the commitment of the defendant.

**(B)** If the court does not make the determination described in subparagraph (A) of this paragraph, the court shall terminate the commitment and shall set a review hearing seven days from the date of the commitment termination for any defendant remaining in custody. At the review hearing, the court shall consider all relevant information, determine an appropriate action in the case as described in ORS 161.370 (Determination of fitness to proceed) (2)(c) and enter an order in accordance with the defendant's constitutional rights to due process.

**(4)**

**(a)** Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a misdemeanor, and the superintendent of the state mental hospital or director of the facility to which the defendant is committed determines that the defendant no longer needs a hospital level of care due to the acuity of symptoms of the defendant's qualifying mental disorder or there are not present public safety concerns, the superintendent or director shall file notice of the determination with the court, along with recommendations regarding the necessary community restoration services that would mitigate any risk presented by the defendant. Upon receipt of the notice, the court shall order that a community mental health program director or the director's designee, within five judicial days:

**(A)** Consult with the defendant and with any local entity that would be responsible for providing community restoration services, if the defendant were to be released in the community, to determine

whether appropriate community restoration services are present and available in the community; and

(B) Provide the court and the parties with recommendations from the consultation.

(b) Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a misdemeanor, and the community mental health program director determines that the community restoration services that would mitigate any risk posed by the defendant are present and available in the community, the community mental health program director may file notice of the determination with the court. Upon receipt of the notice, the court shall order that the superintendent of the state mental hospital or director of the facility to which the defendant is committed, within five judicial days:

(A) Evaluate the defendant to determine whether a hospital level of care is no longer necessary due to present public safety concerns, or no longer necessary due to the acuity of symptoms of the defendant's qualifying mental disorder; and

(B) Provide the court and the parties with recommendations from the evaluation.

(c) Within 10 judicial days of receiving the recommendations described in paragraph (a) or (b) of this subsection, the court shall hold a hearing to determine an appropriate action in accordance with ORS 161.370 (Determination of fitness to proceed) (2)(c) as follows:

(A) After consideration of the factors and possible actions described in ORS 161.370 (Determination of fitness to proceed) (2)(c), the consultation or evaluation and any recommendations described in paragraph (a) or (b) of this subsection, and any other information the court finds to be trustworthy and reliable, the court may continue the commitment of the defendant if the court makes written findings that a hospital level of care is necessary due to public safety concerns and the acuity of symptoms of the defendant's qualifying mental disorder, and that appropriate community restoration services are not present and available in the community.

**(B)** If the court does not make the findings described in subparagraph (A) of this paragraph, the court shall terminate the commitment and shall set a review hearing seven days from the date of the commitment termination for any defendant remaining in custody. At the review hearing, the court shall consider all relevant information, determine an appropriate action in the case as described in ORS 161.370 (Determination of fitness to proceed) (2)(c) and enter an order in accordance with the defendant's constitutional rights to due process.

**(5)**

**(a)** If a defendant remains committed under this section, the court shall determine within a reasonable period of time whether there is a substantial probability that, in the foreseeable future, the defendant will gain or regain fitness to proceed. However, regardless of the number of charges with which the defendant is accused, in no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter:

**(A)** Three years; or

**(B)** A period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted.

**(b)** For purposes of calculating the maximum period of commitment described in paragraph (a) of this subsection:

**(A)** The initial custody date is the date on which the defendant is first committed under this section on any charge alleged in the accusatory instrument; and

**(B)** The defendant shall be given credit against each charge alleged in the accusatory instrument:

**(i)** For each day the defendant is committed under this section, whether the days are consecutive or are interrupted by a period of time during which the defendant has gained or regained fitness to proceed; and

(ii) Unless the defendant is charged on any charging instrument with aggravated murder or a crime listed in ORS 137.700 (Offenses requiring imposition of mandatory minimum sentences) (2), for each day the defendant is held in jail before and after the date the defendant is first committed, whether the days are consecutive or are interrupted by a period of time during which the defendant lacks fitness to proceed.

(c) The superintendent of the state mental hospital or director of the facility to which the defendant is committed shall notify the committing court of the defendant's impending discharge 30 days before the date on which the superintendent or director is required to discharge the defendant under this subsection.

(6)

(a) All notices required under this section shall be filed with the court and may be filed electronically. The clerk of the court shall cause copies of the notices to be delivered to both the district attorney and the counsel for the defendant.

(b) When the committing court receives a notice from the superintendent or director under subsection (1) of this section concerning the defendant's progress or lack thereof, or under subsection (5) of this section concerning the defendant's impending discharge, the committing court shall determine, after a hearing if a hearing is requested, whether the defendant presently has fitness to proceed.

(7) If at any time the court determines that the defendant lacks fitness to proceed, the court shall further determine whether the defendant is entitled to discharge under subsection (5) of this section. If the court determines that the defendant is entitled to discharge under subsection (5) of this section, the court shall dismiss, without prejudice, all charges against the defendant and:

(a) Order that the defendant be discharged; or

(b) Initiate commitment proceedings under ORS 426.070 (Initiation), 426.701 (Commitment of "extremely dangerous" person with qualifying mental disorder) or 427.235 (Notice to court of need for commitment) to

427.290 (Determination by court of need for commitment).

**ORS 430.640**

**(1)** The Oregon Health Authority, in carrying out the legislative policy declared in ORS 430.610 (Legislative policy), subject to the availability of funds, shall:

    **(a)** Assist Oregon counties and groups of Oregon counties in the establishment and financing of community mental health programs operated or contracted for by one or more counties.

    **(b)** If a county declines to operate or contract for a community mental health program, contract with another public agency or private corporation to provide the program. The county must be provided with an opportunity to review and comment.

    **(c)** In an emergency situation when no community mental health program is operating within a county or when a county is unable to provide a service essential to public health and safety, operate the program or service on a temporary basis.

    **(d)** At the request of the tribal council of a federally recognized tribe of Native Americans, contract with the tribal council for the establishment and operation of a community mental health program in the same manner in which the authority contracts with a county court or board of county commissioners.

    **(e)** If a county agrees, contract with a public agency or private corporation for all services within one or more of the following program areas:

        **(A)** Mental or emotional disturbances.

        **(B)** Drug abuse.

        **(C)** Alcohol abuse and alcoholism.

    **(f)** Approve or disapprove the local plan and budget information for the establishment and operation of each community mental health program. Subsequent amendments to or modifications of an approved plan or budget

information involving more than 10 percent of the state funds provided for services under ORS 430.630 (Services to be provided by community mental health programs) may not be placed in effect without prior approval of the authority. However, an amendment or modification affecting 10 percent or less of state funds for services under ORS 430.630 (Services to be provided by community mental health programs) within the portion of the program for persons with mental or emotional disturbances or within the portion for persons with alcohol or drug dependence may be made without authority approval.

**(g)** Make all necessary and proper rules to govern the establishment and operation of community mental health programs, including adopting rules defining the range and nature of the services which shall or may be provided under ORS 430.630 (Services to be provided by community mental health programs).

**(h)** Collect data and evaluate services in the state hospitals in accordance with the same methods prescribed for community mental health programs under ORS 430.634 (Evaluation of programs).

**(i)** Develop guidelines that include, for the development of comprehensive local plans in consultation with local mental health authorities:

**(A)** The use of integrated services;

**(B)** The outcomes expected from services and programs provided;

**(C)** Incentives to reduce the use of state hospitals;

**(D)** Mechanisms for local sharing of risk for state hospitalization;

**(E)** The provision of clinically appropriate levels of care based on an assessment of the mental health needs of consumers;

**(F)** The transition of consumers between levels of care; and

**(G)** The development, maintenance and continuation of older adult mental health programs with mental health professionals trained in geriatrics.

**(j)** Work with local mental health authorities to provide incentives for community-based care whenever appropriate while simultaneously ensuring adequate statewide capacity.

**(k)** Provide technical assistance and information regarding state and federal requirements to local mental health authorities throughout the local planning process required under ORS 430.630 (Services to be provided by community mental health programs) (9).

**(L)** Provide incentives for local mental health authorities to enhance or increase vocational placements for adults with mental health needs.

**(m)** Develop or adopt nationally recognized system-level performance measures, linked to the Oregon Benchmarks, for state-level monitoring and reporting of mental health services for children, adults and older adults, including but not limited to quality and appropriateness of services, outcomes from services, structure and management of local plans, prevention of mental health disorders and integration of mental health services with other needed supports.

**(n)** Develop standardized criteria for each level of care described in ORS 430.630 (Services to be provided by community mental health programs) (9), including protocols for implementation of local plans, strength-based mental health assessment and case planning.

**(o)** Develop a comprehensive long-term plan for providing appropriate and adequate mental health treatment and services to children, adults and older adults that is derived from the needs identified in local plans, is consistent with the vision, values and guiding principles in the Report to the Governor from the Mental Health Alignment Workgroup, January 2001, and addresses the need for and the role of state hospitals.

**(p)** Report biennially to the Governor and the Legislative Assembly on the progress of the local planning process and the implementation of the local plans adopted under ORS 430.630 (Services to be provided by community mental health programs) (9)(b) and the state planning process described in paragraph (o) of this subsection, and on the performance measures and performance data available under paragraph (m) of this subsection.

**(q)** On a periodic basis, not to exceed 10 years, reevaluate the methodology used to estimate prevalence and demand for mental health services using the most current nationally recognized models and data.

**(r)** Encourage the development of regional local mental health authorities comprised of two or more boards of county commissioners that establish or operate a community mental health program.

**(2)** The Oregon Health Authority may provide technical assistance and other incentives to assist in the planning, development and implementation of regional local mental health authorities whenever the Oregon Health Authority determines that a regional approach will optimize the comprehensive local plan described under ORS 430.630 (Services to be provided by community mental health programs) (9).

**(3)** The enumeration of duties and functions in subsections (1) and (2) of this section shall not be deemed exclusive nor construed as a limitation on the powers and authority vested in the authority by other provisions of law.

## Or. Admin. R. 309-091-0050(1)(b)

**(1)** For the purposes of this rule, discharge occurs when the state hospital moves the individual from the state hospital's psychiatric care to either a community setting or other institutional setting, including but not limited to discharge to a jail.

**(2)** Individuals committed to the state hospital pursuant to ORS 161.370 shall be discharged from the state hospital upon any of the following:

**(a)** The court orders that the individual be discharged from the state hospital or that the underlying criminal charges be dismissed;

**(b)** When the ORS 161.370 or 161.365 evaluation report identifies that the patient is fit to proceed ("able") or that there is no substantial probability that the patient will gain or regain fitness to proceed ("never able") when the patient has reached the maximum commitment time under ORS 161.370, 161.371 or 161.365.

**(3)** The state hospital shall send notice of the evaluation finding to the court pursuant to ORS 161.370 or 161.365.

**(4)** Individuals who are committed under ORS 161.370 shall be discharged within a period of time that is reasonable for making a determination concerning whether or not and when the defendant may gain or regain capacity. However, regardless of the number of charges with which the defendant is accused, in no event shall the defendant be committed for longer than permitted by ORS 161.371 or pursuant to a court's order, whichever is shorter.

**Federal Rule of Civil Procedure 24**

**(a)** Intervention of Right. On timely motion, the court must permit anyone to intervene who:

> **(1)** is given an unconditional right to intervene by a federal statute; or

> **(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**(b)** Permissive Intervention.

> **(1)** In General. On timely motion, the court may permit anyone to intervene who:

>> **(A)** is given a conditional right to intervene by a federal statute; or

>> **(B)** has a claim or defense that shares with the main action a common question of law or fact.

> **(2)** By a Government Officer or Agency. On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

>> **(A)** a statute or executive order administered by the officer or agency; or

>> **(B)** any regulation, order, requirement, or agreement issued or made under the statute or executive order.

**(3)** Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

**(c)** Notice and Pleading Required. A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

**Federal Rule of Appellate Procedure 4**

**(a)** Appeal in a Civil Case.

**(1)** Time for Filing a Notice of Appeal.

**(A)** In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

**(B)** The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

**(i)** the United States;

**(ii)** a United States agency;

**(iii)** a United States officer or employee sued in an official capacity; or

**(iv)** a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf -- including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

**(C)** An appeal from an order granting or denying an application for a

**Cir. R. 28-2.7 Addendum**                     A-23

writ of error coram nobis is an appeal in a civil case for purposes of Rule 4(a).

**(2)** Filing Before Entry of Judgment.

A notice of appeal filed after the court announces a decision or order -- but before the entry of the judgment or order -- is treated as filed on the date of and after the entry.

**(3)** Multiple Appeals.

If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

**(4)** Effect of a Motion on a Notice of Appeal.

    **(A)** If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

        **(i)** for judgment under Rule 50(b);

        **(ii)** to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

        **(iii)** for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

        **(iv)** to alter or amend the judgment under Rule 59;

        **(v)** for a new trial under Rule 59; or

        **(vi)** for relief under Rule 60 if the motion is filed within the time allowed for filing a motion under Rule 59.

**(B)**

**(i)** If a party files a notice of appeal after the court announces or enters a judgment - but before it disposes of any motion listed in Rule 4(a)(4)(A) - the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

**(ii)** A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal - in compliance with Rule 3(c) - within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

**(iii)** No additional fee is required to file an amended notice.

**(5)** Motion for Extension of Time.

**(A)** The district court may extend the time to file a notice of appeal if:

**(i)** a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

**(ii)** regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

**(B)** A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

**(C)** No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

**(6)** Reopening the Time to File an Appeal.

The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

> **(A)** the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

> **(B)** the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

> **(C)** the court finds that no party would be prejudiced.

**(7)** Entry Defined.

> **(A)** A judgment or order is entered for purposes of this Rule 4(a):

>> **(i)** if Federal Rule of Civil Procedure 58(a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

>> **(ii)** if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

>>> the judgment or order is set forth on a separate document, or
>>> 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

> **(B)** A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.

**(b)** Appeal in a Criminal Case.

**(1)** Time for Filing a Notice of Appeal.

    **(A)** In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

        **(i)** the entry of either the judgment or the order being appealed; or

        **(ii)** the filing of the government's notice of appeal.

    **(B)** When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

        **(i)** the entry of the judgment or order being appealed; or

        **(ii)** the filing of a notice of appeal by any defendant.

**(2)** Filing Before Entry of Judgment.

A notice of appeal filed after the court announces a decision, sentence, or order — but before the entry of the judgment or order -- is treated as filed on the date of and after the entry.

**(3)** Effect of a Motion on a Notice of Appeal.

    **(A)** If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

        **(i)** for judgment of acquittal under Rule 29;

        **(ii)** for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

**Cir. R. 28-2.7 Addendum**            A-27

**(iii)** for arrest of judgment under Rule 34.

**(B)** A notice of appeal filed after the court announces a decision, sentence, or order -- but before it disposes of any of the motions referred to in Rule 4(b)(3)(A) -- becomes effective upon the later of the following:

> **(i)** the entry of the order disposing of the last such remaining motion; or

> **(ii)** the entry of the judgment of conviction.

**(C)** A valid notice of appeal is effective — without amendment — to appeal from an order disposing of any of the motions referred to in Rule 4(b)(3)(A).

**(4)** Motion for Extension of Time.

Upon a finding of excusable neglect or good cause, the district court may — before or after the time has expired, with or without motion and notice -- extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b).

**(5)** Jurisdiction.

The filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

**(6)** Entry Defined.

A judgment or order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket.

**(c)** Appeal by an Inmate Confined in an Institution.

**(1)** If an institution has a system designed for legal mail, an inmate confined there must use that system to receive the benefit of this Rule 4(c)(1). If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing and:

> **(A)** it is accompanied by:
>
> > **(i)** a declaration in compliance with 28 U.S.C. § 1746—or a notarized statement—setting out the date of deposit and stating that first-class postage is being prepaid; or
> >
> > **(ii)** evidence (such as a postmark or date stamp) showing that the notice was so deposited and that postage was prepaid; or
>
> **(B)** the court of appeals exercises its discretion to permit the later filing of a declaration or notarized statement that satisfies Rule 4(c)(1)(A)(i).

**(2)** If an inmate files the first notice of appeal in a civil case under this Rule 4(c), the 14-day period provided in Rule 4(a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

**(3)** When a defendant in a criminal case files a notice of appeal under this Rule 4(c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

**(d)** Mistaken Filing in the Court of Appeals.

If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.